2022-1462

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

TONIA TIPPINS, DERRIK MAGNUSON, GEORGE HOLLOWAY, JENNIFER REHBERG, GLENDA SMITHLEETH, M. ALLEN BUMGARDNER, For Themselves and as Representatives of a Class of Similarly Situated Persons, Plaintiffs-Appellees,

v.

UNITED STATES, Defendant-Appellant.

---

Appeal from the United States Court of Federal Claims in Case No. 1:18-CV-00923, Judge David A. Tapp

---

## CORRECTED JOINT APPENDIX

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

MARTIN F. HOCKEY, JR.
Deputy Director

Of Counsel:

CDR JARED H. HOOD
Deputy Chief
Office of Claims & Litigation
United States Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, D.C. 20593-7213

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

March 21, 2023

Attorneys for Defendant-Appellant

# **TABLE OF CONTENTS**

**Page(s):**

1. Trial Court Partial Final Judgment (Dec. 9, 2021)......................................1

2. Trial Court Opinion (*Tippins I*) (July 13, 2021)...................................2-17

3. Trial Court Opinion (*Tippins II*) (Dec. 8, 2021)..................................18-26

4. Trial Court Docket Sheet................................................................27-36

5. 14 U.S.C. 357(a) (2012)................................................................37-38

6. Secretary's Decision Authorizing 2012 CRSP (Dec. 21, 2011)*.............39-40

7. Secretary's Decision Authorizing 2013 CRSP (Dec. 19, 2012)*.............41-42

8. Secretary's Decision Authorizing 2014 CRSP (March 7, 2014)*............43-44

9. Precept Convening 2012 CRSP (June 8, 2012)*.................................45-57

10. Precept Convening 2013 CRSP (May 8, 2013)*.................................58-61

11. Precept Convening 2014 CRSP (March 11, 2014)*.............................62-65

12. Coast Guard Announcement of CRSP Pause (Feb. 2015)*.........................66

13. Merriam-Webster's Collegiate Dictionary (9th ed. 1990) (excerpts)**....67-70

14. Random House Unabridged Dictionary of the English Language
    1655 (2d ed. 1987) (excerpts)**......................................................71-73

15. Secretary's Decision Authorizing 2010 CRSP (Sept. 21, 2010)**..........74-75

16. Trial Court Order (July 2, 2019).......................................................76-77

17. Trial Court Order (Aug. 10, 2020)....................................................78-84

18. Secretary's Decision Authorizing 2011 CRSP (April 20, 2011)*............86-87

19. Secretary's Decision Authorizing 2012 CRSP (Dec. 21, 2011)*.............88-89

20. Secretary's Decision Authorizing 2013 CRSP (Dec. 19, 2012)*.............90-91

# **TABLE OF CONTENTS (continued)**

**Page(s):**

21. Secretary's Decision Authorizing 2014 CRSP (March 7, 2014)* ............ 92-93

22. Routing Cover Sheet Accompanying Secretary's Decision Authorizing 2014 CRSP*......................................................................... 94

23. Defendant's Response to Plaintiff's Requests for Admission (Oct. 9, 2020)**.................................................................... 96-104

24. Email Correspondence (July 20, 2010)** .......................................107-108

25. Email Correspondence (July 20, 2010)** .......................................110-111

26. Draft Answers to Frequently Asked Questions (2010)** ....................113-114

27. Defendant's Response to Plaintiff's Interrogatories (Oct. 9, 2020)**....116-129

28. Declaration of Captain Christopher Calhoun (Jan. 28, 2021)**............222-224

29. Plaintiffs' Motion to Strike Calhoun Declaration and Plaintiffs' Exhibits (March 19, 2021) (excerpt)*** ..........................................225-252

30. *In re Winbourne*, No. 2011-130 (CGBCMR March 20, 2012)**..........254-268

31. *In re Avelsgard*, No. 2013-153 (CGBCMR April 10, 2014)**.............271-279

32. Plaintiffs' First Amended Complaint (Nov. 16, 2018) (excerpts) .........289-301

33. Defendant's Answer (Nov. 30, 2018) (excerpts)...............................307-312

* Documents from the administrative record filed in the trial court

** Documents from the summary judgment record filed in the trial court

*** Designated by plaintiffs for inclusion in appendix over defendant's objection

# In the United States Court of Federal Claims

**No. 18-923 C**
**Filed:  December 9, 2021**


**TONIA TIPPINS, et al.**


     **v.**

                                            **RULE 54(b)**
                                            **JUDGMENT**


**THE UNITED STATES**


       Pursuant to the court's Memorandum Opinion and Order, filed July 6, 2021, granting plaintiffs' motion for summary judgment and denying defendant's cross-motion for summary judgment, and Memorandum Opinion and Order, filed December 8, 2021, denying defendant's motion for reconsideration and directing the entry of judgment pursuant to Rule 54(b), there being no just reason for delay,

       IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the United States Coast Guard shall expeditiously correct the military records of Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner.  The Coast Guard shall also award any back pay, allowances, or other benefits to which the named plaintiffs are entitled by law as a result of the corrections.


                              Lisa L. Reyes
                              Clerk of Court

               By:     s/ Debra L. Samler

                              Deputy Clerk


NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 18-923C
Filed: July 6, 2021
Corrected: July 13, 2021[†]

---

**TONIA TIPPINS, et al.,**

*Plaintiffs,*

**v.**

**THE UNITED STATES,**

*Defendant.*

---

*Nathan S. Mammen*, with whom were *Ragan Naresh* and *Emily M. Scott*, Kirkland & Ellis LLP, Washington, D.C., for Plaintiffs.

*Douglas G. Edelschick*, Senior Trial Counsel, with whom were *Marin F. Hockey*, Deputy Director, *Robert E. Kirschman, Jr.*, Director, *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *LCDR Justin R. Jolley*, Deputy Chief, and *Brian Judge*, Chief, Office of Claims & Litigation, U.S. Coast Guard, Of Counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.[1]**

In this military pay case, several former members of the United States Coast Guard ("USCG" or "Coast Guard") challenge their involuntary retirements as unlawful. Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner (collectively, "Plaintiffs") served as enlisted members of the Coast Guard until their respective separations through Career Retention Screening Panels ("CRSPs"). They bring this action seeking corrective action, back pay and related benefits, reinstatement to active service, and a declaratory judgment that the process used to effectuate their retirement was contrary to law. (Am. Compl. at 17, ECF No. 8).

The question at the heart of this dispute appears simple enough: were the CRSPs lawfully convened as part of a "reduction in force" pursuant to 14 U.S.C. § 357(j)? If they were, the

---

[†] This corrected Opinion removes the directive to the Clerk to enter judgment in Section III.

[1] This case was originally assigned to Senior Judge Loren Smith. (ECF No. 2). On December 3, 2019, this case was transferred to the undersigned. (ECF No. 33).

United States is entitled to judgment. If not, the Plaintiffs are entitled to some measure of relief. To answer this question, the Court must determine whether the statute is unambiguous and, if it is not, whether the Coast Guard's application is entitled to deference.

The Court finds the statute is unambiguous and agrees with the Plaintiffs' interpretation of "reduction in force." As the Court will explain below, even if the statute were ambiguous, the Secretary's memoranda authorizing the CRSPs under § 357(j) did not interpret the statute, and thus the Coast Guard would not be entitled to deference. Accordingly, Plaintiffs' Motion for Summary Judgment, (Pls.' Mot., ECF No. 62), is granted, and the United States' Cross-Motion for Summary Judgment, (Def.'s Mot., ECF No. 67), is denied. Finally, the Plaintiffs' Motion to Strike is denied as moot.

## I.     Background[2]

Plaintiffs are Coast Guard veterans who each honorably served twenty years or more before being forced to retire by CRSPs conducted between 2013 and 2015. (Am. Compl. ¶¶ 7–12; Answer ¶¶ 7–12, ECF No. 9). While serving in the Coast Guard their occupations varied widely and each received numerous awards for their excellent service. (Am. Compl. ¶¶ 7–12).

The CRSPs were first authorized in 2010 when the Secretary of Homeland Security (the "Secretary") affixed his signature to a memorandum sent by the Commandant of the Coast Guard. On August 13, 2010, the Commandant received approval from the Secretary "to conduct an Active Duty Enlisted Career Retention Screening Panel in the fall of 2010." (Pls.' Mot. Ex. 7 at pp. 8–9).[3] The Commandant had advised the Secretary that the panel was "required to address high retention and its adverse impact on workforce flow[,]" citing the tendency of junior enlisted members to request voluntary separations, while senior members remained with the force. (*Id*.). The Commandant warned that "[i]f allowed to continue, this trend . . . will result in an imbalance in the enlisted workforce's experience level for many years to come." (*Id*.).

---

[2] The Court has ordered resolution via summary judgment rather than judgment on the administrative record—the normal means for resolving military pay cases. (Order, ECF No. 22). After detailing the facts relevant to this dispute, the Court will explain why this case proceeds on the path less traveled. Despite the exceptional posture, the United States has filed an Administrative Record containing numerous relevant documents. (AR, ECF No. 58). Although the Court is not conducting a trial on the Administrative Record under RCFC 56.1, the parties stipulated that no material factual issues preclude summary judgment. (Tr. of Oral Arg. at 13–14, 26:13–15, ECF No. 74).

[3] To their Motion for Summary Judgment, Plaintiffs have attached as an exhibit the Administrative Record from *Lippmann v. United States*, 127 Fed. Cl. 238 (2016) (Case No. 15-192, ECF No. 11-1). To avoid confusion between that record and the one the United States has filed in this case, the Court will cite to the PDF pagination as it appears in the Court's blue CM/ECF Bates Stamp in the header of Pls.' MSJ Ex. 7. For example, when referring to the *Lippmann* AR, the Court would cite to the cover page, which simply reads "EXHIBIT 7," as "(Pls.' MSJ Ex. 7 at p. 1)."

Invoking 10 U.S.C. § 1169 and 14 U.S.C. § 357(j), the Secretary authorized CRSPs to review "the records of all first class petty officers and below with twenty or more years of service and all chief petty officers and above with twenty or more years of service and three years or more time in grade." (*Id.*). The first of these statutes, 10 U.S.C. § 1169, in relevant part, simply provides that no regular enlisted member of an armed force may be discharged before his or her term of service expires, except as prescribed by the Secretary. When it was in effect, 14 U.S.C § 357[4] governed the involuntary retirement of enlisted members. It provided, in relevant part:

> (j)   When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the [Enlisted Personnel] Board's action.

§ 357(j).

Notably, although it cited § 357(j), the 2010 authorization by the Secretary did not mention a "reduction in force" (often abbreviated as a "RIF"). (Pls.' Mot. Ex. 7 at pp. 8–9; *see also* AR 27 ("Section 357(j) does not define 'reduction in force,' directly or by reference, and the 2010 CRSP avoided that expression in describing the process to the fleet.")). In fact, the Office of Military Personnel, a component of the Coast Guard administrative hierarchy, was messaging to the rank-and-file servicemembers that the 2010 process was "not a RIF and we need to ensure that it is not associated with a RIF." (Pls.' Mot. Ex. 9). This message was part of a strategy to "create flow and provide opportunities to [the Coast Guard's] junior workforce[,]" thus the Coast Guard intended to "design[] and message[]" the CRSPs "as a flow stimulating tool and not a RIF." (Pls.' Mot. Ex. 10). Essentially, the Secretary sought to clear out older members to "accelerate advancement of junior enlisted members" and "reinvigorate accession of recruits[.]" (Pls.' Mot. Ex. 11). "[T]he CRSP was not intended to reduce the overall size of the force." (*Id.*; *see also* Pls.' Mot. Ex. 9 ("Body to billet we are doing fine, but upward mobility and flow continues to be a problem and will pose bigger problems down the road.")).

The Secretary similarly authorized CRSPs in 2011–2014. (AR 27, 53, 86, 128). Interestingly, the memoranda authorizing these CRSPs contain slightly varying language regarding § 357(j) and "reduction(s) in force." The 2011 memorandum stated:

> Under Section 357 (j), the Secretary of Homeland Security must provide authorization for involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." Section 357(j) does not define "reduction in force," directly or by reference, and the 2010 CRSP avoided that expression in describing the process to the fleet. The Assistant Commandant for Human Resources designed CRSP to strategically rebalance the force toward a more upwardly mobile, performance based demographic.

---

[4] Subsection (j) of § 357 was repealed in 2016. Coast Guard Authorization Act of 2015, Pub. L. No. 114-120, § 215, 130 Stat 27, 45–46 (2016).

(AR 27). The 2012 and 2013 memoranda contained the following identical language:

> Under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force," which has specific meanings in other statutory contexts, because title 14 does not define, directly or by reference, "reduction in force."

(AR 53, 86). The 2014 memorandum provided:

> Under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force."

(AR 128).

The 2010 and 2011 CRSPs reviewed the records of all retirement-eligible Coast Guard service members at (1) pay grade E-6 and below with at least twenty years of active military service; and (2) at pay grade E-7 and above with at least twenty years of active military service and three or more years of service at their current pay grades. (AR 17, 32). Servicemembers that had been reviewed in the 2010 CRSP were excluded from the 2011 CRSP. (AR 17, 32). The 2012 CRSP utilized the same selection criteria but did not exclude those previously screened and retained by the 2010 and 2011 CRSPs. (AR 57).

The 2013 CRSP reviewed the records of retirement-eligible service members who were either at pay grade E-6 and below with at least 19.5 years of active military service, or at pay grade E-7 and above with at least 19.5 years of active military service and three or more years of service at their current pay grade that had not been reviewed by the CRSP in the two years prior. (AR 89). The 2014 CRSP reviewed all personnel grade "E-7 and above with 19 or more years of active military service who have three or more [years'] time in grade as of 1 June 2014." (AR 131). Those members reviewed in 2012 or 2013 were excluded from 2014 CRSPs. (AR 132).

Communication between selected members and the CRSPs was limited to a written memorandum with a command signature, without attachments, and less than two pages in length. (AR 18, 33–34, 59, 92, 133). Service members selected for involuntary retirement were permitted to appeal only in circumstances of "material error, newly discovered evidence, or the presence of improper documents" in the member's personnel file. (AR 19, 34, 59, 92, 133).

From 2010 to 2014, the Coast Guard selected a total of 832 service members for involuntary retirement. (Pls.' Mot. Ex. 12 at 8). At the end of fiscal year 2014, "the number of actual enlisted service members (31,126) had dropped to more than 1,000 below the authorized number of enlisted billets (32,368)." (*Id*. at 9). Accordingly, "the Coast Guard decided that it was not necessary to hold another CRSP in 2015." (*Id*. (citing AR 164–65)). Throughout this multi-year process, the Coast Guard "generally did not eliminate the billets that were occupied by the enlisted service members in higher grades (E-7 and above) who were selected for involuntary retirement" but did reduce numbers of enlisted billets for grades E-6 and below. (*Id*. at 9–10).

Notably, the Coast Guard did not eliminate the billets Plaintiffs held prior to their involuntary retirement. (Pls.' Mot. Ex. 8 at 7–8). From 2009 to the end of 2015, the Coast Guard reduced its total number of authorized enlisted billets from 33,550 to 31,990, with each year logging a decline from the previous year. (Pls.' Mot. Ex. 12 at 7–10).

In July 2018, three plaintiffs brought this action on behalf of themselves and a class of service members retired using the 2012–2014 CRSPs. (Compl., ECF No. 1). Several months later, Plaintiffs filed an Amended Complaint, adding three additional service members. (Am. Compl. at 1). Plaintiffs never sought to certify a class under RCFC 23.

In July 2019, the Court determined that this action should proceed on motions for summary judgment under RCFC 56 rather than motions for judgment on the Administrative Record under RCFC 52.1(b). (Order, ECF No. 22); *supra* n.1. The Court reasoned that because Plaintiffs were "challenging the legality of the CRSPs for the first time, and neither the Coast Guard nor a military corrections board has considered this issue, there is no appropriate administrative record for the Court to review" and thus *de novo* review is the appropriate standard. (*Id*. (citing *Lippmann*, 127 Fed. Cl. 238)).[5] Thereafter, the Court permitted limited discovery regarding the Coast Guard's interpretation of "reduction in force" in the context of 14 U.S.C. § 357(j). (Disc. Opinion at 6–7, ECF No. 52).

That limited discovery period now being closed, the parties submit the case on cross-motions for summary judgment. The United States attached an appendix to its Cross-Motion, (Def.'s Appendix ("DA"), ECF No. 67-1), which contains a "Declaration of Captain Christopher P. Calhoun" who served as Chief in the Office of Military Personnel and authored several of the messaging emails described above. (DA 61–63). Plaintiffs, in their Reply and Opposition, move to strike this document. (Pls.' Reply at 14, ECF No. 69). The Court will address those issues in turn.

## II.    Analysis

The parties present the Court with a "*Chevron*" issue. In *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court held that when a court reviews an agency's construction of a statute the agency administers, the court must answer two questions. First, the reviewing court must determine whether Congress has spoken to the precise question at issue—that is, whether the statute is ambiguous or unambiguous. *Id*. at 843. If Congress has clearly spoken—i.e., the court determines that the statute is unambiguous—the Court must give effect to Congress's plain words expressing its intent. *Id*. If Congress has not clearly spoken—i.e., the Court finds that the statute is ambiguous—the Court looks to the agency's interpretation and asks whether that interpretation is reasonable. *Id*. If the agency's interpretation is reasonable, the Court must afford the deference to the agency's construction. *Id*.

---

[5] Although the United States believes this case should have proceeded to judgment on the Administrative Record rather than summary judgment, because there are no disputed issues of material fact, the United States now acknowledges it no longer matters. (Tr. of Oral Arg. at 29–31).

at 844. But if the agency has not offered an administrative interpretation of the statute, then the Court must "impose its own construction on the statute[.]" *Chevron*, 467 U.S. at 843.

Here, the Court concludes that § 357(j) is unambiguous: a "reduction in force" is the elimination of positions or jobs, not merely the separation of personnel. The Court's conclusion differs from the interpretation the Coast Guard offers in its briefs. But the Court owes no deference to that interpretation because it is merely the Coast Guard's convenient litigating position, not based on any meaningful agency interpretive process. Therefore, even if the Court were to determine that § 357(j) was ambiguous, then the Court would be required to "impose its own construction on the statute[.]" That construction would lead the Court to the same conclusion: the Coast Guard's involuntary retirement of Plaintiffs through CRSPs was not part of a "reduction in force" under § 357(j) and thus was contrary to law.

The parties agree that there are no genuinely disputed issues of material fact. (Tr. of Oral Arg. at 26:13–15). And statutory interpretation is purely a matter of law. *Deutsche Bank AG v. United States*, 742 F.3d 1378, 1381 (Fed. Cir. 2014). Therefore, under RCFC 56 and for the reasons that follow, Plaintiffs are entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### A. 14 U.S.C. § 357(j) is unambiguous.

As an initial matter, it is helpful to orient Subsection (j) and the phrase at issue within the context of the entire statute. Title 14 Section 357 of the U.S. Code governed the involuntary retirement of Coast Guard members until its repeal in 2016. *Supra* n.4. Section 357(a) provided that "Enlisted Personnel Boards shall be convened as the Commandant may prescribe to review the records of enlisted members who have twenty or more years of active military service." Subsection (b) prescribed two instances where an Enlisted Personnel Board could review enlisted members and recommend their involuntary retirement to the Commandant: (1) the servicemember's performance was unsatisfactory; or (2) professional dereliction. § 357(b). Subsections (c)–(h) described the procedure for that review process, the makeup of the review Board, procedure for appeal, timing of separation, and entitlement to retired pay. Subsection (i) described the retired pay increase owed upon separation to enlisted members cited for extraordinary heroism in the line of duty. Finally, Subsection (j) announced an exception to the statute's otherwise detailed procedures for involuntary retirements: "[w]hen the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action." § 357(j).

There is no dispute that the CRSPs were not Enlisted Personnel Boards formed under 14 U.S.C. § 357(a)–(g). (Def.'s Mot. at 2). Therefore, Plaintiffs' involuntary retirements through the CRSPs were only lawful if they were part of a "reduction in force" ordered by the Secretary of Homeland Security under § 357(j). This case turns on the meaning of those three words.

The United States argues that Congress intended to assign "reduction in force" a "flexible" definition depending on the circumstances in which § 357(j) was invoked, and the phrase can therefore be read to mean "a reduction in personnel, a reduction in positions, or both." (Def.'s Mot. at 12). Plaintiffs counter that "reduction in force" has a clear meaning: "a reduction in the size of the force—that is, the elimination of positions or jobs—not termination of

individual members or employees." (Pls.' Reply at 5). The Court agrees with Plaintiffs and holds that a "reduction in force" is the elimination of positions or jobs, not merely the separation of personnel.

"In determining the meaning of a statutory provision, [courts must] look first to its language, giving the words used their ordinary meaning." *Artis v. D.C.*, __ U.S. __, 138 S. Ct. 594, 603 (2018) (internal quotations omitted). "[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1335 (Fed. Cir. 2017) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (internal quotation marks omitted)). Although interpretation of the "reduction in force" clause in § 357(j) is an issue of first impression, the Federal Circuit has defined "reduction in force" in other circumstances. In the context of civil service employees, "[a reduction in force] is an administrative procedure by which agencies *eliminate jobs* and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (emphasis added). "A RIF is not an adverse action against a particular employee, but *is directed solely at a position within an agency*." *Id*. (emphasis added); *see also Huber v. Merit Sys. Prot. Bd.*, 793 F.2d 284, 286 (Fed. Cir. 1986). The Federal Circuit has made clear that a "reduction in force" necessarily involves the elimination of positions as a prerequisite. *Gandola v. F.T.C.*, 773 F.2d 308, 310 (Fed. Cir. 1985) ("A reduction in force involves two steps. First, the agency determines which positions to abolish. Second, it selects the people to be eliminated serving in those positions on the basis of their retention standing."). And while the elimination of positions indubitably might involve the separation of personnel who occupy those eliminated positions, the agency cannot target specific personnel and then decide to eliminate their positions under the guise of a reduction in force. *Id*. at 312. ("A reduction in force may not be used as a disguised adverse action to remove or demote a particular employee."); *Huber*, 793 F.2d at 286 ("A RIF is an administrative procedure by which agencies eliminate jobs and account for employees who occupied abolished positions.").

Other Courts have interpreted "reduction in force," albeit in the context of statutes governing civilian workforce protections. In *Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir. 1990), the court considered an age discrimination case brought under the Age Discrimination in Employment Act. There, the court interpreted "reduction in force" to mean the "elimin[ation] of one or more positions[,]" not a situation where the employee "is replaced after his or her discharge." *Id*. at 1465. Critically, the *Barnes* court clarified that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id*. Therefore, a reduction in force can occur where the employer eliminates positions and redistributes responsibilities to remaining employees without replacing the eliminated personnel. *Id*. ("A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."); *see also Sanders v. Kohler Co.*, 641 F.3d 290, 294 (8th Cir. 2011) ("When a company fires one worker and replaces him with another, there is no net loss in the number of employees and no 'reduction in force' as the term is commonly understood.").

In support of its position that Congress intended to assign a flexible definition to the phrase "reduction in force," the United States cites *Cross v. Dep't of Transp.*, 127 F.3d 1443 (Fed. Cir. 1997), *Nat'l Fed'n of Fed. Emps., Loc. 1442 v. Dep't of the Army*, 810 F.3d 1272 (Fed.

Cir. 2015) ("*NFFE, Local 1442*") and *Welch v. Dep't of Army*, 323 F.3d 1042 (Fed. Cir. 2003). However, those cases do not support the broad definition the United States urges the Court to adopt.

In *Cross*, the Federal Circuit examined employment actions surrounding Congress' dissolution of the Interstate Commerce Commission ("ICC"). *Cross*, 127 F.3d at 1445. The ICC was abolished by an act of Congress in 1996 and many of its functions were absorbed by its successor agency, the Surface Transportation Board ("STB"), as well as the Federal Highway Administration within the Department of Transportation. *Id*. In the summer of 1995, while Congress was debating legislation to abolish the ICC, officials within that agency began discussing which functions and positions would be transferred to the STB and the Federal Highway Administration. *Id*. Later the same year, the ICC began to notify employees that the agency would conduct a reduction in force, during which employees "identified as holding positions within the identified functions" would be transferred out of the ICC and into the appropriate agency (STB or the Federal Highway Administration) while those without a surviving function would be separated. *Id*. at 1446. Even before the RIF was announced, it was obvious that all positions within the ICC were to be eliminated, but the *Cross* plaintiffs challenged the RIF on the grounds that, until the law abolishing the ICC was enacted, there was no "lack of funding" that justified the RIF. *Id*. However, the Federal Circuit disagreed, holding that a RIF conducted pursuant to an anticipated shortage of funding was lawful. *Cross*, 127 F.3d at 1447. *Cross* is largely inapplicable to this case, but in recognizing an agency's discretion to conduct a RIF, the Circuit cited *Grier v. Department of Health and Human Servs.*, 750 F.2d 944, 945–46 (Fed. Cir. 1984). Significantly, the *Cross* court summarized its understanding of *Grier*'s holding in a parenthetical: "*a RIF* is not aimed at removing particular individuals, but *is directed solely at positions*." *Cross*, 127 F.3d at 1447 (emphasis added). The Circuit's interpretation of its own case law, focusing on positions rather than individuals, supports Plaintiffs' reading of 14 U.S.C. § 357(j) and contradicts the definition offered by the United States.

The United States cites *NFFE, Local 1442* for the proposition that "a reduction in force may involve a reduction in personnel without a reduction in positions, if, for example, an agency furloughs personnel, or, as in this case, the military needs to ensure the proper functioning of the workforce by reducing personnel without reducing positions[.]" (Def.'s Mot. at 13 (citing *NFFE, Local 1442*, 810 F.3d 1272)). However, *NFFE, Local 1442* does not support that proposition and did not involve or interpret a statutory "reduction in force." In *NFFE, Local 1442*, the plaintiff, a federal workers union comprised of civilian employees at the Letterkenny Army Depot, appealed the workers' six-day furloughs. *NFFE, Local 1442*, 810 F.3d at 1273. "The furloughs were the result of an automatic process of federal agency spending reductions known as 'sequestration.'" *Id*. The furloughs were conducted pursuant to Title 5, chapter 75 of the U.S. Code, which pertains to the organization of the Federal Government and its employees. 5 U.S.C. § 7501 *et seq*.; *see also NFFE, Local 1442*, 810 F.3d at 1277 (discussing various provisions of that title applicable to adverse actions against unionized employees). The unionized workers challenged the adverse action against them under § 7512, which *specifically* "does not apply to . . . a reduction-in-force action[.]" 5 U.S.C. § 7512. *NFFE, Local 1442* simply has no application to this case.

In *Welch*, the plaintiff, an Army Corps of Engineers employee, appealed his involuntary separation from the Corps through a single-position RIF. *Welch*, 323 F.3d at 1044. John Welch,

the plaintiff, was one of five Information Management Officers within the Corps district area. *Id.* One of those positions was GS-14, while the rest (including Welch's) were GS-13. *Id.* After conducting a "consistency review," the Corps recommended that Welch report to the Deputy Commander, rather than to a Special Assistant. *Id.* After his realignment, the Corps adopted a new position description for the district's GS-14 Information Management Officer and announced a vacancy for which Welch applied and was not selected. *Welch*, 323 F.3d at 1044. Afterward, the Corps conducted a RIF and eliminated his GS-13 position, then reassigned Welch to a GS-12 position with a different title. *Id.* Welch appealed to the Merit Systems Protections Board and his claim was denied. *Id.* The Circuit upheld that denial, observing that "[a]lthough a reduction-in-force frequently involves a reduction in the number of employees, it need not do so. *If a position is eliminated* for a proper managerial reason, *that will justify a reduction-in-force*." *Id.* at 1046 (emphasis added). Importantly, in *Welch*, the agency *eliminated positions* as part of the reduction in force.

As the Plaintiffs point out, *Welch* does not support the United States' flexible reading of "reduction in force" because the holding in *Welch* relied on the agency's elimination of positions. Here, the vacated positions were not eliminated, but rather opened to promote junior servicemembers. As the United States admitted, "[w]hen the Secretary of Homeland Security ordered reductions in force in [2010–2014], . . . the Secretary did not separately and specifically order the elimination of particular billets (or positions) in the Coast Guard." (Pls.' Mot. Ex. 12 (Interrogatory Responses) at 11). And Plaintiffs' positions (or "billets") were not eliminated after Plaintiffs were involuntarily retired. (Def.'s Admissions, Pls.' Mot. Ex. 8 at 7–8). As the Sixth Circuit articulated in *Barnes*, "[a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *Barnes*, 896 F.2d at 1465.

Moreover, the Coast Guard's public messaging campaign around the CRSPs sharply undercuts the United States' argument that the involuntary retirements were actually a reduction in force. Under orders from the Assistant Commandant for Human Resources (Rear Admiral Neptun), Captain Calhoun—the Chief of Military Personnel—made clear that he understood the CRSPs were "not a RIF and [the Coast Guard] need[ed] to ensure that [the CRSPs were] not associated with a RIF." (Tr. of Oral Arg. at 39:6–23; Pls.' Mot. Ex. 9).[6] This messaging campaign reflected the reality that if the Coast Guard described the CRSPs as part of a RIF, it would have been misleading "because the CRSP was not intended to reduce the overall size of the force." (Pls.' Mot. Ex. 11). The Coast Guard has since admitted that it never informed its members that it considered the CRSPs to be part of a reduction in force. (Def.'s Admissions at 6–7).

Finally, the United States argues that review of Coast Guard personnel actions is beyond the Court's purview. (Def.'s Mot. at 13–14) (arguing that "Congress did not establish any 'test or standard' that would constrain the Secretary's exercise of military discretion[,]" thus the Court

---

[6] On January 28, 2021, Captain Calhoun signed an affidavit declaring that his email exchanges included as Plaintiffs' Exhibits 9–11 & 14 reflected a "communications strategy," that he did not have legal or policymaking authority. (DA 61–63). That is the context in which the Court places Captain Calhoun's contemporaneous emails, and his current statements prepared for the purposes of this litigation do not contradict his previous statements.

must abstain from judicial review). The United States appears to base this argument on the "necessary and appropriate" clause of the Coast Guard's authorizing statute: "For the purpose of executing the duties and functions of the Coast Guard the Secretary may within the limits of appropriations . . . do any and all things necessary to carry out the purposes of this title." 14 U.S.C. § 501(h).

This argument lacks merit. First, "[t]he very function of the courts is to apply statutes and necessarily to interpret and explain them." *Texas State Com'n for the Blind v. United States*, 796 F.2d 400, 417 (Fed. Cir. 1986). Second, "a 'necessary or appropriate' provision in an agency's authorizing statute does not necessarily empower the agency to pursue rulemaking that is not otherwise authorized." *New York Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 556 (D.C. Cir. 2020); *see also Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015) (explaining that an "appropriate and necessary" clause is not a blank check for agency action).

The United States also cites *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993) ("We have emphasized that judicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct.") and *Allphin v. United States*, 758 F.3d 1336, 1341 (Fed. Cir. 2014). (Def.'s Mot. at 13–14). That quote from *Murphy* lacks context and refers to whether courts should reweigh the evidence presented to a military corrections board. It does not impose a limit on this Court's role as arbiter and interpreter of federal statutes. *Marbury v. Madison*, 1 Cranch 137, 177, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of [the courts] to say what the law is."); *see also Martin v. Creasy*, 360 U.S. 219, 228 (1959) (Douglas, J. dissenting) (Federal courts have a "responsibility in cases properly before them under heads of jurisdiction prescribed by Congress to construe federal statutes and the Federal Constitution."); 28 U.S.C. § 1491 (The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon . . . any Act of Congress . . ..").

Likewise, *Allphin* does not support the United States' argument. *Allphin* involved a similar factual scenario, where Navy servicemembers were separated using Enlisted Retention Boards. 758 F.3d 1336. However, those Boards were constituted by the Secretary of the Navy under 10 U.S.C. § 1169. *Allphin*, 758 F.3d at 1340–41. That statute is much simpler and broader than the one at issue in this case. That section provides:

> No regular enlisted member of an armed force may be discharged before his term of service expires, except--
>
> **(1)** as prescribed by the Secretary concerned;
>
> **(2)** by sentence of a general or special court martial; or
>
> **(3)** as otherwise provided by law.

10 U.S.C § 1169. The Navy used this statute to separate approximately 3,000 sailors from positions that were "overmanned" due to "record high retention in the [2011] economic environment." *Allphin*, 758 F.3d 1340. Positions that were not overmanned were published, and sailors were permitted to apply "as a contingency in case they were selected to be discharged." *Id*. The Federal Circuit held that the Enlisted Retention Boards were properly constituted under

§ 1169, and merits review of the separations was a nonjusticiable personnel decision committed to the discretion of the Navy. *Id.* at 1341–43. Those holdings do not apply to this case, and *Allphin* did not grapple with 14 U.S.C. § 357 nor did it mention a "reduction in force." Therefore, *Allphin* is inapplicable and does not support the United States' urged construction of § 357(j).

It is the Court's role to interpret § 357, if possible, using the plain language of the statute. As stated above, a "reduction in force" involves the elimination of positions or jobs and not merely the separation of personnel. Those words in § 357(j) are plain and unambiguous, and the Court assigns a definition that has been embraced by numerous federal appellate courts. In making this determination, the Court offers no opinion regarding the Coast Guard's policy objectives in shaping its force. That is a matter fittingly within the expertise of the Commandant and the Secretary.

> B.  Even if the Court were to find that 14 U.S.C. § 357(j) is ambiguous, the Coast Guard has not offered an interpretation of the statute that is entitled to Chevron deference.

As explained above, the phrase "reduction in force" is unambiguous and the Court affords those words their plain and ordinary meaning—the same meaning ascribed to them by the Federal Circuit and other U.S. Courts of Appeals. However, in finding § 357(j) unambiguous, the Court has sidestepped what is known as "*Chevron* step-zero"—that is, whether the Court would even need to conduct the full two-step *Chevron* analysis or whether the Court should proceed directly to an interpretation of the statute.

Plaintiffs argue that the Coast Guard described the CRSPs as a "reduction in force" only when the legality of the involuntary retirements was challenged. (Pls.' Mot. at 16–17). Plaintiffs continue that Congress did not authorize the Secretary to define "reduction in force," but even if Congress did, the Secretary never attempted to interpret that phrase in a manner that warrants *Chevron* deference. (Pls.' Reply at 2–3). The United States argues that Congress did authorize the Secretary to define "reduction in force" and the Secretary did so through the CRSP authorization memoranda, which warrant *Chevron* deference. (Def.'s Reply at 2–7, ECF No. 70). The Court agrees with the Plaintiffs on two fronts: (1) the Secretary did not interpret "reduction in force" using the tools that would afford that interpretation *Chevron* deference; and (2) the United States' litigating position is not entitled to *Chevron* deference.

In *Chevron*, the Supreme Court acknowledged that, upon judicial review, courts might find the record devoid of the agency's administrative interpretation of the statute at issue. *Chevron*, 467 U.S. at 843 ("If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, *as would be necessary in the absence of an administrative interpretation*.") (emphasis added). In *United States v. Mead Corp.*, the Supreme Court fleshed out that acknowledgment, holding that:

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the

> agency interpretation claiming deference was promulgated in the exercise of that authority.

*Mead*, 533 U.S. 218, 226–27 (2001). "Delegation of such authority may be shown in a variety of ways," the Supreme Court explained, such "as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Id*. at 227. Thus, *Mead* provided a "safe-harbor" of *Chevron* deference for agency interpretations conducted through formal rulemaking or adjudication, as well as informal notice-and-comment rulemaking. *Id*.

But sometimes informal agency actions are entitled to *Chevron* deference. *Id*. at 219 ("[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they may influence courts facing questions the agencies have already answered."). The *Mead* court, quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), clarified that instances in which courts should defer to informal agency action are context specific. *Mead*, 533 U.S. at 219 ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (internal quotations omitted). Thus, the instances in which courts should defer to less-formal interpretative acts remain murky. *See Barnhart v. Walton*, 535 U.S. 212, 222 (2002) ("[W]hether a court should give such deference depends in significant part upon the interpretive method used and the nature of the question at issue.").

The Supreme Court has recently expounded on and limited the various doctrines of agency deference. In *Kisor v. Wilkie*,[7] the court explained that lower courts "must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Kisor*, __ U.S. __, 139 S. Ct. 2400, 2416 (2019). The court clarified that, to receive deference, the "interpretation must be one actually made by the agency. In other words, it must be the agency's 'authoritative' or 'official position,' rather than any more *ad hoc* statement not reflecting the agency's views." *Id.* at 2416. Elaborating, the court recognized that "the requirement of 'authoritative' action must recognize a reality of bureaucratic life: Not everything the agency does comes from, or is even in the name of, the Secretary or his chief advisers." *Id*. at 2416. As an example, the court pointed to "'official staff memoranda' that were 'published in the Federal Register,' even though never approved by the agency head" as the type of document that should receive deference. *Id*. (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980)). However, the Court did not demarcate boundaries of administrative interpretation, but merely offered a minimum standard: "[t]he interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context. . . . If the interpretation does not do so, a court may not defer." *Id*. at 2416–17,

---

[7] In *Kisor*, the Supreme Court examined whether the character and context of an agency's interpretation of its own *regulations* entitles that interpretation to controlling weight whereas here, the agency interprets a statute. However, the Court made clear that the Chevron step-zero analysis involved an "analogous though not identical inquiry[.]" *Kisor*, 139 S. Ct. at 2416.

2421 ("Remember that a court may defer to only an agency's authoritative and considered judgments.").

Here, there is no evidence of a "considered judgment" by the Coast Guard, and the character of the memoranda establishing the CRSPs is conclusory, not interpretative. When prodded for evidence of interpretive agency analysis, the United States pointed only to the memoranda from the Commandant to the Secretary authorizing the CRSPs:

> **The Court:** What sentence can you point to—I mean, I think we're supposed to be . . . somewhat vigilant about looking for an analysis of agencies and not just agencies saying, well, this is what it is. What sentence in that paragraph provides an analysis?

> **[The United States]:** Your Honor, it is relatively conclusory, I'll grant you that. But there is an interpretation that under 357(j) –

> **The Court:** I've got that one highlighted myself. So "under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by enlisted personnel boards pursuant to a reduction in force." That's a restatement of the statute, right?

> **[The United States]:** Well, it's—it comes in conjunction with the sentence that came two sentences before it that says the legal authority to conduct the CRSP panel derives from 357(j).

> **The Court:** So is that an analysis? That's just a conclusion. . . .

> **[The United States]:** Well, it's an interpretation.

(Tr. of Oral Arg. at 41–42). The United States has not provided the Court with any document other than the CRSP memoranda that purports to interpret the statute.

Despite the United States' urgings, the Coast Guard memoranda are not an interpretation. In *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) the Supreme Court explains that an agency does not receive deference by merely offering conclusory statements. There, the Supreme Court examined whether to apply *Chevron* deference to the Department of Labor's ("DOL") interpretation of the term "salesman" as it appeared in the Fair Labor Standards Act ("FLSA"). From 1970 to 2011, the DOL reversed course twice on whether "service advisors" qualified as "salesmen," and attempted to amend its definition accordingly. *Id*. at 2121–24. But when DOL's 2011 rule was challenged, the Supreme Court found the interpretative explanation lacking: "the [DOL] said almost nothing. It stated only that it would not treat service advisors as exempt [from the FLSA] because 'the statute does not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met.'" *Id*. at 2127. Recognizing that an agency could justify its policy choices by explaining how that policy is consistent with the statute, the Supreme Court noted that the DOL "did not analyze or explain why the statute should be interpreted" consistently with its policy choices. *Id*. In fact, the DOL "gave almost no reasons at all." *Id*. Therefore, the Court declined to

afford deference to the 2011 regulation in interpreting the FLSA, holding that "the [agency's] conclusory statements [did] not suffice to explain its decision." *Id*.

Here, like the agency in *Encino Motorcars*, the Coast Guard has not explained how § 357(j) should be interpreted to permit the policy it seeks to implement. The memoranda authorizing the CRSPs are scant, merely restating the language of the statute. The 2010 memorandum even fails to do that. (Pls.' Mot. Ex. 7 at pp. 8–9; *see also* AR 27). Each memorandum, which the Coast Guard issued annually, is approximately a page-and-a-half long and contains no legal analysis. (AR 27, 53, 86, 128). The memoranda cite the statute but provide no meaningful interpretative analysis of "reduction in force," how it has been previously understood by the Coast Guard or other agencies, how the phrases are used in other statutes, or how the phrase has been interpreted by federal courts and other adjudicative bodies in other contexts. The Administrative Record lacks any indicia of considered interpretive analysis from the Coast Guard, much less the Department of Homeland Security. Like the DOL in *Encino Motorcars*, the Coast Guard offered no explanation at all as to how involuntary separations using CRSPs were a reduction in force permitted under § 357(j). The Commandant's conclusory statements are insufficient to warrant deference.

The United States argues that the military's statutory interpretations are always afforded *Chevron* deference. (Def.'s Reply at 4–5 (citing *Favreau v. United States*, 317 F.3d 1346 (Fed. Cir. 2002) (*per curiam*) and *Small v. United States*, 158 F.3d 576 (Fed. Cir. 1998), *amended on reh'g in part,* 180 F.3d 1343 (Fed. Cir. 1999)). *Favreau* confirms that Congress has given the military "explicit authority to adopt interpretive regulations[.]" *Favreau*, 317 F.3d at 1358. That truism is not at issue here. In *Favreau*, the court examined "whether only those who request separation *voluntarily* come to the end of their enlistment" for the purposes of a bonus recoupment provision. *Id*. (emphasis added). The court was presented with a litany of record evidence interpreting the relevant statute, including military regulations, directives and official orders, memoranda relating to bonus recoupment, the agency's financial regulations, and examples of actual agency practice, "all knit together by the affidavit of [a Colonel]." *Id*. The court explicitly stated that it was relying on the entire package to discern the agency's interpretation of the statute. *Id*. ("It is only by considering this package that one could discern the relevant unifying interpretation[.]"). *Favreau* provides useful background for how the military might lawfully interpret a statute, but it does not support the United States' position here where the Coast Guard did not analyze the statute.

Seeking further support for its automatic deference argument, the United States cites *Small v. United States*, 158 F.3d 576 (Fed. Cir. 1998), *amended on reh'g in part,* 180 F.3d 1343 (Fed. Cir. 1999). *Small* was decided by the Federal Circuit more than two years before the Supreme Court issued its decision in *Mead*, and contains no discussion of the *Chevron* step-zero issues *Mead* highlighted. Furthermore, *Small* does not analyze the question presented in this case—that is, whether the Coast Guard offered an interpretation of the statute at issue.

The United States catalogs several cases from the Court of Federal Claims, which it believes support its automatic deference argument. (Def.'s Reply at 5). However, the cases cited do not involve *Chevron* step-zero analysis, and/or the military's interpretative process is far more extensive than the Coast Guard's conclusory memoranda in this case. *Martin v. United States*, 133 Fed. Cl. 248 (2017) (*Chevron* deference warranted where term at issue was explicitly

defined by three Department of Defense documents); *Towne v. United States*, 106 Fed. Cl. 704 (2012) (the term at issue was explicitly defined by statute *and* by internal DoD memorandum; *Chevron* deference awarded); *Miller v. United States*, 58 Fed. Cl. 540 (2003) (finding the statute was unambiguous and supported the United States' interpretation, but even if ambiguous, *Chevron* deference was warranted where DoD issued a memorandum explaining DoD's construction of the statute). In any event, these cases do not bind this Court. *W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court.").

Here, the Court is left with only the Commandant's short, conclusory memoranda authorizing the CRSPs. Because the Commandant's memoranda are devoid of any analysis suggesting they represent the Coast Guard's "authoritative and considered judgments," the Court does not owe those memoranda *Chevron* deference. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (listing situations in which deference is unwarranted, including "when there is reason to suspect that the agency's interpretation *does not reflect the agency's fair and considered judgment* on the matter in question . . . when the agency's interpretation conflicts with a prior interpretation, . . . or *when it appears that the interpretation is nothing more than a convenient litigating position* . . . or a *post hoc rationalization advanced by an agency seeking to defend past agency action against attack*[.]") (cleaned up) (emphasis added). Likewise, the Court does not owe deference to the definition of "reduction in force" that the United States advances for the first time in its briefs, as that definition appears to be merely a convenient litigation position.

Therefore, even if § 357(j) were ambiguous, the Court would be required to "impose its own construction on the statute" because the Coast Guard failed to offer an interpretation that warrants deference. *Chevron*, 467 U.S. at 843. The Court completed that task in Section II(A) above, determining that "reduction in force" means the elimination of positions or jobs, not merely separation of personnel. That analysis is supported by substantial case law and need not be repeated.

*C.  Plaintiffs' Motion to Strike is denied.*

Finally, as noted above (*supra* n.6), the United States attached an affidavit of a Coast Guard official to its Motion for Summary Judgment. (DA 61–63). In that affidavit, Captain Calhoun addressed emails discussing the CRSPs that were included in the Administrative Record and Plaintiffs' Exhibits. Plaintiffs now move to strike Capt. Calhoun's declaration. (Pls.' Reply at 15). Capt. Calhoun's past and present statements merely indicate that the Coast Guard's current legal strategy differs from its then-offered communication strategy. The Court does not rely on the truth of either Capt. Calhoun's past or present statements for its own legal analysis in this Opinion. In any event, the Court's decision on the merits renders the issue moot. Therefore, Plaintiffs' Motion to Strike is denied.

### III.    Conclusion

The phrase "reduction in force" within 14 U.S.C. § 357(j) is unambiguous. A reduction in force involves the elimination of positions or jobs, not merely separation of personnel. But even if that phrase were ambiguous, the Court would define it as stated, and would not be required to

defer to any Coast Guard definition as the Coast Guard did not interpret the statute in a manner that would entitle its interpretation to *Chevron* deference. Finally, the Court need not address whether to strike Captain Calhoun's affidavit because that issue is mooted by a decision on the merits that does not rely on Capt. Calhoun for its legal analysis.

In summary:

(1) Plaintiffs' Motion for Summary Judgment (ECF No. 62), is **GRANTED**.

(2) Plaintiffs' Motion to Strike is **DENIED AS MOOT**.

(3) The United States' Cross-Motion for Summary Judgment (ECF No. 67), is **DENIED**.

(4) On or before July 20, 2021, the parties shall file a joint status report proposing appropriate next steps consistent with this Opinion, including remedies, and a schedule for post-judgment proceedings should they be necessary.

**IT IS SO ORDERED.**



s/    David A. Tapp
DAVID A. TAPP, Judge

# In the United States Court of Federal Claims

No. 18-923C
Filed: December 8, 2021

|  |  |
|---|---|
| **TONIA TIPPINS, et al.,** | |
| *Plaintiffs*, | |
| **v.** | |
| **THE UNITED STATES,** | |
| *Defendant*. | |

*Nathan S. Mammen*, with whom were *Ragan Naresh* and *Emily M. Scott*, Kirkland & Ellis LLP, Washington, D.C., for Plaintiffs.

*Douglas G. Edelschick*, Senior Trial Counsel, with whom were *Marin F. Hockey*, Deputy Director, *Robert E. Kirschman, Jr.*, Director, *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *LCDR Justin R. Jolley*, Deputy Chief, and *Brian Judge*, Chief, Office of Claims & Litigation, U.S. Coast Guard, Of Counsel, for Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**TAPP, Judge.**

Before the Court is the United States' Motion for Reconsideration, as well as competing memoranda regarding the scope of relief should reconsideration be denied. (Def.'s Mot. to Recons., ECF No. 84). In its bid for reconsideration, the United States challenges portions of the Court's July 13, 2021 Opinion granting summary judgment to Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner (collectively "Plaintiffs"). *See generally*, *Tippins v. United States*, 154 Fed. Cl. 373 (2021) (docketed at ECF 75). Notably, the United States does not request that the Court reconsider its alternate finding that even if 14 U.S.C. § 357 was ambiguous, the Coast Guard has not offered an interpretation of the statute which is entitled to *Chevron* deference. (Def.'s Mot. to Recons. at 20 n.3).[1] The Court first addresses the Motion for Reconsideration.

---

[1] (*See also* Tr. of Oral Arg. at 41–42, ECF No. 74; Tr. of Hearing on Mot. to Recons. at 19:4–12, ECF No. 89.)

## I.    The United States' Motion for Reconsideration

There are two statutes at issue in this case. The first, 10 U.S.C. § 1169, protects honorably serving enlisted members of the armed forces. That statute provides simply that regular enlisted members of an armed force may not be discharged before their term of service expires, except as prescribed by the secretary leading the relevant armed force—in this case, the Secretary of Homeland Security (the "Secretary"). The second operative statute, which is specific to the United States Coast Guard, provides in part that "[w]hen the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the [Enlisted Personnel] Board's action." 14 U.S.C. § 357(j). Enlisted Personnel Board actions involve performance issues of individual service members and are not at issue here.[2] This statutory structure safeguards the service of enlisted members of the Coast Guard. Except in individual cases brought before an Enlisted Personnel Board, enlisted Coast Guard personnel cannot be involuntarily discharged except pursuant to a reduction in force ("RIF") ordered by the Secretary. This statutory structure frames Plaintiffs' claim.

Beginning in 2010 and continuing through 2014, the Secretary authorized the Coast Guard to utilize a newly crafted mechanism entitled Career Retention Screening Panels ("CRSPs"). (*See, e.g.*, Pls.' MSJ Ex. 7 at p. 8–9, ECF No. 62-7).[3] The stated purpose of the CRSPs was to reshape the enlisted ranks to provide for enhanced upward mobility. (AR 27, (CRSP designed to stimulate workforce flow and improve enlisted advancements), AR 26 (describing the 2011 and 2012 CRSPs as a "performance-based enlisted workforce management tool.")).

The Secretary's initial CRSP authorization in 2010 did not reference a "reduction in force" and troublingly, the Coast Guard publicly expressed to its enlisted personnel that the

---

[2] U.S. Coast Guard policy speaks to the use of Enlisted Personnel Boards in cases involving "the involuntary separation, ineligibility for reenlistment, and reduction in rate for incompetence." Enlisted Personnel Administrative Boards Manual (PSCINST M1910.1) p. 3, U.S. Coast Guard, (published June 2014), *available at* https://www.dcms.uscg.mil/Portals/10/CG-1/psc/psd/docs/EPAB%20(Final%20Revised%20August%202017).pdf?ver=2018-03-30-101707-787 (last visited December 8, 2021).

[3] As noted in the Court's July 13, 2021, Memorandum Opinion and Order, Plaintiffs attached as an exhibit to their summary judgment briefing the Administrative Record from *Lippmann v. United States*, Case No. 15-192. The United States did not object. That case involved a single former enlisted Coast Guard member and has substantial factual commonality with this case, including the initial 2010 Secretary of Homeland Security's approval of the inaugural CRSP. The *Lippmann* record contained a document inexplicably omitted from the Administrative Record of this case. To avoid confusion between the records, when referring to the *Lippmann* record the Court will cite to the PDF pagination as it appears in the Court's blue CM/ECF stamp in the header of Plaintiffs' Motion for Summary Judgment Exhibit 7. For example, when referring to the *Lippmann* AR, the Court would cite to the cover page, which simply reads "EXHIBIT 7," as "(Pls.' MSJ Ex. 7 at p. 1)." Citations to the Administrative Record in this case are simply (AR __).

authorized CRSP service record review and resulting forced retirements were not a RIF. (Pls.' MSJ Ex. 7 at p. 8–9; Pls.' MSJ Ex. 9). In fact, the Coast Guard formulated and issued to its members, including those enlisted personnel who would later be subject to involuntary retirement, its policies and procedures governing the initial CRSP *prior* to the Secretary's approval. (*Compare* AR 1 (Internal Comms Bulletin issued August 19, 2010) *with* Pls.' MSJ Ex. 7 at 8–9 (Secretary's approval of the 2010 CRSP on Sept. 21, 2010)). Given that sequence, and in the absence of any record evidence that the Secretary reviewed CRSP policies and procedures, any claim that the Secretary considered and analyzed whether the CRSP was a RIF under 14 U.S.C. § 357(j) lacks credibility.

In the years after 2010, the Coast Guard's request for Secretarial approval referenced "reductions in force" but reflected no analysis concluding that the CRSP constituted a RIF. (*See, e.g.*, AR 27–28). Neither the Coast Guard nor the Secretary has produced contemporaneous documents that establish the CRSPs were simply RIFs by another name. Neither does the uncontested record disclose any analysis suggesting that the Secretary (or the Coast Guard) contemporaneously considered that the CRSPs were a statutorily authorized RIF.

In fact, in the original memorandum from the Commandant of the Coast Guard, setting forth the policies and procedures that would guide the CRSP and preceding the Secretary's CRSP approval, the Commandant acknowledged "[w]hile officer management tools are clearly defined by law and policy, similar workforce shaping tools *do not exist* for the enlisted workforce." (AR 1 (emphasis added)). Lastly, the Coast Guard did not proffer a comparison of the CRSP process to prior RIFs that, at least, might have suggested some degree of similarity from which the Court could conclude that the two were essentially the same. The Coast Guard, however, *now* alleges, rather conveniently, that the CRSPs were in fact a RIF. In doing so, the Coast Guard disavows its own contemporaneous messaging that the CRSPs were not a RIF.

In seeking reconsideration, the United States continues to dispute the Court's interpretation of 14 U.S.C. § 357(j), which authorizes RIFs, and whether that statute justifies the Coast Guard's separation of servicemembers via CRSPs. (Def.'s Mot. to Recons. at 4–19); *Tippins*, 154 Fed. Cl. at 378 (concluding that § 357(j) is unambiguous and the Coast Guard's interpretation is not entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). The United States asks the Court to reconsider its interpretation that the phrase "reduction in force" includes the "elimination of positions or jobs, not merely the separation of personnel." (Def.'s Mot. to Recons. at 4–19); *Tippins*, 154 Fed. Cl. at 378.

The United States' Motion raises four primary grounds on which the Court should reconsider its prior Opinion. (Def.'s Mot. to Recon. at 1–2). The United States asserts: (1) the Court's interpretation is inconsistent with an alternative plain language interpretation based on dictionary definitions and ignores Congress's historical use of the phrase "reduction in force"; (2) the Court erred by relying on case law that interprets civilian statutes; (3) the Federal Circuit has not defined "reduction in force"; and (4) the Court should look to 10 U.S.C. § 1174a, a military statute, for its plain language interpretation of "reduction in force." (*Id.* at 5–19). Though the United States maintains that the Secretary's interpretation of 14 U.S.C. § 357(j) is

entitled to deference under *Chevron* step two, its Motion focuses solely on the Court's plain language determination under *Chevron* step one. (*Id.* at 20 n.3).[4]

The United States' first argument refers to its merits brief, which offers a single dictionary definition of "force." (*See* Def.'s Cross-MSJ at 15, ECF No. 67 (citing to Merriam-Webster's Collegiate Dictionary 489 (11th ed. 2005)).[5] To buttress its first argument, the United States isolates the last word within the phrase "reduction in force." (Def.'s Mot. to Recons. at 5–6). The United States offers no dictionary definition of the complete phrase. Nor does the United States focus on "reduction." Instead, utilizing its chosen dictionary definition of "force," the United States urges the Court to construe the operative wording of § 357(j) as meaning a reduction in "terms of people or troops, not positions or billets." (*Id.*). Utilizing this selective approach, the Court would presumably find that the Coast Guard's involuntary retirement of several hundred enlisted members, which did not have the effect of reducing the total number of authorized billets within the Coast Guard, was lawful.

In its first argument, in addition to urging the Court to go dictionary shopping, the United States adds that Congress has historically utilized the phrases "reduction in personnel" and "reduction in force" interchangeably. (*Id.* at 6). In doing so, however, the United States cites to statutes arising under Title 5 of the United States Code, which the United States characterizes as relating to "re-codification of laws related to civilian Federal employees." (*Id.*). This renders the United States' first argument inconsistent with a fundamental tenet of its second argument. In the page following its suggestion that the Court look to Title 5, the United States urges the Court to eschew the application of statutes governing Federal civilian employees because they are incongruous with those regulating Coast Guard members. (*Id.* at 7–8).

Though the United States urges reliance on its favored dictionary, the Court need not pick from this or other dictionaries in fashioning its interpretation of "reduction in force," a relatively simple phrase. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 226 (courts need not defer to "the agency's choice among available dictionary definitions" and may look at other "contextual indications[.]"). The Court's finding that the phrase "reduction in force" is unambiguous considers the entirety of the term rather than its subparts. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme because the same terminology is used elsewhere in a context that makes its meaning clear[.]"). Congress could have easily expressed the phrase in a manner more attuned to the United States' litigation position. Had it intended to do so, Congress could have chosen some other version of the phrase, perhaps a realignment, repositioning, reorganization, restructuring, redeployment, reformation, reshuffling, or manipulation of the "force." It did not. Congress chose to limit the discharge of

---

[4] The United States does not urge the Court to reconsider its *Chevron* step zero analysis. *Cf. Tippins*, 154 Fed. Cl. at 383 (holding that even if the Court were to find 14 U.S.C. § 357(j) ambiguous, the Coast Guard did not offer an interpretation of the statute that is entitled to *Chevron* deference).

[5] In its Motion to Reconsider, the United States cites to an earlier version of the same dictionary utilizing a similar definition. (Def.'s Mot. to Recons. at 5).

enlisted service members to situations involving individual conduct or by a reduction in force. In the latter instance, the Secretary is statutorily required to "order" a RIF. 14 U.S.C. § 357.

In its second and third arguments, the United States points out that the Federal Circuit has not assigned an all-encompassing definition to the phrase "reduction in force." (Def.'s Mot. to Recons. at 12). The United States urges the Court to reject the Circuit's interpretation and usage of that phrase as circumscribed to Merit Systems Protection Board ("MSPB") appeals and Office of Personnel Management regulations. (*Id*. at 12–17 (citing cases the Court relied on)). The Federal Circuit's usage, though not involving RIFs within a military context, remains useful in the vacuum created by the complete absence of a definition unique to 14 U.S.C. § 357. The United States also argues that the Court should not have relied on *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990), despite previously citing that case in support of its interpretation in analogous litigation before this very Court. (*Compare* Def.'s Mot. to Recons. at 15 (arguing the Court erred in its reliance on *Barnes*) *with Lippmann v. United States*, Case No. 15-192, Def.'s Mot. to Dismiss at 22, ECF No. 10 (citing *Barnes* in support of its argument)). Fourth and finally, for the first time, the United States cites to 10 U.S.C. § 1174a, arguing that the Court should attempt to read that statute in harmony with 14 U.S.C. § 357(j). (Def.'s Mot. to Recons. at 17–19). Nothing within that statute persuasively informs the Court's decision. *See* 10 U.S.C. § 1174a (permitting the Secretary to establish special separations benefits programs in which eligible members may opt-in). Both § 1174a, and its companion statute which it references, 10 U.S.C. § 1175, concern voluntary separation benefits and incentives. That is not the situation here.

The Court declines to adjust its prior conclusions. The United States' arguments, individually and collectively, are unconvincing. Moreover, to the extent that the United States continues to press that "reduction in force" is capable of multiple interpretations to include a reduction in a body of persons, personnel, positions, troops, labor force, jobs, or billets, each at the unbridled discretion of the Coast Guard, the Court rejects such an amorphous interpretation. (*See* Def.'s Mot. to Recons. at 7 ("[W]e have argued that a 'reduction in force' . . . is sufficiently broad to include a reduction in positions, a reduction in personnel, or both . . ..")). The Court again notes that, while not particularly consequential at summary judgment, the Coast Guard's own contemporaneous statements sharply undercut the position it now stakes in seeking reconsideration.

Initially, the Coast Guard Commandant advised the Secretary that its newly conceptualized CRSP was required to address an "imbalance" in junior and senior enlisted service and retention rates. The Commandant did not request, nor did the Secretary authorize, a RIF. A high-level administrative Coast Guard office messaged enlisted members that the 2010 process "was not a RIF" and cautioned other members of the Coast Guard that "we need to ensure that [the CRSP] is not associated with a RIF."[6] (Pls.' MSJ Ex. 9). In subsequent years, the Coast Guard's written request for CRSP approval to the Secretary referenced a RIF but noted

---

[6] Though the Coast Guard now seeks to disavow these earlier statements to its service members, such post hoc rationalizations carry little, if any weight. If in fact, the Coast Guard was purposefully misleading its own enlisted personnel, as the United States seems to now suggest, such efforts are disquieting.

that the CRSP process excluded the use of "reduction in force" language. (*See, e.g.,* AR 53). The written policies guiding CRSP procedure never mentioned a RIF. (*See* AR 69–81).

These characterizations cannot be ignored: the CRSP was not intended to reduce the size of the Coast Guard but rather to account for "upward mobility and flow" concerns and thereby provide for improved opportunities for junior non-commissioned personnel. (*See* AR 27 (The purpose of the 2011 CRSP was "to strategically rebalance the force toward a more upwardly mobile, performance-based demographic.").[7] Based only on the Coast Guard's own contemporaneous statements, the Court has no concern regarding the sagacity of its Opinion and Order granting summary judgment in Plaintiffs' favor.

Here, not only did the Secretary fail to order a reduction in force consistent with the plain meaning of that phrase, the Secretary and the Coast Guard purposefully avoided the phrase and publicly rebuffed any notion that the CRSPs were associated with a RIF. The CRSPs accomplished exactly what the Coast Guard expressed was its intent: the reshuffling of enlisted personnel by forcing the retirement of senior enlisted personnel to enable the upward mobility of more junior personnel. Any reduction in the overall number of enlisted personnel was incidental to the plainly stated purposes of realigning the senior enlisted ranks to promote the upward mobility of junior service members.

This is also not an instance in which Congress authorized early retirements, except in specified circumstances, despite having done so in statutes pertaining to other branches. In fact, for the other branches, Congress delegated broader authority to shape their forces. Under 10 U.S.C. § 638(a)(1), "[a] regular officer on the active-duty list of the Army, Navy, Air Force, Marine Corps, or Space Force may be considered for selective early retirement by a selection board . . ..."). Those service branches have lawfully invoked § 638(a) to conduct reductions in force. *Crumley v. United States*, 133 Fed. Cl. 607, 609 (2017), *aff'd*, 738 F. App'x 1020 (Fed. Cir. 2018) ("In 2011, the USAF conducted a reduction-in-force ('RIF'), pursuant to 10 U.S.C. § 638(a) . . .."). Section 638 also authorizes "Selective Early Retirement Boards" ("SERBs"), which the branches have historically used as a workforce shaping tool, eerily similar to the CRSPs in this case. *See Christian v. United States*, 46 Fed. Cl. 793, 797 (2000) ("Under [§ 638], Regular Army Lieutenant Colonels (LTCs) twice considered but not selected for promotion to Colonel and not placed on another promotion recommendation list may be considered for mandatory early retirement by a [SERB].").

The Coast Guard's absence from 10 U.S.C. § 638 is conspicuous. Likewise, 14 U.S.C. § 357 did not include the broad language contained in an earlier statute which would have plausibly authorized the Coast Guard's use of CRSPs as a force reshaping tool. *Compare* 10 U.S.C. § 1169 (authorizing early discharge of regular enlisted members under circumstances "prescribed by the Secretary[.]") *with* 14 U.S.C. § 357. For the Coast Guard, Congress enhanced

---

[7] In 2015, following the last of the CRSPs, the Coast Guard noted the success of the program: "For the past five years, the Coast Guard has sought and received authorization from the Secretary of Homeland Security (DHS) to convene a CRSP in order to increase workforce flow, address high retention issues through the involuntary retirement of selected enlisted members, and to reduce the size of the retirement eligible enlisted workforce." (AR 164).

the limitation on discharge through § 357 by referencing a selection board and limiting the Secretary's authority to involuntarily separate enlisted service members in two narrow circumstances—pursuant to Enlisted Personnel Board decisions or a RIF.

The Court recognizes that it writes on a blank slate regarding this issue. It agrees that the Federal Circuit has not, within the narrow context of these facts, defined "reduction in force" as that phrase is used in 14 U.S.C § 357(j). Consequently, the Court has resorted to the analogous treatment of the term within the civilian context. Relying on the persuasive authority of decisions from other courts, taken together with the absence of contemporary supporting documentation by the Secretary, the contemporaneous statements of the Coast Guard, and statutes authorizing every other military branch to consider selective early retirements, the Court continues to believe that the 2010–2015 CRSPs were not conducted as part of a RIF and that the phrase "reduction in force" necessarily means the elimination of positions or jobs.

## II.    Appropriate Remedies

Having reaffirmed that Plaintiffs are entitled to summary judgment, the Court now addresses what must come next. Plaintiffs seek certification of a class to pursue the identical claims presented in the Complaint. (Tr. of Hearing on Mot. to Recons. at 43:13–23). Long before the undersigned's involvement, and in an unusual move, the parties agreed that any issue related to certification of a class should await a determination on the merits of Plaintiffs' claims. (*Id*. at 41:11–43:23). That posture presents some obstacles to the efficient resolution of this matter.

In its Motion for Reconsideration, the United States suggests two mutually exclusive avenues to expedite resolution. First, should the Court reverse its conclusion and find that 14 U.S.C. § 357(j) and the operative phrase "reduction in force" are indeed ambiguous, the United States asserts that the Court must remand this case to the Coast Guard for "additional explanation and analysis of the statutory ambiguity." (Def.'s Mot. to Recons. at 20). Second, the United States suggests that if the Court were to deny the United States' motion in its entirety, the Court should enter judgment for the six named plaintiffs and direct the Coast Guard to correct the plaintiffs' military records. (Id. at 20–22). Plaintiffs agree with the second option in principle but seem to suggest that the Court, rather than the Coast Guard, should attempt tabulations of backpay. (Pls.' Resp. at 17, ECF No. 85).

As explained above, the Court declines to reconsider its holdings that 14 U.S.C. § 357 is unambiguous and that statute does not support the Coast Guard's actions here. However, the Court agrees that the Coast Guard is better poised to evaluate the facts and circumstances of each plaintiff and calculate their entitlement to relief. But, in recognizing that the United States is considering its options for appellate review, the Court is compelled to explain that even if it were to find § 357 ambiguous, remand would be unproductive.

As previewed above, the United States argues that "given the Court's ruling that the Secretary has not yet sufficiently articulated a reasonable interpretation, the appropriate remedy would be a remand to the Secretary for additional explanation and analysis of the statutory ambiguity." (Def.'s Mot. to Recons. at 20 (citing *Negusie v. Holder*, 555 U.S. 511, 523 (2009) and *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907–08 (2020)). The Court disagrees.

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Regents of the Univ. of California*, 140 S. Ct. at 1907 (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). If the stated grounds for agency action are inadequate, "a court *may* remand" for the agency to either expand upon its analysis or take new action. *Id*. (emphasis added). If the Court remands for further analysis, the agency may provide additional explanation of its reasoning "*at the time of the agency action.*" *Id*. (emphasis in original) (internal quotation and citation omitted). An agency may amplify its articulation of a prior conclusory observation, or elaborate on its reasons, "but may not provide new ones." *Id*. at 1908. When the agency has not exercised its discretion to interpret a statute, the normal course of action is for the Court to remand. *Negusie*, 555 U.S. at 523.

Initially, the Court notes the deliberate use of the Supreme Court's permissive modal verb—a court *may* remand to the agency. *Michigan*, 576 U.S. at 758. Putting aside the implicit grant of discretion, as the Court explained in *Tippins*, 154 Fed. Cl. at 384, the Coast Guard offered only the most bare-bones conclusory statement without any considered analysis or judgment. In 2010, the Secretary did not use the phrase "reduction in force" in the memo authorizing the CRSP. Therefore, any additional reasoning or explanation could only be considered "new," rather than elaborating on or further articulating a stated reason. *See Regents of the Univ. of California*, 140 S. Ct. at 1908. If the Court were to remand this case and permit the Coast Guard to offer "analysis" of its position from 2010, it would undermine "confidence that the reasons given are not simply convenient litigating positions." *Id*. at 1909 (cleaned up). Additionally (and relatedly), remand would allow a new Secretary of Homeland Security to invoke new justifications and undertake fresh analysis over a decade after the original decision to institute CRSPs. Permitting the Secretary to invoke such "belated justifications" would disrupt the Court's judicial review function and force "both litigants and [the Court] to chase a moving target." *Id*. (internal citations and quotations omitted). Thus, even had the Court found the statute ambiguous, the United States' request for remand would be denied because the United States fails at *Chevron* step zero.

The Court concludes that remand would be inappropriate as a practical matter, but also as a jurisprudential concern. Rote remand scenarios such as those urged by the United States in this case only encourage agency decision-makers to initially avoid articulating justifications in any degree of detail. Why provide a full explanation of the agency's reasoning if, when later challenged, a second opportunity is routinely provided to supply a more fulsome rationale? Especially when, by rendering a decision, the reviewing court might eventually hand the agency a skeleton key to unlock the door to its original intended destination. Here, the Court retains discretion to prevent such a scenario where it is clear that any "additional" analysis would only consist of post hoc rationalizations. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (the reviewing court has "considerable discretion" when the agency seeks remand either to correct errors or provide additional analysis support a decision).

In this case, the record is unequivocal in stating the decision to utilize CRSPs to massage the composition of the Coast Guard's enlisted ranks. Nothing within the record supports the conclusion that the Secretary intended to order a RIF but simply failed to articulate that intent. On the contrary, the Secretary acquiesced to the use of a new administrative policy intended to force senior enlisted members to retire from their service to the United States. Had the Secretary

indicated intent to declare a RIF, not just invoke 14 U.S.C. § 357 as a pretext, then remand might be appropriate to expound on the annual justifications. However, that is not the situation the Court finds here. Absent documentation in the administrative record supporting an intention to declare a reduction in force, the current Secretary has nothing to expound upon.

In summary, even if the Court were to find the statute ambiguous and that the Coast Guard had failed to offer an interpretation, the Court would not remand for further analysis. The Court has both practical and jurisprudential concerns, but most importantly, the facts of this case would not support giving the Coast Guard a second bite at the proverbial apple.

### III.    Conclusion

The Court stands by its analysis in *Tippins v. United States*, 154 Fed. Cl. 373 (2021) (docketed at ECF 75). Consequently, the Court orders the following:

(1) The United States' Motion for Reconsideration, (ECF No. 84), is **DENIED**.

(2) Pursuant to RCFC 54(b), there being no just reason for delay, the Clerk is **DIRECTED** to enter judgment for the six named plaintiffs listed below. This action shall remain open to allow further collective action proceedings.

(3) Consistent with the Court's decision in *Tippins v. United States*, 154 Fed. Cl. 373 (2021), the United States Coast Guard is **ORDERED** to expeditiously correct the military records for:

    a.  Tonia Tippins;

    b.  Derrik Magnuson;

    c.  George Holloway;

    d.  Jennifer Rehberg;

    e.  Glenda Smithleeth; and

    f.  M. Allen Bumgardner.

The Coast Guard is **ORDERED** to award any back pay, allowances, or other benefits to which those plaintiffs are entitled by law as a result of that correction.

(4) On or before January 24, 2021, the parties are **ORDERED** to file a joint status report setting forth a schedule that proposes dates pertinent to the Court's consideration of collective action proceedings.

**IT IS SO ORDERED.**



s/      David A. Tapp
DAVID A. TAPP, Judge

APPEAL,CLASS,ECF

## US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1:18−cv−00923−DAT

TIPPINS et al v. USA
Assigned to: Judge David A. Tapp
Demand: $70,000,000
 Case in other court:  22−01462
Cause: 28:1491 Tucker Act

Date Filed: 06/27/2018
Jury Demand: None
Nature of Suit: 348 Military Pay −
Reinstatement
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**TONIA TIPPINS**                    represented by   **Nathan Scott Mammen**
Kirkland & Ellis LLP (DC)
655 Fifteenth Street, NW
Washington, DC 20005
(202) 879−5949
Email: nathan.mammen@kirkland.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DERRIK MAGNUSON**                  represented by   **Nathan Scott Mammen**
*and*                                                 (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEORGE HOLLOWAY**                  represented by   **Nathan Scott Mammen**
*for Themselves and as Representatives of*            (See above for address)
*a Class of Similarly Situated Persons*               *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**                              represented by   **Douglas Glenn Edelschick**
U.S. Department of Justice − Civil
Division (G)
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353−9303
Fax: (202) 353−7988
Email: douglas.edelschick@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Delisa Maria Sanchez**
U. S. Department of Justice − Civil Div.
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616−0337
Fax: (202) 305−7643
Email: delisa.sanchez@usdoj.gov
*TERMINATED: 08/17/2020*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/27/2018 | 1 | COMPLAINT against USA (HLS) (Filing fee $400, Receipt number 9998−4752347) (Copy Served Electronically on Department of Justice), filed by TONIA TIPPINS, DERRIK MAGNUSON, GEORGE HOLLOWAY. **Answer due by 8/27/2018.** (Attachments: # 1 Civil Cover Sheet)(ar) (Entered: 06/28/2018) |
| 06/27/2018 | 2 | NOTICE of Assignment to Senior Judge Loren A. Smith. (ar) (Entered: 06/28/2018) |
| 06/27/2018 | 3 | NOTICE of Designation of Electronic Case. (ar) (Entered: 06/28/2018) |
| 08/06/2018 | 4 | NOTICE of Appearance by Delisa Maria Sanchez for USA . (Sanchez, Delisa) (Entered: 08/06/2018) |
| 08/20/2018 | 5 | Unopposed MOTION for Extension of Time until 10/26/2018 to File Answer re 1 Complaint, , filed by USA.**Response due by 9/4/2018.**(Sanchez, Delisa) (Entered: 08/20/2018) |
| 08/20/2018 | 6 | ORDER granting 5 Motion for Extension of Time to Answer. **Answer due by 10/26/2018.** Signed by Senior Judge Loren A. Smith. (mr) Service on parties made. (Entered: 08/20/2018) |
| 10/26/2018 | 7 | ANSWER to 1 Complaint, , filed by USA.**JPSR due by 12/14/2018.**(Sanchez, Delisa) (Entered: 10/26/2018) |
| 11/16/2018 | 8 | AMENDED COMPLAINT against USA, filed by All Plaintiffs. , filed by All Plaintiffs.Answer due by 11/30/2018. (Attachments: # 1 Certificate of Service)(Mammen, Nathan) (Entered: 11/16/2018) |
| 11/30/2018 | 9 | ANSWER to Amended Complaint , filed by USA.JPSR due by 1/18/2019. (Sanchez, Delisa) (Entered: 11/30/2018) |
| 01/15/2019 | 10 | Unopposed MOTION to Stay Proceedings *in Light of Lapse of Appropriations*, filed by USA.**Response due by 1/29/2019.**(Sanchez, Delisa) (Entered: 01/15/2019) |
| 01/15/2019 | 11 | ORDER granting 10 Motion to Stay. **Joint Status Report due twenty−one (21) days after restoration of funding to the Department of Justice.** Signed by Senior Judge Loren A. Smith. (dp) Service on parties made. (Entered: 01/15/2019) |
| 02/13/2019 | 12 | Unopposed MOTION for Extension of Time until March 1, 2019 to to file JPSR , filed by USA.**Response due by 2/27/2019.**(Sanchez, Delisa) (Entered: 02/13/2019) |
| 02/14/2019 | 13 | ORDER granting 12 Motion for Extension of Time. **JPSR due by 3/1/2019.** Signed by Senior Judge Loren A. Smith. (dp) Service on parties made. (Entered: 02/14/2019) |
| 03/01/2019 | 14 | JOINT PRELIMINARY STATUS REPORT . (Mammen, Nathan) (Entered: 03/01/2019) |
| 03/07/2019 | | STATUS CONFERENCE ORDER:  **Status Conference set for 3/19/2019 at 02:00 PM in Chambers (Telephonic) before Senior Judge Loren A. Smith.** Signed by Senior Judge Loren A. Smith. (dp) Service on parties made. (Entered: 03/07/2019) |
| 03/11/2019 | 15 | NOTICE of Change of Address by Nathan Scott Mammen (Mammen, Nathan) (Entered: 03/11/2019) |
| 03/19/2019 | | Minute Entry − Was the proceeding sealed to the public? No. Proceeding held in Washington, D.C. on 3/19/2019 before Senior Judge Loren A. Smith: Status Conference. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). To order a certified transcript or an audio recording of the proceeding, click HERE. (dp) (Entered: 03/19/2019) |
| 03/19/2019 | 16 | SCHEDULING ORDER: **Plaintiffs' Motion due by 5/1/2019. Defendant's Response due by 6/3/2019. Plaintiffs' Reply due by 6/10/2019. Oral Argument set for 6/25/2019 at 03:00 PM in National Courts Building before Senior Judge Loren A. Smith.** Signed by Senior Judge Loren A. Smith. (dp) Service on parties made. (Entered: 03/19/2019) |
| 04/22/2019 | 17 | Unopposed MOTION for Leave to File Adminsitrative Record On CD−ROM , filed by USA.**Response due by 5/6/2019.**(Sanchez, Delisa) (Entered: 04/22/2019) |

| 04/24/2019 | 18 | ORDER granting 17 Motion for Leave to File Administrative Record on CD−ROM. Signed by Senior Judge Loren A. Smith. (dp) Service on parties made. (Entered: 04/24/2019) |
| 04/25/2019 | | ADMINISTRATIVE RECORD filed on CD and placed in file, filed by USA. **[No documents uploaded]**. Service: 4/25/2019.(ew) (Entered: 04/26/2019) |
| 05/01/2019 | 19 | MEMORANDUM re: 14 Joint Preliminary Status Report, 16 Scheduling Order,, filed by All Plaintiffs. (Attachments: # 1 Exhibit A)(Mammen, Nathan) (Entered: 05/01/2019) |
| 06/03/2019 | 20 | RESPONSE to 19 Memorandum *DEFENDANTS OPPOSITION TO PLAINTIFFSS MOTION FOR DE NOVO REVIEW AND SUPPLEMENTATION OF THE ADMINISTRATIVE RECORD THROUGH DISCOVERY*, filed by USA. (Sanchez, Delisa) (Entered: 06/03/2019) |
| 06/10/2019 | 21 | RESPONSE to 19 Memorandum *Reply In Support of Adopting Plaintiffs' Proposed Schedule as Outlined in the Joint Preliminary Status Report*, filed by All Plaintiffs. (Attachments: # 1 Appendix A)(Mammen, Nathan) (Entered: 06/10/2019) |
| 06/18/2019 | | ORDER Cancelling Deadline/Hearing: <span style="color:red">Oral Argument on 6/25/2019 at 03:00 PM.</span> ORDER Setting Oral Argument/Hearing on Motion: <span style="color:red">Oral Argument set for 6/27/2019 at 03:00 PM in National Courts Building before Senior Judge Loren A. Smith.</span>  Signed by Senior Judge Loren A. Smith. (dp) Service on parties made. (Entered: 06/18/2019) |
| 06/25/2019 | | **IMPORTANT NOTICE:** On ***Monday, August 26, 2019***, the United States Court of Federal Claims will upgrade its current CM/ECF system to the Next Generation of CM/ECF (NextGen). Complete information regarding the NextGen implementation can be found on the court's website at http://www.uscfc.uscourts.gov. Currently, many attorneys within a firm may share a single PACER account, but once NextGen is imple mented e−filing attorneys will no longer be able to use shared PACER accounts. To access the upgraded system, each e−filing attorney must have an individual upgraded PACER account. Preparing for NextGen CM/ECF is a two−step process. Step one is to upgrade your PACER account, and step two is to link your upgraded PACER account to your current CM/ECF filing account. This notice only addresses the first step because the second step can't be completed until on or after August 26, 2019. The first step is to check and see if your PACER account is an "Upgraded" PACER account. Many PACER accounts have already been upgraded. If either of the following statements is true, you have an upgraded PACER account and no action is required until on or after August 26, 2019: 1) you currently e−file in another NextGen court or 2) your PACER account was created after August 10, 2014. If neither of these statements is true, you must upgrade your PACER account. Additional notices will be sent at a later date on how to handle the second step in this process. If you still have questions please contact the PACER Service Center at 800−676−6856 or the Clerk's Office CM/ECF Help Desk at (202)357−6402.. (dh) (ADI) (Entered: 06/25/2019) |
| 06/28/2019 | | Minute Entry − Was the proceeding sealed to the public? No. Proceeding held in Washington, D.C. on 6/27/2019 before Senior Judge Loren A. Smith: Oral Argument. [Total number of days of proceeding: 1]. Official Record of proceeding taken via electronic digital recording (EDR). To order a certified transcript or an audio recording of the proceeding, click HERE. (dp) (Entered: 06/28/2019) |
| 07/02/2019 | 22 | ORDER granting 19 Memorandum filed by DERRIK MAGNUSON, TONIA TIPPINS, GEORGE HOLLOWAY. The parties shall proceed to Motions for Summary Judgment following the Court's ruling on plaintiffs' Motion to Compel. SCHEDULING ORDER: <span style="color:red">**Plaintiffs' Motion to Compel due by 8/1/2019. Defendant's Response due by 9/3/2019. Plaintiffs' Reply due by 9/17/2019.**</span> Signed by Senior Judge Loren A. Smith. (dp) Service on parties made. (Entered: 07/02/2019) |
| 07/18/2019 | 23 | Notice of Filing of Certified Transcript for proceedings held on June 27, 2019 in Washington, D.C. (ew) (Entered: 07/18/2019) |
| 07/18/2019 | 24 | TRANSCRIPT of proceedings held on June 27, 2019 before Senior Judge Loren A. Smith. Total No. of Pages: 1−30. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 7/25/2019. Redacted Transcript Deadline set for 8/15/2019. Release of Transcript Restriction set for 10/15/2019. (ew) (Entered: 07/18/2019) |

| 07/20/2019 | | **IMPORTANT NOTICE:** On *August 26, 2019*, the United States Court of Federal Claims will upgrade its current CM/ECF system to the Next Generation of CM/ECF (NextGen). Complete information regarding the NextGen implementation can be found on the court's website at http://www.uscfc.uscourts.gov. Preparing for NextGen is a two−step process. Step one is to upgrade your PACER account. If you have not yet re gistered for an individual PACER account or upgraded your existing PACER account, please do so immediately. Step two is to link your upgraded PACER account to your current CM/ECF filing account. Step two cannot be completed until on or after *August 26, 2019*. To link your upgraded PACER account *on or after August 26, 2019*, you must know your current CM/ECF login and password. Do not rely on your login and password to be saved in your web browser, because that method will not work with the NextGen upgrade. If you do not know your login and/or password or have any additional questions, please call the court's Clerks Office CM/ECF Help Desk at (202) 357−6402. (dh) (ADI) (Entered: 07/20/2019) |
|---|---|---|
| 07/24/2019 | <u>25</u> | Unopposed MOTION for Extension of Time until August 15, 2019 to To File Motion to Compel , filed by All Plaintiffs.**Response due by 8/7/2019.**(Mammen, Nathan) (Entered: 07/24/2019) |
| 07/25/2019 | <u>26</u> | ORDER granting <u>25</u> Motion for Extension of Time. **Plaintiffs' Motion to Compel due by 8/15/2019. Defendant's Response due by 9/17/2019. Plaintiffs' Reply due by 10/1/2019.** Signed by Senior Judge Loren A. Smith. (dp) Service on parties made. (Entered: 07/25/2019) |
| 08/15/2019 | <u>27</u> | Unopposed MOTION for Extension of Time until October 18, 2019 to To File Motion to Compel , filed by All Plaintiffs.**Response due by 8/29/2019.**(Mammen, Nathan) (Entered: 08/15/2019) |
| 08/15/2019 | <u>28</u> | ORDER granting <u>27</u> Motion for Extension of Time. **Motion to Compel due by 10/18/2019. Response due by 11/18/2019. Reply due by 12/2/2019.** Signed by Senior Judge Loren A. Smith. (sm) Service on parties made. (Entered: 08/15/2019) |
| 08/16/2019 | | *IMPORTANT NOTICE:* On *August 26, 2019*, the United States Court of Federal Claims will upgrade its current CM/ECF system to the Next Generation of CM/ECF (NextGen). Complete information regarding the NextGen implementation can be found on the court's website at http://uscfc.uscourts.gov. *Please note that the court's CM/ECF system will be unavailable from 12:00 p.m. ( EDT) on Friday, August 23, 2019, until 6:00 a.m. (EDT) on Monday, August 26, 2019.* Although the Clerk's Office will be open on August 23, 2019, it will be deemed inaccessible under Rule 6 of the Rules of the United States Court of Federal Claims for purposes of calculating deadlines. Preparing for NextGen is a two−step process. Step one is to upgrade your PACER account. You should have your individual upgraded PACER account at this time. Step two is to link your upgraded PACER account to your current CM/ECF filing account*on or after August 26, 2019*. Instructions for linking your account can be found on the court's website at http://uscfc. uscourts.gov. To link your accounts, you *MUST* know your CM/ECF login and password−−−do not rely on your browser to remember your login credentials. If you are unsure of your CM/ECF login and/or password, contact the Clerk's Office CM/ECF Help Desk *immediately* at (202) 357−6402. You may also call the Help Desk with any other questions.. (dh) (ADI) (Entered: 08/16/2019) |
| 10/17/2019 | <u>29</u> | Unopposed MOTION for Extension of Time until December 18, 2019 to To File Motion to Compel , filed by All Plaintiffs.**Response due by 10/31/2019.**(Mammen, Nathan) (Entered: 10/17/2019) |
| 10/21/2019 | <u>30</u> | ORDER granting <u>29</u> Motion for Extension of Time. **Motion to Compel due by 12/18/2019. Response due by 1/21/2020. Reply due by 2/3/2020.** Signed by Senior Judge Loren A. Smith. (sm) Service on parties made. (ew) (Entered: 10/21/2019) |
| 10/23/2019 | <u>31</u> | Joint MOTION for Protective Order , filed by USA.**Response due by 11/6/2019.** (Attachments: # <u>1</u> Text of Proposed Order)(Sanchez, Delisa) (Entered: 10/23/2019) |
| 10/29/2019 | <u>32</u> | ORDER granting <u>31</u> Motion for Protective Order.  Signed by Senior Judge Loren A. Smith. (sm) Service on parties made. (Entered: 10/29/2019) |
| 12/03/2019 | <u>33</u> | ORDER REASSIGNING CASE to Judge David A. Tapp. Signed by Chief Judge Margaret M. Sweeney. (ar) Service on parties made. (Entered: 12/03/2019) |

| | | |
|---|---|---|
| 12/03/2019 | 34 | NOTICE of Reassignment. Case reassigned to Judge David A. Tapp for all further proceedings. Senior Judge Loren A. Smith no longer assigned to the case. (ar) (Entered: 12/03/2019) |
| 12/18/2019 | 35 | Unopposed MOTION for Extension of Time until 2/14/2020 to To File Motion to Compel , filed by All Plaintiffs.**Response due by 1/2/2020.**(Mammen, Nathan) (Entered: 12/18/2019) |
| 12/18/2019 | 36 | ORDER Granting 35 Motion for Extension of Time **Motion to Compel due by 2/14/2020. Response due by 3/16/2020. Reply due by 3/30/2020.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 12/18/2019) |
| 02/11/2020 | 37 | Unopposed MOTION for Extension of Time until 3/16/2020 to To File Motion to Compel , filed by All Plaintiffs.**Response due by 2/25/2020.**(Mammen, Nathan) (Entered: 02/11/2020) |
| 02/12/2020 | 38 | ORDER Granting 37 Motion for Extension of Time **Motion to Compel due by 3/16/2020; Response due 4/15/2020; Reply due 4/29/2020.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 02/12/2020) |
| 03/16/2020 | 39 | MOTION to Compel *Defendant's 30(b)(6) Deposition*, filed by All Plaintiffs.**Response due by 3/30/2020.** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Mammen, Nathan) (Entered: 03/16/2020) |
| 04/14/2020 | 40 | Unopposed MOTION for Extension of Time until 04/29/2020 to File Response as to 39 MOTION to Compel *Defendant's 30(b)(6) Deposition* , filed by USA.**Response due by 4/28/2020.**(Sanchez, Delisa) (Entered: 04/14/2020) |
| 04/15/2020 | 41 | ORDER Granting 40 Motion for Extension of Time to File Response re 39 MOTION to Compel *Defendant's 30(b)(6) Deposition*, 40 Unopposed MOTION for Extension of Time until 04/29/2020 to File Response as to 39 MOTION to Compel *Defendant's 30(b)(6) Deposition* **Response due by 4/29/2020. Reply due by 5/13/2020.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 04/15/2020) |
| 04/28/2020 | 42 | Unopposed MOTION for Extension of Time until 05/08/2020 to File Response *to Plaintiffs' Motion to Compel*, filed by USA.**Response due by 5/12/2020.**(Sanchez, Delisa) (Entered: 04/28/2020) |
| 04/29/2020 | 43 | ORDER Granting 42 Motion for Extension of Time to File Response re 39 MOTION to Compel *Defendant's 30(b)(6) Deposition*, 42 Unopposed MOTION for Extension of Time until 05/08/2020 to File Response *to Plaintiffs' Motion to Compel* **Response due by 5/8/2020. Reply due by 5/22/2020.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 04/29/2020) |
| 05/08/2020 | 44 | MOTION for Extension of Time until 05/18/2020 to File Response as to 39 MOTION to Compel *Defendant's 30(b)(6) Deposition* , filed by USA.**Response due by 5/22/2020.**(Sanchez, Delisa) (Entered: 05/08/2020) |
| 05/11/2020 | 45 | ORDER granting 44 Motion for Extension of Time to File Response re 39 MOTION to Compel *Defendant's 30(b)(6) Deposition*, 44 MOTION for Extension of Time until 05/18/2020 to File Response as to 39 MOTION to Compel *Defendant's 30(b)(6) Deposition* **Response due by 5/18/2020. Reply due by 6/1/2020.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 05/11/2020) |
| 05/18/2020 | 46 | **SEALED** MOTION for Protective Order *and Response to Plaintiffs' Motion To Compel Defendant's 30(b)(6)*, filed by USA.**Response due by 6/1/2020.** (Attachments: # 1 Appendix)(Sanchez, Delisa) (Entered: 05/18/2020) |
| 05/26/2020 | 47 | REDACTED DOCUMENT redacting 46 Motion for Protective Order, filed by USA. (Attachments: # 1 Appendix)(Sanchez, Delisa) (Entered: 05/26/2020) |
| 05/27/2020 | 48 | Unopposed MOTION for Extension of Time until 6/15/2020 to File Reply as to 39 MOTION to Compel *Defendant's 30(b)(6) Deposition* , filed by All Plaintiffs.**Response due by 6/10/2020.**(Mammen, Nathan) (Entered: 05/27/2020) |
| 05/28/2020 | 49 | ORDER Granting 48 Motion for Extension of Time to File Reply. **Plaintiff's unopposed motion for extension of time is granted. Plaintiff's Reply due by 6/15/2020.** Judge David A. Tapp. (jm) Service on parties made. (Entered: 05/28/2020) |

| | | |
|---|---|---|
| 06/15/2020 | 50 | REPLY to Response to Motion re 39 MOTION to Compel *Defendant's 30(b)(6) Deposition* , filed by All Plaintiffs. (Mammen, Nathan) (Entered: 06/15/2020) |
| 07/07/2020 | 51 | ORDER Setting Oral Argument/Hearing on Motion 39 MOTION to Compel *Defendant's 30(b)(6) Deposition*, 46 MOTION for Protective Order *and Response to Plaintiffs' Motion To Compel Defendant's 30(b)(6)* : **Motion Hearing set for 8/6/2020 11:00 AM in Chambers (Telephonic) before Judge David A. Tapp.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 07/07/2020) |
| 08/06/2020 | | Minute Entry − Was the proceeding sealed to the public? N. Proceeding held in Washington, D.C. 8/6/2020 before Judge David A. Tapp: Oral Argument. [Total number of days of proceeding: 1]. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE.(jm) (Entered: 08/06/2020) |
| 08/10/2020 | 52 | REPORTED ORDER Deferring ruling on 39 Motion to Compel; Denying 46 Motion for Protective Order;  **The parties are ORDERED to meet and confer by 8/24/2020, Status Report due by 8/27/2020.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 08/10/2020) |
| 08/17/2020 | 53 | NOTICE of Appearance by Douglas Glenn Edelschick for USA *Substituting for Delisa M. Sanchez*. (Edelschick, Douglas) (Entered: 08/17/2020) |
| 08/25/2020 | 54 | Notice of Filing of Certified Transcript for proceedings held on August 6, 2020 in Washington, D.C. (ew) (Entered: 08/25/2020) |
| 08/25/2020 | 55 | TRANSCRIPT of proceedings held on August 6, 2020 before Judge David A. Tapp. Total No. of Pages: 1−26. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 9/1/2020. Redacted Transcript Deadline set for 9/22/2020. Release of Transcript Restriction set for 11/20/2020. (ew) (Entered: 08/25/2020) |
| 08/27/2020 | 56 | JOINT STATUS REPORT , filed by All Plaintiffs. (Mammen, Nathan) (Entered: 08/27/2020) |
| 08/27/2020 | 57 | SCHEDULING ORDER:  **Discovery due by 10/16/2020. Status Report due by 10/23/2020. Dispositive Motion(s) due by 11/16/2020. Cross Motions due by 12/16/2020. Response due by 1/6/2021. Reply due by 1/27/2021.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 08/27/2020) |
| 08/31/2020 | 58 | ADMINISTRATIVE RECORD *(Resubmission Of April 25, 2019 Filing On Disk)*, filed by USA. (Attachments: # 1 AR Certification, # 2 AR Index, # 3 AR)(Edelschick, Douglas) (Entered: 08/31/2020) |
| 10/21/2020 | 59 | JOINT STATUS REPORT , filed by USA. (Edelschick, Douglas) (Entered: 10/21/2020) |
| 10/22/2020 | | ORDER Denying 39 Motion to Compel as moot. **By agreement of the parties, (see ECF No. 59 ), the Court DENIES ECF No. 39 AS MOOT.** Judge David A. Tapp. (jm) Service on parties made. (Entered: 10/22/2020) |
| 11/12/2020 | 60 | Unopposed MOTION for Extension of Time to *File Motion for Summary Judgment*, filed by All Plaintiffs.**Response due by 11/30/2020.**(Mammen, Nathan) (Entered: 11/12/2020) |
| 11/13/2020 | 61 | ORDER Granting 60 Motion for Extension of Time **Plaintiffs' Dispositive Motion(s) due by 11/23/2020. Def.'s Cross Motion and Resp. due by 12/23/2020. Plaintiffs' Reply and Resp. due 1/13/2021. Def.'s Reply due 2/3/2021.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 11/13/2020) |
| 11/23/2020 | 62 | MOTION for Summary Judgment , filed by All Plaintiffs.**Response due by 12/21/2020.** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14)(Mammen, Nathan) (Entered: 11/23/2020) |
| 12/10/2020 | 63 | Consent MOTION to Amend Schedule re: 61 Order on Motion for Extension of Time to File,, filed by USA.**Response due by 12/24/2020.**(Edelschick, Douglas) (Entered: 12/10/2020) |

| 12/10/2020 | 64 | ORDER Granting 63 Motion to Amend Schedule. **Def.'s Cross Motion and Resp. due by 1/22/2021. Plaintiffs' Reply and Resp. due 2/12/2021. Def.'s Reply due 3/5/2021.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 12/10/2020) |
| --- | --- | --- |
| 01/15/2021 | 65 | Unopposed MOTION to Amend Schedule re: 64 Order on Motion to Amend Schedule,, filed by USA.**Response due by 1/29/2021.**(Edelschick, Douglas) (Entered: 01/15/2021) |
| 01/15/2021 | 66 | ORDER Granting 65 Motion to Amend Schedule. **Defendant's Response and Cross Motion due by 1/29/2021. Plaintiffs' Reply and Response due 2/19/2021. Defendant's Reply due 3/12/2021.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 01/15/2021) |
| 01/29/2021 | 67 | CROSS MOTION and RESPONSE to 62 Motion for Summary Judgment, filed by DERRIK MAGNUSON, TONIA TIPPINS, GEORGE HOLLOWAY, filed by USA.**Response due by 2/26/2021.** (Attachments: # 1 Appendix)(Edelschick, Douglas) (Entered: 01/29/2021) |
| 02/09/2021 | 68 | Unopposed MOTION for Extension of Time until 03/19/2021 to File Reply as to 62 MOTION for Summary Judgment *and Response to Defendant's Motion for Summary Judgment*, filed by All Plaintiffs.**Response due by 2/23/2021.**(Mammen, Nathan) (Entered: 02/09/2021) |
| 02/10/2021 | | SCHEDULING ORDER: **(Plaintiffs' Reply and Response due 3/19/2021. Defendant's Reply due 4/9/2021)**; Granting 68 Motion for Extension of Time to File Reply re 68 Unopposed MOTION for Extension of Time until 03/19/2021 to File Reply as to 62 MOTION for Summary Judgment *and Response to Defendant's Motion for Summary Judgment*, 67 CROSS MOTION and RESPONSE to 62 Motion for Summary Judgment, filed by DERRIK MAGNUSON, TONIA TIPPINS, GEORGE HOLLOWAY. Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 02/10/2021) |
| 03/19/2021 | 69 | REPLY to Response to Motion re 62 MOTION for Summary Judgment , filed by All Plaintiffs. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Mammen, Nathan) (Entered: 03/19/2021) |
| 04/09/2021 | 70 | REPLY to Response to Motion re 67 CROSS MOTION and RESPONSE to 62 Motion for Summary Judgment, filed by DERRIK MAGNUSON, TONIA TIPPINS, GEORGE HOLLOWAY , filed by USA. (Edelschick, Douglas) (Entered: 04/09/2021) |
| 04/09/2021 | 71 | REPLY to Response to Motion re 67 CROSS MOTION and RESPONSE to 62 Motion for Summary Judgment, filed by DERRIK MAGNUSON, TONIA TIPPINS, GEORGE HOLLOWAY *(with Corrected Title on Cover Page)*, filed by USA. (Edelschick, Douglas) (Entered: 04/09/2021) |
| 05/17/2021 | | ORDER Setting Oral Argument on 62 MOTION for Summary Judgment , 67 CROSS MOTION and RESPONSE to 62 Motion for Summary Judgment, filed by DERRIK MAGNUSON, TONIA TIPPINS, GEORGE HOLLOWAY; **Oral Argument set for 5/25/2021 10:00 AM via Video Conference − Zoom before Judge David A. Tapp.** Judge David A. Tapp. (jm) Service on parties made. (Entered: 05/17/2021) |
| 05/24/2021 | 72 | ORDER Setting Oral Argument on 62 MOTION for Summary Judgment, and 67 CROSS MOTION and RESPONSE. **Oral Argument set for 6/15/2021 at 10:00 AM (ET) in National Courts Building, Courtroom 4 before Judge David A. Tapp.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 05/24/2021) |
| 06/10/2021 | | NOTICE: **Live audio of this proceeding will be available to the public through AT&T teleconference services. The dial−in information is as follows. Toll−Free Number: (877) 402−9753; Access Code: 2405338.** (jm) Service on parties made. (Entered: 06/10/2021) |
| 06/15/2021 | | Minute Entry − Was the proceeding sealed to the public? n. Proceeding held in Washington, D.C. 6/15/2021 before Judge David A. Tapp: Oral Argument. [Total number of days of proceeding: 1] Approximate duration of proceeding: 1 hour and 30 minutes. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE.(jm) (Entered: 06/15/2021) |

| | | |
|---|---|---|
| 06/25/2021 | 73 | Notice of Filing of Certified Transcript for proceedings held on June 15, 2021 in Washington, D.C. (ew) (Entered: 06/25/2021) |
| 06/25/2021 | 74 | TRANSCRIPT of proceedings held on June 15, 2021 before Judge David A. Tapp. Total No. of Pages: 1−61. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 7/2/2021. Redacted Transcript Deadline set for 7/23/2021. Release of Transcript Restriction set for 9/20/2021. (ew) (Entered: 06/25/2021) |
| 07/06/2021 | 75 | REPORTED Memorandum OPINION and ORDER Granting 62 Motion for Summary Judgment; Denying 67 Cross Motion. **Status Report due by 7/20/2021.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Main Document 75 replaced on 7/13/2021 and docket text edited to remove directive to enter judgment.) (dls). (Entered: 07/06/2021) |
| 07/20/2021 | 76 | JOINT STATUS REPORT , filed by GEORGE HOLLOWAY, DERRIK MAGNUSON, TONIA TIPPINS. (Mammen, Nathan) (Entered: 07/20/2021) |
| 07/23/2021 | | STATUS CONFERENCE ORDER: **Status Conference set for 7/29/2021 at 11:00 AM in Chambers (Telephonic) before Judge David A. Tapp. The parties will be provided with dial−in information via email.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 07/23/2021) |
| 07/29/2021 | | Minute Entry − Was the proceeding sealed to the public? N. Proceeding held in Washington, D.C. 7/29/2021 before Judge David A. Tapp: Status Conference. [Total number of days of proceeding: 1] Approximate duration of proceeding: 30 minutes. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE.(jm) (Entered: 07/29/2021) |
| 07/29/2021 | 77 | MOTIONS SCHEDULING ORDER: **The United States' Motion to Reconsider is due by 8/27/2021. Response due by 10/1/2021. Reply due by 10/15/2021.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 07/29/2021) |
| 07/30/2021 | 78 | Notice of Filing of Certified Transcript for proceedings held on March 19, 2019 in Washington, D.C. (ew) (Entered: 07/30/2021) |
| 07/30/2021 | 79 | TRANSCRIPT of proceedings held on March 19, 2019 before Judge Loren A. Smith. Total No. of Pages: 1−15. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 8/6/2021. Redacted Transcript Deadline set for 8/27/2021. Release of Transcript Restriction set for 10/25/2021. (ew) (Entered: 07/30/2021) |
| 08/12/2021 | 80 | Notice of Filing of Certified Transcript for proceedings held on July 29, 2021 in Washington, D.C. (ew) (Entered: 08/12/2021) |
| 08/12/2021 | 81 | TRANSCRIPT of proceedings held on July 29, 2021 before Judge David A. Tapp. Total No. of Pages: 1−15. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 8/19/2021. Redacted Transcript Deadline set for 9/9/2021. Release of Transcript Restriction set for 11/8/2021. (ew) (Entered: 08/12/2021) |
| 08/16/2021 | 82 | Unopposed MOTION for Extension of Time until 09/03/2021 to file motion for reconsideration , filed by USA.**Response due by 8/30/2021.**(Schroeder, Richard) (Entered: 08/16/2021) |
| 08/16/2021 | | ORDER Granting 82 Motion for Extension of Time. **The United States' Motion to Reconsider is due by 9/3/2021. Response due by 10/1/2021. Reply due by 10/15/2021.** Judge David A. Tapp. (jm) Service on parties made. (Entered: 08/16/2021) |
| 09/03/2021 | 83 | JOINT STATUS REPORT , filed by GEORGE HOLLOWAY, DERRIK MAGNUSON, TONIA TIPPINS. (Mammen, Nathan) (Entered: 09/03/2021) |
| 09/03/2021 | 84 | MOTION for Reconsideration re 75 Order on Motion for Summary Judgment,, Order on Cross Motion [Dispositive],, Reported Opinion, , filed by USA. (Attachments: # 1 Appendix)(Edelschick, Douglas) (Entered: 09/03/2021) |
| 10/01/2021 | 85 | RESPONSE to 84 MOTION for Reconsideration re 75 Order on Motion for Summary Judgment,, Order on Cross Motion [Dispositive],, Reported Opinion, , filed by All |

| | | Plaintiffs.**Reply due by 10/8/2021.** (Mammen, Nathan) (Entered: 10/01/2021) |
|---|---|---|
| 10/13/2021 | 86 | Consent MOTION for Extension of Time to File Reply *in Support of Motion for Reconsideration*, filed by USA.**Response due by 10/27/2021.**(Edelschick, Douglas) (Entered: 10/13/2021) |
| 10/13/2021 | | ORDER Granting 86 Motion for Extension of Time to File Reply re 84 MOTION for Reconsideration re 75 Order on Motion for Summary Judgment. **Reply due by 10/22/2021.** Judge David A. Tapp. (jm) Service on parties made. (Entered: 10/13/2021) |
| 10/22/2021 | 87 | REPLY to Response to Motion re 84 MOTION for Reconsideration re 75 Order on Motion for Summary Judgment,, Order on Cross Motion [Dispositive],, Reported Opinion, , filed by USA. (Attachments: # 1 Appendix)(Edelschick, Douglas) (Entered: 10/22/2021) |
| 10/28/2021 | | ORDER Setting Oral Argument/Hearing on Motion 84 MOTION for Reconsideration. **Motion Hearing set for 11/8/2021 at 11:00 AM in the National Courts Building before Judge David A. Tapp. Courtroom information will be posted in the lobby and on the Court's website on the morning of the hearing.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 10/28/2021) |
| 11/03/2021 | | NOTICE:  **Live audio of the November 8, 2021 Status Conference will be available to the public through AT&T teleconference services. The dial−in information is as follows: Toll−Free Number (877) 402−9753; Access Code 2405338.** Judge David A. Tapp. (jm) Service on parties made. (Entered: 11/03/2021) |
| 11/08/2021 | | Minute Entry − Was the proceeding sealed to the public? No. Proceeding held in Washington DC 11/8/2021 before Judge David A. Tapp: Hearing. [Total number of days of proceeding: 1] Approximate duration of proceeding: 1 hour and 30 minutes. Official record of proceeding taken by court reporter. To order a certified transcript or an audio recording of the proceeding, click HERE. (emc) (Entered: 11/08/2021) |
| 11/22/2021 | 88 | Notice of Filing of Certified Transcript for proceedings held on November 8, 2021 in Washington, D.C. (ew) (Entered: 11/22/2021) |
| 11/22/2021 | 89 | TRANSCRIPT of proceedings held on November 8, 2021 before Judge David A. Tapp. Total No. of Pages: 1−59. Procedures Re: Electronic Transcripts and Redactions. To order a copy of the transcript, click HERE. Notice of Intent to Redact due 11/29/2021. Redacted Transcript Deadline set for 12/20/2021. Release of Transcript Restriction set for 2/17/2022. (ew) (Entered: 11/22/2021) |
| 11/22/2021 | 90 | **DUPLICATE ENRTY**~~Notice of Filing of Certified Transcript for proceedings held on November 3, 2021 in Washington, D.C.~~ . (ew) Modified on 11/22/2021 (ew). (Entered: 11/22/2021) |
| 12/08/2021 | 91 | REPORTED OPINION Denying 84 Motion for Reconsideration.  The Clerk is directed to enter judgment in favor of the six plaintiffs named in this Opinion. This case shall remain open to allow for further collective action proceedings. **Joint Status Report due by 1/24/2022.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 12/08/2021) |
| 12/09/2021 | 92 | RULE 54(b) JUDGMENT entered, pursuant to Rule 58, that the United States Coast Guard shall expeditiously correct the military records of Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner. The Coast Guard shall also award any back pay, allowances, or other benefits to which the named plaintiffs are entitled by law as a result of the corrections. (Service on parties made.) (dls) (Entered: 12/09/2021) |
| 01/24/2022 | 93 | JOINT STATUS REPORT , filed by GEORGE HOLLOWAY, DERRIK MAGNUSON, TONIA TIPPINS. (Mammen, Nathan) (Entered: 01/24/2022) |
| 01/25/2022 | 94 | STATUS REPORT ORDER.  **Status Report due by 2/24/2022.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 01/25/2022) |
| 02/04/2022 | 95 | NOTICE OF APPEAL as to 92 Judgment, 75 Order on Motion for Summary Judgment,, Order on Cross Motion [Dispositive],, Reported Opinion, 91 Order on Motion for Reconsideration,, Reported Opinion,, filed by USA. Filing fee $ 505. Copy |

| | | to CAFC. (Edelschick, Douglas) (Entered: 02/04/2022) |
|---|---|---|
| 02/04/2022 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 95 Notice of Appeal. (ac7) (Entered: 02/04/2022) |
| 02/10/2022 | | CAFC Case Number 2022−1462 for 95 Notice of Appeal, filed by USA. (ac7) (Entered: 02/10/2022) |
| 02/24/2022 | 96 | JOINT STATUS REPORT , filed by GEORGE HOLLOWAY, DERRIK MAGNUSON, TONIA TIPPINS. (Mammen, Nathan) (Entered: 02/24/2022) |
| 03/08/2022 | 97 | Unopposed MOTION to Amend/Correct 32 Order on Motion for Protective Order , filed by All Plaintiffs.**Response due by 3/22/2022.** (Attachments: # 1 Exhibit A)(Mammen, Nathan) (Entered: 03/08/2022) |
| 03/08/2022 | 98 | ORDER Granting 97 Motion to Amend/Correct.  Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 03/08/2022) |
| 03/08/2022 | 99 | AMENDMENT TO PROTECTIVE ORDER. Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 03/08/2022) |
| 03/08/2022 | 100 | Unopposed MOTION to Certify Class , Unopposed MOTION to Appoint Counsel − Class Counsel, filed by All Plaintiffs.**Response due by 3/22/2022.** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Mammen, Nathan) (Entered: 03/08/2022) |
| 03/10/2022 | | **STATUS CONFERENCE ORDER: Status Conference set for 3/14/2022 at 11:00 AM in Chambers (Telephonic) before Judge David A. Tapp. The Clerk's office will circulate dial−in information in advance of the conference.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 03/10/2022) |
| 03/14/2022 | | Minute Entry − Was the proceeding sealed to the public? N. If Yes, only parties to the case may order a copy of the transcript. Proceeding held in Washington, D.C. (AT&T) 3/14/2022 before Judge David A. Tapp: Status Conference. [Total number of days of proceeding: 1] Approximate duration of proceeding: 30 minutes. Official record of proceeding taken via electronic digital recording (EDR). To order a certified transcript or an audio recording of the proceeding, click HERE.(vds) (Entered: 03/14/2022) |
| 03/14/2022 | 101 | ORDER Granting 100 Motion to Certify Class; Granting 100 Motion to Appoint Nathan Mammen as Class Counsel.  Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 03/14/2022) |
| 03/15/2022 | 102 | ORDER Issuing Notice to Putative Class Members re 101 Order on Motion to Certify Class, Order on Motion to Appoint Counsel  Signed by Judge David A. Tapp. (Attachments: # 1 Appendix: Class Action Notice) (jm) Service on parties made. (Entered: 03/15/2022) |
| 06/22/2022 | 103 | Notice of Filing Opt−In Consent Form , filed by All Plaintiffs (Attachments: # 1 Exhibit A.1, # 2 Exhibit A.2, # 3 Exhibit A.3, # 4 Exhibit A.4)(Mammen, Nathan) (Entered: 06/22/2022) |
| 06/30/2022 | 104 | Unopposed MOTION for Extension of Time to Amend *Complaint*, filed by All Plaintiffs.**Response due by 7/14/2022.**(Mammen, Nathan) (Entered: 06/30/2022) |
| 06/30/2022 | | ORDER Granting 104 Motion for Extension of Time to Amend.  **On or before July 22, 2022, Plaintiffs must file an amended complaint on behalf of all plaintiffs who timely returned opt−in consent forms. On or before August 2, 2022, the parties shall file a status report apprising the Court whether these actions have been completed and proposing a schedule for further proceedings.** Signed by Judge David A. Tapp. (jm) Service on parties made. (Entered: 06/30/2022) |

(Aug. 4, 1949, ch. 393, 63 Stat. 521; Pub. L. 98–557, §15(a)(3)(A), Oct. 30, 1984, 98 Stat. 2865; Pub. L. 99–348, title II, §205(b)(8), July 1, 1986, 100 Stat. 700.)

HISTORICAL AND REVISION NOTES

Based on title 14, U.S.C., 1946 ed., §185a (May 24, 1939, ch. 146, §2, 53 Stat. 755).

Changes were made in phraseology. 81st Congress, House Report No. 557.

AMENDMENTS

1986—Pub. L. 99–348 struck out ", with retired pay of the grade or rating with which retired" after "active service".

1984—Pub. L. 98–557 substituted reference to enlisted member for reference to enlisted man.

## [§ 356. Repealed. Aug. 3, 1950, ch. 536, § 36, 64 Stat. 408]

Section, act Aug. 4, 1949, ch. 393, 63 Stat. 521, related to retirement for disabilities incident to service. See sections 1204 and 1376 of Title 10, Armed Forces.

## § 357. Involuntary retirement of enlisted members

(a) Enlisted Personnel Boards may be convened as the Commandant may prescribe to review the records of enlisted members who have twenty or more years of active military service.

(b) Enlisted members who have twenty or more years of active military service may be considered by the Commandant for involuntary retirement and may be retired on recommendation of a Board—

(1) because the member's performance is below the standards the Commandant prescribes; or

(2) because of professional dereliction.

(c) An enlisted member under review by the Board shall be—

(1) notified in writing of the reasons the member is being considered for involuntary retirement;

(2) allowed sixty days from the date on which counsel is provided under paragraph (3) to submit any matters in rebuttal;

(3) provided counsel, certified under section 827(b) of title 10, to help prepare the rebuttal submitted under paragraph (2) and to represent the member before the Board under paragraph (5);

(4) allowed full access to and be furnished with copies of records relevant to the consideration for involuntary retirement prior to submission of the rebuttal submitted under paragraph (2); and

(5) allowed to appear before the Board and present witnesses or other documentation related to the review.

(d) A Board convened under this section shall consist of at least three commissioned officers, at least one of whom shall be of the grade of commander or above.

(e) A Board convened under this section shall recommend to the Commandant enlisted members who—

(1) have twenty or more years of active service;

(2) have been considered for involuntary retirement; and

(3) it determines should be involuntarily retired.

(f) After the Board makes its determination, each enlisted member the Commandant considers for involuntary retirement shall be—

(1) notified by certified mail of the reasons the member is being considered for involuntary retirement;

(2) allowed sixty days from the date counsel is provided under paragraph (3) to submit any matters in rebuttal;

(3) provided counsel, certified under section 827(b) of title 10, to help prepare the rebuttal submitted under paragraph (2); and

(4) allowed full access to and be furnished with copies of records relevant to the consideration for involuntary retirement prior to submission of the rebuttal submitted under paragraph (2).

(g) If the Commandant approves the Board's recommendation, the enlisted member shall be notified of the Commandant's decision and shall be retired from the service within ninety days of the notification.

(h) An enlisted member, who has completed twenty years of service and who the Commandant has involuntarily retired under this section, shall receive retired pay.

(i) An enlisted member voluntarily or involuntarily retired after twenty years of service who was cited for extraordinary heroism in the line of duty shall be entitled to an increase in retired pay. The retired pay shall be increased by 10 percent of—

(1) the active-duty pay and permanent additions thereto of the grade or rating with which retired when the member's retired pay is computed under section 423(a) of this title; or

(2) the member's retired pay base under section 1407 of title 10, when a member's retired pay is computed under section 423(b) of this title.

(j) When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action.

(Aug. 4, 1949, ch. 393, 63 Stat. 521; Aug. 3, 1950, ch. 536, §17, 64 Stat. 407; Pub. L. 88–114, §1(1), Sept. 6, 1963, 77 Stat. 144; Pub. L. 98–557, §15(a)(3)(A), (B), Oct. 30, 1984, 98 Stat. 2865; Pub. L. 99–348, title II, §205(b)(9), July 1, 1986, 100 Stat. 700; Pub. L. 102–241, §6, Dec. 19, 1991, 105 Stat. 2210.)

HISTORICAL AND REVISION NOTES

Based on title 14, U.S.C., 1946 ed., §§185, 185d (May 24, 1939, ch. 146, §§1, 5, 53 Stat. 755).

Subsection (b) is new and implements the preceding subsection; it seems necessary in view of certain statutes enacted as the result of World War II.

Subsection (c) is based on title 14, U.S.C., 1946 ed., §185d (May 24, 1939, ch. 146, §5, 53 Stat. 756). Said section has been divided. The first sentence is incorporated in section 423 of this title. The second proviso is incorporated in section 424 of this title. The remainder is placed in this subsection.

Changes were made in phraseology. 81st Congress, House Report No. 557.

AMENDMENTS

1991—Pub. L. 102–241 substituted "Involuntary retirement of enlisted members" for "Enlisted Personnel

Board" in section catchline and amended text generally. Prior to amendment, text provided that the Commandant assemble annually a Coast Guard Enlisted Personnel Board to recommend enlisted members for retirement, that the recommendations be transmitted to the Commandant for approval, in which event the enlisted members concerned would be notified and given opportunity to file a written protest, which would require a subsequent annual Board determination and approval by the Commandant to effect the involuntary retirement of that member, and further provided that an enlisted member with twenty years' service retired from active duty by the Commandant pursuant to this section was to receive retired pay, and that an enlisted member voluntarily or involuntarily retired by reason of twenty years' service who had been cited for extraordinary heroism was entitled to an increase in retired pay.

1986—Subsec. (b). Pub. L. 99–348, § 205(b)(9)(A), substituted "retired pay" for "the retired pay of the grade or rating with which retired".

Subsec. (c). Pub. L. 99–348, § 205(b)(9)(B), substituted provision that retired pay be increased by an amount equal to 10 percent of the active-duty pay and permanent additions thereto of the grade or rating with which retired, in the case of a member whose retired pay is computed under 423(a) of this title, or the member's retired pay base under section 1407 of title 10, in the case of a member whose retired pay is computed under section 423(b) of this title for provision that the retired pay be increased by an amount equal to 10 per cent of the active-duty pay and permanent additions thereto of the grade or rating with which retired.

1984—Pub. L. 98–557, § 15(a)(3)(A), substituted reference to enlisted member for reference to enlisted man wherever appearing in subsecs. (a) to (c).

Subsec. (a). Pub. L. 98–557, § 15(a)(3)(B), substituted reference to enlisted members for reference to enlisted men in two places.

1963—Subsec. (c). Pub. L. 88–114 struck out provisions which entitled enlisted men whose average marks in conduct were not less than 97½ percent of the maximum to a 10-percent increase of their retired pay.

1950—Subsec. (c). Act Aug. 3, 1950, substituted "years'" for "years".

SERVICE CREDIT FOR CERTAIN ENLISTED PERSONNEL

Act June 3, 1948, ch. 394, 62 Stat. 302, provided: "That those enlisted men of the Coast Guard who, during 1940 and 1941, were discharged from the Coast Guard to accept employment as policemen and guards at the Ivigtut Cryolite Mine, Greenland, and who reenlisted in the Coast Guard within three months after the termination of their service as such policemen and guards, shall be credited with the time between discharge and reenlistment for purposes of longevity pay and retirement, but no increased retroactive pay shall accrue by reason of the enactment of this Act."

ENLISTED MEN IN SERVICE ON SEPTEMBER 6, 1963

Pub. L. 88–114, § 2, Sept. 6, 1963, 77 Stat. 144, provided that: "The amendment made by subsection (1) of section 1 of this Act [amending this section] does not apply to any enlisted man in service on the effective date of this Act [Sept. 6, 1963]."

## [§ 358. Repealed. Pub. L. 88–114, § 1(2), Sept. 6, 1963, 77 Stat. 144]

Section, act Aug. 4, 1949, ch. 393, § 1, 63 Stat. 522, limited number of retirements in a calendar year of enlisted men who had completed 20 years of service, to not more than the whole number nearest 1 percent of the total enlisted force on the active list, and any men so authorized to be retired annually who were not so retired, could be retired during any subsequent year providing the total retired in that year did not exceed 3 percent of the total enlisted force.

## § 359. Recall to active duty during war or national emergency

In times of war or national emergency, the Commandant may order any enlisted member on the retired list to active duty.

(Aug. 4, 1949, ch. 393, 63 Stat. 522; Aug. 3, 1950, ch. 536, § 18, 64 Stat. 407; Pub. L. 98–557, § 15(a)(3)(A), Oct. 30, 1984, 98 Stat. 2865.)

HISTORICAL AND REVISION NOTES

Based on title 14, U.S.C., 1946 ed., § 185c (May 24, 1939, ch. 146, § 4, 53 Stat. 755).

This section was changed so as to make provisions for enlisted men parallel to similar provisions for commissioned and warrant officers (see §§ 240 and 310 of the revised title). It seems fair and equitable that similar provisions should apply to all classes of personnel insofar as practicable. 81st Congress, House Report No. 557.

AMENDMENTS

1984—Pub. L. 98–557 substituted reference to enlisted member for reference to enlisted man.

1950—Act Aug. 3, 1950, struck out all references to pay.

DELEGATION OF AUTHORITY

For delegation of authority under this section, as invoked by section 2 of Ex. Ord. No. 13223, Sept. 14, 2001, 66 F.R. 48201, as amended, to Secretary of Homeland Security when Coast Guard is not serving as part of Navy, see section 5 of Ex. Ord. No. 13223, set out as a note under section 12302 of Title 10, Armed Forces.

## § 360. Recall to active duty with consent of member

Any enlisted member on the retired list may, with his consent, be assigned to such duties as he may be able to perform, except that no enlisted member on the retired list who has reached the age of sixty-two years shall be recalled in time of peace.

(Aug. 4, 1949, ch. 393, 63 Stat. 522; Aug. 3, 1950, ch. 536, § 19, 64 Stat. 407; Pub. L. 98–557, § 15(a)(3)(A), (4)(B)(i), Oct. 30, 1984, 98 Stat. 2865.)

HISTORICAL AND REVISION NOTES

Based on title 14, U.S.C., 1946 ed., § 185c (May 24, 1939, ch. 146, § 4, 53 Stat. 755).

This section was changed so as to make provisions for enlisted men parallel to similar provisions for commissioned and warrant officers (see §§ 241 and 311 of the revised title). It seems fair and equitable that similar provisions should apply to all classes of personnel insofar as practicable. 81st Congress, House Report No. 557.

AMENDMENTS

1984—Pub. L. 98–557 substituted "member" for "man" in section catchline, and in text substituted reference to enlisted member for reference to enlisted man in two places.

1950—Act Aug. 3, 1950, struck out all references to pay.

## § 361. Relief of retired enlisted member promoted while on active duty

Any enlisted member on the retired list recalled to active duty who during such active duty is advanced to a higher grade or rating under a permanent or temporary appointment or promotion shall, upon relief from active duty be advanced on the retired list to the highest grade or rating held while on active duty. In

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-00
Phone: (202) 372-4411
Fax: (202) 372-4960

1040

DEC 1 2 2011

MEMORANDUM FOR:    Janet Napolitano
                   Secretary

FROM:              Admiral R. J Papp, Jr.
                   Commandant; (202) 372-4411

SUBJECT:           COAST GUARD ACTIVE DUTY ENLISTED CAREER
                   RETENTION SCREENING PANEL AUTHORIZATION
                   REQUEST FOR 2012

I request approval for the Coast Guard to hold an Active Duty Enlisted Career Retention Screening Panel (CRSP) in 2012. The Coast Guard held two panels with your approval in 2010 and 2011.

The 2011 panel considered 259 retirement eligible candidates and selected 55 for involuntary retirement by the end of calendar year 2012. These retirements will allow continued accessions and advancements that are essential for a healthy enlisted workforce.

I have determined that holding another panel in 2012 is in the best interest of the Coast Guard. CRSP is designed to strategically rebalance the enlisted force toward a more upwardly mobile, performance based demographic. As in 2010 and 2011, attrition remains lower than normal. Relatively stagnant military end-strength and lower than normal attrition rates continue to result in lower than normal accession forecasts. These dynamics jeopardize the future military workforce of the Coast Guard by slowing the advancement of the Coast Guard's most high performing enlisted members.

Those not selected for continued service will be involuntarily retired. Members identified for involuntary retirement will be entitled to full retirement benefits. The legal authority to conduct a CRSP panel derives from title 10, U. S. Code Section 1169 and title 14, U.S. Code Section 357 (j). Under Section 1169, regular enlisted members of an armed force may be discharged, before service term expiration, as the Secretary concerned may prescribe. Under Section 357 (j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force," which has specific meanings in other statutory contexts, because title 14 does not define, directly or by reference, "reduction in force." USCG counsel, Mort Shea, reviewed this action and has determined it complies with applicable laws and regulations.

Subj:    COAST GUARD ACTIVE DUTY ENLISTED CAREER RETENTION    1040
         SCREENING PANEL AUTHORIZATION REQUEST FOR 2012

As previously indicated, I plan to establish the panel as an annual workforce shaping option for
the Coast Guard to ensure the high performance of our senior enlisted members. I am in the
process of submitting a Legislative Change Proposal (LCP) granting the Coast Guard permanent
authority to hold this panel as needed. Since the LCP approval may take several years, I request
your approval to hold the panel in 2012 while awaiting permanent authority. If approved, the
panel will only review enlisted Coast Guard members who are retirement eligible within the
panel-directed involuntary retirement timeframe.

Your endorsement of this memo will provide the Coast Guard with the legal authority required to
establish the CRSP as a workforce-shaping tool during 2012.

Approve/date _____ 12-21-11    Disapprove/date _____

Modify/date _____    Needs discussion/date _____

cc:



U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-7000
Staff Symbol: CCG
Phone: (202) 372-4411
Fax: (202) 372-4960

1040
DEC 0 5 2012

MEMORANDUM FOR:    Janet Napolitano
                   Secretary

FROM:              Admiral R. J. Papp, Jr.
                   Commandant; (202) 372-4411

SUBJECT:           COAST GUARD ACTIVE DUTY ENLISTED CAREER
                   RETENTION SCREENING PANEL AUTHORIZATION
                   REQUEST FOR 2013

I request approval for the Coast Guard to hold an Active Duty Enlisted Career Retention
Screening Panel (CRSP) in 2013. The Coast Guard held three panels with your approval in
2010, 2011 and 2012.

The 2012 panel considered 677 retirement eligible candidates and selected 147 for involuntary
retirement by the end of calendar year 2013. These retirements will allow continued accessions
and advancements that are essential for a healthy enlisted workforce.

I have determined that holding another panel in 2013 is in the best interest of the Coast Guard.
CRSP is designed to strategically rebalance the enlisted force toward a more upwardly mobile,
performance based demographic. Relatively stagnant military end-strength and lower than
normal attrition rates continue to result in lower than normal accession forecasts. These
dynamics jeopardize the future military workforce of the Coast Guard by slowing the
advancement of the Coast Guard's most high performing senior enlisted members.

Those not selected for continued service will be involuntarily retired. Members identified for
involuntary retirement will be entitled to full retirement benefits. The legal authority to conduct
a CRSP panel derives from title 10, U. S. Code Section 1169 and title 14, U.S. Code Section 357
(j). Under Section 1169, regular enlisted members of an armed force may be discharged, before
service term expiration, as the Secretary concerned may prescribe. Under Section 357 (j), the
Secretary of Homeland Security may authorize involuntary retirements without action by
Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating
confusion in the fleet, the CRSP process does not include the term "reduction in force," which
has specific meanings in other statutory contexts, because title 14 does not define, directly or by
reference, "reduction in force."

As previously indicated, I plan to establish the panel as an annual performance and conduct tool
to ensure we retain the best of our retirement eligible senior enlisted personnel. I have requested

Subj:  COAST GUARD ACTIVE DUTY ENLISTED CAREER RETENTION      1040
       SCREENING PANEL AUTHORIZATION REQUEST FOR 2013

a delegation of authority from you to provide the Coast Guard with the permanent authority to
hold this panel when needed.  While the permanent authority is awaiting your consideration, I
request your approval to hold the panel in 2013.  If approved, the panel will only review enlisted
Coast Guard members who are retirement eligible within the panel-directed involuntary
retirement timeframe.

Your endorsement of this memo will provide the Coast Guard with the legal authority required to
conduct the CRSP during 2013.

Approve/date _____ 12·19·12    Disapprove/date _____

Modify/date _____    Needs discussion/date _____

U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave SE
Washington, DC 20593-7000
Staff Symbol: CCG
Phone: (202) 372-4411
Fax: (202) 372-8302

1040

JAN 22 2014

MEMORANDUM FOR:      Jeh Charles Johnson
                     Secretary of Homeland Security

FROM:                Admiral R. J. Papp, Jr.
                     Commandant; (202) 372-4411

SUBJECT:             COAST GUARD ACTIVE DUTY ENLISTED CAREER
                     RETENTION SCREENING PANEL AUTHORIZATION
                     REQUEST FOR 2014

Purpose

I request approval for the Coast Guard to hold an Active Duty Enlisted Career Retention
Screening Panel (CRSP) in 2014. The Coast Guard held four panels with S-1 approval in 2010,
2011, 2012, and 2013.

Background

The 2013 panel considered 399 retirement eligible candidates and selected 194 for involuntary
retirement by 01 September 2014. These retirements will allow continued accessions and
advancements that are essential for a healthy enlisted workforce.

Discussion

I have determined that holding another panel in 2014 is in the best interest of the Coast Guard.
CRSP is designed to strategically rebalance the enlisted force toward a more upwardly mobile,
performance based demographic. Relatively stagnant military end-strength and lower than
normal attrition rates continue to result in lower than normal accession forecasts. These
dynamics jeopardize the future military workforce of the Coast Guard by slowing the
advancement of the Coast Guard's most high performing senior enlisted members.

Those not selected for continued service will be involuntarily retired. Members identified for
involuntary retirement will be entitled to full retirement benefits. The legal authority to conduct
a CRSP panel derives from title 10, U. S. Code Section 1169 and title 14, U.S. Code Section 357
(j). Under Section 1169, regular enlisted members of an armed force may be discharged, before
service term expiration, as the Secretary concerned may prescribe. Under Section 357 (j), the
Secretary of Homeland Security may authorize involuntary retirements without action by
Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating
confusion in the fleet, the CRSP process does not include the term "reduction in force."

Subj:    COAST GUARD ACTIVE DUTY ENLISTED CAREER          1040
         RETENTION  SCREENING PANEL AUTHORIZATION
         REQUEST FOR 2014

As previously indicated, I plan to establish the panel as an annual performance and conduct tool
to ensure we retain the best of our retirement eligible senior enlisted personnel.  I have requested
a delegation of authority from you to provide the Coast Guard with the permanent authority to
hold this panel when needed.  While the permanent authority is awaiting your consideration, I
request your approval to hold the panel in 2014.  If approved, the panel will only review enlisted
Coast Guard members who are retirement eligible within the panel-directed involuntary
retirement timeframe.

Your endorsement of this memo will provide the Coast Guard with the legal authority required to
conduct the CRSP during 2014.

Approve/date _____ 3/7_____     Disapprove/date _____

Modify/date _____     Needs discussion/date _____

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
United States Coast Guard
Personnel Service Center

Mail Stop 7200
4200 Wilson Boulevard, Suite 1100
Arlington, VA 20598-7200
Staff Symbol: PSC-c
Phone: (202) 493-1901
Fax: (202) 493-1218

1040

# MEMORANDUM

JUN 0 8 2012

From:  D. R. Callahan, RDML
       CG PSC

To:    R. P. Wagner, CAPT

Subj:  PRECEPT CONVENING THE PANEL FOR SCREENING OF ACTIVE DUTY
       ENLISTED PERSONNEL FOR THE 2012 CAREER RETENTION SCREENING
       PANEL (CRSP)

Ref:   (a) COMDT Washington DC 132040Z Jan 12/ALCOAST 025/12
       (b) COMCOGARD PSC Arlington VA 201814Z Jan 12/ALCGENL 007/12

1.  A Career Retention Screening Panel (CRSP) is hereby appointed consisting of yourself, as
President, and the following members:

    CDR Linda Sturgis
    CDR Brian Koshulsky

    Non-voting member:

    Non-voting Recorders:

2.  The panel will convene at 0900, 18 June 2012, in the Richard D. Bowman Board Room, 5th
Floor, Coast Guard Personnel Service Center, or soon thereafter as practicable for the purpose of

Subj: PRECEPT CONVENING THE PANEL FOR SCREENING    1040
OF ACTIVE DUTY ENLISTED PERSONNEL FOR THE 2012
CAREER RETENTION SCREENING PANEL (CRSP)

selecting applicants for continued service. The prescribed uniform for members of the panel is
Tropical Blue.

3. The panel shall consider all retirement eligible enlisted members, pay grade E-6 and below with
20 or more years of active military service as of 1 June 2012, and all retirement eligible enlisted
members in pay grade E-7 and above with 20 or more years of active military service and who have
three or more years time in grade as of 1 June 2012. The 2012 CRSP will also review those who
were previously screened and retained by the 2010 CRSP, provided they still meet the eligibility
requirements listed above. Members with approved retirement dates on or before 1 December
2013, those members who successfully screened and were retained in the 2011 CRSP, and those at
or above the cut for advancement on the May and November 2011 SWE eligibility list as of 1 June
2012 or above the cut for promotion to Chief Warrant Officer shall be excluded from the panel
process. Chief, Enlisted Personnel Management Division will provide you with a list of those
individuals included in the candidate pool.

4. I have personally appointed the members of this panel. During the panel process, the personnel
assigned as panel members work directly for me, under oath. The performance of these duties will
have a greater effect on the future of the Coast Guard than any other duty they perform. During the
panel process, all other duties of an assigned member are secondary to the panel process and the
utmost care will be given to ensure the process is not compromised or rushed to accommodate
outside concerns. Each record reviewed represents over 20 years of service to our Nation by the
individual candidate. It is absolutely essential that our evaluation afford each eligible candidate fair
and equitable consideration.

5. This is a performance and conduct based panel, in accordance with references (a) and (b). The
goal of this screening panel is to produce a list of screened personnel who show a propensity for
upward mobility, advancement, and superior performance within the enlisted ranks, by applying the
performance criteria provided and considering the member's whole record. The panel shall list its
results alphabetically by categories of **"selected for retention"** and **"selected for involuntary
retirement."** There is no quota for the number of personnel selected for involuntary retirement and
there is no quota for the number of personnel selected for involuntary retirement within a particular
rating.

6. In a military structure, advancements to the next higher grade mandate commensurate increases
in responsibility and authority over others. You should look to retain members and leaders who
have demonstrated a record of creating and sustaining effective command climates and work
environments characterized by respect for others and attention to the morale and welfare of
subordinates. An effective leader demonstrates the ability to inspire, mentor, and encourage our
people to greater levels of performance; to set the bar high; and to inculcate the Coast Guard's Core
Values. Likewise, leaders must display the strength of character to hold subordinates accountable
for lapses in performance and/or behavior. Our people are the Coast Guard's greatest asset. Our
ability to perform our mission ultimately depends on ensuring our people are well trained, well led,
professional, and dedicated. The Coast Guard needs leaders who put the mission first, but people
always, and who look out for their subordinates' professional and personal interests.

7. Those members identified for retention must reflect the highest standards of conduct, integrity,
capability, attitude, and military bearing. You should look to retain members who demonstrate
dedication to professional growth commensurate with their chosen ratings; show evidence of
progressive development within their rate as they ascend in rank; apply their skills aptly, efficiently
and effectively; demonstrate a commitment to continual learning and self improvement through the
pursuit of advanced education, certifications, or participation in professional organizations; possess

2

Subj: PRECEPT CONVENING THE PANEL FOR SCREENING          1040
OF ACTIVE DUTY ENLISTED PERSONNEL FOR THE 2012
CAREER RETENTION SCREENING PANEL (CRSP)

an attitude of selflessness, humility, professionalism and enthusiasm; live by our Core Values of
Honor, Respect and Devotion to Duty; seek responsibility, understand their authorities, exercise
them judiciously, and ensure accountability. These challenges can only be met by people with
sound character who have demonstrated a true commitment to the Coast Guard and who possess
competencies to achieve mission success. The enlisted members you identify must also be capable
of providing the leadership necessary to meet the current missions and operational tempo, while
preparing the Coast Guard for future challenges. If we are to be successful in retaining a quality
work force, you must ensure only the fully qualified remain in Service.

8. The Coast Guard is firmly committed to equality of treatment and opportunity for all personnel
without regard to race, creed, color, gender, or national origin. The candidates you select must be
able to help the Coast Guard provide superior public service across all missions and foster
cohesiveness in our workforce while strengthening the development of diversity. It is vital that we
retain a talented and highly skilled workforce that strengthens our Service by enabling us to better
perform our demanding maritime missions. They must have the ability to form effective
partnerships within and outside of the service, as our versatile and adaptable maritime service is
operating in an increasing globalized world that continues to present new threats and challenges of
ever-increasing complexity. They must be able to sustain key relationships to make our Service
more capable and credible in local areas of operation and as well as in the greater maritime domain
and to support the innovations needed to more effectively and efficiently manage the Coast Guard's
resources. This guidance should not be interpreted as requiring or permitting preferential treatment
of any candidate or group of candidate on the grounds of race, religion, color, gender, or national
origin.

9. You and your panel members are the principal guarantors that the proper balance of leadership,
accomplishment, caring, performance, discipline, moral ethics, professional skills, and adherence to
our Core Values abides in those selected for retention. **You may discount minor errors, based on
how recently they occurred, and as long as subsequent performance reflects lessons learned.**

10. The panel will be provided with the necessary records and clerical assistance by ▮▮▮▮
▮▮▮ and ▮▮▮▮▮▮ of the Enlisted Advancements and Separations Branch. Both will be
available at all times to assist you. Furthermore, Chief, Enlisted Advancements and Separations
Branch will be available to address any concerns or issues that may arise during the panel
discussions. Upon completion of your deliberations, deliver your report to Chief, Enlisted
Personnel Management Division.

11. The panel shall be sworn. The recommendations of the panel require a **two-thirds majority
vote for members selected** and shall be kept confidential until its report is approved. You shall
direct panel members not to divulge any information related to the proceedings or deliberations of
this panel.

#

5 Enclosures:  (1) General Guidance
               (2) Selection Standard
               (3) Equal Opportunity Guidance
               (4) Panel Reports
               (5) Oaths

Copy:  CG PSC-epm

3

# GENERAL GUIDANCE

1. **Duties of the Panel President**. The president of the panel has been appointed by me and shall perform prescribed administrative duties. The panel president has no authority to constrain the panel from identifying candidates for retention, whom **two-thirds majority of the members of the panel** agree should continue on active duty, or from identifying candidates for involuntary retirement that **two-thirds majority of the members of the panel** agree should not continue on active duty. Those enlisted members whom two-thirds of the members of the panel identified for retention are considered in the best interest of the Coast Guard to retain.

2. **Panel Procedures**. The following directions apply to all panel proceedings:

   a. Each of you (president, members, recorders, and administrative support personnel) must maintain the integrity and independence of this screening panel, and foster careful consideration, without prejudice or partiality, of all eligible shipmates.

   b. You must pay particularly close attention to the rules governing communications with and among other panel members, the information authorized to be furnished to you, and the procedures you should follow if you believe that the integrity of this screening panel has been improperly affected.

   c. You may not receive, initiate, or participate in communications or discussions involving information that Department of Homeland Security (DHS) and Service policy preclude from consideration by a screening panel. Base your recommendations on the material in each CRSP candidate's official Military Personnel Data Record (PDR), any information I have provided to the panel in accordance with DHS and Service policies, and any information communicated to you by individual eligible Coast Guard personnel under regulations I have issued. In your deliberations, you must limit your discussions to matters contained in the records provided to you. Any information or personal knowledge, positive or negative, that any board member may have about a CRSP candidate, shall not be discussed, unless that information is otherwise available from the records provided to you. When considering your own personal knowledge concerning the professional qualifications of CRSP candidates, the member shall remain objective and not discuss that personal knowledge or evaluation unless such matters are contained in the CRSP candidate's official record or other material placed before the panel in compliance with the law and Service policy. *Should you feel that you cannot remain objective about a candidate due to personal knowledge, positive or negative, or you are currently in a candidate's rating chain (or have influence over their rating chain) you shall abstain from the voting process.* In the case of an abstention, the remaining panel members must still meet the two-thirds majority vote for candidates both identified for retention and for involuntary retirement. You may not discuss or disclose the opinion of any person not a member of the panel concerning a CRSP candidate being considered unless that opinion is contained in material provided to the panel. In addition, should a CRSP candidate's record reveal the removal of an Enlisted Evaluation Report (EER), the panel member may not discuss any personal knowledge regarding the circumstance(s) which resulted in the removal of the EER.

   d. The Master Chief Petty Officer of the Coast Guard (MCPOCG) and I are the only persons who may appear in person to address you on other than administrative matters. All communications with this panel, other than those that are clearly administrative, must be in writing, given to each

of you, and made part of the panel's record. I have designated in writing those persons authorized to provide routine administrative information to you.

e. To ensure impartiality, you may not visit or communicate with Assignment Officer's (AO's) or any candidate immediately prior to or during the screening panel. Communications with outside parties (i.e., other than panel members, recorders, the panel sponsor, and support staff) before, during, or after the panel relating in any way to the screening panel or its proceedings are completely prohibited. Questions concerning the propriety of any communications prior to the panel should be addressed to EPM or EPM-1. Proceedings, deliberations, or recommendations of the screening panel may not be disclosed unless expressly authorized or required by me.

f. Before the report of the 2012 Career Retention Screening Panel is signed, the recommendations may be disclosed only to members of the panel, recorders, and those administrative support personnel I have designated in writing. I will release the names of the selectees for notification after the panel's report is approved. Do not discuss the names of recommended selectees until after those identified for involuntary retirement have been notified. The proceedings and deliberations of the panel may not be disclosed to any person who is not a panel member, panel recorder, or administrative support personnel.

g. If at any time you believe that you cannot in good conscience perform your duties as a member of the screening panel without prejudice or partiality, you shall request relief by me from this duty. I will honor any such request. If a member or recorder believes that the integrity of the panel's proceedings has been affected by an improper influence of military or civilian authority, misconduct by the panel president or a member, or any other reason, or believes someone is exerting or attempting to exert inappropriate influence over the panel or its proceedings, he or she shall request from me relief from the obligation not to disclose panel proceedings and, upon receiving it, to report the basis for this belief.

h. During the period the panel is in session, you are not authorized to hold social gatherings/meetings that involve groups of panel members/recorders and non-board members. Discussions involving panel actions may be held only in panel spaces with recorders present.

3. **Marital Status**. Screening panels are prohibited from considering the marital status of an eligible CRSP candidate or the employment, education, or volunteer service of an eligible CRSP candidate's spouse.

4. **Leadership of Diverse Organizations**. When reviewing a CRSP candidate's potential for retention, consider that the Coast Guard benefits when Coast Guard leadership possesses a broad spectrum of experience with a depth and breadth of vision. The Coast Guard needs innovative and bold leaders who think creatively, challenge assumptions, and take well calculated risks that maximize effectiveness. Deck plate results and command success through team performance are significant criteria for consideration. Today's Coast Guard is manned by shipmates representing 24 ethnic groups and literally hundreds of cultural heritages. In light of this diversity, you should give careful attention to selecting shipmates who have demonstrated the potential to lead a diverse workforce and create circumstances for the success of all Coast Guard members. The Coast Guard's ability to meet this leadership challenge depends, in part, on having deck plate leaders capable of influencing diverse groups of people to successfully complete their assigned mission.

5. **Adverse Information**. Just as you must consider positive performance, you must consider incidents of misconduct and substandard performance documented in a CRSP candidate's official PDR when determining those CRSP candidates to be identified for retention. For those CRSP candidates who are recommended for retention and who have received disciplinary action, or whose privileged PDR contains matters relating to conduct or performance of duty that occurred within the **past five years or since advancement to their current pay grade (E5, E6, E7, E8, E9) whichever is longer**, all such incidents must be fully disclosed when the slates are briefed for recommendation for retention and prior to the final panel decision.

6. **PDR & Electronic Systems.** You will be provided hardcopy documents and electronic record systems for use during the screening process. As you proceed, there is a high probability that you will encounter an EER(s) in Direct Access (DA) that is still in progress and visible; however, this should be disregarded. You shall only consider EERs that are approved and final, as that is when they become part of the official record and valid for consideration. Additionally, you are reminded that comments for the EER dimensions may only be contained in DA and not on a CG Form-3307.

## SELECTION STANDARD

1. The screening panel shall consider carefully, without prejudice or partiality, the record of every eligible Career Retention Screening Panel (CRSP) candidate. The candidates identified for retention by the 2012 CRSP, for enlisted personnel with greater than 20 years active service, will be those shipmates whose continued service is considered to be the best interest of the Coast Guard by a **two-thirds majority of the members of the panel**. CRSP candidates identified for involuntary retirement must also be established by a **two-thirds majority of the members of the panel**.

2. The following considerations should guide your recommendations. Members assigned to brief individual records are expected to use these considerations to guide their briefs' review and structure. Each panel member is expected to apply this guidance when deliberating and voting. Considerations are:

   a. The Coast Guard requires senior enlisted personnel to serve as deck plate leaders that demonstrate the ability to develop shipmates and enforce standards while conducting themselves in a consistently professional and ethical manner. Their personal and professional attributes include being a visible leader, setting the tone of the unit, and serving as the technical experts in their chosen field. They produce well trained enlisted and officer teams. They teach, uphold and enforce standards while providing proactive solutions that are well-founded and linked to mission accomplishment. They demonstrate uncompromising integrity; take full responsibility for their actions while demonstrating loyalty to seniors, peers and subordinates. They encourage open and frank communication that increases unit efficiency, mission readiness and mutual respect. They define our past and guide the Coast Guard's future to enhance pride in service to our country. They have positive command and Coast Guard wide mission impact. They demonstrate adherence to Coast Guard and DHS ethical standards, Coast Guard weight and body fat standards, loyalty to the Coast Guard Core Values and the Commandant's Guiding Principles of Steady the Service, Honor Our Profession, Strengthen Our Partnerships, and Respect Our Shipmates.

   b. While the above represents the "gold standard" of senior enlisted performance, the following adverse performance indicators occurring **within the last 5 years**, or since advancement to current grade (E5, E6, E7, E8, E9), whichever is longer (e.g., if a member was advanced to their current rank nine years ago, the last nine years of performance will be used), shall be specifically addressed when considering whether a CRSP candidate's continuation is in the best interest of the Coast Guard. The below adverse performance indicators will be applied objectively, identified by categories of yes and no:

   "Yes" will indicate the CRSP candidate's record reflects an adverse performance indicator or

   "No" a CRSP candidate's record has no adverse performance indicator:

   (1) Substandard performance of duty to include receipt of a "not recommended" for advancement based on loss or recommendation, performance probation or incompetency,

Enclosure (2)

**AR 75**

an unsatisfactory conduct mark, and/or declining performance with the same approving official in the rating chain;

(2) Receipt of an Enlisted Evaluation Report (EER) with a minimum average characteristic marks of 3.5 or below;

(3) Moral or professional dereliction, such as Relief for Cause;

(4) Failure to meet service norms or regulations concerning alcohol use and body fat standards;

(5) Documented misconduct involving violation of the UCMJ, e.g., Non-Judicial Punishment or conviction by military Court-Martial; or conviction by civilian court;

(6) Other documented adverse information clearly indicating that the CRSP candidate's continuation may be inconsistent with national security interest or may otherwise not be in the best interest of the Coast Guard, such as losing one's security clearance;

(7) Financial irresponsibility; such as failure to pay just debts or a pattern of Government Credit Card delinquency/revocation of a CRSP candidates Government Credit Card due to misuse or failure to pay outstanding balance.

(8) A candidate on performance probation who does not demonstrate progress during the probationary period in overcoming the deficiency;

(9) Failure to demonstrate upward mobility to include participation in SWE, completion of EPME, completion of OIC qualifications, attendance at the CPO Academy, and viability for future advancement. For E-8 and below, this adverse performance indicator alone cannot be enough to determine involuntary retirement. For E-9's failure to demonstrate upward mobility means a lack of career positions that demonstrate versatility in rate and leadership responsibility.

c. For CRSP candidates who do not have documented adverse performance indicators according to the above guidance, continuation shall be presumed to be in the best interest of the Coast Guard.

d. For a CRSP candidate who has documented information indicating adverse performance according to the above guidance, continuation shall be presumed to not be in the best interest of the Coast Guard. A secondary and subjective review shall be applied to allow consideration for retention when the majority of the panel members find that:

(1) The CRSP candidate can continue to effectively exercise leadership and be a positive role model for junior shipmates;

(2) For E7 or E8, the CRSP candidate remains viable for further advancement; and

(3) The CRSP candidate's record, including consideration of critical skills, is otherwise so meritorious as to overcome concerns raised by the adverse performance information.

e. Today's Coast Guard comprises shipmates representing 24 different ethnic groups and hundreds of cultural heritages. Senior enlisted Petty Officers must have demonstrated the ability to successfully lead diverse workforces, while executing the Coast Guard's strategic diversity initiatives and effectively retaining the right quality and quantity of performance-proven personnel.

f. Among the eligible CRSP candidates presented to the panel, you must consider the following in your deliberations of meritorious service:

(1) Deck-plate Leadership. Proven and sustained superior performance in difficult and challenging leadership positions is the number one factor for selection to continue. When applying this factor you must consider that the future Coast Guard leadership will comprise a mix of service members that have excelled in both traditional and alternate career paths. Demonstrated skill in developing teamwork and individual performance improvements should be carefully considered along with subordinate achievements and accomplishments. Eligible CRSP candidates must have clearly set the tone for the personnel assigned to their units and demonstrated commitment to subordinates' personal and professional growth.

(2) Arduous Duty. Consideration shall be given to evidence of professional and leadership excellence under arduous conditions.

Enclosure (2)

Appx53                                                    **AR 77**

## EQUAL OPPORTUNITY GUIDANCE

1.   The Department of Homeland Security is dedicated to equality of treatment and opportunity for all personnel without regard to race, religion, color, gender, or national origin.   The Coast Guard strives to maintain a professional working environment in which an individual's race, religion, color, gender, or national origin will not limit his or her professional opportunities.   Accordingly, within this screening panel's charter to determine the candidates that are "best and fully qualified," you must ensure that candidates are not disadvantaged because of their race, religion, color gender, or national origin.

2.   Your evaluation of all candidates must afford them fair and equitable consideration. You should be particularly vigilant in your evaluation of records to take care that no candidate's selection opportunity is disadvantaged by service utilization policies or practices.   You should evaluate each candidate's potential to assume greater, more challenging responsibilities, the overriding factor being performance of assigned duties.

3.   The Coast Guard has assigned some candidates to special assignments outside of traditional career development patterns, e.g., institutional instructors, recruiting and equal opportunity billets.  In addition, other utilization policies or practices, such as those based on statutory restrictions on the assignment of women, may have had an effect on career opportunities.   These assignments, though beneficial to the Coast Guard, may have precluded some candidates from serving on traditional career development assignments. Such assignment practices should not prejudice the selection of these candidates for selection.   Successful performance of assigned duties is the key in measuring a candidate's potential for selection. Accordingly, in determining the qualification for selection of any candidate that has been affected by such utilization policies or practices, duty performed well in such assignments should be given weight equal to duty performed well by a candidate not affected by such policies or practices.

4.   This guidance should not be interpreted as requiring or permitting preferential treatment of any candidate or group of candidates on the grounds of race, religion, color, gender, or national origin.

## SCREENING PANEL REPORTS

1. The record of the screening panel's proceedings shall be compiled by the recorder, assistant recorder, and administrative support personnel. The written report of the screening panel shall be signed by the panel president, the panel members, the panel recorder, and the assistant panel recorder. It shall contain, separately, an alphabetical listing of the names of the Career Retention Screening Panel (CRSP) candidates identified for retention and those identified for involuntary retirement with appropriate selection statistics as well as the following items:

   a. All instructions, information, and guidance that were provided to the panel.

   b. Certification that:

      (1) To the best of your knowledge, the panel complied with all instructions contained in the precept and, as appropriate, other memorandums of guidance or instruction provided by me;

      (2) You were not subject to or aware of any censure, reprimand, or admonishment about the recommendations of the screening panel or the exercise of any lawful function within the authorized discretion of the panel;

      (3) You were not subject to or aware of any attempt to coerce or influence improperly any action in the formulation of the panel's recommendations;

      (4) You were not party to or aware of any attempt at unauthorized communications;

      (5) To the best of your knowledge, the screening panel carefully considered the records of each candidate whose name was furnished to the panel;

      (6) The CRSP candidates identified for retention are, in the opinion of at least two-thirds of the members of the panel, fully qualified for retention to meet the needs of the Coast Guard among those candidates whose names were furnished to the panel;

      (7) You are aware that the names of those identified for retention will not be released to the public after the panel report is approved, but each individual approved for continued service will be notified in writing by EPM following the notification of those identified for involuntary retirement, and you know that you may not disclose the recommended selectees;

      (8) You are aware that the names of those identified for involuntary retirement will not be released to the public, but that each individual will be notified privately of their selection for involuntary retirement by their chain of command, after the panel report is approved, and you know that you may not disclose the names of those recommended for retention; and

(9) You understand that, except as authorized by Coast Guard Regulations you may never disclose the proceedings and deliberations of the screening panel to any person who is not a panel member, recorder, or assistant recorder.

c. A list of all candidates eligible for consideration.

d. Precept.

2. The screening panel report shall be forwarded for approval to me via the Chief, Enlisted Personnel Management, Coast Guard Personnel Service Center.

Enclosure (4)

**AR 80**

# OATHS

1. Chief, Enlisted Personnel Management Division shall administer the following oath or affirmation to, the Chief, Enlisted Advancements and Separations Branch:

> *"Do you, solemnly swear (or affirm) that you will keep a true record of the proceedings of this screening panel, and you will not divulge the proceedings of this panel except as authorized or required by the Commander, Coast Guard Personnel Service Center (CG PSC) or higher authority, so help you God?"*

2. Chief, Enlisted Advancements and Separations Branch shall then administer the following oath or affirmation to the Career Retention Screening Panel, panel recorder, and assistant panel recorder:

> *"Do you, and each of you, solemnly swear (or affirm) that you will perform your duties as a member of the screening panel without prejudice or partiality, having in view both the special fitness of candidates and the efficiency of the United States Coast Guard, and you will not divulge the proceedings of this panel except as authorized or required by the Commander, Coast Guard Personnel Service Center (CG PSC) or higher authority, so help you God?"*

3. The recorder or assistant recorder shall then administer the following oath or affirmation to the other support personnel:

> *"Do you, and each of you, solemnly swear (or affirm) that you will not divulge the proceedings of this screening panel except as authorized or required by the Command, Coast Guard Personnel Service Center (CG PSC) or higher authority, so help you God?"*

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commander
United States Coast Guard
Personnel Service Center

Mail Stop 7200
4200 Wilson Boulevard, Suite 1100
Arlington, VA 20598-7200
Staff Symbol: PSC-c
Phone: (202) 493-1901
Fax: (202) 493-1218

1040

MAY 0 8 2013

# MEMORANDUM

From:   D. R. Callahan, RDML
        CG PSC

To:     B. Kerr, CAPT

Subj:   PRECEPT CONVENING THE PANEL FOR SCREENING OF ACTIVE DUTY
        ENLISTED PERSONNEL FOR THE 2013 CAREER RETENTION SCREENING
        PANEL (CRSP)

Ref:    (a) COMDT COGARD Washington DC 191443Z Dec 12/ALCOAST 531/12
        (b) COMCOGARD PSC Arlington VA 141519Z Jan 13/ALCGENL 008/13

1. A Career Retention Screening Panel (CRSP) is hereby appointed consisting of yourself, as
President, and the following members:

CDR Beth Naff                      Non-voting member:
CDR Adrian West                    MCPOCG M. Leavitt



Primary Clerical Assistance:       Non-voting Recorders:



2. The panel shall convene at 0900, 17 June 2013, in the Richard D. Bowman board room, 5th floor,
Coast Guard Personnel Service Center, or as soon thereafter as practicable, for the purpose of
considering enlisted members for continued service in the United States Coast Guard. Members of
the board shall swear or affirm that they will, without prejudice or partiality, and having in view
both the special fitness of the candidates and efficiency of the Coast Guard, perform the duties
imposed upon them, and that they will not disclose their proceedings of this panel to any person not
a member of the panel. The prescribed uniform for members of the panel is Tropical Blue.

Subj: PRECEPT CONVENING THE PANEL FOR SCREENING      1040
OF ACTIVE DUTY ENLISTED PERSONNEL FOR THE 2013
CAREER RETENTION SCREENING PANEL (CRSP)               MAY 0 8 2013

3. The panel shall consider all eligible enlisted personnel who were not reviewed by the 2011 or 2012 CRSP and who meet the following criteria:

   A. All E-6 and below with 19.5 or more years of active military service as of 1 June 2013.

   B. All E-7 and above with 19.5 or more years of active military service who have three or more years time in grade as of 1 June 2013.

Members with approved retirement letters, and those at or above the cut for advancement on the May and November 2012 SWE eligibility list as of 1 June 2013 or above the cut for promotion to Chief Warrant Officer have been excluded from the panel process. Chief, Enlisted Personnel Management Division will provide you with a list of those individuals included in the candidate pool.

4. The 2013 CRSP will use a ***performance and conduct based methodology*** that focuses on leadership, accomplishment, performance, conduct, professional skills, professional growth, and adherence to our Core Values to retain those members that best meet the high standards required in our enlisted service, as enumerated in enclosure (1). **You may discount minor errors, based on how recently they occurred, and as long as subsequent performance reflects lessons learned.** Accordingly, you are not bound by any opportunity of selection when selecting a candidate for retention.

5. Diversity is vital to mission relevance, readiness, and execution. Diversity of talent, ability, ideas and viewpoints – as well as ethnicity, gender, culture, color and creed are critical in a Service that represents our employers: the American people. Accordingly, this guidance does not require or permit the preferential treatment of any enlisted member or group of enlisted members based on race, religion, color, gender or national origin.

6. You should emphasize to the members of the Panel the importance of their obligation to confine themselves to facts of record and not predicate judgments on rumor or hearsay. At the end of your deliberations, all members must be able to say that the enlisted members recommended for continued service are, in the opinion of at least two-thirds of the members of the Panel, those shipmates whose continued service is considered to be in the best interest of the Coast Guard.

7. The panel will be provided with the necessary records and clerical assistance by ▮▮▮▮▮▮ and ▮▮▮▮▮▮ ▮▮▮▮▮▮ of the Enlisted Advancements and Separations Branch. Both will be available at all times to assist you. Furthermore, Chief, Enlisted Advancements and Separations Branch will be available to address any concerns or issues that may arise during the panel discussions. Upon completion of your deliberations, deliver your report to Chief, Enlisted Personnel Management Division.

8. The Panel shall submit a report in writing signed by all members of the Panel. Except for the report of this Panel, the proceedings of the Panel shall not be disclosed to any persons not a member of the Panel. You will direct members of the Panel that their recommendations shall be kept confidential until the Assistant Commandant for Human Resources, CG-1, approves the report on behalf of the Commandant, and the 2013 CRSP candidates have been notified of the panel recommendations.

                                          #

Enclosure:    (1) Selection Standard

                                          2

## 2013 CAREER RETENTION SCREENING PANEL SELECTION STANDARDS

1.  The 2013 Career Retention Screening Panel (CRSP) shall consider carefully, without prejudice or partiality, the record of every eligible CRSP candidate. *The candidates identified for retention will be those shipmates whose continued service is considered to be in the best interest of the Coast Guard by a two-thirds majority of the members of the panel.*

2. The 2013 CRSP will use a *performance and conduct based methodology* that focuses on leadership, accomplishment, performance, conduct, professional skills, professional growth, and adherence to our Core Values to retain those members that best meet the high standards required in our enlisted service.

3. Period of Review:

   For E-6 and below: The 2013 CRSP waiver panel will evaluate the member's record for the previous **seven years** or since advancement to current pay-grade, whichever is longest.

   For E-7, E-8 and E-9: The 2013 CRSP waiver panel will evaluate the member's record for the previous **seven years** or since advancement to E-7, whichever is longest.

### Performance and Conduct

The following *Performance and Conduct based* considerations should guide your recommendations.

   a.  Substandard performance of duty to include receipt of a "not recommended" for advancement based on loss of recommendation, performance probation or incompetency, an unsatisfactory conduct mark, and/or declining performance with the same approving official in the rating chain;

   b. Receipt of an Enlisted Evaluation Report (EER) with a minimum average characteristic marks of 3.5 or below;

   c. Moral or professional dereliction, such as Relief for Cause, removal from primary duties;

   d. Failure to meet service norms or regulations concerning alcohol abuse including, but not limited to, documented instances or conviction(s) for operating a vehicle, or any other mode of transportation under the influence of alcohol or controlled substances during the period of review;

   e. Any documented instances of sexual assault and/or harassment;

   f. Have no conviction(s) by a civil court for any felony offense, or any finding by a civil court tantamount to a felony conviction, during the period of review;

g. Other documented adverse information clearly indicating that the CRSP candidate's continuation may be inconsistent with national security interest or may otherwise not be in the best interest of the Coast Guard, such as revocation of security clearance;

h. Financial irresponsibility; such as failure to pay just debts or a pattern of Government Credit Card delinquency/permanent revocation of the Government Credit Card due to misuse or failure to pay outstanding balance;

i. A candidate on performance probation who does not demonstrate progress during the probationary period in overcoming the deficiency, inability to maintain qualifications or recertify;

j. Failure to demonstrate upward mobility/professional development and growth to include:

(1) Consistent participation in SWE
(2) Completion of EPME and other advancement eligibility requirements (e.g., EOCTs, sea time, qualifications/certifications, physical fitness standards, etc...)
(3) Completion of OIC certifications
(4) Graduation from the USCG CPO Academy, USN Senior Enlisted Academy or USAF Senior Non-commissioned Officer Academy
(5) Positions of increased leadership/responsibility

k. Have more than three weight probationary periods during current period of review, or currently on weight probation.

Enclosure (1)

**AR 117**

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
United States Coast Guard
Personnel Service Center

Mail Stop 7200
4200 Wilson Boulevard, Suite 1100
Arlington, VA 20598-7200
Staff Symbol: PSC-c
Phone: (703) 872-6475
Fax: (703) 872-6473

1040
11 Mar 14

# MEMORANDUM

From:    D. R. Callahan, RDML
         CG PSC

To:      T. A. Tobiasz, CAPT

Subj:    PRECEPT CONVENING THE PANEL FOR SCREENING OF ACTIVE DUTY
         ENLISTED PERSONNEL FOR THE 2014 CAREER RETENTION SCREENING
         PANEL (CRSP)

Ref:     (a) COMDT COGARD Washington DC R292244Z Jan 14/ALCOAST 030, CG-1,
             COMDTNOTE 1000
         (b) COMCOGARD PSC Arlington VA R060048Z Feb 14/ALCGENL 016/14

1. A Career Retention Screening Panel (CRSP) is hereby appointed consisting of yourself, as
President, and the following members:

   CDR Owen L. Gibbons, CG TRACEN Cape May
   CDR Kenneth E. Blair, CG Sector New Orleans
    CG SFLC
                       CG-0952
                       PAC-00B
                       CGD Seven
                       CGD Five
                       CG-DCO

   MCPOCG Michael P. Leavitt, non-voting member

   Non-voting Recorders/Primary Clerical Assistance:



2. The Panel shall convene at 0830, 17 March 2014, in the Richard D. Bowman Board Room, 5th
Floor, Coast Guard Personnel Service Center, or soon thereafter as practicable for the purpose of
considering enlisted members for continued service in the United States Coast Guard. Members
of the panel shall swear or affirm that they will, without prejudice or partiality, and having in
view both the special qualifications of the candidates and efficiency of the Coast Guard, perform
the duties imposed upon them, and that they will not disclose proceedings of this Panel to any
person not a member of the Panel. The prescribed uniform for members of the Panel is Tropical
Blue.

3. The Panel shall consider all eligible enlisted personnel who were not reviewed in the 2012 or
2013 Panels and who meet the following criteria: All E-7 and above with 19 or more years of

Subj:    PRECEPT CONVENING THE PANEL FOR          1040
         SCREENING OF ACTIVE DUTY ENLISTED         11 Mar 14
         PERSONNEL FOR THE 2014 CAREER RETENTION
         SCREENING PANEL (CRSP)

active military service who have three or more years time in grade as of 1 June 2014. Members with an EPM-1 approved retirement and members serving in the Musician rating have been excluded from the panel process. Chief, Enlisted Advancements and Separations Branch shall provide you with a list of those individuals included in the candidate pool.

4.   The 2014 CRSP will use a ***performance and conduct-based methodology*** that focuses on leadership, accomplishment, performance, conduct, professional skills, professional growth, and adherence to our Core Values to retain those members that best meet the high standards required in our enlisted service, as enumerated in enclosure (1). **You may discount minor errors, based on how recently they occurred, and as long as subsequent performance reflects lessons learned.** Accordingly, you are not bound by any opportunity of selection when selecting a candidate for retention.

5.   Diversity is vital to mission relevance, readiness and execution. Diversity of talent, ability, ideas and viewpoints – as well as ethnicity, gender, culture, color and creed are critical in a Service that represents our employers: the American people. Accordingly, this guidance does not require or permit the preferential treatment of any enlisted member or group of enlisted members based on race, religion, color, gender or origin.

6.   You should emphasize to the members of the Panel the importance of their obligation to confine themselves to facts of record and not predicate judgments on rumor or hearsay. At the end of your deliberations, all members must be able to say that the enlisted members recommended for continued service are, in the opinion of at least two-thirds of the members of the Panel, those shipmates whose continued service is considered to be in the best interest of the Coast Guard.

7.   The Panel will be provided with the necessary records and clerical assistance by █████ ███████████████████████ and ███████████████████ of the Enlisted Advancements and Separations Branch. They will be available at all times to assist you. Furthermore, Chief, Enlisted Advancements and Separations Branch will be available to address any concerns or issues that may arise during the Panel discussions. Upon completion of your deliberations, deliver your report to Chief, Enlisted Personnel Management Division.

8.   The Panel shall submit a report in writing signed by all members of the Panel. Except for the report of this Panel, the proceedings of the Panel shall not be disclosed to any persons not a member of the Panel. You will direct members of the Panel that their recommendations shall be kept confidential until the Assistant Commandant for Human Resources, CG-1, approves the report on behalf of the Commandant, and the 2014 CRSP candidates have been notified of the Panel recommendations.

                                        #

Enclosure:     (1) Selection Standards

**AR 140**

### 2014 CAREER RETENTION SCREENING PANEL SELECTION STANDARDS

1. The 2014 Career Retention Screening Panel (CRSP) shall consider carefully, without prejudice or partiality, the record of every eligible CRSP candidate. *The candidates identified for retention will be those shipmates whose continued service is considered to be in the best interest of the Coast Guard by a two-thirds majority of the members of the Panel.*

2. Period of Review:

For E-7, E-8 and E-9: The 2014 CRSP will evaluate the member's record for the previous **seven years** or since advancement to E-7, whichever is longest.

3. The 2014 CRSP will use a performance and conduct-based methodology that focuses on leadership, accomplishment, performance, conduct, professional skills, professional growth, and adherence to our Core Values to retain those members that best meet the high standards required in our enlisted service.

4. The following ***Performance and Conduct-based*** considerations should guide your recommendations.

   a. Substandard performance of duty to include receipt of a "not recommended" for advancement based on loss of recommendation, performance probation or incompetency, an unsatisfactory conduct mark, and/or declining performance with the same approving official in the rating chain;

   b. Moral or professional dereliction, such as Relief for Cause, removal from primary duties;

   c. Failure to meet service norms or regulations concerning alcohol abuse including, but not limited to, documented instances or conviction(s) for operating a vehicle, or any other mode of transportation under the influence of alcohol or controlled substances during the period of review;

   d. Any documented instances of sexual assault and/or harassment;

   e. Conviction(s) by a civil court for any felony offense, or any finding by a civil court tantamount to a felony conviction, during the period of review;

   f. Other documented adverse information clearly indicating that the CRSP candidate's continuation may be inconsistent with national security interest or may otherwise not be in the best interest of the Coast Guard, such as revocation of security clearance;

   g. Financial irresponsibility; such as failure to pay just debts or a pattern of government travel charge card (GTCC) delinquency/permanent revocation of the GTCC due to misuse or failure to pay outstanding balance;

   h. A candidate on performance probation who does not demonstrate progress during the probationary period in overcoming the deficiency, inability to maintain qualifications or recertify;

   i. Failure to demonstrate upward mobility/professional development and growth to include:

      (1) Inconsistent participation in SWE
      (2) Noncompletion of EPME or other advancement eligibility requirements (e.g., EOCTs, sea time, qualifications/certifications, physical fitness standards, etc…)
      (3) Inability to obtain OIC certification

Enclosure (1)

(4) Nonattendance to the CG CPO Academy, USN Senior Enlisted Academy or USAF Senior Non-commissioned Officer Academy

(5) Lack of assignment to positions of increased leadership/responsibility

j. Have more than three weight probationary periods during the current period of review, or currently on weight probation.

Note 1. Selection standard j shall be associated with some type of conduct or performance related issue.

Enclosure (1)

**AR 142**

**FLAG VOICE #446**
**2015 Active Duty Career Retention Screening Panel Pause**

I will soon release an ALCOAST announcing my decision not to hold an Active Duty Career Retention Screening Panel (CRSP) in 2015. For the past five years, the Coast Guard has sought and received authorization from the Secretary of Homeland Security (DHS) to convene a CRSP in order to increase workforce flow, address high retention issues through the involuntarily retirement of selected enlisted members, and to reduce the size of the retirement eligible enlisted workforce. A performance and conduct-based panel, the CRSP ensured that the continued retention of our best and top-performing retirement eligible senior enlisted accompanied the reduction in the senior enlisted workforce.

The implementation of several workforce management tools since the CRSP's inception in 2010 have reduced the need for a 2015 CRSP to ensure healthy workforce flow. These initiatives, which include the reactivation of high year tenure (HYT), ending indefinite reenlistments, and updating reenlistment standards have increased our overall ability to stabilize accessions, improve workforce upward flow, and retain our best enlisted personnel while separating those not eligible for reenlistment due to performance and conduct issues.

These workforce management tools emphasize continued adherence to the highest standards of performance and conduct and hold accountable members failing to maintain those standards. The lack of a CRSP in no way implies a reduced emphasis on performance and conduct. Moreover, the complete impact of these initiatives is yet to be fully evaluated and I feel it necessary for the enlisted workforce to adjust to these new policies. This pause in 2015 will facilitate such adjustment by the enlisted workforce and allow the service the further evaluate the potential need to seek authority for CRSP in subsequent years.

Facing workforce flow challenges over the past four years as a result of high retention and stagnant advancements that hindered new accessions, the Reserve held their first CRSP in 2014 by authority delegated to the Commandant by the DHS Secretary. The R-CRSP, which will be held again in 2015, is designed to strategically rebalance the structure of the Reserve enlisted workforce and provide advancement opportunities for junior Reserve personnel. By involuntary retiring select senior enlisted Reservists and retaining top-performing members, the overall reduction in retirement-eligible senior enlisted Reservists will ultimately restore desirable workforce flow. The potential need for the R-CRSP is re-evaluated every year based on the health of the workforce and needs of the service.

While this Flag Voice and accompanying ALCOAST address my decision not to pursue authorization for a CRSP in 2015, members who were not retained in a previous CRSP must still retire as directed.

RADM DAVE CALLAHAN
Assistant Commandant for Human Resources

# Ninth New Collegiate Dictionary

*a Merriam-Webster*

MERRIAM-WEBSTER INC., *Publishers*
Springfield, Massachusetts, U.S.A.



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1990 by Merriam-Webster Inc.

Philippines Copyright 1990 by Merriam-Webster Inc.

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.
     p.     cm.
    ISBN 0-87779-508-8. — ISBN 0-87779-509-6  (indexed). -— ISBN
0-87779-510-X (deluxe)
    1.   English language—Dictionaries.
PE1628.W5638   1990
423—dc20                       89-38961
                                    CIP

Webster's Ninth New Collegiate Dictionary principal copyright 1983

COLLEGIATE trademark Reg. U.S. Pat. Off.

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

383940RMcN90

Case: 22-1462    Document: 34    Page: 72    Filed: 03/21/2023

482    forbear • foregather

¹for-bear \for-'ba(a)r, far-, -'be(a)r\ vb -bore \-'bo(a)r, -'bo(a)r\; -borne \-'bo(a)rn, -'bo(a)rn\; -bear-ing [ME forberen, fr. OE forberan to endure, do without, fr. for- + beran to bear] vt (bef. 12c)  1 obs : to leave alone : SHUN (~ his presence —Shak.)  2 obs : to do without  3 : to hold oneself back from esp. with an effort of self-restraint ~ vi  1 : HOLD BACK, ABSTAIN  2 : to control oneself when provoked : be patient — for-bear-er n

²forbear var of FOREBEAR

for-bear-ance \for-'bar-on(t)s, far-, -'ber-\ n (1576)  1 : a refraining from the enforcement of something (as a debt, right, or obligation) that is due  2 : the act of forbearing : PATIENCE  3 : the quality of being forbearing : LENIENCY

for-bid \far-'bid, for-\ vt -bade \-'bad, -'bād\ or -bad \-'bad\; -bid-den \-'bid-'n\; -bid-ding [ME forbidden, fr. OE forbēodan, fr. for- + bēodan to bid — more at BID] (bef. 12c)  1 : to proscribe from or as if from the position of one in authority : command against (the law ~s stores to sell liquor to minors) (her mother ~s her to go)  2 : to hinder or prevent as if by an effectual command (space ~s further treatment here) — for-bid-der n

syn FORBID, PROHIBIT, INTERDICT, INHIBIT mean to debar one from doing something or to order that something not to be done. FORBID implies that the order is from one in authority and that obedience is expected; PROHIBIT suggests the issuing of laws, statutes, or regulations; INTERDICT implies prohibition by civil or ecclesiastical authority usu. for a given time or a declared purpose; INHIBIT implies the imposition of restraints or restrictions that amount to prohibitions, not only by authority but also by the exigencies of the time or situation.

for-bid adj, archaic (1606) : ACCURSED (the shall live a man ~ —Shak.)

for-bid-dance \far-'bid-'n(t)s, for-\ n (1608) : the act of forbidding

for-bid-den \-'bid-'n\ adj (1923) : not conforming to the usual selection principles — used of quantum phenomena (~ transition) (~ radiation) (~ spectral line)

forbidden fruit n [fr. the forbidden fruit of the Garden of Eden in Gen 3: 2-19] (1662) : an immoral or illegal pleasure

for-bid-ding adj (1712)  1 : such as to make approach or passage difficult or impossible (~ walls)  2 : DISAGREEABLE, REPELLENT (a ~ task)  3 : GRIM, MENACING — for-bid-ding-ly \-'bid-iŋ-lē\ adv

for-bode var of FOREBODE

¹for-by or for-bye \for-'bī\ prep [ME forby, prep. & adv., fr. fore- + by] (14c)  1 archaic  a : PAST  b : NEAR  2 chiefly Scot : BESIDES

²forby or forbye adv, chiefly Scot (1590) : BESIDES; in addition

¹force \'fō(a)rs, 'fó(a)rs\ n [ME, fr. MF, fr. (assumed) VL fortia, fr. L fortis strong] (14c)  1  a : strength or energy exerted or brought to bear : cause of motion or change : active power (~s of nature) (the love of justice has been a powerful motivating ~ in his life)  b : moral or mental strength  c : capacity to persuade or convince (couldn't resist the ~ of his argument)  2  a : military strength (1) : a body (as of troops or ships) assigned to a military purpose  (2) pl : the whole military strength (as of a nation)  c : a body of persons or things available for a particular end (a labor ~) (the missile ~)  d : an individual or group having the power of effective action (police and citizens must join ~s to prevent violence) (he was a ~ behind the passing of that bill)  3 : violence, compulsion, or constraint exerted upon or against a person or thing  4 : an agency or influence that if applied to a free body results chiefly in an acceleration of the body and sometimes in elastic deformation and other effects  5 : the quality of conveying impressions intensely in writing or speech  syn see POWER — force-less \-las\ adj — in force  1 : in great numbers (police were summoned in force)  2 : VALID, OPERATIVE (his suspension from school must remain in force)

²force vt forced; forc-ing (14c)  1 : to do violence to: esp : RAPE  2 : to compel by physical, moral, or intellectual means  3 : to make or cause through natural or logical necessity (forced to admit he was right)  4  a : to press, drive, attain to, or effect against resistance or inertia (~ a bill through the legislature)  b : to impose or thrust urgently, importunately, or inexorably (~ unwanted attentions on a woman)  5 : to achieve or win by strength in struggle or violence : a : to win one's way into (~ a castle) (forced the mountain passes)  b : to break open or through (~ a lock)  6  a : to raise or accelerate to the utmost (forcing the pace)  b : to produce only with unnatural or unwilling effort (she forced a smile in spite of her distress)  c : to wrench, strain, or use (language) with marked unnaturalness and lack of ease  7  a : to hasten the rate of progress or growth of  b : to bring (as plants) to maturity out of the normal season (forcing lilies for the Easter trade)  8 : to induce (as a particular bid or play by another player) in a card game by some conventional act, play, bid, or response  9  a : to cause (a runner in baseball) to be put out on a force play  b : to cause (a run) to be scored in baseball by giving a base on balls when the bases are full — forc-er n — force one's hand : to cause one to act precipitously : force one to reveal his purpose or intention

forced \'fō(a)rst, 'fó(a)rst\ adj (ca. 1537)  1 : compelled by force : INVOLUNTARY (a ~ landing)  2 : done or produced with effort, exertion, or pressure (a ~ laugh) — forced-ly \fō(a)rsd-lē, 'fó(a)r-\ adv

force-feed vt (1901)  1 : to feed (as an animal) by forcible administration of food  2 : to force to take in (~ students the classics)

forced-ful \'fōrs-fal, 'fórs-\ adj (1571) : possessing or filled with force : EFFECTIVE — force-ful-ly \-fa-lē\ adv — force-ful-ness n

force ma-jeure \,fōrs-ma-'zhər, ,fōrs-, -əma-\ n [F, superior force] (1883)  1 : superior or irresistible force  2 : an event or effect that cannot be reasonably anticipated or controlled — compare ACT OF GOD

force-meat \'fōr-,smēt, 'fór-\ n [force (alter. of -farce) + meat] (1688) : finely chopped and highly seasoned meat or fish that is either served alone or used as a stuffing — called also farce

force of habit n (ca. 1925) : behavior made involuntary or automatic by repeated practice

force-out \'fō(a)r-,saut, 'fór-\ n (1896) : FORCE PLAY

force play n (1897) : a play in baseball in which a runner is put out when he is forced to advance to the next base but fails to do so safely

for-ceps \'fōr-saps, -,seps\ n, pl forceps [L, fr. formus warm + capere to take — more at WARM, HEAVE] (1670) : an instrument for grasping, holding firmly, or exerting traction upon objects esp. for delicate operations (as by jewelers or surgeons) — for-ceps-like \-,līk\ adj

force pump n (1659) : a pump with a solid piston for drawing and forcing through valves a liquid (as water) to a considerable height the pump or under a considerable pressure

force-ible \'fōr-sa-bal, 'fór-\ adj (14c)  1 : effected by force used in opposition or resistance  2 : characterized by force, efficiency, or energy : POWERFUL — force-ible-ness n — forc-ibly \-blē\ adv

¹ford \'fō(a)rd, 'fó(a)rd\ n [ME, fr. OE; akin to ON fjorthr fjord, L portus port, OE faran to go — more at FARE] (bef. 12c) : a shallow part of a body of water that may be crossed by wading

²ford vt (1614) : to cross (a body of water) by wading — ford-able \'fōrd-a-bal, 'fórd-\ adj

fore \'fō(a)r, 'fó(a)r\ vt -did \-'did\; -done \'\don\, -do-ing \-'dü-iŋ\; fordon, fr. OE fordon, fr. for- + dōn to do] (bef. 12c)  1 archaic : to do away with : DESTROY  2 : to overcome with fatigue — used esp. in past participle (quite fordone with the heat)

¹fore \'fō(a)r, 'fó(a)r\ adv [ME, fr. OE; akin to OE for] (bef. 12c)  1 : at an earlier time or place  2 : in front, or adjacent to the front : FORWARD

²fore also ¹fore prep (bef. 12c)  1 chiefly dial : BEFORE  2 : in the presence of

³fore adj [fore-] (15c)  1 : situated in front of something else : FORWARD  2 : prior in order of occurrence : FORMER

⁴fore n (1842) : something that occupies a front position — to the fore  1 : in or into a position of prominence : FORWARD

⁵fore interj [prob. short for before] (1878) — used by a golfer to warn anyone within range of the probable line of flight of his ball

fore- comb form [ME for-, fore-, fr. OE fore, fr. fore, adv.]  1  a : earlier : beforehand (foresee)  b : occurring earlier : occurring beforehand (foreordain)  2  a : situated at the front : in front (forelimb) : front part of (something specified) (forearm)

fore-and-aft \,fōr-a-'naft, ,fór-\ adj (1820)  1 : lying, running, or aligned in the general line of the length of a construction (as a ship or a house)  : LONGITUDINAL  2 : having no square sails

fore and aft adv (1618)  1 : lengthwise of a ship : from stem to stern : in, at, or toward both the front and rear  3 : in or at the front back

fore-and-after \-'naf-tər\ n (1823) : a ship with a fore-and-aft rig : SCHOONER

fore-and-aft rig n (1879) : a sailing-ship rig in which most or all of the sails are not attached to yards but are bent to gaffs or set on the masts or on stays in a fore-and-aft line

fore-arm \(')fōr-'ärm, (')fór-\ vt (1592) : to arm in advance : PREPARE

²fore-arm \'fōr-,ärm, 'fór-\ n (1741) : the part of the arm between the elbow and the wrist; also : the corresponding part in other vertebrates

fore-bay \'fō(a)r-,bā, 'fó(a)r-\ n (1770) : a reservoir or canal from which water is taken to run equipment (as a waterwheel or turbine)

fore-bear \-,ba(a)r, -,be(a)r\ n [ME (Sc) forebear, fr. fore- + -bear been to be] (15c) : ANCESTOR, FOREFATHER — usu. used in pl.

fore-bode \(')fōr-'bōd, (')fór-\ vt (1603)  1 : to have an inward conviction of (as coming ill or misfortune)  2 : FORETELL, PORTEND ~ vi : GUR, PREDICT — fore-bod-er n

¹fore-bod-ing \-'bōd-iŋ\ n (14c) : the act of one who forebodes; also : omen, prediction, or presentiment esp. of coming evil : PORTENT

²forebod-ing adj (1679) : indicative of or marked by foreboding — fore-bod-ing-ly \-iŋ-lē\ adv — fore-bod-ing-ness n

fore-brain \'fō(a)r-,brān, 'fó(a)r-\ n (1879) : the anterior of the three primary divisions of the developing vertebrate brain or the corresponding part of the adult brain that includes esp. the cerebral hemispheres and more caudally esp. the thalamus and hypothalamus — called also prosencephalon; compare DIENCEPHALON, TELENCEPHALON

fore-cad-die \-,kad-ē\ n (1792) : a golf caddie who is stationed in the fairway and who indicates the position of balls on the course

¹fore-cast \'fōr-,kast; fōr-'kast, fór-\ vb -cast; -cast-ing (14c)  1  a : to forecast also foretold  b : to calculate or predict (some future event or condition) usu. as a result of rational study and analysis of available pertinent data: esp : to predict (weather conditions) on the basis of correlated meteorological observations  b : to indicate as likely to occur  2 : to serve as a forecast of : MESSAGE (such events may ~ peace) ~ vi : to calculate the future  syn see FORETELL — fore-cast-able \-ə-bəl\ adj — fore-cast-er n

¹fore-cast \'fōr-,kast, fór-, -kast\ n (1541)  1 archaic : foresight of consequences and provision against them : FORETHOUGHT  2 : a prophecy, estimate, or prediction of a future happening or condition

fore-cas-tle \'fōk-sal; 'fōr-,kas-al, 'fór-\ n (14c)  1 : the part of the upper deck of a ship forward of the foremast or of the fore channels  2 : a forward part of a merchantman where the crew is housed

fore-check \'fō(a)r-,chek, 'fó(a)r-\ n (1951) : to guard an opponent in ice hockey in his own defensive zone

fore-close \(')fōr-'klōz, (')fór-\ vb [ME forclosen, fr. MF forclos pp. of forclore, fr. fors outside (fr. L foris) + clore to close — more at FOR-] (14c)  1 : to shut out : PRECLUDE  2 : to hold exclusively  3 : to deal with or close in advance  4 : to subject to foreclosure proceedings ~ vi : to foreclose a mortgage

fore-clo-sure \-'klō-zhər\ n (1728) : an act or instance of foreclosing; specif : a legal proceeding that bars or extinguishes a mortgagor's right of redeeming a mortgaged estate

fore-deck \'fō(a)r-,dek, 'fó(a)r-\ n (1565) : the forepart of a ship's main deck

foredo var of FORDO

fore-doom \(')fōr-'düm, (')fór-\ vt (1608) : to doom beforehand

fore-face \'fō(a)r-,fās, 'fó(a)r-\ n (1545) : the part of the head of a quadruped that is in front of the eyes

fore-fa-ther \-,fä(t)h-ər, -,fät̲h-\ n (14c)  1 : ANCESTOR 1a  2 : a person of an earlier period and common heritage

fore-feel \(')fōr-'fē(a)l, (')fór-\ vt -felt \-'felt\; -feel-ing (1580) : to have presentiment of

forefend var of FORFEND

fore-fin-ger \'fō(a)r-,fiŋ-gər, 'fó(a)r-\ n (15c) : the finger next to the thumb — called also index finger

fore-foot \,füt\ n (14c)  1 : one of the anterior feet esp. of a quadruped  2 : the forward part of a ship where the stem and keel meet VANGUARD

fore-front \-,frant\ n (15c) : the foremost part or place : VANGUARD

fore-gath-er var of FORGATHER

**personal foul** *n* (ca. 1829) : a foul in a game (as basketball) involving usu. physical contact with or deliberate roughing of an opponent — compare TECHNICAL FOUL

**per·son·al·ism** \ˈpərs-nə-ˌliz-əm, -ˈn-ə-\ *n* (ca. 1846) : a doctrine emphasizing the significance, uniqueness, and inviolability of personality — **per·son·al·ist** \-list\ *n or adj* — **per·son·al·is·tic** \ˌpərs-nə-ˈlis-tik, -ˈn-ə-\ *adj*

**per·son·al·i·ty** \ˌpərs-ᵊn-ˈal-ət-ē, ˌpər-ˈsnal-\ *n, pl* **-ties** [ME *personalite*, fr. LL *personalitas*, *personalitas*, fr. *personalis*] (14c) **1 a** : the quality or state of being a person **b** : personal existence **2 a** : the condition or fact of relating to a particular person; *specif* : the condition of referring directly to or being aimed disparagingly or hostilely at an individual **b** : an offensively personal remark (indulgence in *personalities*) **3** : the complex of characteristics that distinguishes an individual or a nation or group; *esp* : the totality of an individual's behavioral and emotional characteristics **4 a** : distinction or excellence of personal and social traits; *also* : a person having such quality **b** : a person of importance, prominence, renown, or notoriety (a TV ~) *syn see* DISPOSITION
**personality inventory** *n* (1932) : any of several tests that attempt to characterize the personality of an individual by objective scoring of replies to a large number of questions concerning his or her own behavior — compare MINNESOTA MULTIPHASIC PERSONALITY INVENTORY
**personality test** *n* (1904) : any of several tests that consist of standardized tasks designed to determine various aspects of the personality or the emotional status of the individual examined

**per·son·al·ize** \ˈpərs-nə-ˌlīz, -ˈn-ə-\ *vt* **-ized; -iz·ing** (ca. 1727) **1** : PERSONIFY **2** : to make personal or individual; *specif* : to mark as the property of a particular person (*personalized* stationery) — **per·son·al·iza·tion** \ˌpərs-nə-lə-ˈzā-shən, -ˈn-ə-\ *n*

**per·son·al·ly** \ˈpərs-nə-lē, -ˈn-ə-\ *adv* (14c) **1** : in person (attend to the matter ~) **2** : as a person : in personality (~ attractive but not very trustworthy) **3** : for oneself : as far as oneself is concerned
**personal pronoun** *n* (1668) : a pronoun (as *I, you,* or *they*) that expresses a distinction of person
**personal property** *n* (1838) : property other than real property consisting of things temporary or movable : CHATTELS
**personal tax** *n* (ca. 1935) : DIRECT TAX
**per·son·al·ty** \ˈpərs-nᵊl-tē, -ˈn-əl-tē, *n, pl* **-ties** [ME, fr. AF *personaltié*, fr. LL *personalitas*, *personalitas* personality] (15c) : PERSONAL PROPERTY
**per·so·na non gra·ta** \pər-ˌsō-nə-ˌnän-ˈgrat-ə, -ˈgrät-\ *adj* [NL, person not acceptable] (1904) : personally unacceptable or unwelcome

**per·son·ate** \ˈpərs-ᵊn-ˌāt\ *vt* **-at·ed; -at·ing** (1591) **1 a** : IMPERSONATE, REPRESENT **b** : to assume without authority and with fraudulent intent (some character or capacity) **2** : to invest with personality or personal characteristics (*personating* their gods ridiculous, and themselves past shame — John Milton) — **per·son·ation** \ˌpərs-ᵊn-ˈā-shən\ *n* — **per·son·ative** \ˈpərs-ᵊn-ˌāt-iv\ *adj* — **per·son·ator** \-ˌāt-ər\ *n*
**per·son·i·fi·ca·tion** \pər-ˌsän-ə-fə-ˈkā-shən\ *n* (ca. 1755) **1** : attribution of personal qualities; *esp* : representation of a thing or abstraction as a person or by the human form **2** : a divinity or imaginary being representing a thing or abstraction **3** : EMBODIMENT, INCARNATION
**per·son·i·fy** \pər-ˈsän-ə-ˌfī\ *vt* **-fied; -fy·ing** (1727) **1** : to conceive of or represent as a person or as having human qualities or powers **2** : to be the embodiment or personification of : INCARNATE (a man who *personified* kindness) — **per·son·i·fi·er** \-ˌfī-ər\ *n*

**per·son·nel** \ˌpərs-ᵊn-ˈel\ *n* [F, fr. G *personals, personal*, fr. MF, fr. LL, neut. of *personalis* personal] (1837) **1 a** : a body of persons usu. employed (as in a factory, office, or organization) **b personnel** *pl* : PERSONS **2** : a division of an organization concerned with personnel
**per·spec·tive** \pər-ˈspek-tiv\ *n* [ME *perspectyf*, fr. ML *perspectivum*, fr. neut. of *perspectivus* of sight, optical, fr. L *perspectus,* pp. of *perspicere* to look through, see clearly, fr. *per-* through + *specere* to look — more at FER-SPY] (14c) **1** : an optical glass (as a telescope)
**²perspective** *n* [MF, prob. modif. of OIt *prospettiva,* fr. *prospetto* view, prospect, fr. L *prospectus* — more at PROSPECT] (1563) **1 a** : the technique or process of representing on a plane or curved surface the spatial relation of objects as they might appear to the eye; *specif* : LINEAR PERSPECTIVE **b** : a picture in linear perspective **2 a** : the interrelation in which a subject or its parts are mentally viewed (places the issues in proper ~); *also* : POINT OF VIEW **b** : the capacity to view things in their true relations or relative importance (urge you to maintain your ~ and to view your own task in a larger framework —W. J. Cohen) **3 a** : a visible scene; *esp* : one giving a distinctive impression of distance : VISTA **b** : a mental view or prospect (to gain a broader ~ on the international scene —*Current Biog.*) **4** : the appearance to the eye of objects in respect to their relative distance and positions — **per·spec·tival** \pər-ˈspek-tiv-əl\ *adj*
**³perspective** *adj* [ML, fr. ML *perspectivus*] (1570) **1** *obs* : aiding the vision (his eyes should be like unto the wrong end of a ~ glass —Alexander Pope) **2** : of, relating to, employing, or seen in perspective (~ drawing) — **per·spec·tive·ly** *adv*
**per·spi·ca·cious** \ˌpər-spə-ˈkā-shəs\ *adj* [L *perspicac-, perspicax,* fr. *perspicere*] (1640) : of acute mental vision or discernment : KEEN *syn see* SHREWD — **per·spi·ca·cious·ly** *adv* — **per·spi·ca·cious·ness** *n* — **per·spi·cac·i·ty** \-ˈkas-ət-ē\ *n*
**per·spic·u·ous** \pər-ˈspik-yə-wəs\ *adj* [L *perspicuus* transparent, perspicuous, fr. *perspicere*] (1586) : plain to the understanding esp. because of clarity and precision of presentation (a ~ argument) *syn see* CLEAR — **per·spi·cu·ity** \ˌpər-spə-ˈkyü-ət-ē\ *n* — **per·spic·u·ous·ly** \pər-ˈspik-yə-wəs-lē\ *adv* — **per·spic·u·ous·ness** *n*
**per·spi·ra·tion** \ˌpər-spə-ˈrā-shən\ *n* (1626) **1** : the action or process of perspiring **2** : a saline fluid secreted by the sweat glands : SWEAT
**per·spi·ra·to·ry** \pər-ˈspī-rə-ˌtōr-ē, ˈpər-sp(ə-)rə-, -ˌtȯr-\ *adj* (1725) : of, relating to, secreting, or inducing perspiration
**per·spire** \pər-ˈspī(ə)r\ *vb* **perspired; per·spir·ing** [F *perspirer,* fr. MF, fr. L *per-* through + *spirare* to blow, breathe — more at FER- SPIRIT] (1725) : to emit matter through the skin; *specif* : to secrete and emit perspiration
**per·suad·able** \pər-ˈswäd-ə-bəl\ *adj* (ca. 1598) : capable of being persuaded
**per·suade** \pər-ˈswäd\ *vt* **per·suad·ed; per·suad·ing** [L *persuadēre,* fr. *per-* thoroughly + *suadēre* to advise, urge — more at SWEET] (15c) **1** : to move by argument, entreaty, or expostulation to a belief, position, or course of action **2** : to plead with : URGE — **per·suad·er** *n*

**per·sua·si·ble** \-ˈswä-zə-bəl, -ˈswä-sə-\ *adj* [MF, fr. L *persuasibilis*, fr. *persuasus*] (1502) : PERSUADABLE
**per·sua·sion** \pər-ˈswā-zhən\ *n* [ME *persuasioun,* fr. MF or L; MF *persuasion,* fr. L *persuasion-, persuasio,* fr. *persuasus,* pp. of *persuadēre*] (14c) **1 a** : the act or process of persuading **b** : the condition of being persuaded **3 a** : an opinion held **b** : a system of religious beliefs; *also* : a group adhering to a particular system of beliefs **4** : KIND, SORT *syn see* OPINION
**per·sua·sive** \-ˈswā-siv, -ziv\ *adj* (15c) : tending to persuade — **per·sua·sive·ly** *adv* — **per·sua·sive·ness** *n*
**pert** \ˈpərt\ *adj* [ME, open, bold, pert, modif. of OF *apert,* fr. L *apertus,* pp. of *aperire* to open] (14c) **1 a** : saucily free and flippantly cocky and assured **b** : being trim and chic : JAUNTY (a little hat) **c** : piquantly stimulating (is a ~ notion and might dominate the attention —G. J. Nathan) **2** : LIVELY, VIVACIOUS (a ~ saucy) — **pert·ly** *adv* — **pert·ness** *n*
**per·tain** \pər-ˈtān\ *vi* [ME *perteinen,* fr. MF *partenir,* fr. L *pertinēre* to reach to, belong, fr. *per-* through + *tenēre* to hold — more at THIN] (14c) **1 a** (1) : to belong as a part, member, accessory, or product (2) : to belong as an attribute, feature, or function (the deuce of havoc ~*ing* to war) (3) : to belong as a duty or right (responsibilities that ~ to fatherhood) **b** : to be appropriate to something (those ills ... will be different from those that ~ elsewhere —J. B. Conant) **c** : to have reference (books ~*ing* to birds)
**per·ti·na·cious** \ˌpərt-ᵊn-ˈā-shəs\ *adj* [L *pertinac-, pertinax,* fr. *per-* + *tenac-, tenax* tenacious, tenacious, fr. *tenēre*] (1626) **1 a** : adhering resolutely to an opinion, purpose, or design **b** : perversely persistent **2** : stubbornly unyielding or tenacious *syn see* OBSTINATE — **per·ti·na·cious·ly** *adv* — **per·ti·na·cious·ness** *n* — **per·ti·nac·i·ty** \-ˈas-ət-ē\ *n*
**per·ti·nence** \ˈpərt-ᵊn-ən(t)s, ˈpərt-nən(t)s\ *n* (1659) : the quality or state of being pertinent : RELEVANCE
**per·ti·nen·cy** \-ᵊn-ən-sē, -nən-sē\ *n* (1598) : PERTINENCE
**per·ti·nent** \ˈpərt-ᵊn-ənt, ˈpərt-nənt\ *adj* [ME, fr. MF, fr. L *pertinent-, pertinens,* prp. of *pertinēre*] (14c) : having a clear decisive relevance to the matter in hand *syn see* RELEVANT — **per·ti·nent·ly** *adv*
**per·turb** \pər-ˈtərb\ *vt* [ME *perturben,* fr. MF *perturber,* fr. L *perturbare,* fr. *per-* thoroughly + *turbare* to disturb — more at BD] (14c) **1** : to disturb greatly in mind : DISQUIET **2** : to throw into confusion : DISORDER **3** : to cause to experience a perturbation *— see* DISCOMPOSE — **per·turb·able** \-ˈtər-bə-bəl\ *adj*
**per·tur·ba·tion** \ˌpərt-ər-ˈbā-shən, -pər-ˌtər-\ *n* (14c) **1** : the act or perturbing : the state of being perturbed **2** : a disturbance of motion, course, arrangement, or state of equilibrium; *esp* : a disturbance of the regular and usu. elliptic course of motion of a celestial body that is produced by some force additional to that which causes its regular motion — **per·tur·ba·tion·al** \-shnəl, -shən-ᵊl\ *adj*
**per·tus·sis** \pər-ˈtəs-əs\ *n* [NL, fr. L *per-* thoroughly + *tussis* cough] (1799) : WHOOPING COUGH
**pe·ruke** \pə-ˈrük\ *n* [MF *perruque,* fr. OIt *parrucca, perrucca* hair, wig] (ca. 1565) : WIG; *specif* : one of a type popular from the 17th to the early 19th century
**pe·ruse** \pə-ˈrüz\ *vt* **perused; pe·rus·ing** [ME *perusen,* prob. fr. L *per-* thoroughly + ME *usen* to use] (15c) **1** : to examine or consider with attention and in detail : STUDY **2** : READ — **pe·rus·al** \-ˈrü-zəl\ *n* — **pe·rus·er** *n*
**per·vade** \pər-ˈvād\ *vt* **per·vad·ed; per·vad·ing** [L *pervadere* to go through, pervade, fr. *per-* through + *vadere* to go — more at WADE] (1659) : to become diffused throughout every part of — **per·va·sion** \pər-ˈvā-zhən\ *n* (1661) : the action of pervading or condition of being pervaded
**per·va·sive** \pər-ˈvā-siv, -ziv\ *adj* (ca. 1750) : that pervades or tends to pervade — **per·va·sive·ly** *adv* — **per·va·sive·ness** *n*
**per·verse** \(ˌ)pər-ˈvərs, ˈpər-\ *adj* [ME, fr. L *perversus,* fr. pp. of *pervertere*] (14c) **1 a** : turned away from what is right or good : CORRUPT **b** : IMPROPER, INCORRECT **c** : contrary to the evidence or the direction of the judge on a point of law (~ verdict) **2 a** : obstinate in opposing what is right, reasonable, or accepted : WRONGHEADED **b** : arising from or indicative of stubbornness or obstinacy **3** : marked by peevishness or petulance : CRANKY *syn see* CONTRARY — **per·verse·ly** *adv* — **per·verse·ness** *n* — **per·ver·si·ty** \pər-ˈvər-sət-ē, -stē\ *n*
**per·ver·sion** \pər-ˈvər-zhən, -shən\ *n* (14c) **1** : the action of perverting : the condition of being perverted **2** : a perverted form; *esp* : an aberrant sexual practice esp. when habitual and preferred to normal coitus
**per·ver·sive** \-ˈvər-siv, -ziv\ *adj* (1817) **1** : that perverts or tends to pervert **2** : arising from or indicative of perversion
**¹per·vert** \pər-ˈvərt\ *vt* [ME *perverten,* fr. MF *pervertir,* fr. L *pervertere* to overturn, corrupt, pervert, fr. *per-* through + *vertere* to turn — more at FER- WORTH] (14c) **1 a** : to cause to turn aside or away from what is good or true or morally right : CORRUPT **b** : to cause to turn aside or away from what is generally done or accepted : MISDIRECT **a** : to divert to a wrong end or purpose : MISUSE **b** : to twist the meaning or sense of : MISINTERPRET *syn see* DEBASE — **per·vert·er** *n*
**²per·vert** \ˈpər-ˌvərt\ *n* (ca. 1661) : one that has been perverted; *specif* : one given to some form of sexual perversion
**per·vert·ed** \pər-ˈvərt-əd\ *adj* (1667) **1** : CORRUPT **2** : marked by perversion — **per·vert·ed·ly** *adv* — **per·vert·ed·ness** *n*
**per·vi·ous** \ˈpər-vē-əs\ *adj* [L *pervius,* fr. *per-* through + *via* way — more at VIA] (1614) **1** : ACCESSIBLE (~ to reason) **2** : PERMEABLE (~ soil) — **per·vi·ous·ness** *n*
**Pe·sach** \ˈpä-ˌsäk\ *n* [Heb *pesaḥ*] (1613) : PASSOVER
**pe·se·ta** \pə-ˈsāt-ə\ *n* [Sp, fr. dim. of *peso*] (1811) — see MONEY table
**pe·se·wa** \pā-ˈsā-wä\ *n* [native name in Ghana] (1965) — see *cedi* at MONEY table
**pes·ky** \ˈpes-kē\ *adj* **pes·ki·er; -est** [prob. irreg. fr. *pest* + *-y*] (1775) : TROUBLESOME, VEXATIOUS
**pe·so** \ˈpā-(ˌ)sō, *pes-(ˌ)ō\ *n, pl* **pesos** [Sp, lit., weight, fr. L *pensum,* more at POISE] (1555) **1** : an old silver coin of Spain and Spanish America equal to eight reals **2** — see MONEY table **3** : the basic monetary unit of Chile replaced in 1960 by the escudo, a former basic monetary unit of Argentina replaced in 1985 by the *austral* — see *austral* at MONEY table
**pes·sa·ry** \ˈpes-ə-rē\ *n, pl* **-ries** [ME *pessarie,* fr. LL *pessarium,* fr. *pessum* pessary, fr. Gk *pessos* oval stone for playing checkers, pessary]

U.S. DEPARTMENT OF JUSTICE
Criminal Branch Library
Seventh Floor Bond

13 APR 1988

REF
PE
1625
R3
1987

# THE
# RANDOM HOUSE
# DICTIONARY
# OF THE
# ENGLISH
# LANGUAGE

## Second Edition

## Unabridged

*Dedicated to the memory of*
*Jess Stein*

COPYRIGHT © 1987, BY RANDOM HOUSE, INC.

First Edition: Copyright © 1983, 1981, 1979, 1973, 1971, 1970, 1969, 1967, 1966, by Random House, Inc.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced in any form or by any means, electronic or mechanical, including photocopying, without permission in writing from the publisher. All inquiries should be addressed to Reference Department, Random House, Inc., 201 E. 50th Street, New York, N.Y. 10022. Published in the United States by Random House, Inc., and simultaneously in Canada by Random House of Canada Limited, Toronto

*The Random House Dictionary of the English Language* and its abbreviations, RHD, RHDEL, RHD-1, and RHD-II, are trademarks of Random House, Inc.

Library of Congress Cataloging-in-Publication Data
The Random House dictionary of the English language.
(Random House dictionaries)
1. English language—Dictionaries. I. Flexner,
Stuart Berg. II. Series.
PE1625.R3    1987      423      87-4500
ISBN 0-394-50050-4; 0-394-56500-2 deluxe ed.

A number of entered words which we have reason to believe constitute trademarks have been designated as such. However, no attempt has been made to designate as trademarks or service marks all words or terms in which proprietary rights may exist. The inclusion, exclusion, or definition of a word or term is not intended to affect, or to express a judgment on, the validity or legal status of the word or term as a trademark, service mark, or other proprietary term.

*The Concise French Dictionary*, edited by Francesca L. V. Langbaum, Copyright © 1983, 1954, by Random House, Inc.

*The Concise German Dictionary*, edited by Jenni Karding Moulton, Copyright © 1983, 1959, by Random House, Inc.

*The Concise Italian Dictionary*, edited by Robert A. Hall, Jr., Copyright © 1983, 1957, by Random House, Inc.

*The Concise Spanish Dictionary*, edited by Donald F. Solá, Copyright © 1983, 1954, by Random House, Inc.

Entire contents of the *Atlas*, Copyright © 1987, by C. S. Hammond & Company.

*International Phonetic Alphabet*, courtesy International Phonetic Association.

Manufactured in the United States of America

r.s/uh

person's shoulders, or the like. **9.** to work or move up from the proper place or position (usually fol. by *up*): *Her skirt rode up above her knees.* **10.** to extend or project over something, as the edge of one thing over the edge of another thing. **11.** to turn or rest on something: *the great globe of the world riding on its axis.* **12.** to appear to float in space, as a heavenly body: *A blood-red moon rode in the cloudless sky.* **13.** to lie at anchor, as a ship.
—v. t. **14.** to sit on and manage (a horse, bicycle, etc.) so as to be carried along. **15.** to sit or move along (something); be carried or borne along on: *The ship rode the waves. We rode a bus.* **16.** to ride over, along, or through (a road, boundary, region, etc.); traverse. **17.** to ridicule or harass persistently: *The boys keep riding him about his poor grades.* **18.** to control, dominate, or tyrannize over: *a man ridden by fear; a country that is ridden by a power-mad dictator.* **19.** to cause to ride. **20.** to carry (a person) on something as if on a horse: *He rode the child about on his back.* **21.** to execute by riding: *to ride a race.* **22.** to rest on, esp. by overlapping. **23.** to keep (a vessel) at anchor or moored. **24.** *Jazz.* to play improvisations on (a melody). **25.** *ride down,* **a.** to trample or overturn by riding upon or against. **b.** to ride up to; overtake; capture: *The posse rode down the escaping bank robber.* **c.** *Naut.* to bear down upon (a rope or a tackle) with all one's weight. **26.** *ride for a fall,* to conduct oneself so as to invite misfortune or injury. **27.** *ride herd on.* See **herd**[1] (def. 5). **28.** *ride out,* **a.** to sustain (a gale, storm, etc.) without damage, as while riding at anchor. **b.** to sustain or endure successfully. **29.** *ride the beam,* *Aeron.* to fly along the course indicated by a radio beam. **30.** *ride shotgun.* See **shotgun** (def. 3).
—n. **31.** a journey or excursion on a horse, camel, etc., or on or in a vehicle. **32.** a means of or arrangement for transportation by motor vehicle: *We'll handle rides to be sure everyone gets home safely.* **33.** the vehicle used for transportation: *I've got to hang up now—my ride's here.* **34.** a vehicle or device, as a Ferris wheel, roller coaster, or merry-go-round, on which people ride for amusement. **35.** a way, road, etc., made esp. for riding. **36.** *take for a ride,* *Slang.* **a.** to murder, esp. by abduction and forcible transfer for that purpose. **b.** to deceive; trick: *It was obvious to everyone but me that I was taken for a ride.* [bef. 900; 1915–20 for def. 17; ME *riden* (v.), OE *rīdan;* c. OFris *rīda,* G *reiten,* ON *rītha;* akin to OIr *rīad* journey (cf. PALFREY, RHEDA). See ROAD]
—Syn. **2.** See **drive**.

**ride·a·ble** (rīʹdə bəl), *adj.* ridable.

**ri·dent** (rīdʹnt), *adj.* laughing; smiling; cheerful. [1600–10; < L *rīdent-* (s. of *rīdēns,* prp. of *rīdēre* to laugh); see -ENT]

**rid·er** (rīʹdər), *n.* **1.** a person who rides a horse or other animal, a bicycle, etc. **2.** something that rides. **3.** an additional clause, usually unrelated to the main body, attached to a legislative bill in passing it. **4.** an addition or amendment to a document, testament, etc. **5.** any object or device that straddles, is mounted upon, or is attached to something else. **6.** a rail or stake used to brace the corners in a snake fence. **7.** *Shipbuilding.* any of various members following and reinforcing primary framing members, esp. a plate or timber running along the top of a keel. **8.** *Numis.* **a.** a former gold coin of Scotland, first issued by James III in 1475, whose obverse bears an equestrian figure of the king. **b.** any of several gold or silver coins of the Netherlands bearing the figure of a horseman. [bef. 1100; ME *ridere,* OE. See RIDE, -ER[1]] —*rid·er·less,* adj.

**ride·red** (rīʹdərd), *adj.* braced or reinforced with riders, as a snake fence. [1825–35; RIDER + -ED[3]]

**rid·er·ship** (rīʹdər shipʹ), *n.* the passengers who use a given public transportation system, as buses or trains, or the number of such passengers. [1965–70; RIDER + -SHIP]

**ride·shar·ing** (rīdʹshârʹing), *adj.* **1.** *Also,* **ride·share**[1]. of or pertaining to sharing rides or transportation, esp. among commuters: *The agency was set up to devise a ridesharing program.* —n. **2.** an act or instance of sharing rides or transportation, esp. by commuters: *A statewide campaign to encourage ridesharing would reduce overcrowding on the highways.* [RIDE + SHARE[1] + -ING[1]]

**ridge** (rij), *n., v.,* **ridged, ridg·ing.** —*n.* **1.** a long, narrow elevation of land; a chain of hills or mountains. **2.** the long and narrow upper edge, angle, or crest of something, as a hill, wave, or vault. **3.** the back of an animal. **4.** any raised, narrow strip, as on cloth. **5.** the horizontal line in which the tops of the rafters of a roof meet. **6.** (on a weather chart) a narrow, elongated area of high pressure. —*v.t.* **7.** to provide with or form into a ridge or ridges. **8.** to mark with or form into ridges. —*v.i.* **9.** to form ridges or ridgelike parts. [bef. 900; ME *rigge* (n.), OE *hrycg* spine, crest, ridge; c. D *rug,* G *Rücken,* ON *hryggr*] —*ridgeʹlikeʹ, adj.*

**ridge·back** (rijʹbakʹ), *n. Informal.* See **Rhodesian Ridgeback.** [1935–40; by shortening]

**Ridge·crest** (rijʹkrestʹ), *n.* a town in central California. 15,929.

**Ridge·field** (rijʹfēldʹ), *n.* **1.** a town in SW Connecticut. 20,120. **2.** a borough in NE New Jersey. 10,294.

**Ridge·field Parkʹ,** a town in NE New Jersey. 12,738.

**ridge·ling** (rijʹling), *n. Vet. Med.* any male animal, esp. a colt, with undescended testicles. *Also,* **ridg·ling.** *Also called* **rig·el, ridg·il** (rijʹəl). [1545–55; perh. RIDGE + -LING[1], from the belief that the undescended organs were in the animal's back]

**ridge·pole** (rijʹpōlʹ), *n.* the horizontal timber or member at the top of a roof, to which the upper ends of the rafters are fastened. *Also,* **ridgeʹ poleʹ.** *Also called* **ridgepiece** (rijʹpēsʹ), **ridgeʹ boardʹ.** See diag. under **queen post.** [1780–90; RIDGE + POLE[1]] —*ridgeʹpoledʹ, adj.*

**Ridge·wood** (rijʹwoŏdʹ), *n.* a city in NE New Jersey. 25,208.

**Ridg·way** (rijʹwā), *n.* **Matthew Bunker,** born 1895, U.S. army general: chief of staff 1953–55.

**Rid·gy** (rijʹē), *adj.,* **ridg·i·er, ridg·i·est.** rising in a ridge or ridges. [1690–1700; RIDGE + -Y[1]]

**ri·di·cule** (ridʹi kyoōlʹ), *n., v.,* **-culed, -cul·ing.** —*n.* **1.** speech or action intended to cause contemptuous laughter at a person or thing; derision. —*v.t.* **2.** to deride; make fun of. [1665–75; < L *rīdiculum* a joke, equiv. to *rīdi(re)* to laugh + -*i* + *-ī·* + *-culum* CULE[2]] —*ridʹi·culʹer, n.*
—Syn. **1.** mockery, raillery, sarcasm, satire, irony. **2.** banter, chaff, rally, twit, burlesque, satirize, lampoon. RIDICULE, DERIDE, MOCK, TAUNT imply making game of a person, usually in an unkind, jeering way. To RIDICULE is to make fun of, either sportively and good-humoredly, or unkindly with the intention of humiliating: *to ridicule a pretentious person.* To DERIDE is to assail one with scornful laughter: *to deride a statement of belief.* To MOCK is sometimes playfully, sometimes insultingly, to imitate and caricature the appearance or actions of another: *She mocked the seriousness of his expression.* To TAUNT is to call attention to something annoying or humiliating, usually maliciously and exultingly and often in the presence of others: *to taunt a candidate about his defeat in an election.*
—Ant. praise.

**ri·dic·u·lous** (ri dikʹyə ləs), *adj.* causing or worthy of ridicule or derision; absurd; preposterous; laughable: *a ridiculous plan.* [1540–50; < LL *rīdiculōsus* laughable, droll, and L *rīdiculus* (adj; deriv. of *rīdiculum* RIDICULE); see -OUS] —*ri·dicʹu·lous·ly, adv.* —*ri·dicʹu·lous·ness,* n.
—Syn. nonsensical, ludicrous, funny, droll, comical, farcical. See **absurd.** —Ant. sensible.

**rid·ing**[1] (rīʹding), *n.* **1.** the act of a person or thing that rides. —*adj.* **2.** used in traveling or in riding: *riding clothes.* [bef. 1000; ME th., adj.); OE *rīdende* (adj.). See RIDE, -ING[1], -ING[2]]

**rid·ing**[2] (rīʹding), *n.* **1.** any of the three administrative divisions into which Yorkshire, England, is divided, namely, North Riding, East Riding, and West Riding. **2.** any similar administrative division elsewhere. [1250–1300; ME *riding,* OE **thriding* < ON *thrithjungr* third part; t- of NED, var. of *th-* (of OE), lost by assimilation to -*t* in *east, west,* which commonly preceded]

**rid·ing bootʹ,** a knee-high boot of black or brown leather, without fastenings, forming part of a riding habit. [1850–55]

**rid·ing breechʹes,** calf-length trousers of whipcord or other durable fabric, flaring at the sides of the thighs and fitting snugly at and below the knees, worn with riding boots for horseback riding, hunting, etc. Also called **breeches.** Cf. **jodhpurs.**

**rid·ing cropʹ,** crop (def. 7).

**rid·ing habʹit,** habit (def. 11). [1660–70]

**rid·ing lightʹ.** See **anchor light.**

**rid·ing masʹter,** a person who teaches equitation. [1640–50]

**rid·ing sailʹ,** *Naut.* a triangular sail set on the aftermost mast of a vessel, esp. a fishing vessel, to head it into the wind; trysail.

**rid·ing schoolʹ,** a place where equitation is taught. [1670–80]

**rid·ley** (ridʹlē), *n., pl.* **-leys. 1.** *Also called* **Atlantic ridley, bastard ridley, bastard turtle.** a gray sea turtle, *Lepidochelys kempii,* of the Atlantic and Gulf coasts of North America, about 24 in. (61 cm) long, previously thought to be a hybrid of the loggerhead and green turtles: an endangered species. **2.** *Also called* **olive ridley, Pacific ridley.** an olive-colored sea turtle, *L. olivacea,* similar to *L. kempii,* inhabiting tropical waters of the Indian, Pacific, and South Atlantic oceans: threatened or endangered throughout its range. [1940–45; of undetermined orig.]

**Rid·ley** (ridʹlē), *n.* **1. Nicholas,** c1500–55, English bishop, reformer, and martyr. **2.** a town in SE Pennsylvania, near Philadelphia. 33,771.

**ri·dot·to** (ri dotʹō), *n., pl.* **-tos.** a public ball or dance with music and often in masquerade, popular in the 18th century. [1715–25; < It: retreat, resort; see REDOUBT]

**rie·beck·ite** (rēʹbe kītʹ), *n.* an amphibolic mineral, silicate of sodium and iron, occurring usually in feldspathoid rocks. [1888–90; named after Emil *Riebeck* (d. 1885), German explorer; see -ITE[1]]

**Rie·fen·stahl** (rēʹfən shtälʹ), *n.* **Le·ni** (lāʹnē), born 1902, German film director.

**Rie·ga** (rēʹgä; *Serbo-Croatian.* ˈrē yeʹkä), *n.* **Rijeka.**

**riel** (rel, rē elʹ), *n.* a paper money and monetary unit of Cambodia, equal to 100 sen.

**Riel** (rē elʹ), *n.* **Louis,** 1844–85, Canadian revolutionary.

**Rie·mann** (rēʹmän; *Eng.* rēʹmän, -mən), *n.* **Ge·org Frie·drich Bern·hard** (gə ôrkʹ frēʹdriKH bernʹhärt), 1826–66, German mathematician. —*Rie·mann·i·an* (rē māʹnē ən), *adj.*

**Rie·mann·i·an geomʹetry,** *Geom.* **1.** *Also called* **elliptic geometry,** the branch of non-Euclidean geometry that replaces the parallel postulate of Euclidean geometry with the postulate that in a plane every pair of distinct lines intersects. Cf. **hyperbolic geometry. 2.** the differential geometry of a metric space that generalizes a Euclidean space. [1915–20]

**Rie·mann inʹtegral,** *Math.* integral (def. 8a). [1910–15; named after G. F. B. RIEMANN]

**Rie·mann sphereʹ,** *Math.* a sphere used for a stereographic projection. [named after G. F. B. RIEMANN]

**Rie·mann-Stielʹtjes inʹtegral** (rēʹmän stēlʹchiz),

---

given interval approaches zero, the sum of the products of the first of two functions evaluated at some point in each subinterval multiplied by the difference in functional values of the second function at the endpoints of the subinterval. [named after G. F. B. RIEMANN and T. J. *Stieltjes*]

**Rie·mann surʹface,** *Math.* a geometric representation of a function of a complex variable in which a multiple-valued function is depicted as a single-valued function on several planes, the planes being connected at some of the points at which the function takes on more than one value. Cf. **branch cut, branch point.** [1890–95; named after G. F. B. RIEMANN]

**rien ne va plus** (RYAN nə va plyⁿ), *French.* (in roulette) no further bets.

**Rhōn·zl** (rē enʹzē; *It.* ryenʹdzē), *n.* **Co·la di** (kōʹlä dē), (*Nicholas Gabrini*), 13137–54, Roman orator and tribune. Also, **Ri·en·zo** (rē enʹzō; *It.* ryenʹdzō).

**Ries·ling** (rēzʹling, rēsʹ-), *n.* **1.** *Hort.* a variety of grape. **b.** the vine bearing this grape, grown in Europe and California. **2.** a fragrant, white, dry or sweet wine made from this grape. [1825–35; < G]

**Ries·man** (rēsʹmən), *n.* **David,** born 1909, U.S. sociologist.

**Riesz spaceʹ** (rēs), *Math.* a topological space in which sets containing one point are closed. [after Frigyes *Riesz* (1880–1956), Hungarian mathematician]

**Rie·ti** (rē etʹē; *It.* ryeʹtē), *n.* **Vit·to·ri·o** (vēt tôrʹyō), born 1898, U.S. composer, born in Italy.

**Riet·veld** (rētʹfelt), *n.* **Ger·rit Tho·mas** (KHERʹit tōʹmäs), 1888–1965, Dutch architect.

**rif** (rif), *v.t.,* **riffed, rif·fing.** *Informal.* to discharge (a person) from military or civil service, esp. as part of an economy program. Also, **riff.** [1945–50; special use of *reduction*]

**Rif** (rif), *n.* **Er** (er), a mountainous coastal region in N Morocco. Also, **Riff.**

**RIF** (rif), *n.* **1.** *Mil.* a reduction in the personnel of an armed service or unit. **2.** a reduction in the number of persons employed by a business, government department, etc., esp. for budgetary reasons. [*R(eduction) I(n) F(orce)*]

**Ri·fa·i·ya** (rē fäʹ ēʹya), *n. Islam.* a band of dervishes who achieved ecstasy during prayer by violent body movements and self-inflicted pain; formed in the 12th century; outlawed in 1925.

**ri·fam·pin** (ri famʹpin), *n. Pharm.* a semisynthetic broad-spectrum antibiotic, $C_{43}H_{58}N_4O_{12}$, used in the treatment of pulmonary tuberculosis, asymptomatic carriers of meningococcal disease, and leprosy. [1965–70; prob. *rifam(ycin)* (orig., *rifomycin,* equiv. to *rifo-* (perh. < It *rifo(rmare)* to REFORM) + -MYCIN) + PI(PERAZINE)]

**rife** (rīf), *adj.* **1.** of common or frequent occurrence; prevalent; in widespread existence, activity, or use: *Crime is rife in the slum areas of our cities.* **2.** current in speech or report: *Rumors are rife that the government is in financial difficulty.* **3.** abundant, plentiful, or numerous. **4.** abounding (usually fol. by *with*). [bef. 1150; ME OE *rīfe;* c. MD *rijf* abundant, ON *rīfr*] —*rifeʹly, adv.* —*rifeʹness, n.*
—Syn. **3.** plenteous, multitudinous; teeming, swarming. —Ant. **3.** scarce.

**riff**[1] (rif), *Jazz.* —*n.* **1.** a melodic phrase, often constantly repeated, forming an accompaniment or part of an accompaniment for a soloist. —*v.i.* **2.** to perform riffs. [1930–35; perh. alter. and shortening of REFRAIN[2]]

**riff**[2] (rif), *v.t. Informal.* rif.

**Riff** (rif), *n., pl.* **Riffs, Riff·i** (rifʹē), (*esp. collectively*) **Riff. 1.** a member of the Berber people living in Er Rif in northern Morocco. **2.** Rif. —*Riffʹi·an, adj., n.*

**rif·fle** (rifʹəl), *v.,* **-fled, -fling,** *n.* —*v.t.* **1.** to turn hastily; flutter and shift: *to riffle a stack of letters; to riffle through a book.* **2.** *Cards.* to shuffle by dividing the deck in two, raising the corners slightly, and allowing them to fall alternately together. **3.** to cause or become a riffle. —*n.* **4.** a rapid, as in a stream. **5.** a ripple, as upon the surface of water. **6.** *Mining.* the lining of transverse bars or slats on the bed of a sluice, arranged so as to catch heavy minerals, as gold or platinum. **7.** a hopper for distributing bulk material. **8.** the act or method of riffling cards. [1635–40; b. RIPPLE[1] and RUFFLE[1]]

**rif·fler** (rifʹlər), *n.* a small curved file. [1790–1800; perh. < G *riffel(n)* to cut grooves into (see RIFLE[2]); cf. F *rifloir* a kind of file (see RIFLE[2])]

**riff·raff** (rifʹrafʹ), *n.* **1.** people, or a group of people, regarded as disreputable or worthless: *a pack of riffraff.* **2.** the lowest classes; rabble: *the riffraff of the city.* **3.** trash; rubbish. —*adj.* **4.** worthless, disreputable, or trashy. [1425–75; late ME *rif and raf* every particle, things of small value < OF *rif et raf,* formed on *rifler* to spoil (see RIFLE[1]), *raffer* to ravage, snatch away]

**ri·fle**[1] (rīʹfəl), *n., v.,* **-fled, -fling.** —*n.* **1.** a shoulder firearm with spiral grooves cut in the inner surface of the gun barrel to give the bullet a rotatory motion and thus a more precise trajectory. See illus. on next page. **2.** one of the grooves. **3.** a cannon with such grooves. [1610–20; special use of RIFLE[2]] —*ri·flerʹless, adj.* —*ri·flerʹman,* n., of a certain military units or bodies equipped with rifles. **5.** to cut spiral grooves

CONCISE PRONUNCIATION KEY: *act, cāpe, dâre, pärt; set, ēqual; if, īce; ox, ōver, ôrder, oil, boŏk, boōt; out, up, ûrge; child; sing; shoe; thin, that; zh as in treasure. ə = a as in alone, e as in system, i as in easily, o as in gallop, u as in circus;* as in fire (fīʳr), hour (ouʳr). * and n can serve as syllabic consonants, as in cradle (krādʹl), and button (butʹn). See the full key inside the front cover.

U.S. Department of
Homeland Security

United States
Coast Guard

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CCG
Phone: (202) 372-4400
Fax: (202) 372-4960

**AUG 1 3 2010**

MEMORANDUM FOR:    Secretary Janet Napolitano

FROM:    Admiral R. J. Papp, Jr.
U. S. Coast Guard

SUBJECT:    COAST GUARD ACTIVE DUTY ENLISTED CAREER
RETENTION SCREENING PANEL

---

I request your approval for the Coast Guard to conduct an Active Duty Enlisted Career Retention
Screening Panel in the fall of 2010. The panel is required to address high retention and its
adverse impact on workforce flow. The legal authority to conduct such a panel derives from
Title 14, U.S. Code Section 357 (j) and from Title 10, U. S. Code Section 1169. Per Title 14
U.S. Code, Section 357 (j), the Secretary of Homeland Security must provide authorization for
involuntary retirements without a Board's action.

The Coast Guard has taken steps to resolve the retention problem. We have reduced our
accessions to the lowest level in our records. We temporarily waived obligated service
requirements to allow voluntary separations. However, the majority (91%) of over 700 recent
voluntary separation requests were from junior enlisted ranks, and not our more senior
workforce. If allowed to continue, this trend, along with our reduced accessions, will result in an
imbalance in the enlisted workforce's experience level for many years to come.

The panel will review approximately 1600 records, including the records of all first class petty
officers and below with twenty or more years of service and all chief petty officers and above
with twenty or more years of service and three years or more time in grade. Because the panel
will only review those with twenty or more years of service, everyone reviewed will be
retirement eligible. Members asked to involuntary retire will still be entitled to full retirement
benefits.

Your endorsement of this memo will provide the Coast Guard with the legal authority required to
conduct this panel.

**Recommendation:**

Recommended you sign.

**Executive Secretariat Clearance:**

Phil McNamara

DATE: 8/24/10

**The Secretary**

APPROVED: _____     DATE: 9-21-10 _____

DISAPPROVED: _____     DATE: _____

COMMENTS:

# In the United States Court of Federal Claims

No. 18-923C
Filed: July 2, 2019

|  |  |
|---|---|
| TONIA TIPPINS, et. al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |

**ORDER**

On March 1, 2019, the parties filed a Joint Preliminary Status Report ("JPSR"). ECF No. 14. In the JPSR, the parties disagreed on whether the Court should proceed on motions for judgment on the administrative record in accordance with Rule 52.1(b) of the Rules of the Court of Federal Claims ("RCFC") or motions for summary judgment under RCFC 56. *See id.* at 2. The Court requested briefing on this issue after a telephonic status conference on March 19, 2019.

Plaintiffs contend that a decision based on an administrative record is inappropriate, as plaintiffs challenge the legality of the Coast Guard's refusal to provide plaintiffs with an Enlisted Personnel Board, rather than challenging a prior administrative decision of the Coast Guard or a military corrections board. *See generally* Plaintiffs' Memorandum (hereinafter "Pl.'s Mem."). Defendant argues that judgment on the administrative record is appropriate, as plaintiffs are asking the Court to determine whether the decision of the Coast Guard to discharge plaintiffs based on the recommendation of the CRSPs was lawful. *See* Defendant's Opposition to Plaintiffs' Memorandum (hereinafter "Def.'s Resp.") at 9. In support of its argument, defendant points to a number of cases, all of which have held that a service member's decision to bypass a correctional board's review does not alter the APA standard of review the Court is required to apply. *See generally Walls v. United States,* 582 F.3d 1358,1367 (Fed. Cir. 2009); *Metz v. United States,* 466 F.3d 991, 998 (Fed. Cir. 2006); *Martinez v. United States* 333 F.3d 1295, 1304–06, 1314 (Fed. Cir. 2003). Plaintiffs respond that those cases deal with a decision by a military corrections board, while plaintiffs' claims have not been considered by any administrative authority and, therefore, should be reviewed *de novo*. Plaintiffs' Reply (hereinafter "Pl.'s Reply") at 3.

*Lippmann v. United States*, 127 Fed. Cl. 238 (2016), sets forth the standard that claims brought to this Court without previous consideration by an administrative board are reviewed *de novo*. *See* 127 Fed. Cl. at 250. Similar to the circumstances in this case, Marcus Randolph

Lippmann was a senior Coast Guard non-commissioned officer that was forced to retire under the 2013 CRSP. *Id.* Lippmann challenged the legality of the Coast Guard's decision to involuntarily retire him based on the recommendation of the CRSP. *Id.* The Court noted that Lippmann's claim was not reviewed or decided upon by the Coast Guard or by a military corrections board. *Id.* The Court reviewed the claim *de novo*, as the plaintiff "assert[ed] his claims for the first time in th[e] litigation." *Id.*

Plaintiffs here are challenging the legality of the Coast Guard's use of CRSPs under 14 U.S.C. § 357. Pl.'s Mem. at 6. Specifically, plaintiffs allege there was no reduction in force and that the service members' statutory rights were violated when they did not receive an Enlisted Personnel Board. *See id.* at 1. As plaintiffs are challenging the legality of the CRSPs for the first time, and neither the Coast Guard nor a military corrections board has considered this issue, there is no appropriate administrative record for the Court to review. Accordingly, the Court will review plaintiffs' legal claims, and the parties will proceed with Cross-Motions for Summary Judgment.

It appears to the Court that the appropriate legal standard is governed by the decision in *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Discussion of that issue will await a decision on the Motion to Compel and will be considered when the Cross-Motions for Summary Judgment are heard.

During oral argument, a dispute arose regarding discovery. The Court will allow plaintiffs to file a motion to compel on the issue of the Coast Guard's current and past interpretation of "reduction in force" in accordance with 14 U.S.C. § 357. Plaintiffs shall file its Motion to Compel on or before July 29, 2019.

Pursuant to discussion held during the oral argument on June 27, 2019, this case will proceed on Motions for Summary Judgment. Those Motions shall be delayed pending a decision on plaintiffs' forthcoming Motion to Compel. Plaintiffs' Motion to Compel shall be filed on or before **August 1, 2019**. Defendant's Response to plaintiffs' Motion to Compel shall be filed on or before September 3, 2019. Plaintiffs' Reply in Support of its Motion to Compel shall be filed on or before September 17, 2019. Oral Argument on the Motion to Compel will be set at a later date.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge

# In the United States Court of Federal Claims

No. 18-923C

Filed: August 10, 2020

|  |  |
|---|---|
| **TONIA TIPPINS, et al.,**<br><br>*Plaintiffs,*<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>*Defendant.* | **Keywords:** Involuntary Retirement; Career Retention Screening Panel; Discovery; RCFC 30(b)(6); Motion to Compel |

*Nathan S. Mammen, Ragan Naresh, and Emily M. Kustina*, Kirkland & Ellis LLP, Washington, D.C., for the plaintiff.

*Dlisa M. Sanchez*, Trial Attorney, Commercial Litigation Branch, *with whom were Martin F. Hockey, Jr.,* Deputy Director, *Robert E. Kirschman, Jr.,* Director, Civil Division, *Ethan P. Davis,* Acting Assistant Attorney General, U.S. Department of Justice, Washington, D.C., *and LCDR Jesse L. Houck*, U.S. Coast Guard, Of Counsel, for the defendant.

## OPINION AND ORDER

**Tapp, Judge.**

Plaintiffs Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner (collectively "Plaintiffs") brought this action to challenge the legality of their involuntary retirement from the United States Coast Guard. On March 16, 2020, the Plaintiffs filed a Motion to Compel the United States, through the Coast Guard, to produce a designee for a RCFC 30(b)(6) Deposition. (Mot. to Comp., ECF No. 39). On May 18, 2020, the United States responded and moved for a protective order relieving it of any obligation to provide a representative to testify about the twelve topics contained in Plaintiffs' RCFC 30(b)(6) deposition notice. (Def.'s Resp. and Mot. for Prot. Order ("Def.'s Resp."), ECF No. 46). Plaintiffs filed their Reply on June 15, 2020. (Pls.' Reply, ECF No. 50). These competing motions now stand submitted.

For the following reasons, the United States' Motion for a Protective Order is **DENIED**. The Court **DEFERS** resolution of Plaintiffs' Motion to Compel pending further discussions between the parties.

### I.    Background

The ultimate resolution of this case turns on whether the Coast Guard acted contrary to law when it involuntarily retired numerous Coast Guard members from 2010 to 2014 through Career Retention Screening Panels ("CRSPs"). The United States maintains that the retirements were part of a lawful "reduction in force" under 14 U.S.C. § 357(j). There have been no

proceedings before an administrative board to determine the lawfulness of these retirements. This Court has previously determined this case should be briefed for summary judgment on the legality of Plaintiffs' retirement via CRSPs in lieu of Enlisted Personnel Boards. (Order, ECF No. 22 (J. Smith)).[1]

To that end, Plaintiffs seek to depose a representative from the Coast Guard regarding several topics outlined in a July 11, 2019 request for production of documents. (Mot. to Comp., Ex. 1). Plaintiffs served a formal RCFC 30(b)(6) notice on the United States on November 27, 2019, which outlined twelve topics of examination. (Mot. to Comp., Exs. 4, 5). On February 7, 2020, the United States responded to that notice stating it would oppose further discovery in this case. (Mot. to Comp., Ex. 6). Plaintiffs now ask the Court to compel the Coast Guard to produce a representative for live deposition testimony, and the United States seeks a protective order relieving it from any obligation to do so.

## II.     Legal Standard

RCFC 26(b)(1) governs the scope of permissible discovery, constraining parties to "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Whether discovery is proportional to the needs of the case requires considerations of "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

Under RCFC 30(b)(6), a party may notice deposition to a government agency, which then must designate an appropriate representative to testify on its behalf. The notice "must describe with reasonable particularity the matters for examination" before the agency is required to designate a representative to be examined. RCFC 30(b)(6); *see also Alexander v. F.B.I.*, 186 F.R.D. 137 (D.D.C. 1998). Once this burden is satisfied, the government agency then "has an affirmative duty to make available persons who will be able to give complete, knowledgeable and binding answers on its behalf." *Dairyland Power Co-op. v. United States*, 79 Fed. Cl. 709, 714 (2007) (internal quotations omitted). The representative is obligated to be prepared to testify "about information known or reasonably available to the organization." RCFC 30(b)(6); *see also AG-Innovations, Inc. v. United States*, 82 Fed. Cl. 69, 80 (2008).

## III.     Analysis

The parties' motions place two issues before the Court. First, the parties disagree as to whether discovery is available in this case. Second, assuming for the sake of argument that discovery is permitted, the parties disagree over the proper scope of that discovery.

### A.   Availability of Discovery in This Case.

Plaintiffs argue that they are entitled to discovery because they elected to bring this military pay action before this Court in the first instance, rather than first seeking review from the Coast Guard Board for Correction of Military Records. (Mot. to Comp. at 6). Plaintiffs urge

---

[1] The Court reserved a decision on the appropriate standard of review for consideration in concert with the parties' cross-motions for summary judgment. (ECF No. 22 at 2).

that limited discovery was contemplated by this Court's July 2, 2019, Order. (Pls.' Reply at 7 (citing ECF No. 22)). The United States argues that discovery outside the administrative record is categorically prohibited because this is a military pay case, which must proceed only on the administrative record. (Def.'s Resp. at 1 ("[P]laintiffs' strategic decision to bypass review of their claims by a Coast Guard correction board does not entitle them to discovery in this Court."), 12 ("Pursuing *de novo* review of their claims in this court, however, does not entitle plaintiffs to discovery.")).

      i.   The Court's July 2, 2019 Order Does Not Rule on the Availability of Discovery in This Case.

On June 27, 2019, the Court heard oral argument on whether this case should proceed on motions for summary judgment or motions for judgment on the administrative record. (*See* ECF No. 22 at 2 (holding the case should proceed on motions for summary judgment)). During oral argument, discussion ensued regarding whether Plaintiffs would be entitled to discovery. Ultimately the Court entered an order allowing Plaintiffs to file a motion to compel to address that issue. (*Id*.). Despite vehement contentions to the contrary, that Order provides no support for either party's position on whether discovery is available in this case, much less the scope of the contemplated discovery.

      ii.   Discovery is Not Categorically Prohibited in Military Pay Cases.

Plaintiffs argue that, like in *Lippmann v. United States*, 127 Fed. Cl. 238 (2016), fact discovery is necessary to determine "whether the CRSP process was conducted pursuant to a reduction in force in view of the Coast Guard's pre-litigation understanding and use of that term." (Mot. to Comp. at 7). Plaintiffs further contend that because the evidence they seek was unavailable below, this Court's review of Plaintiffs' claims is not limited to the administrative record. (*Id*. at 8 (citing *Wyatt v. United States*, 23 Cl. Ct. 314, 319 (1991)). The United States counters that *Lippmann* was incorrectly decided and cites several cases in support of its argument that this Court's review is limited to the administrative record in military pay cases.[2] (Def.'s Resp. at 13). While there is merit to both sides' arguments, Plaintiffs place too much weight on *Lippman*, even if correctly decided, and the cases to which the United States cites do not squarely address the issue presented in this case.

In *Lippmann v. United States*, 127 Fed. Cl. 238 (2016), a servicemember challenged the Coast Guard's decision to involuntarily retire him pursuant to the recommendation of a CRSP. As here, that servicemember elected to bypass a military records corrections board and instead brought a challenge in this court. *Id*. at 242. The Court held that it would review the servicemember's claims *de novo*. *Id*. at 250. Further, the Court held in abeyance the parties' cross-motions for summary judgment pending further briefing on whether the servicemember was entitled to a hearing before an Enlisted Personnel Board pursuant to 14 U.S.C. § 357, the

---

[2] The United States contends *Lippmann* is incorrect and "contrary to other decisions of the Federal Circuit, this Court, and this Court's predecessor[.]" (Def. Resp. at 13 (citing *Allphin v. United States*, 758 F.3d 1336 (Fed. Cir. 2014); *Bateson v. United States*, 48 Fed. Cl. 162 (2000), *aff'd,* 64 F. Appx. 244 (Fed. Cir 2003); and *Wyatt v. United States*, 23 Cl. Ct. 314 (1991))).

same "reduction in force" statute at issue in this case. *Id*. at 251–52. In concluding that supplemental briefing on the issue was necessary, the Court determined that "a more complete factual record [was] needed to inform the Court's analysis of the parties' cross-motion for summary judgment on [the issue of whether the Secretary of the Department of Homeland Security actually ordered a reduction in force]." *Id*. at 252. However, *Lippmann* was dismissed by stipulation of the parties prior to resolution of the § 357 issue. In any event, *Lippmann* provides little guidance as to whether discovery is available or warranted here.

In *Allphin v. United States*, 758 F.3d 1336 (Fed. Cir. 2014), approximately 300 plaintiff-servicemembers were separated from the Navy through an Enlisted Retention Board ("ERB"). The Federal Circuit agreed that the decisions to convene the ERBs and discharge servicemembers were nonjusticiable, but reviewed whether creation of the ERB exceeded the Navy's statutory authority. *Id*. at 1341–42. On this issue, the Federal Circuit affirmed judgment on the administrative record for the United States, finding the Navy did not exceed its statutory authority in implementing the ERBs. *Id*. at 1342. The Federal Circuit also affirmed the Court of Federal Claims' denial of the plaintiffs' motion to supplement the administrative record with four documents relevant only to the nonjusticiable claims, finding no abuse of discretion in that decision. *Id*. at 1344. Ignoring that *Allphin* was adjudicated on the administrative record, the United States highlights that the Federal Circuit affirmed the Court of Federal Claims' decision to deny supplementation of the administrative record and argues that this case contradicts *Lippman*. (Def.'s Resp. at 13). The Court sees no irreconcilable tension between the two cases and finds *Allphin* largely inapplicable to the discovery dispute at hand.

In *Bateson v. United States*, 48 Fed. Cl. 162, 164 (2000), *aff'd*, 64 F. Appx. 244 (Fed. Cir 2003), Air Force officers were involuntarily separated as a result of non-selection for promotion. The plaintiffs contended the selection boards were conducted in violation of statutory and regulatory procedural requirements. *Id*. at 163. Several plaintiffs did not pursue administrative remedies with the Air Force Board for the Correction of Military Records ("AFBCMR"). *Id*. For those plaintiffs, the administrative record before the Court comprised only of those plaintiffs' personnel files. *Id*. The Court considered two issues: (1) whether those plaintiffs who did not pursue administrative remedies before the AFBCMR were entitled to discovery, and (2) whether those plaintiffs who had presented claims to the AFBCMR were entitled to conduct discovery in order to supplement the existing administrative record. *Id*. at 164. The Court determined that "[i]n cases where an officer has not pursued an administrative appeal the officer has waived the right to make an administrative record and has to rely [on] a subsequent action for judicial review on the evidentiary record before the deciding official." *Id*. at 164. "[W]here the evidentiary record is found to be inadequate," the Court explained, "it is not this Court's role to fill in the evidentiary gaps." *Id*. at 165 (citing *Long v. United States*, 12 Cl. Ct. 174, 177 (1987)). In the *Bateson* Court's view, plaintiffs may submit new evidence in such cases "only if, (1) the evidence was unavailable below or (2) if there is a strong showing of bad faith or improper behavior which creates serious doubts about the integrity of the administrative action." *Bateson*, 48 Fed. Cl. at 165 (citing *Wyatt v. United States*, 23 Cl. Ct. 314, 319 (1991)).

In *Wyatt*, 23 Cl. Ct. 314, the Claims Court examined a servicemember's challenge to his involuntary separation. Our predecessor court held that the servicemember was not required to present his claims for correction of military records to an administrative body prior to bringing

4

them in the Claims Court.[3] *Id.* at 318. However, the Court also held that the servicemember did not have the right to present new evidence in the Claims Court unless the evidence was unavailable to the deciding official or the plaintiff demonstrated bad faith or improper behavior. *Id.* at 319. Nevertheless, *Wyatt* is readily distinguishable from this case. The Court in *Wyatt* reviewed a battalion commander's decision to discharge the servicemember for unsatisfactory performance. *Id.* at 320. The Court found the battalion commander's decision, conducted under a regulation that clearly committed the action to the commander's discretion, was not arbitrary, capricious, in bad faith, or unsupported by substantial evidence, or contrary to law. *Id.* at 320–322. Here, the plaintiffs were involuntarily retired by a panel formed pursuant to a different statute and the underlying claim pertains to the authority of that panel to retire the plaintiffs, not the substance of the panel's decision-making process.

In both *Bateson* and the present dispute, the plaintiffs filed a motion seeking to conduct discovery. *Id.* at 163; (Mot. to Comp.). However, the topics of discovery sought in *Bateson* can be distinguished from the discovery sought here. In *Bateson*, the plaintiffs sought discovery related to the proceedings before the board. *Id.* at 163, and n.3 (seeking discovery "concerning the involvement of board members in board proceedings[,]" the "'quality control' and auditing process[,]" "statistical analyses of promotion board results" to compare selection board panels, and clarification on the process itself, including the meaning of certifying signatures and "secretarial approval."). Here, Plaintiffs primarily seek discovery to determine the interpretation of the relevant statute by the agency in order to determine whether the implementation of the CRSPs was statutorily permissible. (Mot. to Comp. at 8–9). In this case, Plaintiffs do not attempt to nitpick adherence to proper procedure by which they were selected for involuntary separation; they reject the entire process as invalid and seek to gather evidence that was unavailable below. (*Id.* ("Plaintiffs did not have the option to bring claims that their involuntary retirements through the CRSP violated their statutory rights before a military corrections board[.]")).

The Court finds the standard set out in *Bateson* instructive. Discovery is available in military pay cases brought for the first time in the Court of Federal Claims where "(1) the evidence was unavailable below or (2) if there is a strong showing of bad faith or improper behavior which creates serious doubts about the integrity of the administrative action." *Bateson*, 48 Fed. Cl. at 164, *aff'd*, 64 F. Appx. 244 (citing *Wyatt*, 23 Cl. at 319). Therefore, the United States' Motion for a Protective Order must be denied because it incorrectly seeks relief on the basis discovery is categorically unavailable in military pay cases.

This conclusion is supported by the same rationale that allows supplementation of the administrative record in standard military pay cases. "[W]hen a service member does pursue [relief from a military corrections board], the Court of Federal Claims reviews the Board's action under the same standard as any other agency action." *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006). That is, "whether the decision is arbitrary, capricious, unsupported by

---

[3] Unlike other circuits, this Court may hear claims for injunctive relief prior to exhaustion of administrative remedies. *Heisig v. United States*, 719 F.2d 1153, 1155 (Fed. Cir. 1983); *contra Navas v. Gonzales Vales*, 752 F.2d 765, 796 (1st Cir. 1985) (finding servicemember-plaintiff's claim nonjusticiable where he failed to exhaust intraservice administrative remedies prior to seeking judicial review); *Ballenger v. Marsh*, 708 F.2d 349, 350–51 (8th Cir. 1983) (same); *Diliberti v. Brown*, 583 F.2d 950, 951 (7th Cir. 1978) (same).

substantial evidence, or contrary to law." *Porter v. United States,* 163 F.3d 1304, 1312 (Fed. Cir. 1998). "The focus of judicial review of agency action remains the administrative record, *which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA.*" *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (emphasis added). However, the Court does not "[lose] its ability to hold evidentiary hearings to determine jurisdictional facts, or to consider 'extra-record' evidence in extremely limited situations." *Metz*, 466 F.3d at 998. In this extraordinary case, the Plaintiffs should not be denied the opportunity to supply the Court with "extra-record" evidence that was unavailable to support their claim in the administrative proceedings below.

### B. Discovery Is Limited to the Coast Guard's Interpretation of 14 U.S.C. § 357.

In their Notice of Deposition, Plaintiffs proposed twelve topics of potential examination for their requested RCFC 30(b)(6) deposition. (*See* Pls.' Not. of Dep., ECF No. 39-4). As the Court expressed during the August 6, 2020 oral argument, while the Court is convinced limited discovery is appropriate in this case, it will defer ruling on whether the twelve topics proposed fall within this limited scope. For now, the Court defers resolving issues of the scope of deposition topics in favor of negotiations between the parties who, presumably, are in the best position to determine with specificity those topics that are necessary to illuminate how the Coast Guard interpreted 14 U.S.C. § 357 prior to litigation in this case. However, the Court acknowledges some discussion may aid those negotiations and ultimately render Plaintiffs' Motion to Compel moot.

The parties agree that this case turns on whether the Coast Guard conducted a reduction in force pursuant to 357(j), or whether retirement using the CRSP was unlawful because there was no reduction in force. (*See* Mot. to Comp. at 1; Def.'s Resp. at 7). In requesting that the Coast Guard produce a representative for deposition, Plaintiffs seek to gain context for the documents the United States has already produced, as well as context for documents contained in the "administrative record" compiled by the United States. (Pls.' Reply at 8–9). The Court finds that additional discovery is warranted to determine the Coast Guard's interpretation of "reduction in force," which may be gleaned from prior uses of the CRSP, and/or prior Coast Guard "workforce flow" tools under 357(j) within a reasonable amount of time. Additionally, insight into the decision-making process that resulted in a public messaging campaign emphasizing that the CRSP was a not reduction in force—a message directly contrary to the position the United States now takes—is likely to be relevant to the Plaintiffs' claim and proportional to the needs of the case.

While the Court makes no decision as to compelling discovery on particular topics identified by Plaintiffs, the Court hopes its discussion of these issues will guide the parties to appropriate boundaries for limited discovery.

### IV.    Conclusion

Based on the foregoing, the United States' Motion for a Protective Order (ECF No. 46) is **DENIED**. The Court **DEFERS** resolution of Plaintiffs' Motion to Compel (ECF No. 39), pending additional discussions between the parties.

**On or before August 24, 2020**, the parties shall meet and confer in good faith to come to an agreement regarding the topics and form of discovery. **On or before August 27, 2020**, the

parties shall file a joint status report apprising the Court of the results from those discussions, including whether areas of disagreement necessitate a ruling on Plaintiffs' Motion to Compel. This status report shall also contain a proposed schedule for further proceedings, including an agreed schedule for dispositive motions.

**IT IS SO ORDERED.**



s/      David A. Tapp
DAVID A. TAPP, Judge

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CCG
Phone: (202) 372-4411
Fax: (202) 372-4960

1040

APR 1 8 2011

MEMORANDUM FOR:    Secretary Janet Napolitano

FROM:    Admiral R. J. Papp, Jr.
Commandant; (202) 372-4411

SUBJECT:    COAST GUARD ACTIVE DUTY ENLISTED CAREER
RETENTION SCREENING PANEL AUTHORIZATION
REQUEST FOR 2011

---

I request approval for the Coast Guard to hold an Active Duty Enlisted Career Retention
Screening Panel (CRSP) in 2011. The Coast Guard successfully held its first panel with your
approval in 2010.

The 2010 panel considered 1,181 retirement eligible candidates and selected 377 for involuntary
retirement by the end of calendar year 2011. These retirements will allow continued accessions
and advancements that are essential for a healthy enlisted workforce.

I have determined that holding another panel in 2011 is in the best interest of the Coast Guard.
As in 2010, attrition remains lower than normal. Relatively stagnant military end-strength and
lower than normal attrition have resulted in lower than normal accession forecasts. These
dynamics will once again place the enlisted workforce in an unhealthy situation, jeopardizing the
future military workforce of the Coast Guard. Those not selected for continued service will be
involuntarily retired. Members asked to involuntary retire will be entitled to full retirement
benefits.

The legal authority to conduct such a panel derives from title 10 U. S. Code Section 1169 and
title 14, U.S. Code Section 357 (j). Under Section 357 (j), the Secretary of Homeland Security
must provide authorization for involuntary retirements without action by Enlisted Personnel
Boards pursuant to a "reduction in force." Section 357(j) does not define "reduction in force,"
directly or by reference, and the 2010 CRSP avoided that expression in describing the process to
the fleet. The Assistant Commandant for Human Resources designed CRSP to strategically
rebalance the force toward a more upwardly mobile, performance based demographic.

I plan to establish the panel as an annual workforce shaping option for the Coast Guard to ensure
the high performance of our senior enlisted members. I intend to submit a Legislative Change
Proposal (LCP) granting the Coast Guard permanent authority to hold this panel as needed.
Since the LCP approval will take several years, I request your approval to hold the panel in 2011
while awaiting permanent authority. If approved, the panel will only review enlisted Coast
Guard members who are retirement eligible within the panel-directed involuntary retirement
timeframe.

**AR 27**

Subj:  COAST GUARD ACTIVE DUTY ENLISTED CAREER                    1040
       RETENTION SCREENING PANEL AUTHORIZATION
       REQUEST FOR 2011

Your endorsement of this memo will provide the Coast Guard with the legal authority required to establish the CRSP as a workforce-shaping tool during 2011.

**Recommendation:**

Recommended you sign.

**Executive Secretariat Clearance:**

_____                    DATE: 4/19/11
Phil McNamara

**The Secretary**

APPROVED: _____                  DATE: 4-20-11

DISAPPROVED: _____               DATE: _____

COMMENTS:

**Attachments: None**

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2100 Second Street, S.W.
Washington, DC 20593-0001
Staff Symbol: CG-00
Phone: (202) 372-4411
Fax: (202) 372-4960

1040

DEC 12 2011

MEMORANDUM FOR:    Janet Napolitano
                   Secretary

FROM:              Admiral R. J. Papp, Jr.
                   Commandant; (202) 372-4411

SUBJECT:           COAST GUARD ACTIVE DUTY ENLISTED CAREER
                   RETENTION SCREENING PANEL AUTHORIZATION
                   REQUEST FOR 2012

I request approval for the Coast Guard to hold an Active Duty Enlisted Career Retention Screening Panel (CRSP) in 2012. The Coast Guard held two panels with your approval in 2010 and 2011.

The 2011 panel considered 259 retirement eligible candidates and selected 55 for involuntary retirement by the end of calendar year 2012. These retirements will allow continued accessions and advancements that are essential for a healthy enlisted workforce.

I have determined that holding another panel in 2012 is in the best interest of the Coast Guard. CRSP is designed to strategically rebalance the enlisted force toward a more upwardly mobile, performance based demographic. As in 2010 and 2011, attrition remains lower than normal. Relatively stagnant military end-strength and lower than normal attrition rates continue to result in lower than normal accession forecasts. These dynamics jeopardize the future military workforce of the Coast Guard by slowing the advancement of the Coast Guard's most high performing enlisted members.

Those not selected for continued service will be involuntarily retired. Members identified for involuntary retirement will be entitled to full retirement benefits. The legal authority to conduct a CRSP panel derives from title 10, U. S. Code Section 1169 and title 14, U.S. Code Section 357 (j). Under Section 1169, regular enlisted members of an armed force may be discharged, before service term expiration, as the Secretary concerned may prescribe. Under Section 357 (j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force," which has specific meanings in other statutory contexts, because title 14 does not define, directly or by reference, "reduction in force." USCG counsel, Mort Shea, reviewed this action and has determined it complies with applicable laws and regulations.

**AR 53**

Subj:   COAST GUARD ACTIVE DUTY ENLISTED CAREER RETENTION   1040
SCREENING PANEL AUTHORIZATION REQUEST FOR 2012

As previously indicated, I plan to establish the panel as an annual workforce shaping option for the Coast Guard to ensure the high performance of our senior enlisted members. I am in the process of submitting a Legislative Change Proposal (LCP) granting the Coast Guard permanent authority to hold this panel as needed. Since the LCP approval may take several years, I request your approval to hold the panel in 2012 while awaiting permanent authority. If approved, the panel will only review enlisted Coast Guard members who are retirement eligible within the panel-directed involuntary retirement timeframe.

Your endorsement of this memo will provide the Coast Guard with the legal authority required to establish the CRSP as a workforce-shaping tool during 2012.

Approve/date _____ 12-21-11     Disapprove/date _____

Modify/date _____     Needs discussion/date _____

cc:



| U.S. Department of Homeland Security<br><br>United States Coast Guard | Commandant<br>United States Coast Guard | 2100 Second Street, S.W.<br>Washington, DC 20593-7000<br>Staff Symbol: CCG<br>Phone: (202) 372-4411<br>Fax: (202) 372-4960 |

1040
DEC 0 5 2012

MEMORANDUM FOR:    Janet Napolitano
                   Secretary

FROM:              Admiral R. J. Papp, Jr.
                   Commandant; (202) 372-4911

SUBJECT:           COAST GUARD ACTIVE DUTY ENLISTED CAREER
                   RETENTION SCREENING PANEL AUTHORIZATION
                   REQUEST FOR 2013

I request approval for the Coast Guard to hold an Active Duty Enlisted Career Retention Screening Panel (CRSP) in 2013. The Coast Guard held three panels with your approval in 2010, 2011 and 2012.

The 2012 panel considered 677 retirement eligible candidates and selected 147 for involuntary retirement by the end of calendar year 2013. These retirements will allow continued accessions and advancements that are essential for a healthy enlisted workforce.

I have determined that holding another panel in 2013 is in the best interest of the Coast Guard. CRSP is designed to strategically rebalance the enlisted force toward a more upwardly mobile, performance based demographic. Relatively stagnant military end-strength and lower than normal attrition rates continue to result in lower than normal accession forecasts. These dynamics jeopardize the future military workforce of the Coast Guard by slowing the advancement of the Coast Guard's most high performing senior enlisted members.

Those not selected for continued service will be involuntarily retired. Members identified for involuntary retirement will be entitled to full retirement benefits. The legal authority to conduct a CRSP panel derives from title 10, U. S. Code Section 1169 and title 14, U.S. Code Section 357 (j). Under Section 1169, regular enlisted members of an armed force may be discharged, before service term expiration, as the Secretary concerned may prescribe. Under Section 357 (j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force," which has specific meanings in other statutory contexts, because title 14 does not define, directly or by reference, "reduction in force."

As previously indicated, I plan to establish the panel as an annual performance and conduct tool to ensure we retain the best of our retirement eligible senior enlisted personnel. I have requested

Subj:   COAST GUARD ACTIVE DUTY ENLISTED CAREER RETENTION       1040
        SCREENING PANEL AUTHORIZATION REQUEST FOR 2013

a delegation of authority from you to provide the Coast Guard with the permanent authority to
hold this panel when needed.  While the permanent authority is awaiting your consideration, I
request your approval to hold the panel in 2013.  If approved, the panel will only review enlisted
Coast Guard members who are retirement eligible within the panel-directed involuntary
retirement timeframe.

Your endorsement of this memo will provide the Coast Guard with the legal authority required to
conduct the CRSP during 2013.

Approve/date _____ 12·19·12      Disapprove/date _____

Modify/date _____        Needs discussion/date _____

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave SE
Washington, DC 20593-7000
Staff Symbol: CCG
Phone: (202) 372-4411
Fax: (202) 372-8302

1040

JAN 22 2014

MEMORANDUM FOR:     Jeh Charles Johnson
                    Secretary of Homeland Security

FROM:               Admiral R. J. Papp, Jr.
                    Commandant; (202) 372-4411

SUBJECT:            COAST GUARD ACTIVE DUTY ENLISTED CAREER
                    RETENTION SCREENING PANEL AUTHORIZATION
                    REQUEST FOR 2014

Purpose

I request approval for the Coast Guard to hold an Active Duty Enlisted Career Retention Screening Panel (CRSP) in 2014. The Coast Guard held four panels with S-1 approval in 2010, 2011, 2012, and 2013.

Background

The 2013 panel considered 399 retirement eligible candidates and selected 194 for involuntary retirement by 01 September 2014. These retirements will allow continued accessions and advancements that are essential for a healthy enlisted workforce.

Discussion

I have determined that holding another panel in 2014 is in the best interest of the Coast Guard. CRSP is designed to strategically rebalance the enlisted force toward a more upwardly mobile, performance based demographic. Relatively stagnant military end-strength and lower than normal attrition rates continue to result in lower than normal accession forecasts. These dynamics jeopardize the future military workforce of the Coast Guard by slowing the advancement of the Coast Guard's most high performing senior enlisted members.

Those not selected for continued service will be involuntarily retired. Members identified for involuntary retirement will be entitled to full retirement benefits. The legal authority to conduct a CRSP panel derives from title 10, U. S. Code Section 1169 and title 14, U.S. Code Section 357 (j). Under Section 1169, regular enlisted members of an armed force may be discharged, before service term expiration, as the Secretary concerned may prescribe. Under Section 357 (j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force."

Subj:  COAST GUARD ACTIVE DUTY ENLISTED CAREER        1040
       RETENTION  SCREENING PANEL AUTHORIZATION
       REQUEST FOR 2014

As previously indicated, I plan to establish the panel as an annual performance and conduct tool
to ensure we retain the best of our retirement eligible senior enlisted personnel.  I have requested
a delegation of authority from you to provide the Coast Guard with the permanent authority to
hold this panel when needed.  While the permanent authority is awaiting your consideration, I
request your approval to hold the panel in 2014.  If approved, the panel will only review enlisted
Coast Guard members who are retirement eligible within the panel-directed involuntary
retirement timeframe.

Your endorsement of this memo will provide the Coast Guard with the legal authority required to
conduct the CRSP during 2014.

Approve/date _____ 3/7        Disapprove/date _____

Modify/date _____             Needs discussion/date _____

| COMPONENT TASKED: | DRAFT DUE DATE: | DRAFT RECEIVED DATE: |
|---|---|---|
| USCG | N/A | N/A |

**SUMMARY OF DOCUMENT:**
COAST GUARD ACTIVE DUTY ENLISTED CAREER RETENTION SCREENING PANEL AUTHORIZATION REQUEST FOR 2014.

| CLEARED BY | DATE | CLEARED BY | DATE |
|---|---|---|---|
| PLCY/GAIL KAUFMAN | 1/22/2014 | MGMT/VINCE MICONE | 1/31/2014 |
| OGC/MEGHAN LUDTKE | 2/5/2014 | FRONT OFFICE STAFF/BECCA WEXLER | 2/28/2014 |
| DCOS/MATTHEW CHANDLER | 2/28/2014 | | |

| SIGNATURE NEEDED BY DATE: | | REASON: | |
|---|---|---|---|

| OFFICE | SIGNATURE | DATE | COMMENTS |
|---|---|---|---|
| EXECUTIVE SECRETARY | *Patrici Alli-Joseph for* | 2/28/14 | |
| S2 COS | *[signature]* | 3/4/14 read 3/4/14 | |
| S2 | ANM | 3/5/14 | |
| CHIEF OF STAFF | *[signature]* | 3/7/14 | |
| S1 | *[signature]* | 3/7 | |

**AFTER REVIEW RETURN TO:**
DOROTA BAGWELL, COORDINATOR , EXECUTIVE SECRETARIAT

TELEPHONE
202-282-8221

APPROVED FOR AUTOPEN: _____ YES _____ NO    DATE AND INITIALS FOR AUTOPEN APPROVAL: _____

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TONIA TIPPINS, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 18-923C |
| v. | ) Judge David A. Tapp |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

DEFENDANT'S RESPONSE TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Rules 26 and 36 of the Court's Rules, defendant, the United States, hereby

responds to plaintiffs' first set of requests for admission dated August 28, 2020.

REQUEST FOR ADMISSION NO. 1:    Admit that the Secretary did not order a
reduction in force by the Coast Guard prior to 2010.

OBJECTION: Defendant objects that this request is overbroad insofar as it calls for
information "prior to 2010" because it does not establish the beginning of the relevant timeframe
and potentially calls for information going back to 1791.  Subject to and without waiving this
objection, defendant's response construes this request as having a reasonable timeframe from
December 19, 1991 (the date of enactment of the relevant statute), through December 2009.

RESPONSE:    Admits that the Secretary of Transportation did not order a reduction in

force by the Coast guard from 1997 through 2003; admits that the Secretary of Homeland

Security did not order a reduction in force by the Coast Guard from 2003 through 2009;

otherwise denies for lack of information after having made reasonable inquiry because the

information readily available is insufficient to enable defendant to admit or deny.

REQUEST FOR ADMISSION NO. 2:    Admit that the Coast Guard did not carry out
any "reductions in force" prior to 2010.

OBJECTION: Defendant objects that this request is overbroad insofar as it calls for
information "prior to 2010" because it does not establish the beginning of the relevant timeframe
and potentially calls for information going back to 1791.  Subject to and without waiving this

objection, defendant's response construes this request as having a reasonable timeframe from December 19, 1991 (the date of enactment of the relevant statute), through December 2009.

RESPONSE:   Admits that the Coast Guard did not carry out a reduction in force from 1997 through 2009; otherwise denies for lack of information after having made reasonable inquiry because the information readily available is insufficient to enable defendant to admit or deny.

REQUEST FOR ADMISSION NO. 3:   Admit that the Coast Guard did not have any policies or procedures governing "reductions in force" prior to 2014.

OBJECTION: Defendant objects that this request is overbroad insofar as it calls for information "prior to 2014" because it does not establish the beginning of the relevant timeframe and potentially calls for information going back to 1791.  Subject to and without waiving this objection, defendant's response construes this request as having a reasonable timeframe from December 19, 1991 (the date of enactment of the relevant statute), through December 2014. Defendant further objections that this request is overbroad, vague, and ambiguous insofar as it does not distinguish between the Coast Guard's military and civilian workforces.  Subject to and without waiting this objection, defendant's response construes this request as pertaining to the Coast Guard's military workforce only.

RESPONSE:   Admits that, between December 1991 and December 2014, when 14 U.S.C. § 357(j) governed involuntary retirements of enlisted personnel during reductions in force by the Coast Guard, there were no Coast Guard regulations, policies, or procedures in existence that generally would have governed all reductions in force in connection with military personnel; otherwise denies.

REQUEST FOR ADMISSION NO. 4:   Admit that the Secretary did not order the elimination of billets or positions in the Coast Guard in 2010.

RESPONSE:   Admits that, when the Secretary of Homeland Security ordered a reduction in force in 2010 and approved budgets that impacted the number of enlisted billets (or positions) that the Coast Guard reasonably could afford to maintain, the Secretary did not separately and specifically order the elimination of particular enlisted billets (or positions) in the Coast Guard; otherwise denies.

REQUEST FOR ADMISSION NO. 5:    Admit that the CRSP in 2010 was not necessitated by a reduction in authorization for personnel.

OBJECTION: Defendant objects that this request is ambiguous, insofar as the request does not identify the agency or body responsible for the "authorization for personnel" described, and does not identify the nature of the "authorization for personnel" described.  For example, Congress typically authorizes a total force strength (combined for both officers and enlisted members), whereas, the Coast Guard separately authorizes billets (or positions) that the Coast Guard has determined it can afford to maintain, and the Coast Guard uses workforce shaping tools to adjust authorized personnel levels within various parts of the workforce.  Subject to and without waiving these objections, our response distinguishes between these potential meanings of "authorization for personnel."

RESPONSE:    Admits that, although the Active Duty Enlisted Career Retention Screening Panel (CRSP) in 2010 was necessitated by the Secretary of Homeland Security's order to reduce the number of authorized personnel in the retirement eligible enlisted workforce, the 2010 CRSP was not necessitated by either (1) a reduction in the Congressional authorization for total force strength in the Coast Guard, or (2) a reduction in the authorized number of enlisted billets in higher grades (E-7 and above); otherwise denies.

REQUEST FOR ADMISSION NO. 6:    Admit that the Secretary did not order the elimination of billets or positions in the Coast Guard in 2011.

RESPONSE:    Admits that, when the Secretary of Homeland Security ordered a reduction in force in 2011 and approved budgets that impacted the number of enlisted billets (or positions) that the Coast Guard reasonably could afford to maintain, the Secretary did not separately and specifically order the elimination of particular enlisted billets (or positions) in the Coast Guard; otherwise denies.

REQUEST FOR ADMISSION NO. 7:    Admit that the CRSP in 2011 was not necessitated by a reduction in authorization for personnel.

OBJECTION: Defendant objects that this request is ambiguous, insofar as the request does not identify the agency or body responsible for the "authorization for personnel" described, and does not identify the nature of the "authorization for personnel" described.  For example, Congress typically authorizes a total force strength (combined for both officers and enlisted members), whereas, the Coast Guard separately authorizes billets (or positions) that the Coast Guard has determined it can afford to maintain, and the Coast Guard uses workforce shaping

tools to adjust authorized personnel levels within various parts of the workforce.  Subject to and without waiving these objections, our response distinguishes between these potential meanings of "authorization for personnel."

RESPONSE:    Admits that, although the 2011 CRSP was necessitated by the Secretary of

Homeland Security's order to reduce the number of authorized personnel in the retirement

eligible enlisted workforce, the 2011 CRSP was not necessitated by either (1) a reduction in the

Congressional authorization for total force strength in the Coast Guard, or (2) a reduction in the

authorized number of enlisted billets in higher grades (E-7 and above); otherwise denies.

REQUEST FOR ADMISSION NO. 8:    Admit that the Secretary did not order the elimination of billets or positions in the Coast Guard in 2012.

RESPONSE:    Admits that, when the Secretary of Homeland Security ordered a reduction

in force in 2012 and approved budgets that impacted the number of enlisted billets (or positions)

that the Coast Guard reasonably could afford to maintain, the Secretary did not separately and

specifically order the elimination of particular enlisted billets (or positions) in the Coast Guard;

otherwise denies.

REQUEST FOR ADMISSION NO. 9:    Admit that the CRSP in 2012 was not necessitated by a reduction in authorization for personnel.

OBJECTION: Defendant objects that this request is ambiguous, insofar as the request does not identify the agency or body responsible for the "authorization for personnel" described, and does not identify the nature of the "authorization for personnel" described.  For example, Congress typically authorizes a total force strength (combined for both officers and enlisted members), whereas, the Coast Guard separately authorizes billets (or positions) that the Coast Guard has determined it can afford to maintain, and the Coast Guard uses workforce shaping tools to adjust authorized personnel levels within various parts of the workforce.  Subject to and without waiving these objections, our response distinguishes between these potential meanings of "authorization for personnel."

RESPONSE:    Admits that, although the 2012 CRSP was necessitated by the Secretary of

Homeland Security's order to reduce the number of authorized personnel in the retirement

eligible enlisted workforce, the 2012 CRSP was not necessitated by either (1) a reduction in the

Congressional authorization for total force strength in the Coast Guard, or (2) a reduction in the authorized number of enlisted billets in higher grades (E-7 and above); otherwise denies.

REQUEST FOR ADMISSION NO. 10:  Admit that the Secretary did not order the elimination of billets or positions in the Coast Guard in 2013.

RESPONSE:   Admits that, when the Secretary of Homeland Security ordered a reduction in force in 2013 and approved budgets that impacted the number of enlisted billets (or positions) that the Coast Guard reasonably could afford to maintain, the Secretary did not separately and specifically order the elimination of particular enlisted billets (or positions) in the Coast Guard; otherwise denies.

REQUEST FOR ADMISSION NO. 11:  Admit that the CRSP in 2013 was not necessitated by a reduction in authorization for personnel.

OBJECTION: Defendant objects that this request is ambiguous, insofar as the request does not identify the agency or body responsible for the "authorization for personnel" described, and does not identify the nature of the "authorization for personnel" described.  For example, Congress typically authorizes a total force strength (combined for both officers and enlisted members), whereas, the Coast Guard separately authorizes billets (or positions) that the Coast Guard has determined it can afford to maintain, and the Coast Guard uses workforce shaping tools to adjust authorized personnel levels within various parts of the workforce.  Subject to and without waiving these objections, our response distinguishes between these potential meanings of "authorization for personnel."

RESPONSE:   Admits that, although the 2013 CRSP was necessitated by the Secretary of Homeland Security's order to reduce the number of authorized personnel in the retirement eligible enlisted workforce, the 2012 CRSP was not necessitated by either (1) a reduction in the Congressional authorization for total force strength in the Coast Guard, or (2) a reduction in the authorized number of enlisted billets in higher grades (E-7 and above); otherwise denies.

REQUEST FOR ADMISSION NO. 12:  Admit that the Secretary did not order the elimination of billets or positions in the Coast Guard in 2014.

RESPONSE:   Admits that, when the Secretary of Homeland Security ordered a reduction in force in 2014 and approved budgets that impacted the number of enlisted billets (or positions)

that the Coast Guard reasonably could afford to maintain, the Secretary did not separately and

specifically order the elimination of particular enlisted billets (or positions) in the Coast Guard;

otherwise denies.

REQUEST FOR ADMISSION NO. 13:  Admit that the CRSP in 2014 was not
necessitated by a reduction in authorization for personnel.

OBJECTION: Defendant objects that this request is ambiguous, insofar as the request
does not identify the agency or body responsible for the "authorization for personnel" described,
and does not identify the nature of the "authorization for personnel" described.  For example,
Congress typically authorizes a total force strength (combined for both officers and enlisted
members), whereas, the Coast Guard separately authorizes billets (or positions) that the Coast
Guard has determined it can afford to maintain, and the Coast Guard uses workforce shaping
tools to adjust authorized personnel levels within various parts of the workforce.  Subject to and
without waiving these objections, our response distinguishes between these potential meanings
of "authorization for personnel."

RESPONSE:   Admits that, although the 2014 CRSP was necessitated by the Secretary of

Homeland Security's order to reduce the number of authorized personnel in the retirement

eligible enlisted workforce, the 2014 CRSP was not necessitated by either (1) a reduction in the

Congressional authorization for total force strength in the Coast Guard, or (2) a reduction in the

authorized number of enlisted billets in higher grades (E-7 and above); otherwise denies.

REQUEST FOR ADMISSION NO. 14:  Admit that the Coast Guard did not publicly
communicate that the CRSP was a "reduction in force" at the time of the 2010 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 15:  Admit that the Coast Guard did not
communicate to enlisted service members that the CRSP was a "reduction in force" at the time of
the 2010 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 16:  Admit that the Coast Guard did not publicly
communicate that the CRSP was a "reduction in force" at the time of the 2011 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 17:  Admit that the Coast Guard did not communicate to enlisted service members that the CRSP was a "reduction in force" at the time of the 2011 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 18:  Admit that the Coast Guard did not publicly communicate that the CRSP was a "reduction in force" at the time of the 2012 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 19:  Admit that the Coast Guard did not communicate to enlisted service members that the CRSP was a "reduction in force" at the time of the 2012 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 20:  Admit that the Coast Guard did not publicly communicate that the CRSP was a "reduction in force" at the time of the 2013 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 21:  Admit that the Coast Guard did not communicate to enlisted service members that the CRSP was a "reduction in force" at the time of the 2013 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 22:  Admit that the Coast Guard did not publicly communicate that the CRSP was a "reduction in force" at the time of the 2014 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 23:  Admit that the Coast Guard did not communicate to enlisted service members that the CRSP was a "reduction in force" at the time of the 2014 CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 24:  Admit that the Food Service Chief Petty Officer, MWR Pizza Parlor Manager position at USCG Base Kodiak was not eliminated after Plaintiff Tonia Tippins was retired following the CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 25:  Admit that the Port Services Chief position at USCG Base Kodiak position was not eliminated after Plaintiff Derrik Magnuson was retired following the CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 26:   Admit that the Culinary Specialist Chief Petty Officer position at USCG Base Kodiak was not eliminated after Plaintiff George Holloway was retired following the CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 27:   Admit that the Chief Storekeeper & Contracting Officer, Comptroller position at Training Center Yorktown was not eliminated after Plaintiff Jennifer Rehberg was retired following the CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 28:   Admit that the Master Chief Storekeeper, Comptroller Branch, Purchasing Section position at Training Center Cape May was not eliminated after Plaintiff Glenda Smithleeth was retired following the CRSP.

RESPONSE:   Admits.

REQUEST FOR ADMISSION NO. 29:   Admit that the Command Master Chief position at USCG Base Boston was not eliminated after Plaintiff M. Allen Bumgardner was retired following the CRSP.

RESPONSE:   Admits.

Respectfully submitted,

SCOTT G. STEWART
Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

 s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Deputy Director

 s/ Douglas G. Edelschick
DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-9303

October 9, 2020                    Attorneys for Defendant

| | |
|---|---|
| **From:** | Shea, Mortimer |
| **Sent:** | Tuesday, July 20, 2010 5:58 PM |
| **To:** | Calhoun, Christopher CAPT; Mathers, Dwight CAPT; Soriano, Edward LCDR; MacDonald, Erin CDR; Allman, Daniel CDR; Woolcott, Patricia LCDR; Woosley, Margaret; Hopkins, Robert |
| **Cc:** | Odom, Curtis; Gebele, Glenn; McLeish, David; Beistle, Thomas D CIV; Monk, Janis D CIV |
| **Subject:** | RE: Military Workforce Status Brief to LC Today |



Mort Shea
Chief, General Law (CG-0944)
U.S. Coast Guard
2100 Second Street SWSTOP 7121
Washington, DC 20593-7121
(202) 372-3755
mortimer.c.shea@uscg.mil

A Coast Guard Attorney prepared this document for INTERNAL GOVERNMENT USE ONLY.  This document is pre-decisional in nature and qualifies as an inter-agency/intra-agency document containing deliberative process material. This document contains confidential attorney-client communications relating to a legal matter for which the client has sought professional advice.  Under exemption 5 of section (b) of 5 U.S.C. § 552 (Freedom of Information Act), this material is EXEMPT FROM RELEASE TO THE PUBLIC.

-----Original Message-----
From: Calhoun, Christopher CAPT
Sent: Tuesday, July 20, 2010 1:27 PM
To: Mathers, Dwight CAPT; Soriano, Edward LCDR; Shea, Mortimer; MacDonald, Erin CDR; Allman, Daniel CDR; Woolcott, Patricia LCDR; Woosley, Margaret; Hopkins, Robert
Cc: Odom, Curtis; Gebele, Glenn CAPT; McLeish, David
Subject: FW: Military Workforce Status Brief to LC Today

OK, here is the decision we have been waiting for.  We will need to rapidly ramp up these efforts to coordinate with the many stakeholders to execute this in the timeframe we are left with, i.e. the end of the calendar year.

For CG-1221 Staff:  This is takes precedence right now over the other work going on.  LCDR Woolcott and Ms. Maggie Woosley will be my leads.

CG-092:  We will need you to help with the messaging.
CG-0944: We will need you to help with the legal reviews of the process, and it would no doubt as mentioned before, help to have you in at the ground floor

Tippins Gov-00009330

From a messaging perspective, you can see below what RADM Hewitt desires. I am convinced we need to message this from the requirement to stimulate flow and to improve upward mobility opportunities for the military workforce, specifically advancements and A school quotas, due to the lack of attrition. As mentioned below, the ALCOAST should be more general, we can get into the specifics later in an ALPSC. That being said, we will need to begin to generate some FAQs based on the questions that will no doubt follow once the CRSP is announced.

This is not a RIF and we need to ensure that it is not associated with a RIF. Body to billet we are doing fine, but upward mobility and flow continues to be a problem and will pose bigger problems down the road.

I will attempt to find out the timeline for release of the ALCOAST. I will recommend the beginning of Aug which will give us some time to develop what I discussed above. It will also provide some time for the MCPOCG to develop the precept with EPM. I think we will need that to help answer FAQs and to prepare the PAG and ICB.

Downside is that I am out of town all next week, but will be available to follow the progress via OWA/treo.

V/R Chris
C. P. Calhoun, CAPT
U.S. Coast Guard
Chief, Office of Military Personnel (CG-122)
2100 2nd Street SW Stop 7801
Washington, DC 20593-7801
(202) 475-5360


-----Original Message-----
From: Hewitt, Ronald RADM
Sent: Tuesday, July 20, 2010 1:06 PM
To: Calhoun, Christopher CAPT; McLeish, David; May, Daniel RDML; Odom, Curtis
Cc: Leavitt, Michael MCPOCG; Isherwood, Kevin CMC; Lederer, Calvin; Tiongson, Andrew CAPT; McAllister, Michael CAPT; Gebele, Glenn CAPT
Subject: Military Workforce Status Brief to LC Today

I appreciate all the work that went into the Leadership Council brief today on Military Workforce Status. With the great support from MCPOCG Leavitt and VADM Currier the LC agreed with conducting a CRSP this year to help create better flow in the enlisted workforce. So now we need to finalize the project and communications plans. MCPOCG Leavitt will provide the Panel Precept. The panel will look at all enlisted members >20 TIS and >3 TIG and select those that meet the Precept requirements for retention (no pre-established number to be retained).

What I need next is the next Workforce ALCOAST that announces the CRSP. I recommend that we put out a generic ALCOAST on where we stand and that we will be conducting a CRSP and then PSC follows up with a detailed message that identifies who will go through the panel and specifics.

Again, I appreciate the work done by the entire team!
V/R

RADM Ronald Hewitt
Assistant Commandant for
Human Resources (CG-1)
(202)475-5000

Tippins Gov-00009331

| | |
|---|---|
| **From:** | Shea, Mortimer |
| **Sent:** | Tuesday, July 20, 2010 5:59 PM |
| **To:** | Monk, Janis D CIV; Beistle, Thomas D CIV |
| **Subject:** | FW: Workflow Status (Please do not forward) |
| **Importance:** | High |
| **Sensitivity:** | Confidential |

I haven't digested this yet.  Printed it out for reading during DWHZ mtg.

-----Original Message-----
From: Calhoun, Christopher CAPT
Sent: Tuesday, July 20, 2010 11:14 AM
To: Mathers, Dwight CAPT; Soriano, Edward LCDR; Allman, Daniel CDR
Cc: Gebele, Glenn CAPT; McLeish, David; Shea, Mortimer
Subject: Workflow Status (Please do not forward)
Importance: High
Sensitivity: Confidential

Folks,

After a long day yesterday, here is where Calhoun thinks we stand on Tuesday 20 Jul 2010 (always subject to change).

Today, RADM Hewitt is briefing the Leadership Council on Workforce Flow.  After numerous briefings and discussions with DCMS Senior Leadership, MCPOCG and CCS, he is going to recommend that we go forward with the CRSP this fall. He is going to recommend that the pool of candidates contain all members that have both 20 or more years TIS and 3 or more years TIG.  The precept/criteria for non-selection will be developed by a joint team led by the MCPOCG in close cooperation with PSC-epm, and CG-0944 (to make sure it is all legal and defensible).  I am not sure if there will be a quota or OOS for this panel (lots of math to look at this), the idea primarily is to retain the best and productive members of the organization while culling out those members who may be simply receiving a paycheck and not striving for more (i.e. those that do not do things that would get them discharged, but don't do anything above or beyond that either). Obviously there will be a lot more discussion on this topic over the next several months.  This action is recommended in order to create flow and provide opportunities to our junior workforce and as stated above to retain the best and most productive members of the organization.  Messaging is going to be critical in this, so this is close hold for the time being. One of the keys as I see it, is ensuring that this is designed and messaged as a flow stimulating tool and not a RIF tool as HYT was wrongly 15 years ago.  This is to stimulate flow and incentivize people to do more than the minimum to continue.  I see this very similar to the US Navy's efforts last year which retired approx 2% of the people it reviewed, and those were primarily members with recent blemishes on their record.

RADM Hewitt will also be recommending that we create a long term policy that provides the ability to regulate flow through the organization.  He spoke to all of the heads of the other services this past weekend and they all believe that a tool to regulate flow is necessary in the services.  The method he likes best at the present time is the US Army's Retention Control Points.  If you google Army Retention Control Points (RCP), you will find plenty of info on them.  RCPs would be used in combination with reenlistments.  I.e. indefinite reenlistments would be abolished (good thing in my opinion) and there would be specific points that a member would have to meet to be eligible for reenlistment to earn a contract to the next RCP.  If not, the member would be offered a reenlistment based on the needs of the service and only if they had met other requirements (yet TBD).  I see these as being eligibility for advancement requirements, weight control, CPOA for CPOs and above, etc.

1

Appx110

Tippins Gov-00008478

Lots of work to be done yet if the LC concurs and gives CG-1 the authority to move ahead, but I wanted to give you some idea on the direction we are heading. I don't believe the CRSP would become a annual event. If a long term solution is put in place, the need for this would be negated.

Not looking for input at this point, but wanted to put the bug in your ear and get you thinking about this potential future reality (which is still just a bunch of ingredients on the kitchen countertop!

V/R cpc
C. P. Calhoun, CAPT
U.S. Coast Guard
Chief, Office of Military Personnel (CG-122)
2100 2nd Street SW Stop 7801
Washington, DC 20593-7801
(202) 475-5360

Tippins Gov-00008479

Question #1: What authority does the Coast Guard have to conduct the CRSP?

Answer #1: On September 21, 2010, the Secretary of Homeland Security authorized the Coast Guard to conduct an active duty enlisted Career Retention Screening Panel (CRSP) in the fall of 2010. Section 1169 of title 10, U. S. Code and Section 357 (j) of title 14, U.S. Code authorize the Secretary to approve the CRSP. 10 U.S.C. §1169 simply authorizes the Secretary to prescribe how an enlisted member may be "discharged before his term of service expires." 14 U.S.C. §357(j) authorizes the Commandant to involuntarily separate enlisted personnel from the Coast Guard without action by an Enlisted Personnel Board when the Secretary orders a reduction in force. The organic authority to convene an Enlisted Personnel Board to recommend involuntarily retirement of a single member is vested in the Commandant. *See,* 14 U.S.C. §§357(a) – (i). But only the Secretary can approve convening a panel to consider many members for involuntary separation at the same time. *See,* 14 USC §357(j). The Commandant has the organic authority to approve retirement or separation recommendations in both cases.


Question #2: Why didn't the Commandant's memo use the term "reduction in force"?

Answer #2: The term "reduction in force" would have been misleading because the CRSP was not intended to reduce the overall size of the force. The CRSP was convened to efficiently and fairly, based on uniform performance and conduct criteria, identify retirement eligible enlisted personnel for involuntary retirement; accelerate advancement of junior enlisted members; and reinvigorate accession of recruits into the Coast Guard.


Question #3: Why was the CRSP even necessary?

Answer #3: The Coast Guard has been experiencing historically high retention rates at the most senior enlisted ranks. Retirement eligible enlisted personnel have elected to remain on active duty well beyond the time that attrition statistics predicted they would stay. This has led to rank stagnation in the junior enlisted workforce and significantly lower opportunities to access qualified recruits into the Coast Guard. As the Commandant stated in his letter to the Secretary:

> We have reduced our accessions to the lowest level in our records. We temporarily waived obligated service requirements to allow voluntary separations. However, the majority (91%) of over 700 recent voluntary separation requests were from junior enlisted ranks, and not our more senior workforce. If allowed to continue, this trend, along with our reduced accessions, will result in an imbalance in the enlisted workforce's experience level for many years to come.

Tippins Gov-00009293

The CRSP was necessary to safeguard the vital continuum of professional development particularly within the upper levels of the enlisted workforce. The CRSP was determined to be a better option than less targeted tools such as High Year Tenure (HYT) that blindly employs a time in grade tripwire. For example, the CRSP provides affected members officer and senior enlisted panel review of their record of performance and conduct against established standards; an opportunity for members to supplement their personnel file and/or comment on adverse information, and an administrative appeal process to CG-1.

Question #4: Why didn't the Coast Guard conduct Enlisted Personnel Boards in accordance with Article 12.C.10 of the Coast Guard Personnel Manual for the member's identified for involuntary retirement?

Answer #4: Article 12.C.10 of the Coast Guard Personnel Manual is based on the Commandant's authority to convene involuntary retirement boards in accordance with 14 U.S.C. §§ 357 (a) - (i). Convening involuntary retirement boards for the over 1,100 eligible members would have been a time and resource prohibitive process that would have led to unacceptable delay and aggravated the problem of an increasingly imbalanced enlisted force. Additionally, convening individual boards of different composition would not have guaranteed consistent application of the same set of performance and conduct standards to all eligible members as the CRSP, convened under Secretarial authority, was specifically designed to do.

Tippins Gov-00009294

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |
|---|---|
| TONIA TIPPINS, *et al*., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 18-923C |
| v. | ) Judge David A. Tapp |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

<u>DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES</u>

Pursuant to Rules 26 and 33 of the Court's Rules, defendant, the United States, hereby responds to plaintiffs' first set of interrogatories dated August 28, 2020. The following response is based upon defendant's current knowledge, information, and belief, after making reasonable inquiry. Defendant reserves the right to modify or supplement its response as further information becomes available through discovery or otherwise.

<u>INTERROGATORY NO. 1:</u> If your response to Request for Admission No. 1 is anything other than "admit," describe in detail any "reduction in force" authorized by the Secretary prior to 2010.

<u>OBJECTION</u>: Defendant objects that this interrogatory is overbroad and unduly burdensome, insofar as it calls for information "prior to 2010," because it does not establish the beginning of the relevant timeframe and potentially calls for information going back to 1791. Defendant's answer construes this interrogatory as having a reasonable timeframe from December 19, 1991 (the date of enactment of the relevant statute), through December 2009. Defendant also objects that this interrogatory is overbroad and unduly burdensome insofar as it calls for information that is not readily available in existing Coast Guard records. Defendant's answer provides responsive information to the extent that it is readily available.

<u>ANSWER</u>:    Subject to and without waiving these objections, defendant answers interrogatory number 1 as follows:

a.    Given the passage of time, it is not known with certainty whether the Secretary of Transportation ordered reductions in force under 14 U.S.C. § 357(j), or whether the Coast Guard

used other workforce shaping tools, to reduce the authorized number of enlisted billets and the actual number of enlisted service members, from the end of fiscal year 1991 through the end of fiscal year 1996.

b.      The Coast Guard reduced the authorized number of enlisted billets from the end of fiscal year 1991 through the end of fiscal year 1996, as follows:  September 1991 (30,556 enlisted billets); September 1992 (30,149 enlisted billets); September 1993 (29,502 enlisted billets); September 1994 (29,004 enlisted billets); September 1995 (28,618 enlisted billets); and September 1996 (27,739 enlisted billets).  Accordingly, there was a reduction of 2,817 enlisted billets authorized from the end of fiscal year 1991 through the end of fiscal year 1996.  The figures in this paragraph represent the Coast Guard's contemporaneous judgment regarding the number of billets that the agency could afford to maintain and authorize at the time in light of current and anticipated budget constraints and competing funding priorities.

c.      The Coast Guard reduced the actual number of enlisted service members from the end of fiscal year 1991 through the end of fiscal year 1996, as follows:  September 1991 (30,285 enlisted members); September 1992 (30,918 enlisted members); September 1993 (30,699 enlisted members); September 1994 (29,002 enlisted members); September 1995 (28,401 enlisted members); and September 1996 (27,129 enlisted members).  Accordingly, there was a reduction of 3,156 enlisted service members from the end of fiscal year 1991 through the end of fiscal year 1996.

INTERROGATORY NO. 2:  If your response to Request for Admission No. 2 is anything other than "admit," describe in detail any "reduction in force" carried out by the Coast Guard prior to 2010.

OBJECTION: Defendant objects that this interrogatory is overbroad and unduly burdensome insofar as it calls for information "prior to 2010" because it does not establish the beginning of the relevant timeframe and potentially calls for information going back to 1791. Defendant's answer construes this interrogatory as having a reasonable timeframe from December 19, 1991 (the date of enactment of the relevant statute), through December 2009.

Defendant also objects that this interrogatory is overbroad and unduly burdensome insofar as it calls for information that is not readily available in existing Coast Guard records. Defendant's answer provides responsive information to the extent that it is readily available.

ANSWER: Subject to and without waiving these objections, defendant answers interrogatory number 2 as follows:

a. Given the passage of time, it is not known with certainty whether the Secretary of Transportation ordered reductions in force under 14 U.S.C. § 357(j), or whether the Coast Guard used other workforce shaping tools, to reduce the authorized number of enlisted billets and the actual number of enlisted service members, from the end of fiscal year 1991 through the end of fiscal year 1996.

b. The Coast Guard reduced the authorized number of enlisted billets from the end of fiscal year 1991 through the end of fiscal year 1996, as follows: September 1991 (30,556 enlisted billets); September 1992 (30,149 enlisted billets); September 1993 (29,502 enlisted billets); September 1994 (29,004 enlisted billets); September 1995 (28,618 enlisted billets); and September 1996 (27,739 enlisted billets). Accordingly, there was a reduction of 2,817 enlisted billets authorized from the end of fiscal year 1991 through the end of fiscal year 1996. The figures in this paragraph represent the Coast Guard's contemporaneous judgment regarding the number of billets that the agency could afford to maintain and authorize at the time in light of current and anticipated budget constraints and competing funding priorities.

c. The Coast Guard reduced the actual number of enlisted service members from the end of fiscal year 1991 through the end of fiscal year 1996, as follows: September 1991 (30,285 enlisted members); September 1992 (30,918 enlisted members); September 1993 (30,699 enlisted members); September 1994 (29,002 enlisted members); September 1995 (28,401 enlisted members); and September 1996 (27,129 enlisted members). Accordingly, there was a

reduction of 3,156 enlisted service members from the end of fiscal year 1991 through the end of

fiscal year 1996.

INTERROGATORY NO. 3:  If your response to Request for Admission No. 3 is anything other than "admit," identify and describe in detail all Coast Guard policies and procedures governing reductions in force.

OBJECTION: Defendant objects that this interrogatory is overbroad and unduly burdensome, insofar as it incorporates the call for information "prior to 2014" in request for admission number 3, because it does not establish the beginning of the relevant timeframe and potentially calls for information going back to 1791.  Defendant's answer construes this interrogatory as having a reasonable timeframe from December 19, 1991 (the date of enactment of the relevant statute), through December 2014.

ANSWER:     Subject to and without waiving this objection, defendant answers

interrogatory number 3 as follows:

a.     Between December 1991 and December 2014, 14 U.S.C. § 357(j) governed

reductions in force by the Coast Guard for enlisted service members.  Pursuant to statutory

authority, 14 U.S.C. § 357(j), the Secretary of Homeland Security ordered reductions in force in

2010, 2011, 2012, 2013, and 2014, to be carried out through Active Duty Enlisted Career

Retention Screening Panels (CRSPs), to reduce the size of the retirement eligible enlisted

workforce and increase opportunities for accessions and advancements among the remaining

enlisted service members in all grades.  AR 27-28, 53-54, 86-87, 128-29.

b.     Each of the 2010, 2011, 2012, 2013, and 2014 CRSPs was governed by a precept,

which set forth policies and procedures that governed those particular reductions in force.  AR

36-48, 69-81, 114-17, 139-42.  Between December 1991 and December 2014, there were no

Coast Guard regulations, policies, or procedures in existence that otherwise would have

governed all reductions in force generally or these CRSPs in particular.

INTERROGATORY NO. 4:  Identify and describe in detail all Coast Guard policies and procedures in effect from 2008 to 2014 governing "workforce flow" or "workforce shaping."

OBJECTION: Defendant objects that this interrogatory is overbroad and unduly burdensome insofar as it calls for information regarding other types of workforce management tools (also known as workforce shaping or workforce flow tools) that are not CRSPs and were not used by the Coast Guard in selecting plaintiffs for the involuntary retirements at issue.

ANSWER:     Subject to and without waiving this objection, defendant answers interrogatory number 4 as follows:

a.     CRSPs were one of several workforce management tools (also known as workforce shaping or workforce flow tools) that the Coast Guard used to reduce the size of the retirement eligible enlisted workforce and increase opportunities for accessions and advancements among the remaining enlisted service members in all grades during the 2008 through 2014 timeframe.

b.     Each of the CRSPs in 2010, 2011, 2012, 2013, and 2014, was governed by a precept, which set forth policies and procedures that governed the CRSP.  AR 36-48, 69-81, 114-17, 139-42.  Between 2008 and 2014, there were no Coast Guard regulations, policies, or procedures in existence that otherwise would have governed all CRSPs generally.

c.     Other workforce management tools that the Coast Guard used during the 2008 through 2014 timeframe included, but were not limited to, reduced accessions (new enlistments), reactivation of high year tenure, ending indefinite reenlistments, updating reenlistment standards, and early retirement and voluntary separation programs.

INTERROGATORY NO. 5:  Describe in detail any efforts by the Coast Guard from 1991 to 2010 to address "workforce flow" and create opportunities for enlisted service members to be promoted.

OBJECTION: Defendant objects that this interrogatory is overbroad and unduly burdensome insofar as it calls for information regarding other types of workforce management tools (also known as workforce shaping or workforce flow tools) that are not CRSPs and were not used by the Coast Guard in selecting plaintiffs for the involuntary retirements at issue.

ANSWER:     Subject to and without waiving this objection, defendant answers interrogatory number 5 as follows:

a.      CRSPs were one of several workforce management tools (also known as workforce shaping or workforce flow tools) that the Coast Guard used during the 2010 through 2014 timeframe.  As a workforce management tool, CRSPs reduced the size of the retirement eligible enlisted workforce and increased opportunities for accessions and advancements among the remaining enlisted service members in all grades.  CRSPs also improved the flow within the enlisted workforce structure from entrance to exit as measured by retention rates, loss rates, time in service and time in grade.  By improving enlisted workforce flow, CRSPs enabled advancement opportunities for high performing junior enlisted personnel.

b.      Other workforce management tools that the Coast Guard used during the 1991 through 2014 timeframe included, but were not limited to, reduced accessions (new enlistments), reactivation of high year tenure, ending indefinite reenlistments, updating reenlistment standards, and early retirement and voluntary separation programs.

INTERROGATORY NO. 6:  If any of your responses to Requests for Admission Nos. 4, 6, 8, 10, and 12 are anything other than "admit," specify the billets or positions that were eliminated, the year in which those billets or positions were eliminated, whether the Secretary ordered the elimination of those billets or positions in conjunction with authorizing the CRSP for each respective year, and whether personnel serving in those billets or positions were involuntarily retired by that year's CRSP.  Please identify where such order from the Secretary can be found in the relevant sections of the "administrative record" produced by Defendant on April 24, 2019 or the documents produced in response to Plaintiffs' requests for production.

OBJECTION: Defendant objects that this interrogatory as overbroad and unduly burdensome, insofar as it calls for information that is not readily available in existing Coast Guard records.  Defendant's answer provides responsive information to the extent that it is readily available in existing Coast Guard records.  Defendant also objects to the interrogatory as unduly burdensome to the extent that it requests identification of documents that support our answer.  However, where appropriate, defendant has cited by Bates number documents from the administrative record that that are relevant to the answer to the interrogatory.

ANSWER:    Subject to and without waiving these objections, defendant answers interrogatory number 6 as follows:

a.    The Secretary of Homeland Security ordered reductions in force in 2010, 2011, 2012, 2013, and 2014, to be carried out through CRSPs, pursuant to 14 U.S.C. § 357(j).  AR 27-28, 53-54, 86-87, 128-29.  The Secretary of Homeland Security also approved all Coast Guard budgets during this timeframe, which, in turn, impacted the number of billets (or positions) that the Coast Guard determined it could afford to maintain and authorize.

b.    The Coast Guard reduced the authorized number of enlisted billets from the end of fiscal year 2009 through the end of fiscal year 2015, as follows:  September 2009 (33,550 enlisted billets); September 2010 (33,680 enlisted billets); September 2011 (33,494 enlisted billets); September 2012 (33,397 enlisted billets); September 2013 (32,535 enlisted billets); September 2014 (32,368 enlisted billets); and September 2015 (31,990 enlisted billets).  Accordingly, from the end of fiscal year 2009 through the end of fiscal year 2015, there was a reduction of 1,560 enlisted billets, and the vast majority of the enlisted billets that were eliminated were in the grades of E-1, E-2, E-5, and E-6.  The figures in this paragraph represent the Coast Guard's contemporaneous judgment regarding the number of billets that the agency could afford to maintain and authorize at the time in light of current and anticipated budget constraints and competing funding priorities.

c.    The Coast Guard reduced the actual number of enlisted service members from the end of fiscal year 2009 through the end of fiscal year 2015, as follows:  September 2009 (34,103 enlisted members); September 2010 (32,836 enlisted members); September 2011 (33,549 enlisted members); September 2012 (33,331 enlisted members); September 2013 (31,983 enlisted members); September 2014 (31,126 enlisted members); and September 2015 (30,693 enlisted members).  Accordingly, there was a reduction of 3,410 enlisted service members from

the end of fiscal year 2009 through the end of fiscal year 2015, and the vast majority of these reductions consisted of enlisted service members in the grades of E-3, E-4, E-5, and E-6.

d.      CRSPs were one of several workforce management tools that the Coast Guard used during the period from September 2009 through September 2015.  Other workforce management tools that the Coast Guard used during this same time period included reduced accessions (new enlistments), reactivation of high year tenure, ending indefinite reenlistments, updating reenlistment standards, and early retirement and voluntary separation programs. CRSPs were not used to select particular enlisted billets (or positions) for elimination.

e.      At the end of fiscal year 2009, the number of actual enlisted service members (34,103) was 553 higher than the authorized number of enlisted billets (33,550).  At the end of fiscal year 2011, the number of actual enlisted service members (33,549) was 55 higher than the authorized number of enlisted billets (33,494).

f.      During the 2010, 2011, 2012, 2013, and 2014 CRSPs, the Coast Guard selected a total of 832 enlisted service members for involuntary retirement, as follows:  2010 CRSP (377 enlisted members); 2011 CRSP (55 enlisted members); 2012 CRSP (147 enlisted members); 2013 CRSP (194 enlisted members); and 2014 CRSP (59 enlisted members).  Of the 377 enlisted service members who were selected for involuntary retirement during the 2010 CRSP, seven of those enlisted service members successfully appealed their selection and were not involuntarily retired.  Accordingly, the Coast Guard involuntarily retired:  (i) 370 enlisted service members as a result of the 2010 CRSP; and (ii) a total of 825 enlisted service members as a result of the 2010, 2011, 2012, 2013, and 2014 CRSPs.

g.      At the end of fiscal year 2014, the number of actual enlisted service members (31,126) had dropped to more than 1,000 below the authorized number of enlisted billets (32,368).

h.      Following the end of fiscal year 2014, the Coast Guard decided that it was not necessary to hold another CRSP in 2015.  AR 164-65.

i.      The Coast Guard generally did not eliminate the billets that were occupied by the enlisted service members in higher grades (E-7 and above) who were selected for involuntary retirement during the 2010, 2011, 2012, 2013, and 2014 CRSPs.  This is because the Coast Guard not only had a goal of reducing the overall size of the entire workforce, but also had a goal of rebalancing the workforce to ensure opportunities for continued accessions and advancements, which were essential for the Coast Guard to maintain a healthy enlisted workforce.  To achieve these twin goals during the period from the end of fiscal year 2009 through the end of fiscal year 2015, the Coast Guard required a combination of (i) reduced numbers of enlisted service members in certain of the lower grades (E-6 and below), (ii) reduced numbers of enlisted billets in certain of the lower grades (E-6 and below), (iii) reduced numbers of retirement eligible enlisted service members and increased turnover in higher grades (E-7 and above), and (iv) stable numbers of enlisted billets in higher grades (E-7 and above).  For example, the increased turnover associated with involuntary retirements of enlisted service members in higher grades (E-7 and above), while maintaining those higher graded billets, reduced the size of the retirement eligible enlisted workforce and increased opportunities for accessions and advancements among the remaining enlisted service members in all grades.  Likewise, reducing the number of enlisted service members in certain of the lower grades (E-6 and below), while also reducing the number of enlisted billets in certain of those lower grades, reduced the overall

size of the workforce and increased opportunities for accessions and advancements by remaining

enlisted service members in those lower grades.

        j.      When the Secretary of Homeland Security ordered reductions in force in 2010,

2011, 2012, 2013, and 2014, and approved budgets that impacted the number of billets that the

Coast Guard reasonably could afford to maintain and authorize in fiscal years 2010 through

2014, the Secretary did not separately and specifically order the elimination of particular billets

(or positions) in the Coast Guard.

        k.      For ease of reference, the figures set forth above in paragraphs 6(b) through 6(g)

regarding enlisted billets and enlisted service members are presented again in the following

chart:

| Fiscal Year End | Authorized Enlisted Billets | Actual Enlisted Members | CRSP Reductions In Enlisted Members | Other Reductions In Enlisted Members |
|---|---|---|---|---|
| 2009 | 33,550 | 34,103 | | |
| 2010 | 33,680 | 32,836 | 370 | 897 |
| 2011 | 33,494 | 33,549 | 55 | -768 |
| 2012 | 33,397 | 33,331 | 147 | 71 |
| 2013 | 32,535 | 31,983 | 194 | 1,154 |
| 2014 | 32,368 | 31,126 | 59 | 798 |
| 2015 | 31,990 | 30,693 | 0 | 433 |
| TOTAL | | | 825 | 2,585 |

    INTERROGATORY NO. 7:  If any of your responses to Requests for Admission Nos.
24-29 are anything other than "admit," state when each position was eliminated.

    ANSWER:    Defendant does not answer this interrogatory because it has admitted

requests for admission numbers 24 through 29.

## VERIFICATION

I hereby declare under penalty of perjury that the foregoing answers to interrogatories in paragraph numbers 1(a), 2(a), 3(a), 3(b), 4(a), 4(b), 4(c), 5(a), 5(b), 6(a), 6(d), 6(e) (mathematical tabulation only), 6(f), 6(g) (mathematical tabulation only), 6(h), 6(i), 6(j), and 6(k) (CRSP reductions column of chart and mathematical tabulation in other reductions column of chart only), are true and correct, to the best of my knowledge, information, and belief. My knowledge is based upon personal knowledge and my review of the documents (bearing bates numbers AR 1-165) from the administrative record in this case.

Rear Admiral Daniel A. Neptun
United States Coast Guard (Ret.)

## VERIFICATION

I hereby declare under penalty of perjury that the foregoing answers to interrogatories in paragraph numbers 1(c), 2(c), 6(c), 6(e) (member information only), 6(g) (member information only), and 6(k) (actual enlisted members column of chart only), are true and correct to the best of my knowledge, information, and belief.  My knowledge is based upon personal knowledge and my review of enlisted member data stored in the Coast Guard's electronic systems.

Commander Morgan T. Holden
United States Coast Guard

VERIFICATION

I hereby declare under penalty of perjury that the foregoing answers to interrogatories in paragraph numbers 1(b), 2(b), 6(b), 6(e) (billet information only), 6(g) (billet information only), and 6(k) (authorized enlisted billet column of chart only) are true and correct to the best of my knowledge, information, and belief. My knowledge is based upon personal knowledge, my review of enlisted billet data stored in the Coast Guard's electronic systems, and historical enlisted billet data reported on page 10 of a published report by the United States General Accounting Office, entitled *Coast Guard Workforce Mix* (March 2000), *available at* https://www.gao.gov/new.items/rc00060.pdf (last visited Sept. 25, 2020).

Lieutenant Commander Chad M. Conrad
United States Coast Guard

Respectfully submitted,

SCOTT G. STEWART
Deputy Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

 s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Deputy Director

 s/ Douglas G. Edelschick
DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-9303

October 9, 2020                    Attorneys for Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TONIA TIPPINS, *et al.*,                    )
                                            )
        Plaintiffs,                         )
                                            )
        v.                                  )      No. 18-923C
                                            )      Judge David A. Tapp
THE UNITED STATES,                          )
                                            )
        Defendant.                          )
                                            )

## DECLARATION OF CHRISTOPHER P. CALHOUN

I, Christopher P. Calhoun, declare as follows:

1.      I previously served in the United States Coast Guard and retired in the rank of
Captain. I served as Chief, Office of Military Personnel (CG-122), from July 10, 2009, through
August 14, 2011.

2.      As part of my duties and responsibilities in the CG-122 position, I was
responsible for implementing the personnel policy decisions that were made by my superiors in
the chain of command, which included Rear Admiral Ronald Hewitt and Admiral R.J. Papp, Jr.,
whereas, I personally did not have authority to make any policy decisions. Accordingly, I
participated in implementing the Coast Guard Active Duty Enlisted Career Retention Screening
Panels (CRSPs) in 2010 and 2011, but I did not have authority to make any decisions with
respect to these CRSPs. I understand that there may have been additional CRSPs in 2012, 2013,
and 2014, but I did not have any involvement with them.

3.      I have reviewed exhibits 9, 10, 11, and 14 to plaintiffs' motion for summary
judgment that I understand were filed in this case. In this declaration, I will refer to these
documents by their exhibit number as designated by plaintiffs.

4.      Exhibit 10 is an email thread that includes an email that I drafted and sent on July
20, 2010 at approximately 11:14 a.m. Exhibit 9 is an email thread that includes an email that I
drafted and sent on July 20, 2010 at approximately 1:27 p.m. At the time that I sent my emails in
exhibits 9 and 10, we were in the planning stages for the 2010 CRSP, which at that point had not
yet been authorized by the Secretary of the Department of Homeland Security (Secretary). In my
emails in exhibits 9 and 10, I sought to convey communications strategy (also known as
messaging strategy). By discussing in my emails in exhibits 9 and 10 issues related to workforce
"flow," I sought to convey my understanding that workforce flow was the motivating purpose
behind the proposed 2010 CRSP. When I drafted my emails in exhibits 9 and 10, I understood
that the proposed 2010 CRSP would not involve a reduction in the overall size of the workforce,
and, instead, I understood that the proposed 2010 CRSP would involve a targeted reduction in
force that addressed workforce flow issues by reducing only the number of retirement eligible

- Page 1 of 3 -

enlisted members on active duty. At the time when I drafted my emails in exhibits 9 and 10, I sometimes used the term, "RIF," in all capital letters, to refer to reductions in the overall size of the workforce, which was not consistent with my understanding of the purpose of the proposed 2010 CRSP to reduce only the number of retirement eligible enlisted members on active duty. This is all that I intended to communicate when I wrote "this is not a RIF" in exhibit 9 and "this is not a RIF tool" in exhibit 10. At the time I wrote my emails in exhibits 9 and 10, I was writing about communications strategy, not legal authority, because I understood at the time that the legal authority for the proposed 2010 CRSP would be as a reduction in force under 14 U.S.C. § 357(j), and I never intended for my emails to suggest that the proposed 2010 CRSP would not be a reduction in force under 14 U.S.C. § 357(j).

5.    In my email in exhibit 9, I directed the generation of some answers to frequently asked questions (or FAQs) regarding the proposed 2010 CRSP, which was part of a communications strategy. I also supervised and participated in the drafting of FAQs regarding the 2010 CRSP, which subsequently was approved by the Secretary in September 2010. It appears that Exhibit 11 is the final version of those FAQs, which were posted online for review by members of the fleet sometime near the end of 2010.

6.    The FAQs in exhibit 11 address questions of both legal authority and communications strategy. For example, in the answer to FAQ number 1, I sought to communicate that the 2010 CRSP was a reduction in force under 14 U.S.C. § 357(j), and that legal authority for the 2010 CRSP is mentioned several times and the term "reduction in force" is used as well. Likewise, in the answers to FAQ numbers 1 and 4, I sought to communicate that enlisted personnel boards would not be conducted in accordance with 14 U.S.C. § 357(a)-(i) because the 2010 CRSP was being convened pursuant to Secretary's authority under 14 U.S.C. § 357(j). But, in the answer to FAQ number 2, I sought to communicate my understanding of why the 2010 CRSP authorization memorandum signed by the Secretary did not use the term "reduction in force." At the time when I supervised and participated in the drafting of the FAQs, I sought to convey that the 2010 CRSP was not intended to achieve reductions in the overall size of the workforce, and, instead, that the 2010 CRSP was intended to achieve a targeted reduction in force that addressed workforce flow issues by reducing only the number of retirement eligible enlisted members on active duty. This is all that I intended to communicate when FAQ number 2 says, "[t]he term 'reduction in force' would have been misleading because the CRSP was not intended to reduce the overall size of the force," because "[t]he CRSP was convened to efficiently and fairly, based on uniform performance and conduct criteria, identify retirement eligible enlisted personnel for involuntary retirement; accelerate advancement of junior enlisted members; and reinvigorate accession of recruits into the Coast Guard." Exhibit 11. The answer to FAQ number 3 further elaborated on my understanding of the reasons why the 2010 CRSP was necessary. At the time when I supervised and participated in the drafting of the FAQs, I understood that the legal authority for the 2010 CRSP was as a reduction in force under 14 U.S.C. § 357(j), and I never intended for the FAQs to suggest that the proposed 2010 CRSP would not be a reduction in force under 14 U.S.C. § 357(j).

7.    I supervised and participated in drafting the FAQs in exhibit 11 in the December 2010 timeframe. Exhibit 14 is an email thread that includes an email that I drafted and sent on December 29, 2010 at approximately 9:13 a.m. The email thread in exhibit 14 pertains to the drafting of the FAQs.

- Page 2 of 3 -

8.    Unlike the 2010 CRSP authorization memorandum signed by the Secretary, which did not use the term "reduction in force," the 2011 CRSP authorization memorandum signed by the Secretary did use the term "reduction in force." My understanding is that this change occurred solely because of a shift in the Coast Guard's communications strategy, and not because of any change in the legal authority for the CRSPs. During the entire time when I was involved with the 2010 and 2011 CRSPs, I understood that the legal authority for the 2010 and 2011 CRSPs was as a reduction in force under 14 U.S.C. § 357(j), and no one ever told me that the 2010 or 2011 CRSPs were not a reduction in force under 14 U.S.C. § 357(j).

9.    I have personal knowledge of the facts in this declaration.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746. Executed on this 28th day of January, 2021.

Captain Christopher P. Calhoun (Ret.)

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**TONIA TIPPINS, DERRIK MAGNUSON, GEORGE HOLLOWAY, JENNIFER REHBERG, GLENDA SMITHLEETH, AND M. ALLEN BUMGARDNER**

*For Themselves and as Representatives of a Class of Similarly Situated Persons,*

**Plaintiffs,**

**v.**

**UNITED STATES OF AMERICA**

**Defendant.**

Case No.: 18-cv-00923-DAT

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND MOTION TO STRIKE THE DECLARATION OF CAPTAIN CHRISTOPHER P. CALHOUN**

### III. THE CALHOUN DECLARATION SHOULD BE STRICKEN, OR AT LEAST DISREGARDED, BECAUSE IT WAS NOT DISCLOSED PRIOR TO THE CLOSE OF FACT DISCOVERY

As noted above and in Plaintiffs' opening brief, multiple documents contemporaneous with the decision to implement the CRSPs indicate that high-ranking personnel at the Coast Guard knew that the CRSP "is ***not*** a RIF and we need to ensure that it is not associated with a RIF." Dkt. 62, Ex. 9 (Tippins Gov-00009330) at 331 (emphasis added); *see also id.*, Ex. 10 (Tippins Gov-00008478) at 478 (Chief of the Office of Military Personnel explaining to staff that "[o]ne of the keys as I see it, is ensuring that [the CRSP] is designed and messaged as a flow stimulating tool and not a RIF tool"); *id.*, Ex. 11 (Tippins Gov-00009293) at 293 ("[t]he term 'reduction in force' would have been misleading because the ***CRSP was not intended to reduce the overall size of the force***.") (emphasis added); *see also* Dkt. 62 at 7, 16. Defendant opposed Plaintiffs' attempt to seek a deposition of Defendant, including on the topics of "[t]he Coast Guard's messaging and explanations within the Coast Guard regarding CRSP" and "[t]he Coast Guard's public messaging regarding CRSP." Dkt. 46 at 17 (topics 8 and 10). Defendant told the Court and Plaintiffs that these "topics are duplicative of information that plaintiffs already possess." *Id*. at 21. In fact, this was a point of discussion at the August 6, 2020 hearing before the Court in which Plaintiffs noted that Defendant's public messaging regarding CRSPs were inconsistent with Defendant's internal statements. Dkt. 55 at 20:25-24:3. The Court specifically noted "a statement from a Coast Guard official stating these CRSPs are not a reduction in force," but Defendant never stated that it had new information from this Coast Guard official—Captain Christopher P. Calhoun—that would contradict or undermine what he said in his statement. *See id*. at 21:22-22:9. At the close of fact discovery, Defendant agreed with Plaintiffs that "there are no outstanding discovery issues" in this case, never raising any additional statements or information from Capt. Calhoun. Dkt. 59 at 2.

14

Now, however, after Defendant avoided a deposition and obtained limits on discovery, Defendant has submitted a declaration by Capt. Calhoun in which he attempts to walk back with post-hoc rationalizations the clear statements set forth in the contemporaneous documents. *See* Dkt. 67-1 at DA61-63. Submitted more than four months after the close of fact discovery, this declaration is entirely improper and should be stricken.

Defendant was required to disclose its reliance on Capt. Calhoun's testimony pursuant to RCFC 26(a)(1)(A), which requires disclosure of "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses."[5] During fact discovery, the parties negotiated and agreed that Defendant could produce documents and submit written discovery responses to obviate the need for an organizational witness for deposition. *See* Dkt. 59. Defendant made no indication during the discovery period that it intended to rely on any fact testimony or declarations (including from Capt. Calhoun) in support of its motion for summary judgment. Relying on this silence, the parties' agreement surrounding deposition testimony, and the straightforward nature of Defendant's produced documents and written discovery responses, Plaintiffs did not seek any individual depositions from Defendant. After receiving the Calhoun Declaration more than four months after the close of fact discovery, however, Plaintiffs promptly requested a half-day deposition of Capt. Calhoun regarding the contents of his declaration and the accompanying exhibits. *See* Ex. 1 (2/8/21 Scott email to Edelschick). Defendant refused to put Capt. Calhoun up for a deposition, and would only agree to

---

[5] While "an action for review on an administrative record, including procurement protest and military pay cases" is exempt from the initial disclosure rule pursuant to RCFC 26(a)(1)(B)(i), that rule does not apply here. The court previously determined that this case will not proceed on review of the administrative record, and both parties filed motions for summary judgment rather than motions for judgment on the administrative record.

withdraw the Calhoun Declaration if Plaintiffs withdrew their arguments regarding Defendant's timely-produced documents authored by Capt. Calhoun. *See* Ex. 2 (2/9/21 Edelschick email to Scott).

Pursuant to RCFC 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by RCFC 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The "sanction of exclusion is automatic and mandatory" unless Defendant can show that the failure to disclose is substantially justified or harmless. *Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 167 (2006). Defendant's failure to disclose its reliance on Capt. Calhoun and the substance of his declaration prior to the close of fact discovery, as required by RCFC 26(a), is neither substantially justified nor harmless. Defendant relies on the Calhoun Declaration to support its arguments with regard to a key issue in this case—whether the Coast Guard considered the CRSPs to be reductions in force under 14 U.S.C. § 357(j) at the time the CRSPs were implemented. Defendant never told Plaintiffs about the information in the Calhoun Declaration before submitting it in opposition to Plaintiffs' summary judgment motion—despite Capt. Calhoun's statements that CRSPs were not a reduction in force being centrally featured in this case well before the close of fact discovery. Although Plaintiffs had offered to not oppose this untimely produced evidence if Defendant made Capt. Calhoun available for a deposition, Defendant refused. And Defendant has provided no explanation for why it could not have timely provided this information. Defendant knew at least since the Court's questions at the August 6 hearing that any information from Capt. Calhoun was relevant. As such, because Defendant failed to timely disclose this information, the declaration from Capt. Calhoun should be stricken. *Abbey v. United States*, 132 Fed. Cl. 307, 311

# EXHIBIT 1

**From:**          Scott, Emily M.
**Sent:**          Monday, February 8, 2021 2:19 PM
**To:**            Edelschick, Douglas (CIV)
**Cc:**            Mammen, Nathan; Brier, Grace C.
**Subject:**       Tippins - Request

Hi Doug,

Hope you and your family are doing well. First, I am writing to request consent to our motion for a 4-week extension of time, up to and including March 19, 2021, for our reply in support of our motion for summary judgment/response to defendant's motion for summary judgment. This motion is warranted for several reasons, including Nathan's involvement in a remote trial over the coming weeks. We also will request a corresponding 4-week extension for defendant's reply. Please let us know if you consent to this motion.

Second, in view of defendant's submission of the Declaration of Capt. Christopher P. Calhoun in conjunction with its motion for summary judgment, plaintiffs request the opportunity to conduct a half-day deposition of Capt. Calhoun regarding the contents of his declaration and the accompanying exhibits. Please let us know by the end of the week if defendant will agree to make Capt. Calhoun available for deposition.

Thanks,
Emily

**Emily M. Scott (Kustina)**
---------------------------------------------
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5269  **M** +1 202 701 5514
**F** +1 202 389 5200
---------------------------------------------
emily.scott@kirkland.com

# EXHIBIT 2

| | |
|---|---|
| **From:** | Edelschick, Douglas (CIV) <Douglas.Edelschick@usdoj.gov> |
| **Sent:** | Tuesday, February 9, 2021 2:18 PM |
| **To:** | Scott, Emily M. |
| **Cc:** | Mammen, Nathan; Brier, Grace C. |
| **Subject:** | Re: Tippins - Request |

 > This message is from an EXTERNAL SENDER - be cautious, particularly with links and attachments.

Dear Ms. Scott,

We consent to plaintiffs' proposed motion for a four week extension of the remaining deadlines on the briefing schedule. We very much appreciated plaintiffs' professional courtesy in consenting to previous extensions of time requested by defendant, and we are happy to return that courtesy to accommodate Mr. Mammen's trial schedule.

With respect to the second issue raised in your email, we object to plaintiffs' proposed deposition of Captain Calhoun. The proposed deposition would take place more than four months after the October 2020 deadline when the Court had ordered that "[t]he parties shall complete all discovery." Order at 1, Aug. 27, 2020, ECF No. 57; *see also* Joint Status Report at 2, Oct. 21, 2020, ECF No. 59 ("The parties agree that there are no outstanding discovery issues[.]"). We produced Captain Calhoun's emails to plaintiffs in November 2019, nearly one year before the close of discovery, and plaintiffs did not request a deposition to ascertain his testimony about the emails at any time during discovery. Moreover, there is no need for the proposed deposition because, as stated in his declaration, Captain Calhoun had no decision making authority with respect to any CRSP, he had no involvement whatsoever with the 2012-2014 CRSPs at issue in this case, and the Calhoun documents cited by plaintiffs were dated more than one year before the Coast Guard even requested authority from the Secretary to hold the 2012 CRSP. Since then, Captain Calhoun has retired from the Coast Guard and is busy working in a full time job in the private sector. The principal reason we submitted his declaration was to respond to the Calhoun-related arguments and documents that plaintiffs had included in their summary judgment motion. Therefore, notwithstanding our objection to any further discovery, if plaintiffs are willing to amend their summary judgment motion to withdraw the Calhoun documents (Pls. Exs. 9, 10, 11, 14) and related argument, we are willing to amend our response brief to withdraw the Calhoun declaration and related argument, because none of that material is necessary for the resolution of the core legal issue of statutory interpretation in this case.

Best regards,

Doug

Douglas G. Edelschick
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(For overnight deliveries please use:
1100 L Street NW, Room 9108, Washington, DC 20005)
202.353.9303 (direct dial)
202.305.7643 (fax)
douglas.edelschick@usdoj.gov



On Feb 8, 2021, at 2:19 PM, Scott, Emily M. <emily.scott@kirkland.com> wrote:

Hi Doug,

Hope you and your family are doing well. First, I am writing to request consent to our motion for a 4-week extension of time, up to and including March 19, 2021, for our reply in support of our motion for summary judgment/response to defendant's motion for summary judgment. This motion is warranted for several reasons, including Nathan's involvement in a remote trial over the coming weeks. We also will request a corresponding 4-week extension for defendant's reply. Please let us know if you consent to this motion.

Second, in view of defendant's submission of the Declaration of Capt. Christopher P. Calhoun in conjunction with its motion for summary judgment, plaintiffs request the opportunity to conduct a half-day deposition of Capt. Calhoun regarding the contents of his declaration and the accompanying exhibits. Please let us know by the end of the week if defendant will agree to make Capt. Calhoun available for deposition.

Thanks,
Emily

**Emily M. Scott (Kustina)**

**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W., Washington, D.C. 20004
**T** +1 202 389 5269  **M** +1 202 701 5514
**F** +1 202 389 5200

emily.scott@kirkland.com

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# DEPARTMENT OF HOMELAND SECURITY
# BOARD FOR CORRECTION OF MILITARY RECORDS

Application for the Correction of
the Coast Guard Record of:

**BCMR Docket No. 211-130**

**WINBOURNE, James W.**
**1070545, ETCM**

## FINAL DECISION

This proceeding was conducted according to the provisions of section 1552 of title 10 and section 425 of title 14 of the United States Code. The Chair docketed the application upon receipt of the applicant's completed application on March 23 2011, and subsequently prepared the final decision as required by 33 CFR § 52.61(c).

This final decision, dated March 20, 2012, is approved and signed by the three duly appointed members who were designated to serve as the Board in this case.

### APPLICANT'S REQUEST

The applicant, a retired master chief electronics technician (ETCM; pay grade E-9) asked the Board to correct his record by reinstating him on active duty or by retiring him with 30 years of active service at his current pay grade. The applicant was involuntarily retired from active duty on December 1, 2011 with approximately 22 years of active service as a result of selection for such retirement by a Career Retention Screening Panel (CRSP).

Prior to enlisting in the Coast Guard in 1992, the applicant had served in the Army and Army Reserve for approximately 4½ years. After enlisting in the Coast Guard, the applicant advanced to pay grade E-8 and was subsequently commissioned a chief warrant officer, pay grade W-2 (CWO2) on September 1, 2004. However, the applicant encountered some difficulty while serving as a warrant officer for which he received a punitive letter of reprimand on November 3, 2006 for his "reproachable manner by engaging in excessive drinking with his subordinates; conduct that was a violation of station regulations and which undermined [the applicant's] authority as [commanding officer (CO)] to enforce standards of behavior." The letter of reprimand also noted that the applicant had received non-judicial punishment for being derelict in the performance of his duties in violation of Article 92 of the Uniform Code of Military Justice (UCMJ), and for fraternizing with enlisted personnel in violation of Article 134 of the UCMJ.

Tippins Gov-00008924

The applicant received a special OER to document the NJP and his November 29, 2006 permanent relief of duty as CO. The applicant stated that after review by a board of officers, his warrant officer commission was revoked and he was discharged from the Coast Guard in 2007. However, his request for permission to reenlist in pay grade E-8 was granted and he reenlisted in the Coast Guard on August 16, 2007. The applicant stated that after his reenlistment, he earned his CO's recommendation for advancement and in 2010 and 2011 and placed above the cut at number 5 on the ETCM 2011 advancement list. He was selected for involuntary retirement by the CRSP panel that convened on September 27, 2010. He appealed his involuntary retirement on November 16, 2010. His appealed was denied on January 19, 2011.

## ALLEGATIONS

The applicant alleged that the CRSP decision to involuntarily retire him was unjust because it constituted administrative double jeopardy, because it was a breach of his contract, and because it used 14 U.S.C. § 357[1] improperly.

With regard to administrative double jeopardy, the applicant explained that the CRSP used the same adverse information to involuntarily retire him that the board of officers had already used to revoke his CWO commission and to discharge him from the Coast Guard in 2007. The adverse information consisted of the NJP, the LOR, the special OER noting the applicant's relief as CO, and an alcohol incident letter. According to the applicant, the panel's decision to select him for involuntary retirement could only have been based on the adverse performance documentation because there was no other negative information in his record. The applicant stated that his enlisted performance prior and subsequent to his warrant officer service was impeccable.

With regard to the contract violation issue, the applicant argued that he has upheld the terms of his recent enlistment contract but the Coast Guard has not. The applicant reenlisted for an indefinite period in 2007, which allowed him to remain in the service for up to 30 years. He stated that he does not know whether his involuntary retirement was due to the needs of the service or due to his performance.

---

[1]  The pertinent provisions of 14 U.S.C. § 357 are: "(a) Enlisted Personnel Boards shall be convened as the Commandant may prescribe to review the records of enlisted members who have twenty or more years of active military service. (b) Enlisted members who have twenty or more years of active military service may be considered by the Commandant for involuntary retirement and may be retired on recommendation of a Board—(1) because the member's performance is below the standards the Commandant prescribes; or (2) because of professional dereliction. (c) An enlisted member under review by the Board shall be—(1) notified in writing of the reasons the member is being considered for involuntary retirement; (2) allowed sixty days from the date on which counsel is provided . . . to submit any matter in rebuttal. (3) provided counsel . . . to help prepare the rebuttal . . . and to represent the member before the Board . . . (4) Allowed full access to and be furnished with copies of records relevant to the consideration for involuntary retirement prior to submission of the rebuttal . . . and (5) allowed to appear before the Board and present witnesses or other documentation related to the review."

Subsection (j) states that "When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action."

Tippins Gov-00008925

With regard to the legality of the CRSP, the applicant argued that the Secretary violated the spirit and intent of 14 U.S.C. § 357(j) by using it as a workforce shaping tool to enhance the opportunity for advancement of junior personnel by involuntarily retiring members with more than 20 years of service without the board action required by 14 U.S.C. § 357(b)-(i). The applicant pointed out that 14 U.S.C. § 357(j) states "When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the [enlisted personnel board's] action."

The applicant stated that the Secretary approved a Coast Guard memorandum that authorized involuntary retirements without board action, but she did not order a reduction in force. According to the applicant, the memorandum approved by the Secretary on behalf of the Coast Guard states that "the [CRSP] is required to address high retention and its adverse impact on workforce flow."   The applicant also stated:

> Of the 1181 candidates, 377 were selected for involuntary retirement; however at the end of 2011, the Coast Guard workforce numbers will remain the same. . . . In fact the Coast Guard boasts that over 1000 advancements will result from this measure. The [CRSP's] precept . . . states that there is no quota for the number of personnel selected for involuntary retirement; further confirming that this was not a reduction in force but a cost effective means to conduct a panel. The Secretary . . . provided authorization for involuntary retirements without Board action, yet the Coast Guard proceeded with a performance-based panel, clearly as a means to circumvent the law.   Unfortunately for those affected by the panel's decisions, conducting a panel in such a manner did not afford each of the 1181 candidates due rights or process.

The applicant stated that although convening a board in accordance with 14 U.S.C. § 357 (a)-(i) would have been costly, it would have afforded each candidate certain rights that they were denied with the CRSP. Members undergoing an enlisted personnel board would have been

- notified in writing of the reasons the member is being considered for involuntary retirement;

- allowed 60 days from the date on which counsel is provided to submit a rebuttal;

- provided with counsel to assist in preparing the rebuttal and to represent the member before the board;

- allowed full access to and be furnished with copies of records relevant to the consideration for involuntary retirement prior to submission of the rebuttal; and

- allowed to appear before the board and present witnesses or other documentation related to the review.

Tippins Gov-00008926

**Final Decision in BCMR Docket No. 2011-130**                                      **p. 4**

The applicant stated that the only due process provided by the CRSP to candidates was 15 days to appeal an adverse decision of the CRSP and the basis of the appeal was limited to material error, newly discovered evidence, or the presence of improper documents in the record.

The applicant argued that the Coast Guard already has workforce management tools in place such as High Year Tenure (HYT) and enlisted personnel boards under 14 U.S.C. § 357 (b). The applicant argued that adhering to the HYT policy would have achieved similar results at the E-5 and E-6 level and possibly the E-7 level. The applicant stated that using the HYT policy would have provided long term effects whereas using the CRSP was only a temporary measure. The applicant concluded his statement with the following:

> Beyond the unlawful use of 14 U.S.C. 357 by conducting the CRSP in the manner that they did; which was unjust to an additional 376 Coast Guardsman, the Coast Guard further disregarded my rights of double jeopardy and which resulted in a breach of contract. Furthermore, the panel did not adhere to their own precept or goals. I have shown my value to the organization and ability to advance within the organization, which will in turn allow others to advance. My retirement as senior chief petty officer or advancement to master chief petty officer will afford the same members the opportunity to advance in their respective pay grades regardless.

### BACKGROUND FOR THE CRSP

**ALCOAST 165/10[2]**

On April 1, 2010, the Coast Guard issued ALCOAST 165/10 entitled "ACTIVE DUTY MILITARY MANAGEMENT." It stated the following in pertinent part:

> Within our active duty workforce, we continue to experience historically high retention levels in both our officer and enlisted ranks. Currently we have more active duty enlisted members and officers than funded billets. Looking ahead to fiscal year (FY) 2011, the president's budget for the Coast Guard projects billet losses that will exacerbate this overage in our active duty workforce. A military workforce requires flows at all levels to ensure career progression for our people. Absent normal separation rates at all levels, opportunities for advancement and promotion become significantly reduced, thus increasing time-in-grade at every level.
>
> Over the past six months, the Coast Guard has implemented several initiatives to reduce the impacts of high retention, including eliminating all selective re-enlistment bonuses (SRB), waiving up to 12 months time-in-grade requirements for retirements, and reducing accessions to TRACEN Cape May to their lowest level on record. Officer accessions have also been reduced. *Even with this careful management, the active duty workforce still remains above our funded*

---

[2] An ALCOAST is a directive from the Commandant, the Vice-Commandant, or the Chief of Staff of the Coast Guard.

Tippins Gov-00008927

*level. This situation, coupled with the planned military billet reductions proposed in the President's FY 2011 budget necessitates the use of additional workforce management tools.* (Emphasis added.)

#     #     #

*To manage the enlisted workforce:    CG–PSC–EPM will consider waiving obligated service requirements based on needs of the service.*

The President's FY 2011 budget proposal has not yet been approved by Congress . . . we must prepare now to match the number of people in our active duty workforce to the number of funded billets.  To help mitigate the impact of these overages, we will:  [Insource] work presently conducted by contractors [and] Market transition . . . to the Reserve.

#     #     #

If the above measures are unable to align body to billet levels  . . . We will use a performance-based retention panel to align the enlisted work force.

## ALCOAST 333/10

June 25, 2010, the Coast Guard issued ALCOAST 333/10 that suspended the voluntary separation programs due mainly to Deep Water Horizon.  The ALCOAST also noted the following:

[Through voluntary separation programs for both enlisted and officers], to date we have processed over 700 officer and enlisted member requests from all levels of the service.

[The voluntary separation] initiative has met our desired goals and provided some relief to our personnel strength.  There is still some concern due to our continued high retention that other workforce shaping initiatives may be needed to ensure we have the vibrant and healthy workforce for the long term, including normal accessions and advancement opportunities.

## ALCOAST 408/10

The Coast Guard issued ALCOAST 408/10 on August 5, 2010.  It stated the following in pertinent part:

Over the course of the last two years the entire military workforce has experienced record high retention that has decreased accessions, reduced A-school quotas, and significantly slowed down advancements/promotions.  To ensure viability and growth potential, we must take steps to ensure that we maintain workforce flow and advancement opportunities.

Tippins Gov-00008928

**Final Decision in BCMR Docket No. 2011-130**                                    p. 6

Similar workforce shaping tools similar to those of officers do not exist for the enlisted workforce. Given our high retention rates, this inconsistency compromises our ability to maintain a healthy advancement flow. . . . It is necessary to implement an additional workforce tool. Our goal is to ensure that the Coast Guard has vibrant and healthy enlisted workforce for the long term, one with consistent accession levels and steady advancement opportunities.

To meet this goal, we are planning to hold a career retention screening panel (CRSP) for enlisted personnel who [who are retirement eligible].

## Commandant's Request for Coast Guard Active Duty Enlisted Career Retention Screening Panel (CRSP)

In an August 13, 2010 memorandum, the Commandant requested approval from the Secretary to conduct an active duty enlisted CRSP in the fall of 2010 to address high enlisted retention and its adverse impact on the workforce flow. The Coast Guard stated that 14 U.S.C. § 357 (j) and 10 U.S.C. § 1169[3] gave the Secretary the authority to order the CRSP and that "[p]er Title 14 U.S. Code, Section 3357(j), the Secretary of Homeland Security *must provide authorization for involuntary retirements without board action.* " (Emphasis added.) The memorandum further stated the following:

The Coast Guard has taken steps to resolve the retention problem. We have reduced our accessions to the lowest level in our records. We temporarily waived obligated service requirements to allow voluntary separations. However, the majority (91%) of over 700 recent voluntary separations were from junior enlisted ranks, and not our more senior workforce. If allowed to continue, this trend, along with our reduced accessions, will result in an imbalance in the enlisted workforce's experience level for many years to come.

The panel will review approximately 1600 records, including the records of all first class petty officers and below with twenty or more years of service and all chief petty officers and above with twenty or more years of service and three years or more time in grade. Because the panel will only review those with twenty or more years of service, every one reviewed will be retirement eligible. Members asked to involuntary retire will still be entitled to full retirement benefits.

Your endorsement of this memo will provide the Coast Guard with the legal authority required to conduct this panel.

The Secretary approved the Commandant's request to hold a CRSP to select members for retention.

---

[3] Section 1169 of title 10 of the United States Code states that "no regular enlisted member of an armed force may be discharged before his term of service expires, except—(1) as prescribed by the Secretary concerned; (2) by sentence of a general or special court-martial; or (3) as otherwise provided by law."

Tippins Gov-00008929

## ALCGENL 140/10

ALCGENL 140/10 announced to enlisted personnel the implementation of the CRSP and that it was scheduled to convene in the fall at PSC to assess the continued service of retirement eligible personnel who meet the following criteria:

A.  All retirement eligible E6 and below with 20 or more years of active military service as of 1 September 2010.
B.  All retirement eligible E-7 and above with 20 or more years of active military service who have three or more years time in grade as of 1 September 2010.

Section 12.B. stated that personnel selected for involuntary retirement can appeal the decision based only on material error, newly discovered evidence, or the presence of improper documents in the member's personnel file.

Section 12.F. stated that personnel may request a waiver extending beyond 1 December 2011, waivers were to be considered based on service need and approval by PSC-EPM.

## ALCOAST 464/10

ALCOAST 464/10 issued on September 21, 2010 announced further guidance with regard to the CRSP and noted that it would be held on September 27, 2010 and that it would be performance based.    In this regard, the ALCOAST provided the following guidance, in pertinent part:

4.  Documented misconduct and substandard or marginal performance are the primary reasons CRSP eligible candidates will be considered for involuntarily retirement . . .  The focus will be performance within the last five years, or since the members advancement to their current grade . . .  whichever timeframe is longer . . .  The factors listed below will indicate to the panel that an individual may not meet the performance requirements for continuation . . . .

A.  Substandard performance of duty to include receipt of a not recommended for advancement based on an unsatisfactory conduct mark or declining performance with the same approving official in the rating chain.
B.  Receipt of an enlisted evaluation report with a minimum average characteristic marks of 3.5 or below.
C.  Moral or professional dereliction, such as relief for cause.
D.  Failure to meet service norms or regulations concerning alcohol use and body fat standards.
E.  Documented misconduct involving violation of the UCMJ, e.g., non-judicial punishment, or conviction by military court-martial/conviction by a civilian court.
F.  Other documented adverse information clearly indicating the CRSP candidates' continuation may be inconsistent with national security interests

Tippins Gov-00008930

or may otherwise not be in the best interest of the Coast Guard, such as
losing one's security clearance.

G. Financial irresponsibility, such as failure to pay just debts or a pattern of
government credit card delinquency, including revocation of the
government credit card due to misuse or failure to pay outstanding balance.

H. Performance probation

I. Failure to demonstrate upward mobility by not qualifying or participating in
the service wide examination.

The pertinent ALCOAST stated that the panel may consider the above factors along with
the entire official military personal data record to select candidates for the continuation. While
the list of factors is not all inclusive, it provides the performance indicators the panel will
consider to select those CRSP candidates for involuntary retirement.

The CRSP met on September 27, 2010 and selected 377 members for involuntary
retirement out of 1,181 candidate records considered. The applicant was one of those selected
for involuntary retirement. The results of the panel were subsequently approved by the
Commandant.

## VIEWS OF THE COAST GUARD

On September 9, 2011, the Judge Advocate General (JAG) submitted an advisory opinion
in which he recommended that the Board deny relief. The JAG argued that the CRSP was
properly convened and duly composed in accordance with Coast Guard policy and law. The
JAG stated that on September 21, 2010, the Secretary approved the Commandant's request to
hold a CRSP in accordance with 14 U.S.C. § 357(j) and 10 U.S.C. § 1169 to address high
retention and its adverse impact on the Coast Guard workforce flow.

The JAG stated that the CRSP convened on September 27, 2010, and considered the
records of 1,181 members for involuntary retirement, including the applicant's record. Three
hundred seventy-seven enlisted members were selected for involuntary retirement. The CRSP
recommendations were reviewed and approved by the Commandant.

The JAG asserted that the applicant has failed to substantiate an error or injustice
regarding the CRSP recommendation for his involuntary retirement from the Coast Guard and
has therefore failed to meet his burden of proof. The JAG stated that the applicant's argument
that the CRSP recommendations are unlawful and should be overturned is without merit. The
JAG stated that the applicant's assertions are speculative at best and fail to show that the Coast
Guard violated policy or law regarding the CRSP processes. The JAG noted that the applicant
was afforded an additional level of due process by submitting an appeal on November 16, 2010,
which was denied.

The JAG attached comments from the Commander, Personnel Service Center (PSC) to
the advisory opinion. PSC argued that 10 U.S.C. § 1169 authorized the Secretary to prescribe
how an enlisted member may be "discharged before his term of service expires" and that 14 §
357(j) permits Coast Guard enlisted personnel to be involuntarily retired from the service

Tippins Gov-00008931

without an individual hearing before a board *when the Secretary orders a reduction in force.* (Emphasis added.) PSC further stated:

> Because the Coast Guard has recently experienced historically high retention rates for senior enlisted personnel, on September 21, 2010, the Secretary of Homeland Security exercised her authority under both 10 U.S.C. § 1169 and 14 U.S.C. § 357(j) to direct the Coast Guard to conduct an active duty enlisted CRSP to efficiently identify retirement eligible enlisted personnel for involuntary retirement.
>
> By identifying senior, retirement eligible personnel, and directing their separation from the Service, the Secretary and the Coast Guard acted to accelerate advancement of junior members by returning advancement and "A" School opportunities to adequate levels and by reinvigorating accession of recruits into the Coast Guard. The CRSP considered the records of 1,181 retirement eligible members for potential involuntary retirement including the applicant . . .

With regard to the applicant's "administrative double jeopardy" argument, the Coast Guard stated that the applicant's view that since one administrative action was taken based on information properly documented in his record no additional actions could be taken based on that same information is wrong. In this regard, PSC pointed to the paragraph 5 of the guidance provided to the CRSP, which states in pertinent part:

> Just as you must consider positive performance, you must consider incidents of misconduct and substandard performance documented in a CRSP candidate's official Military Personnel Data Record (PDR) when determining those CRSP candidates to be recommended for continuation. For those CRSP candidates who are recommended for continuation and who have received disciplinary action, or whose privileged information record contains matter relating to conduct or performance of duty that occurred **within the past five years** or since active duty advancement to their current pay grade .. .. whichever is longer . . . must be fully disclosed when the slates are briefed for recommendation . . . prior to the final panel decision. (Emphasis added to quote.)

PSC noted that the applicant did not allege that the information contained in his PDR was inaccurate or improperly placed in his record. Therefore, the applicant he has not shown that the information was improperly considered.

### APPLICANT'S REPLY TO THE ADVISORY OPINION

On January 27, 2012, the Board received the applicant's reply to the views of the Coast Guard. The applicant disagreed with the advisory opinion's conclusion that he had not submitted evidence that the Coast Guard committed an error or injustice.

The applicant's major contention is that the Secretary of Homeland Security violated the intent of 14 U.S.C. § 357(j) by using the law as a workforce shaping tool to screen and

Tippins Gov-00008932

involuntarily retire members with 20 or more years of service for the stated goal of enhancing junior enlisted advancement instead directing involuntary retirements due to a reduction in force. The applicant points out that 14 U.S.C. § 357(j) states "When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the [enlisted personnel board's] action."

The applicant stated that the advisory opinion's statement that the Secretary enacted the CSRP in order to "accelerate advancement of junior enlisted members by returning advancement and "A" school opportunities to adequate levels and by reinvigorating accession of recruits into the Coast Guard" is an admission that the Secretary did not approve the CRSP to implement an order for a "reduction in force," as required by 14 U.S.C. § 357(j).  He argued that since the Secretary used 14 U.S.C. § 357(j) as a workforce shaping tool, he should have been afforded the due process as outlined in 14 U.S.C. § 357 (b), (c), and (f).

The applicant asserted that a workforce reduction is intended to reduce the overall level of personnel in the service and is not to be used as a management tool to increase advancement opportunities for enlisted personnel.  The applicant asserted that at the time the Coast Guard conducted the CRSP there was an increase in overall manning levels from 34,540 at the end of 2010 to 35,207 at the end of 2011.  Therefore he asserted that there was no reduction in force.

The applicant reasserted his argument that he has been the victim of administrative double jeopardy.  He stated again that it appears that the only reason that he was selected for involuntary retirement was because of the incident that occurred when he was a warrant officer. He stated that he has paid for that transgression by losing his CWO commission and that that information should not be used against him a second time.  He stated that the Coast Guard allowed him to reenlist as an E-8 on August 16, 2007.  He stated that he was advanced to master chief petty officer (E-9 (highest enlisted pay grade)) on April 1, 2011.  (He was involuntarily retired on December 1, 2011).  He argued that the Coast Guard's actions are contradictory.  On the one hand the CRSP found that he did not meet the performance requirements to continue to serve, and on the other hand, the Coast Guard found that he met the performance requirements to be advanced to E-9.

The applicant stated that the advisory opinion failed to address whether the Coast Guard violated its contract with him.  In this regard, the applicant stated the following:

> Pursuant to the Coast Guard Personnel Manual . . . 1.G.6 states, "a member entering an indefinite contract is authorized to serve on active duty up to the last day of the month that he or she completed 30 years of active service."  On 16 August 2007, I signed an indefinite reenlistment contract and my performance from this point has been superb as evidenced by my selection to E-9.  My obligations of my indefinite reenlistment contract have been met and the Coast Guard is violating their end of the agreement with selection of the CRSP and not providing me with my due process rights under 14 U.S.C. § 357 (b) (c) and (f).

## FINDINGS AND CONCLUSIONS

Tippins Gov-00008933

The Board makes the following findings and conclusions on the basis of the applicant's military record and submissions, the Coast Guard's submission and applicable law:

1. The Board has jurisdiction concerning this matter pursuant to section 1552 of title 10 of the United States Code. The application was timely.

2. On August 13, 2010, citing 10 U.S.C. § 1169 and 14 U.S.C. § 357(j), the Commandant requested the Secretary's approval for the Coast Guard to conduct a CRSP to address enlisted high retention and its adverse impact on workforce flow by reviewing the records of approximately 1,600 retirement-eligible enlisted members and by involuntarily retiring those selected for retirement because the voluntary separation program did not reduce the senior enlisted workforce sufficiently to meet service need.

Section 1169 of title 10 of the United States Code states that "no regular enlisted member of an armed force may be discharged before his term of service expires, except—(1) as prescribed by the Secretary concerned; (2) by sentence of a general or special court-martial; or (3) as otherwise provided by law."

Section 357(j) of title 14 of the United States Code states, "When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's actions."

3. The applicant argued that his selection for involuntary retirement by the CRSP was erroneous and unjust because the review subjected him to administrative double jeopardy, because his involuntary retirement was a breach of his enlistment contract, and because the CRSP was convened in violation 14 U.S.C. § 357(j).

4. The applicant's allegation that the CRSP was convened in violation of 14 U.S.C. 357(j) is by far the most serious and the Board will address it first. In this regard, the applicant argued that his involuntary retirement under 14 U.S.C. § 357(j) was a violation of that statute because the Secretary never ordered a reduction in force, which was a necessary condition for the Coast Guard to involuntary retire members without affording them hearings that included the due process rights articulated in 14 U.S.C. § 357 (b), (c), and (f). The applicant further asserted that the Coast Guard used 14 U.S.C. § 357(j) as a workforce management tool to involuntarily retire members so that junior enlisted personnel could have advancement opportunities.

5. The advisory opinion argued that 10 U.S.C. § 1169 authorizes the Secretary to prescribe how an enlisted member may be discharged before his term of service expires and that 14 U.S.C. § 357(j) permits Coast Guard enlisted personnel to be involuntarily retired from the service without receiving an individual hearing before an enlisted personnel board *when the Secretary orders a reduction in force*. The advisory opinion further argued that the Secretary exercised her authority under both 10 U.S.C. § 1169 and 14 U.S.C. § 357(j) on September 21, 2010, by directing the Coast Guard to conduct an active duty enlisted CRSP to identify retirement eligible enlisted personnel for involuntary retirement "to accelerate the advancement of junior enlisted members by returning advancement and "A" school opportunities to adequate levels and by reinvigorating accession of recruits into the Coast Guard."

Tippins Gov-00008934

6. Therefore, the question before this Board is whether the Secretary's approval of the Coast Guard's request for a CRSP to address high retention and its adverse impact on workforce flow by involuntarily retiring some enlisted members was, in fact, a reduction in force order. The statute does not define reduction in force. The Secretary of Transportation citing *FDIC v. Meyer*, 114 S. Ct. 996 (1994) stated in BCMR No. 167-94 that when there is no statutory definition for a particular term, it should be defined in accordance with its ordinary or natural meaning. A RIF (reduction in force) is the reduction in staff of a government organization, especially for budgetary reasons. *See The Random House Dictionary of the English Language*, the Unabridged Edition, p. 1232. However, a reduction in force can occur for other than budgetary reasons. *In Rahlf, Stelter & Johnson v. Mo-Tech Corp., Inc.*, 642 F.3d 633, 638 (8th Cir. 2010), the court recognized as legitimate Mo-Tech's reduction in force "because of shifting (and reduced) customer needs as well as concerns about continued profitability." Also in *Williams v. Emco Maier Corporation*, 212 F. Supp 2d 780, 784 (D.OH 2002), *citing Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir 1990), the court stated "a reduction in force situation occurs when business considerations cause an employer to eliminate one or more positions within the company." Although neither the Coast Guard nor the Secretary used the words "reduction in force" the Board finds that at the time the Secretary authorized the use of the CRSP to select enlisted members E-6 and above with 20 or more years of active duty for involuntarily retirement, the Coast Guard was undergoing a reduction in force situation.

7. The Board is persuaded that the Coast Guard was undergoing a reduction in force based on the issuance of a series of ALCOASTs that began with ALCOAST 165/10 on April 1, 2010. In ALCOAST 165/10, the Commandant acknowledged that the Coast Guard had more personnel than it had funded billets and that the President's budget for FY 2011 projected billet losses that would exacerbate the situation, and therefore, it was necessary to implement workforce management tools. The Commandant's plan to alleviate the overage of personnel was first to use voluntary measures to get people to leave the service, but if the voluntary management tools failed to resolve the problem, a performance-based retention panel (the CRSP) to align the enlisted workforce would be implemented. In ALCOAST 333/10, issued on June 25, 2010, the Commandant stated that voluntary separation measures were suspended due to Deep Water Horizon, and that although the "[voluntary separation program] initiative has met our desired goals and provided some relief to our personnel strength, other workforce shaping initiatives may be needed to ensure we have the vibrant and healthy workforce for the long term." On August 5, 2010, in ALCOAST 408/10, the Commandant announced that the service was still experiencing high retention in its enlisted ranks that inhibited the Coast Guard ability to maintain a healthy advancement flow for the long term. To alleviate that problem, the Commandant announced that it intended to hold a CRSP for members who were retirement eligible (20 or more years of service). On August 13, 2010, the Coast Guard requested the Secretary's approval under 10 U.S.C. § 1169 and 14 U.S.C. § 357(j) to conduct a CRSP that would lead to the involuntary retirement of members selected for retirement. The Board interprets the Coast Guard's announcement in ALCOAST 165/10 that it needed to reduce its numbers because it had more personnel than funded billets and was anticipating a cut in funding for billets in the FY 2011 budget to be a reduction in force decision. [4] The Coast Guard's plan to

---

[4] The ALCOAST also noted the Coast Guard's problem with workforce flow and stated "A military workforce requires flows at all levels to ensure career progression for our people. Absent normal separation rates at all levels,

Tippins Gov-00008935

reduce its forces included voluntary as well as involuntary measures. The Coast Guard notified members that a CRSP would be convened to align the enlisted workforce if voluntary discharge programs were not effective.

Although the Coast Guard was able to reduce its numbers through voluntary separations, that program did not reduce the senior enlisted ranks to a number that allowed for workforce flow and for future stability of the Coast Guard. The Commandant described this as a problem that "will result in an imbalance in the workforce's experience level for many years to come, if not corrected." The CRSP and the involuntary retirement of those selected for retirement allowed the Coast Guard to realign its force as part of it overall plan to reduce its numbers and effectively manage its personnel. The board is not aware of any law or regulation that states that a reduction in force cannot include a reshaping of the workforce during a reduction in force or a reshaping of the workforce after a reduction in force occurs. In light of the above, the Board finds that the Coast Guard's use of 14 U.S.C. § 357(j) was proper because it obtained the necessary approval for that portion of the Coast Guard's reduction in force plan that called for the involuntary retirement of certain members with 20 or more years of service without board action.

8.    With regard to the allegation of administrative double jeopardy, the applicant has presented no authority which states that only one administrative action may be taken based upon properly documented adverse material in the service record.    Once good or negative performance is properly placed in a service record, it is there for each succeeding board or entity to review as necessary. The Board notes that the applicant does not argue that any of his positive performance information should be disregarded. Moreover, the applicant was not treated any differently than other members of the Coast Guard who had adverse material in their records. Double jeopardy refers to protection from a second criminal prosecution for the same crime. The CRSP was not a criminal proceeding and the applicant's selection for involuntary retirement was not a punishment.    The applicant's selection for involuntary retirement was an administrative measure based on the needs of the service.    The Board is not persuaded by the applicant's administrative jeopardy argument.

9.    The applicant's claim that he is entitled to relief because the Coast Guard violated his contract is not persuasive. In *Giglio v. United States*, 17 Cl. Ct. 160, 166 (1989), the court stated that "[i]t is established . . . that enlisted personnel in the military service do not have a contractual right to remain in the services until the expiration of their enlistment terms." However, that court, citing *Waller v. United States*, 198 Ct. Cl. 908, 913 (1972), recognized that "an administrative discharge issued to an enlisted person prior to expiration of his or her enlistment term is void, if it exceeds applicable statutory authority, or ignores pertinent procedural regulations, or violates minimum concepts of basic fairness." *Giglio* at 166. None of which is present in the applicant's situation.

10.    The applicant argued that there was no reduction in force because by the end of FY 2011 there were more individuals in the Coast Guard than at the end of FY 2010. The Court

---

opportunities for advancement and promotion become significantly reduced, thus increasing time-in-grade at every level."

Tippins Gov-00008936

stated in *Williams v. Emco Maier Corporation* at 785, that the fact that a company employs more people than it did when the reduction in force began does not mean that the company did not engage in a reduction in force. The court further stated that "a company facing financial hardships may wish to eliminate certain positions in an effort to alleviate those difficulties, while still adding other positions in an effort to improve the company's operations." *Id.* The fact that the Coast Guard may have had more personnel at the end of FY 2011 than at the end of FY 2010 does not prove that there was not a reduction in force. The applicant has produced insufficient evidence that any increase in the Coast Guard's active duty personnel during the reduction in force was for other than improving the Coast Guard's operations and long term stability.

11. The applicant alleged that there were other workforce shaping tools available to the Coast Guard other than involuntary retirements. However, apparently the Coast Guard determined that a CRSP to select members for involuntary retirement met the needs of the Service at that particular time. The fact that the Coast Guard chose one method over another does not prove that the method used was in error or unjust.

12. Accordingly, the applicant has failed to prove an error or injustice with regard to his involuntary retirement and the application should be denied.

**[ORDER AND SIGNATURES APPEAR ON NEXT PAGE]**

Tippins Gov-00008937

## ORDER

The application of ETCM James W. Winbourne, 1070545, USCG (Ret.) for correction of his military record is denied.


Paul B. Oman


Jeffrey E. VanOverbeke


Dorothy J. Ulmer

Tippins Gov-00008938

## DEPARTMENT OF HOMELAND SECURITY
## BOARD FOR CORRECTION OF MILITARY RECORDS

Application for Correction of
the Coast Guard Record of:

BCMR Docket No. 2013-153

**AVELSGARD, Brian J.**
1095634; OSCS (Retired)

## FINAL DECISION

This is a proceeding under the provisions of section 1552 of title 10 and section 425 of title 14 of the United States Code. The Chair docketed the case after receiving the applicant's completed application on July 25, 2013, and prepared the decision for the Board as required by 33 C.F.R. § 52.61(c).

This final decision, dated April 10, 2014, is approved and signed by the three duly appointed members who were designated to serve as the Board in this case.

### APPLICANT'S REQUEST AND ALLEGATIONS

The applicant, a senior chief operations specialist (OSCS; pay grade E-8) who was retired from the Coast Guard while his application was pending, asked the Board to correct his record to show that he was not selected for involuntary retirement by the Career Retention Screening Panel (CRSP) in June 2012 and was instead allowed to remain on active duty.

The applicant explained that he was selected for involuntary retirement by the CRSP that convened in June 2012, and he was notified in August 2012 that he would be retired involuntarily on December 1, 2013. The Coast Guard, however, failed to provide any reason for his selection in this regard. He appealed the decision, but his appeal was denied. The applicant stated that he also submitted a request to the Master Chief Petty Officer of the Coast Guard, who referred him to his Sector's Command Master Chief, but that position was vacant and the officer who served as the District's Command Master Chief had served on the CRSP, so asking him would have been unethical.

The applicant argued that the entire CRSP process was unjust because he was never told why he was selected "as not being worthy to continue serving" in the Coast Guard. He stated that there is no negative information in his record that "stands out that would be used to flag me and to discard me under the CRSP," and so he submitted his appeal "blindly" because no one could tell him why he was selected for retirement. In this regard, he noted that the proceedings of the CRSP are privileged and confidential. He argued that he could not reasonably appeal his selection since no one would tell him why he was selected.

Tippins Gov-00008954

The applicant stated that the only reason he might have been selected for retirement was his lack of recent advancement. He noted that he had repeatedly competed for advancement to master chief but always ended up in the middle of the advancement list and so was not advanced because there are not enough vacancies. However, he placed higher on the advancement list following the May 2012 servicewide examination (SWE) and so expected to advance to master chief before his retirement. The applicant noted that he also applied for and was selected to attend the prestigious U.S. Army Sergeants Major Academy (USASMA) to improve his leadership, which cost the Coast Guard thousands of dollars for him to attend. He was required to obligate an additional 30 months of service following graduation to attend the school, but instead of being allowed to fulfill that obligation, he was involuntarily retired. Therefore, the Coast Guard will not get its return on the investment.

The applicant stated that the Board should grant relief because the Coast Guard failed to provide him with any reason for his selection for retirement. Another basis for granting relief, he stated, is that the Coast Guard changed the rules for the CRSP. He explained that after the first CRSP convened in 2010, he was not selected for retirement, and the Coast Guard stated that those who were not selected would not be rescreened until 2013. In January 2012, however, the Coast Guard announced that everyone who had been screened in 2010 would be rescreened in 2012 instead of 2013.

The applicant concluded that he should be retained on active duty, advanced to master chief, and assigned to an appropriate master chief billet. In support of his allegations, the applicant submitted the following documents:

- The CRSP precept, dated June 8, 2012, directed a nine-member panel of officers and master chiefs to convene on June 18, 2012, to consider members who were eligible for retirement for involuntary retirement. The precept instructed the panel to review the candidates' records carefully to "afford each eligible candidate fair and equitable consideration." The panel was instructed to prepare a list of those selected for retirement and another list of those selected for continuation and was not given any quota. The panel was instructed to screen for continuation those who, *inter alia*, "show a propensity for upward mobility, advancement, and superior performance"; who "demonstrate a commitment to continual learning and self-improvement through the pursuit of advanced education"; who had "a record of creating and sustaining effective command climates and work environments characterized by respect for others and attention to the morale and welfare of subordinates"; who "possess an attitude of selflessness, humility, professionalism and enthusiasm"; who could "inspire, mentor, and encourage our people to greater levels of performance"; who would "hold subordinates accountable for lapses in performance and/or behavior"; who could provide "the leadership necessary to meet the current missions and operational tempo"; "who have demonstrated the potential to lead a diverse workforce and create circumstances for the success of all Coast Guard members"; and who reflect "the highest standards of conduct, integrity, capability, attitude, and military bearing."

- A certificate and transcript show the applicant's successful completion of the USASMA on June 22, 2012.

Tippins Gov-00008955

- Correspondence shows that while on leave in August 2012, the applicant was advised by phone call, email, and letter that he had been selected for involuntary retirement by the CRSP.

- On August 30, 2012, the applicant appealed the decision of the CRSP on the following grounds: (a) He graduated from the USASMA in late June following the CRSP, and the Coast Guard would not get a return on its investment if he were retired; (b) his predecessors in his current billet had retired in 2011 and 2012 and so his retirement in 2013 would deprive the Command Center of leadership stability; he had always intended to serve 30 years and had pursued education via the USASMA, the Command Master Chief Course, the Chief Petty Officers Academy, a bachelor's degree in Human Resources and Management, and a master's degree in Human Resources "to ensure that the Coast Guard had a leader that had the knowledge, skills, and abilities that the Coast Guard needs."

- On October 5, 2012, the Commanding Officer of the Personnel Service Center (PSC) denied the applicant's appeal and reminded him to submit his request to retire on or before December 1, 2013.

- On January 16, 2013, the Coast Guard responded to an inquiry from a congressman on behalf of the applicant. The Coast Guard stated that the Secretary had authority to approve the results of the CRSP under 10 U.S.C. § 1169 and 14 U.S.C. § 357(j). The Coast Guard noted that no reason could be provided for the applicant's selection for retirement because the deliberations and proceedings of the CRSP are privileged, but that the panel was aware of the applicant's educational achievements and that two-thirds of the nine-member panel had to approve a member's selection or non-selection for retirement.

- On January 30, 2013, the Coast Guard responded in similar fashion to an inquiry from a senator on behalf of the applicant.

- On July 19, 2013, the applicant sent an email to a Command Master Chief following up on a telephone conversation. He argued that he should not be retired because the Coast Guard had not yet received its return on the investment of taxpayers' dollars in sending him to USASMA, that he had had to obligate additional service to attend the school, and that the Coast Guard should therefore honor its obligation to him. He noted some of the many sacrifices he and his family had made over the years for the Coast Guard and stated that he felt discarded and disgraced since no one would tell him why he was selected for retirement.

## VIEWS OF THE COAST GUARD

On November 26, 2013, the Judge Advocate General (JAG) of the Coast Guard submitted an advisory opinion recommending that the Board deny the applicant's request.

The JAG argued that the Board should deny relief because the applicant has failed to substantiate any error or injustice in his selection for retirement by the CRSP based on a two-thirds vote of the nine-member panel. The JAG stated that the CRSP was announced in ALCOAST 025/12, issued on January 13, 2012, and those eligible for the screening were advised to check their military records for accuracy.

Tippins Gov-00008956

The JAG noted that the applicant complained about the lack of a reason for his selection but that the proceedings of such boards are privileged, and the members may not discuss their deliberations. In addition, the JAG stated, the applicant "was afforded an additional level of review and consideration through his appeal of 30 August 2012, which was subsequently denied."

The JAG also adopted the findings and analysis provided in a memorandum prepared by the Personnel Service Center (PSC). PSC stated that the applicant's record was reviewed by the CRSP in accordance with the precept and that he was selected for retirement by a vote of two-thirds of the nine panel members. His appeal was carefully considered and denied. Therefore, PSC argued, no relief should be granted.

## APPLICANT'S RESPONSE TO THE VIEWS OF THE COAST GUARD

On January 12, 2014, the applicant responded to the views of the Coast Guard. The applicant repeated many of the allegations that he included in his application and noted that since he was retired on December 1, 2013, he is now requesting that his retirement be voided and that he be reinstated on active duty with back pay and allowances. In addition, he asked to be advanced to master chief on December 1, 2013, because members who placed below him on the advancement list were advanced on that date.

The applicant argued that his pursuit of continuing education, completion of USASMA, and performance record show that he has the leadership skills needed by the Coast Guard. He argued that the CRSP results showed that the Coast Guard cares only about saving money and not about the value people bring to the organization.

The applicant stated that because he was assigned to the USASMA, he did not see ALCOAST 025/12 and was unaware that he would be subject to the CRSP. He reviewed his record after the CRSP, however, and did not find any negative information or error that might have caused his selection for retirement by the panel.

## APPLICABLE LAW AND POLICY

Title 14 U.S.C. § 357 includes the following provisions: "(a) Enlisted Personnel Boards shall be convened as the Commandant may prescribe to review the records of enlisted members who have twenty or more years of active military service. (b) Enlisted members who have twenty or more years of active military service may be considered by the Commandant for involuntary retirement and may be retired on recommendation of a Board—(1) because the member's performance is below the standards the Commandant prescribes; or (2) because of professional dereliction. (c) An enlisted member under review by the Board shall be—(1) notified in writing of the reasons the member is being considered for involuntary retirement; (2) allowed sixty days from the date on which counsel is provided ... to submit any matter in rebuttal; (3) provided counsel ... to help prepare the rebuttal ... and to represent the member before the Board ...; (4) allowed full access to and be furnished with copies of records relevant to the consideration for involuntary retirement prior to submission of the rebuttal ...; and (5) allowed to appear before the

Tippins Gov-00008957

Board and present witnesses or other documentation related to the review." However, subsection (j) of § 357 states, "When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action."

Title 10 U.S.C. § 1169 states that "no regular enlisted member of an armed force may be discharged before his term of service expires, except—(1) as prescribed by the Secretary concerned; (2) by sentence of a general or special court-martial; or (3) as otherwise provided by law."

ALCOAST 025/12, issued on January 13, 2012, announced the upcoming CRSP and stated the following:

> 1. Planning is underway to conduct the 2012 CRSP in June. The CRSP was initially implemented in 2010 to preserve upward mobility in the enlisted workforce. The 2012 CRSP will again use a performance and conduct based methodology to determine who will be retained on active duty. The candidate pool will consist of all eligible enlisted personnel who were not reviewed by the 2011 CRSP and who meet the following criteria:
> 
> A. All E-6 and below with 20 or more years of active military service as of 01 June 2012.
> 
> B. All E-7 and above with 20 or more years of active military service who have three or more years' time in grade as of 01 June 2012.
> 
> 2. All personnel who meet the criteria in paragraph 1 above should use the next few months to review and update Direct Access information and work with SPO or admin offices to ensure the electronic personnel data record (EI-PDR) is accurate and complete. It is the SPO responsibility to ensure that all required information in the member's SPO PDR is also in the member's EI-PDR. However, it is in each member's best interest to verify the contents.
> 
> 3. Additional information on the 2012 CRSP will be provided in future messages. Previous CRSP messages, FAQS, and statistics are available on the PSC-EPM-1 website …

### PRIOR BCMR CASE

In BCMR Docket No. 2011-130, the Board addressed the legality of the 2010 CRSP, determined that the CRSP was held pursuant to a "reduction in force," and denied the applicant's request for relief in that case. The Board noted that 10 U.S.C. § 1169 authorizes the Secretary to prescribe how an enlisted member may be discharged before his term of service expires and that 14 U.S.C. § 357(j) permits Coast Guard enlisted personnel to be involuntarily retired from the service without receiving an individual hearing before an enlisted personnel board when the Secretary orders a "reduction in force." The Board based its holding that the 2010 CRSP process was a "reduction in force" on a series of ALCOAST messages in that time frame stating that the Coast Guard had more personnel than funded billets.

Tippins Gov-00008958

Final Decision in BCMR Docket No. 2013-153                                    p. 6

## FINDINGS AND CONCLUSIONS

The Board makes the following findings and conclusions on the basis of the applicant's military record and submissions, the Coast Guard's submissions, and applicable law:

1.      The Board has jurisdiction over this matter under 10 U.S.C. § 1552(a). The application was timely filed.

2.      The applicant requested an oral hearing before the Board. The Chair, acting pursuant to 33 C.F.R. § 52.51, denied the request and recommended disposition of the case without a hearing. The Board concurs in that recommendation.[1]

3.      The applicant alleged that his involuntary retirement pursuant to the CRSP convened in June 2012 was erroneous and unjust because nothing in his record warrants selection for separation, because the Coast Guard failed to get the 30 months of additional service it required him to obligate before attending USASMA, and because the Coast Guard provided him with no reason for his selection for retirement, and because the Coast Guard changed the rules for the CRSP. When considering allegations of error and injustice, the Board begins its analysis by presuming that the disputed information in the applicant's military record is correct as it appears in his record, and the applicant bears the burden of proving by a preponderance of the evidence that the disputed information is erroneous or unjust.[2] Absent evidence to the contrary, the Board presumes that Coast Guard officials and other Government employees have carried out their duties "correctly, lawfully, and in good faith."[3]

4.      As did BCMR Docket No. 2011-130 with respect to the 2010 CRSP, this case involves the validity of the 2012 CRSP under 10 U.S.C. § 1169 and 14 U.S.C. § 357(j). The Board has concerns on this point. While the definition of "reduction in force" is not specifically defined for purposes of section 357(j) by statute or regulation, the essence of that term as used in other contexts is the termination of employment based on the elimination of the employee's position for budgetary or other business reasons. The Board is troubled by the discontinuity between the term reduction in force and the stated goal for the 2012 CRSP—the preservation of upward mobility—since in order for that goal to be achieved, more senior positions would need to be maintained in order to fill them through advancement of more junior members of the Coast Guard, rather than terminated. A process that, at its core, removes personnel from their employment positions in order to fill those positions with others who are viewed as more desirable as a matter of military policy, and in turn to fill the lower ranking positions with new accessions, regardless of its merits as policy (which the Board does not contest), is of questionable consistency with the term "reduction in force." Numerous cases stand for the proposition that when an employee is replaced in his or her position, that is not a "reduction in force."[4] However, there is evidence that the Coast Guard continued to undergo reductions in effective strength during the

---

[1] *Armstrong v. United States*, 205 Ct. Cl. 754, 764 (1974) (stating that a hearing is not required because BCMR proceedings are non-adversarial and 10 U.S.C. § 1552 does not require them).
[2] 33 C.F.R. § 52.24(b).
[3] *Arens v. United States*, 969 F.2d 1034, 1037 (Fed. Cir. 1992); *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979).
[4] *See, e.g., Sanders v. Kohler Co.*, 641 F.3d 290, 294-95 (8th Cir. 2011); *Oil, Chemical and Atomic Workers Int'l Union v. RMI Titanium Co.*, 199 F.3d 881, 885 (6th Cir. 2000).

Tippins Gov-00008959

period of the 2012 CRSP. According to Coast Guard data, in fiscal year (FY) 2010 the Coast Guard had 32,802 enacted enlisted positions. The FY 2011 President's Budget proposed a reduction of 978 positions from the enlisted workforce. The FY 2012 President's Budget proposed a reduction of 116 positions from the enlisted workforce. The FY 2013 President's Budget proposed a reduction of 738 positions from the enlisted workforce. The FY 2014 President's Budget proposed a reduction of 979 positions from the enlisted workforce. The numbers reflect a downward trend in the number of enlisted positions in the Coast Guard. Although the actual enacted numbers varied from the President's Budget requests, the Coast Guard needed to take appropriate steps to meet those proposed budgeted numbers. The enacted numbers also show a downward trend for enlisted positions. In FY 2010 the Coast Guard had 32,802 enlisted positions, but in FY 2014 the Coast Guard has 31,944 enlisted positions, which is a reduction of 858 enlisted positions since FY 2010. The Board notes as well that shortly after the January 2012 announcement of the 2012 CRSP, Commandant Papp stated in his February 23, 2012 State of the Coast Guard Address, "Navigating Uncertain and Stormy Seas": "The de-commissioning of high endurance cutters and patrol boats and the tightening of staffs in 2013 budget will reduce our personnel strength by over 1,000 people." Given that, and in light of the broad authority generally granted to Service Secretaries under 10 U.S.C. § 1169 to determine the discharges of enlisted personnel, the Board's concerns do not rise to the level of overcoming the presumption of regularity with respect to the implementation of the 2012 CRSP.

5.      The applicant has not proved by a preponderance of the evidence that his involuntary retirement pursuant to the CRSP in 2012 constituted an error or injustice. Pursuant to the CRSP, the applicant was selected for retirement. He has not shown that those selected for retirement were legally entitled to a hearing or even a reason for their selection for retirement despite their lengthy careers and honorable devotion to duty. The applicant's selection shows only that at least six of the nine members of the CRSP selected him for retirement based on the criteria in the precept and the need to increase upward mobility in the shrinking enlisted workforce. Hundreds of skilled, educated, and experienced senior petty officers have been selected for involuntary retirement by the CRSPs in recent years.[5] The applicant has not shown that his being one of them is a result of error or injustice.

6.      The applicant alleged that he was advised after being selected for continuation by the CRSP in 2010 that he would not be subject to screening until 2013, but the Coast Guard reneged on this promise by subjecting him to screening in 2012. The applicant did not submit anything to support his claim, but even if the Board assumes it is true, the policy change presumably met Service needs, and he has not shown that he was singled out or treated differently than other similarly situated petty officers who were selected for continuation in 2010.

7.      The applicant argued that he should not have been separated because the Coast Guard spent thousands of dollars in 2012 for him to attend USASMA, and to attend that school, a member must agree to remain on active duty for at least 30 months after graduation. An enlistment contract, however, does not establish a contractual right to remain on active duty.[6] Certainly, as the applicant stated, obligated service requirements for training are intended to ensure that the Coast Guard benefits from the training it pays for, and the CRSP's decision pre-

---

[5] The 2012 CRSP reviewed 677 members, of whom 530 were selected for retention and continued service.
[6] *Giglio v. United States*, 17 Cl. Ct. 160, 166 (1989).

Tippins Gov-00008960

vented the Coast Guard from reaping some of the benefit of the applicant's training. Because the proceedings of such boards are confidential, however, no one but the CRSP knows how it weighed such matters, but obligated service requirements are not mentioned in the CRSP's precept. The applicant drew this issue to the attention of the Personnel Service Center in his appeal of the CRSP's decision, but his appeal was not approved.[7] Therefore, it appears that matters other than obligated service requirements weighed most heavily in the decision-making of the CRSP and PSC. The applicant has not persuaded the Board that the CRSP or PSC erred or committed injustice in this regard.

8.        Because the applicant has not proved by a preponderance of the evidence that his involuntary retirement on December 1, 2013, pursuant to the CRSP was erroneous or unjust, his request for relief should be denied.

**(ORDER AND SIGNATURES ON NEXT PAGE)**

---

[7] ALCGENL 007/12 stated that "personnel notified that they have been identified for involuntary retirement can appeal the decision based only on material error, newly discovered evidence, or the presence of improper documents in the member's personnel file."

Tippins Gov-00008961

Final Decision in BCMR Docket No. 2013-153                                                    p. 9

## ORDER

The application of OSCS Brian J. Avelsgard, 1095634, USCG (Retired), for correction of his military record is denied.


April 10, 2014

_____
Philip B. Busch


_____
Christopher M. Dunne


_____
Dana Ledger

Tippins Gov-00008962

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**TONIA TIPPINS, DERRIK MAGNUSON, GEORGE HOLLOWAY, JENNIFER REHBERG, GLENDA SMITHLEETH, AND M. ALLEN BUMGARDNER**

*For Themselves and as Representatives of a Class of Similarly Situated Persons,*

**Plaintiffs,**

**v.**

**UNITED STATES OF AMERICA**

**Defendant.**

Case No.: 18-cv-00923-LAS

### FIRST AMENDED COMPLAINT

Plaintiffs Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner (collectively, "Plaintiffs") bring this action individually and on behalf of a class of similarly situated persons against Defendant United States of America, and allege as follows:

### NATURE OF ACTION

1.    Over 25 years ago, Congress established the requirement that enlisted servicemembers of the United States Coast Guard ("Coast Guard") who have actively served for twenty years or more could be forced to retire only if (1) there was a reduction in force, or (2) an Enlisted Personnel Board determined after a hearing that the servicemember's performance was substandard or the servicemember had committed professional dereliction.

2.    Congress imposed by statute significant procedural requirements to protect senior enlisted servicemembers' due process rights in proceedings before the Enlisted Personnel Boards:

provided these servicemembers with almost no opportunity to be involved in the review process, entirely disregarding the statutory protections of the Enlisted Personnel Board procedures.

6.     This action is brought on behalf of the hundreds of Coast Guard members who were involuntarily retired through the 2012, 2013, and 2014 CRSPs.  Every member of the class served this country in the Coast Guard for twenty or more years, and was authorized to continue serving had they not been forced to retire.  They were not forced to retire as part of a reduction in force, and no reduction in force took place during the relevant time period.  Therefore, their involuntary retirements through the CRSP process were unauthorized and contrary to law because the CRSP panels were not Enlisted Personnel Boards pursuant to 14 U.S.C. § 357 and these servicemembers were not provided the rights and protections required by law.  Plaintiffs and the class are thus entitled to constructive service credit, back pay, allowances, and reinstatement on active duty.

**PARTIES**

7.     Plaintiff Tonia Tippins served in the Coast Guard from June 13, 1988 until her involuntary retirement on September 1, 2014 pursuant to the 2013 CRSP.  Upon retirement, she was a Food Service Specialist, Chief Petty Officer ("FSC") at pay grade E-7.  During her service, Ms. Tippins was awarded the Coast Guard Achievement Medal, the Coast Guard Bicentennial Unit Commendation Ribbon, the Coast Guard Commandant Letter of Commendation Ribbon with three gold stars, the Coast Guard Meritorious Team Commendation Ribbon, the Coast Guard Meritorious Unit Commendation Ribbon with two gold stars, the Coast Guard Pistol Expert Medal, the Coast Guard Presidential Unit Citation, the Coast Guard Sea Service Ribbon, the Coast Guard Unit Commendation Ribbon with one gold star, the DOT 9-11 Ribbon, the DOT Outstanding Unit Award, the Global War Terror Service Medal, the Humanitarian Service Medal with two gold stars, and the National Defense Service Medal with one gold star.

8.    Plaintiff Derrik Magnuson served in the Coast Guard from September 15, 1992 until his involuntary retirement on August 31, 2014 pursuant to the 2013 CRSP.  Upon retirement, he was a Boatswain's Mate, Chief Petty Officer ("BMC") at pay grade E-7.  During his service, Mr. Magnuson was awarded the Coast Guard "E" Ribbon with one gold star, the Coast Guard Achievement Medal with two gold stars, Coast Guard Artic Service with one bronze star, the Coast Guard Commandant Letter of Commendation Ribbon with one gold star, the Coast Guard Commendation Medal with one gold star, the Coast Guard Cutterman Insignia, the Coast Guard Meritorious Team Commendation Ribbon with three gold stars, the Coast Guard Meritorious Unit Commendation Ribbon with three gold stars, the Coast Guard Pistol Expert Medal, the Coast Guard Presidential Unit Citation, the Coast Guard Rifle Expert Medal, the Coast Guard Sea Service Ribbon with three bronze stars, the Coast Guard Special Operations Service Ribbon, the Coast Guard Taclet/Ledet Uniform Insignia, the Coast Guard Unit Commendation Ribbon with one gold star, the DOT 9-11 Ribbon, the DOT Outstanding Unit Award, the Global War on Terrorism Service Medal, the Humanitarian Service Medal, and the National Defense Service Medal with one bronze star.

9.    Plaintiff George Holloway served in the Coast Guard from October 6, 1992 until his involuntary retirement on August 31, 2014 pursuant to the 2013 CRSP.  Upon retirement, he was a Food Service Specialist, Chief Petty Officer ("FSC") at pay grade E-7.  During his service, Mr. Holloway was awarded the Coast Guard Commandant Letter of Commendation Ribbon with two gold stars, the Coast Guard Cutterman Insignia, the Coast Guard Meritorious Team Commendation Ribbon, the Coast Guard Meritorious Unit Commendation Ribbon with one gold star, the Coast Guard Presidential Unit Citation, the Coast Guard Sea Service Ribbon, the Coast Guard Special Operations Service Medal with two bronze stars, the Coast Guard "E" Ribbon with

one gold star, the Coast Guard Achievement Medal with one gold star, the Coast Guard Commendation Medal, the Coast Guard Unit Commendation Ribbon with two gold stars, the DOT 9-11 Medal, the DOT Outstanding Unit Award, the Global War on Terrorism Service Medal, the Humanitarian Service Medal, and the National Defense Service Medal. Mr. Holloway also earned a bachelor's and master's degree while serving, and graduated from the Air Force Non-Commissioned Officer's Academy and the Coast Guard's Chief Petty Officer Academy.

10.     Plaintiff Jennifer Rehberg served in the Coast Guard from October 29, 1991 until her involuntary retirement on October 31, 2014 pursuant to the 2013 CRSP. Upon retirement, she was a Storekeeper Chief Petty Officer ("SKC") at pay grade E-7. She graduated from the Coast Guard Chief Petty Officer Academy in 2012. During her service, Ms. Rehberg was awarded the Coast Guard "E" Ribbon, the Coast Guard Achievement Medal with five gold stars, the Coast Guard Commandant's Letter of Commendation Ribbon with one gold star, the Coast Guard Meritorious Team Commendation Ribbon with five gold stars, the Coast Guard Meritorious Unit Commendation Ribbon with one gold star, the Coast Guard Presidential Unit Citation, the Coast Guard Special Operations Service Ribbon, the Coast Guard Unit Commendation Ribbon with two gold stars, the Department of Transportation Outstanding Unit Award, the Global War on Terrorism Service Medal, the Humanitarian Service Medal, the National Defense Service Medal with one bronze star, and the Seventh Coast Guard Good Conduct Medal.

11.     Plaintiff Glenda Smithleeth served in the Coast Guard from July 27, 1987 until October 31, 2013 pursuant to the 2012 CRSP. Upon retirement, she was a Storekeeper Master Chief Petty Officer ("SKCM") at pay grade E-9. During her service, Ms. Smithleeth received four Achievement Medals and two Letters of Commendation. She was also awarded the Coast Guard Achievement Medal with two gold stars, the Coast Guard Bicentennial Unit Commendation

Ribbon, the Coast Guard Meritorious Team Commendation Ribbon with one gold star, the Coast Guard Meritorious Unit Commendation Ribbon with two gold stars, the Coast Guard Presidential Unit Citation, the Coast Guard Recruiting Service Ribbon, the Coast Guard Unit Commendation Ribbon with 2 gold stars, the Commandant's Letter of Commendation Ribbon with one gold star, the Department of Transportation Outstanding Unit Award, the Eighth Coast Guard Good Conduct Medal, the Global War on Terrorism Service Medal, the Humanitarian Service Medal, and the National Defense Service Medal with one bronze star. In 2013, Ms. Smithleeth received a Delegation as a Senior Field Contractor and Certificate of Appointment as a Contracting Officer.

12.     Plaintiff M. Allen Bumgardner served in the Coast Guard from February 4, 1992 until his involuntary retirement on February 28, 2015 pursuant to the 2014 CRSP. Upon retirement, he was a Master Chief Petty Officer (ITCM) at pay grade E-9. During his service, Mr. Bumgardner was awarded the Coast Guard Commendation Medal with gold star, the Global War on Terrorism Service Medal, the Coast Guard Achievement Medal with Two Gold Stars, the Meritorious Service Medal, the Coast Guard Unit Commendation Ribbon with two gold stars, the Coast Guard Meritorious Unit Commendation Ribbon with gold star, the Coast Guard Meritorious Team Commendation Ribbon with gold stars, the Coast Guard Commandant's Letter of Commendation Ribbon, the Coast Guard "E" Ribbon with two gold stars, the National Defense Service Medal with bronze star, the Humanitarian Service Medal with bronze star, the Coast Guard Presidential Unit Citation with Hurricane Device, the Coast Guard Sea Service Ribbon with bronze star, the Seventh Coast Guard Good Conduct Medal, the Department of Transportation 9-11 Ribbon, and the Department of Transportation Outstanding Unit Award.

13.     Defendant is the United States of America, acting through the Coast Guard.

48.    The 2014 CRSP reviewed the records of 340 servicemembers, and selected 59 for involuntary retirement.

49.    In total, the Coast Guard involuntarily retired 832 servicemembers through the CRSPs between 2010 and 2014.

50.    At no time during that time period did a reduction in force take place.

51.    The CRSP proceedings were confidential and could not be disclosed to anyone who was not a panel member, including the servicemembers selected for involuntary retirement.  While the proceedings were underway, the servicemembers under review were allowed to communicate with the panel only through a two-page memo describing mitigating information that could counsel against their selection for involuntary retirement.  The servicemembers were otherwise excluded from participating in CRSP proceedings, and were not permitted to know the reason or reasons (if any) for their selection for involuntary retirement.

52.    Servicemembers selected for involuntary retirement through the CRSP process had a limited opportunity to appeal the decision.  Appeals were only permitted to address "material error, newly discovered evidence, or presence of improper documents in the member[']s personnel file."

53.    Upon being selected for involuntary retirement by the CRSP, servicemembers had the "'choice' to elect voluntary retirement" on their Certificate of Release or Discharge from Active Duty, DD Form 214, if they did not want an "involuntary retirement" coded on the form.  This "choice" did not change the nature and circumstances of these servicemembers' involuntary retirement through the CRSP process: the servicemembers had no choice but to retire.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TONIA TIPPINS, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 18-923C |
| v. | ) Senior Judge Loren A. Smith |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S ANSWER TO FIRST AMENDED COMPLAINT

For its answer to the complaint, defendant admits, denies, and alleges as follows:

1.     The allegations contained in paragraph 1 do not reference a statute; to the extent they may be deemed allegations of fact stemming from the provisions set forth in 14 U.S.C. § 357, they are admitted to the extent supported by the language contained therein, which is the best evidence of its contents; otherwise denies the allegations in paragraph 1.

2.     The allegations contained in paragraph 2 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact stemming from the Coast Guard Authorization Act of 1991, they are admitted to the extent supported by that statute; otherwise denies the allegations in paragraph 2.

3.     The allegations contained in paragraph 3 are conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

4.     The allegations contained in paragraph 4 are conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

5.     The allegations contained in paragraph 5 are plaintiffs' characterization of their case and conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

6.      The allegations contained in paragraph 6 are plaintiffs' characterization of their case and conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

7.      Admits.

8.      Admits.

9.      Admits.

10.     Admits.

11.     Admits.

12.     Admits.

13.     Admits.

14.     The allegations contained in paragraph 14 are plaintiffs' characterization of their case and conclusions of law, to which no answer is required; to the extent they may be deemed allegations of fact, they are admitted to the extent supported by the statutes cited, which are the best evidence of their content; otherwise denies the allegations in paragraph 14.

15.     Denies the allegations contained in paragraph 15 for lack of knowledge or information sufficient to form a belief as to the truth.

16.     The allegation contained in paragraph 16 is a conclusion of law to which no answer is required; to the extent it may be deemed an allegation of fact, it is denied.

17.     The allegations contained in paragraph 17 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are admitted to the extent supported by the statute cited, which is the best evidence of its contents; otherwise denies the allegations in paragraph 17.

46.    Denies.

47.    Denies the allegation contained in the first sentence in paragraph 47.  Avers that the 2014 CRSP convened on March 18, 2014.  Admits the allegation contained in the second sentence in paragraph 47.

48.    Admits.

49.    Denies.  Avers that a total of 832 service members were selected for involuntary retirement as a result of the CRSPs held between 2010 and 2014, but not all 832 service members ultimately were involuntarily retired as a result of the CRSPs; with respect to the CRSPs held in 2012, 2013, and 2014, 397 service members were selected for involuntary retirement, but only 356 service members were involuntarily retired.

50.    Denies.

51.    Admits the allegation contained in the first sentence in paragraph 51.  Denies the allegation contained in the second sentence in paragraph 51.  Avers that service members under review were not allowed to communicate with the panel "while the proceedings were underway," but service members had the option of submitting a memorandum setting forth mitigating information for consideration by the panel prior to the panel convening.  Admits the allegation contained in the third sentence in paragraph 51.

52.    The allegation contained in the first sentence of paragraph 52 constitutes a characterization plaintiffs' case and a conclusion of law, to which no answer is required; to the extent it may be deemed an allegations of fact, it is denied.  Admits the allegation contained in the second sentence in paragraph 52.

53.    Admits the allegation contained in the first sentence in paragraph 53.  Denies the allegation contained in the second sentence in paragraph 53.  Avers that, although the allegation

6

## CERTIFICATE OF SERVICE

I hereby certify that, on this 21st day of March, 2023, I caused to be served electronically to all parties by operation of the Court's electronic filing system, a copy of the foregoing document, "Corrected Joint Appendix."

/s/ Douglas G. Edelschick