2022-1462

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

TONIA TIPPINS, DERRIK MAGNUSON, GEORGE HOLLOWAY, JENNIFER REHBERG, GLENDA SMITHLEETH, M. ALLEN BUMGARDNER, For Themselves and as Representatives of a Class of Similarly Situated Persons,
Plaintiffs-Appellees,

v.

UNITED STATES,
Defendant-Appellant.

---

Appeal from the United States Court of Federal Claims
in Case No. 1:18-CV-00923, Judge David A. Tapp

---

# CORRECTED BRIEF FOR DEFENDANT-APPELLANT UNITED STATES

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

MARTIN F. HOCKEY, JR.
Deputy Director

DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendant-Appellant

Of Counsel:

CDR JARED H. HOOD
Deputy Chief
Office of Claims & Litigation
United States Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, D.C. 20593-7213

April 7, 2023

# TABLE OF CONTENTS

**Page:**


TABLE OF AUTHORITIES ..... iii

STATEMENT OF RELATED CASES ..... viii

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF THE ISSUE ..... 1

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS ..... 1

I. Nature Of The Case ..... 1

II. Statement Of Facts ..... 3

III. The Course Of Proceedings And Disposition Below ..... 7

SUMMARY OF THE ARGUMENT ..... 10

ARGUMENT ..... 11

I. Standard Of Review ..... 11

II. The Trial Court Misconstrued The Plain Meaning Of "Reduction In Force" In Section 357(j) As Necessarily Requiring Elimination Of Military Jobs, When Dictionary Definitions And The Statutory Scheme Establish That A Reduction In Military Force Includes A Reduction In Military Personnel ..... 11

A. Congress Broadly Authorized, But Did Not Define, Reductions In Force ..... 12

B. Dictionary Definitions Demonstrate That The Plain Meaning Of "Reduction In Force" Includes Reductions Of Military Personnel ..... 15

C. The Dictionary Definitions Are Consistent With The Statutory Scheme Where Enlisted Members Serve In Grades, Not Positions ..... 18

D. Another Military Statute Reinforces The Plain Meaning Of Section 357(j) ..... 19

## TABLE OF CONTENTS (continued)

**Page:**

E. The Trial Court Erroneously Relied Upon Cases Regarding Reductions In Force Under Statutes and Regulations Addressing Civilian Employees.......... 23

1. Statutes Governing Federal Civil Service Employees And Military Members Do Not Have a Similar Purpose.......... 24

2. The Trial Court Misconstrued The Term "Reduction In Force" From The Civilian Sphere.......... 28

a. Congress Has Used The Terms "Reduction In Force" And "Reduction In Personnel" Interchangeably In The Civilian Context .......... 28

b. This Court Has Recognized That Congress Has Not Specified The Circumstances Under Which Reductions In Force May Be Appropriate In The Civilian Sphere.......... 30

c. Reductions In Force Are Not Limited To Circumstances With An Elimination Of Jobs In The Civilian Context .......... 31

d. The Trial Court Erroneously Relied Upon Precedents Concerning Reductions In Force Involving Civilian Employees.......... 32

CONCLUSION.......... 38

## TABLE OF AUTHORITIES

**Cases:** **Page(s):**

*Aectra Ref. & Mktg. v. United States*, 565 F.3d 1364 (Fed. Cir. 2009)................22

*Allphin v. United States*, 758 F.3d 1336 (Fed. Cir. 2014)...............8, 13, 19, 25, 26

*Alvin v. United States*, 50 Fed. Cl. 295 (2001)................................................27

*Anderson v. United States*, 111 Fed. Cl. 572, 583 (2013)............................. 26-27

*Azar v. Alina Health Servs.*, 139 S. Ct. 1804 (2019)........................................21

*Baker v. United States*, 34 Fed. Cl. 645 (1995)...............................................27

*Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir. 1990) ................................ 8, 36

*Bateson v. United States*, 48 Fed. Cl. 162 (2000)...............................................8

*Berkley v. United States*, 287 F.3d 1076 (Fed. Cir. 2002) ............................ 25-26

*Berkley v. United States*, 59 Fed. Cl. 675 (2004) .............................................27

*Consol. Coal Co. v. United States*, 528 F.3d 1344 (Fed. Cir. 2008)....................11

*Consol. Coal Co. v. United States*, 351 F.3d 1374 (Fed. Cir. 2003)....................11

*Cornetta v. United States*, 851 F.2d 1372 (Fed. Cir. 1988)................................24

*Cross v. Dep't of Transp.*, 127 F.3d 1443 (Fed. Cir. 1997)................................30

*Crumley v. United States*, 133 Fed. Cl. 607 (2017) .........................................26

*Curry v. United States*, 609 F.2d 980 (Ct. Cl. 1979)....................................26, 27

*Davidson v. United States*, 650 F.2d 285 (Ct. Cl. 1980)..............................26, 27

*Doneghy v. United States*, 618 F.2d 121 (Ct. Cl. 1979) ..............................26, 27

*Erlenbaugh v. United States*, 409 U.S. 239 (1972)..........................................22

*Gandola v. F.T.C.*, 773 F.2d 308 (Fed. Cir. 1985) ..........................7-8, 32, 34-35

*Huber v. Merit Sys. Prot. Bd.*, 793 F.2d 284 (Fed. Cir. 1986)....................7, 31-35

## TABLE OF AUTHORITIES (continued)

**Cases (continued):** **Page(s):**


*James v. Von Zemenszky*, 284 F.3d 1310 (Fed. Cir. 2002) ........................7, 32-35

*Johnson v. Alexander*, 572 F.2d 1219 (8th Cir. 1978)................................. 24-25

*Lamar v. United States*, 241 U.S. 103 (1916)............................................16, 17

*Lippmann v. United States*, 127 Fed. Cl. 238 (2016)....................................... 12

*Metz v. United States*, 466 F.3d 991 (Fed. Cir. 2006)........................................8

*Motto v. United States*, 360 F.2d 643 (Ct. Cl. 1966)........................................25

*Murphy v. United States*, 993 F.2d 871 (Fed. Cir. 1993)........................ 25, 26, 27

*Roberts v. United States*, 151 Ct. Cl. 360 (1960) ............................................25

*Rowker v. United States*, 650 F.2d 290 (Ct. Cl. 1980) ................................26, 27

*Sanders v. Kohler Co.*, 641 F.3d 290 (8th Cir. 2011) ............................. 8, 36, 37

*Sargisson v. United States*, 913 F.2d 918 (Fed. Cir. 1990)..........................26, 27

*Sherengos v. United States*, 214 Ct. Cl. 749 (1977)...................................26, 27

*Strategic Hous. Fin. Corp. v. United States*, 608 F.3d 1317 (Fed. Cir. 2010).......22

*Telecare Corp. v. Leavitt*, 409 F.3d 1345 (Fed. Cir. 2005)..................... 15-16, 17

*Tippins v. United States*, 154 Fed. Cl. 373 (2021)............................................2

*Tippins v. United States*, 157 Fed. Cl. 284 (2021)............................................2

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 (1988)...............................................................21

*Vierrether v. United States*, 27 Fed. Cl. 357 (1992) .........................................27

*Wyatt v. United States*, 23 Cl. Ct. 314 (1991)..................................................8

*Wilder v. Merit Sys. Prot. Bd.*, 675 F.3d 1319 (Fed. Cir. 2012).........................24

## TABLE OF AUTHORITIES (continued)

**Statutes:** **Page(s):**

2 U.S.C. § 1315 ........ 37
5 U.S.C. § 861 (1964) ........ 29
5 U.S.C. § 2101 ........ 18
5 U.S.C. § 2105 ........ 18
5 U.S.C. § 3501 ........ 30
5 U.S.C. § 3502 ........ 30, 32, 33
5 U.S.C. § 3502 (1970) ........ 29
5 U.S.C. § 3595 ........ 30
5 U.S.C. § 5361 ........ 30
5 U.S.C. § 5362 ........ 30
5 U.S.C. § 7511 ........ 31
5 U.S.C. § 7512 ........ 30, 33
5 U.S.C. § 7513 ........ 33
10 U.S.C. § 101 ........ 12, 18
10 U.S.C. § 505 ........ 18
10 U.S.C. § 531 ........ 18
10 U.S.C. § 571 ........ 18-19
10 U.S.C. § 601 ........ 19
10 U.S.C. § 624 ........ 19
10 U.S.C. § 1169 ........ 5, 12, 14
10 U.S.C. § 1174a ........ 9, 10, 19-22

## TABLE OF AUTHORITIES (continued)

**Statutes (continued):** **Page(s):**

14 U.S.C. § 357 (2012) ........ *passim*

28 U.S.C. § 1295 ........ 1

29 U.S.C. § 621 ........ 36

29 U.S.C. § 623 ........ 36

29 U.S.C. § 630 ........ 36

29 U.S.C. § 633a ........ 36

29 U.S.C. § 2101 ........ 36-37

Act of Sept. 6, 1966, Pub. L. 89-554, 80 Stat. 428 (1966) ........ 29

Coast Guard Authorization Act of 2016, Pub. L. 114-120, § 215, 130 Stat. 45 (2016) ........ 1, 6

Coast Guard Authorization Act of 1991, Pub. L. 102-241, 105 Stat. 2211 (1991) ........ 15, 22

National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub. L. 102-190, 105 Stat. 1394 (1991) ........ 22

**Legislative History:**

H.R. Rep. No. 102-132, 102nd Cong., 1st Sess. 29 (1991) ........ 15

H.R. Rep. No. 89-901, 89th Cong., 1st Sess. (1965) ........ 29

S. Rep. No. 114-168, 114th Cong., 1st Sess. 13 (2015) ........ 6

S. Rep. No. 102-169, 102nd Cong., 1st Sess. 9 (1991) ........ 15

S. Rep. No. 89-1380, 89th Cong., 1st Sess. (1966) ........ 29

**Regulations:**

5 C.F.R. part 351 ........ 30, 32

**TABLE OF AUTHORITIES (continued)**

**Regulations (continued):** **Page(s):**

5 C.F.R. § 351.201 .......... 31, 32, 34-35

5 C.F.R. § 351.401 .......... 32, 34, 35

5 C.F.R. § 351.501 .......... 35

5 C.F.R. § 351.901 .......... 32, 33

**Other Authorities:**

Merriam-Webster's Collegiate Dictionary (9th ed. 1990) .......... 16, 29

Random House Unabridged Dictionary of the English Language (2d ed. 1987) .......... 16-17

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for defendant-appellant, the United States, states that he is not aware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Ongoing proceedings in this case before the Court of Federal Claims will be directly affected by the Court's decision in this appeal. Counsel is not aware of any other case pending in this or any other court that may directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The Court possesses jurisdiction to entertain this appeal from a partial final judgment of the United States Court of Federal Claims (trial court). 28 U.S.C. § 1295(a)(3). The trial court entered the partial final judgment in December 2021, Appx1, and we timely filed a notice of appeal in February 2022. *See* Appx35-36.

## STATEMENT OF THE ISSUE

Whether the trial court erred in holding that involuntarily retiring hundreds of enlisted Coast Guard members, without eliminating military positions, did not constitute a "reduction in force" within the meaning of 14 U.S.C. 357(j) (2012).[1]

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

### I. Nature Of The Case

Plaintiffs-appellees (plaintiffs) are former enlisted service members in the United States Coast Guard. The Coast Guard selected plaintiffs for involuntary retirement during Active Duty Enlisted Career Retention Screening Panels (CRSPs) in 2012, 2013, and 2014. During the CRSP process, the Coast Guard did not use enlisted personnel board procedures set forth in 14 U.S.C. § 357(a)-(g),

[1] In 2016, Congress repealed the relevant provisions of 14 U.S.C. § 357 (2012). Coast Guard Authorization Act of 2016, Pub. L. 114-120, § 215, 130 Stat. 45 (2016) (repealing subsections (a)-(h) and (j) of section 357). All citations to section 357 in this brief refer to the 2012 edition of title 14, United States Code, a copy of which is reproduced in the appendix. Appx37-38.

which do not apply "[w]hen the Secretary orders a reduction in force."[2] 14 U.S.C. § 357(j). The Secretary invoked 14 U.S.C. § 357(j) and authorized the Coast Guard to conduct the 2012, 2013, and 2014 CRSPs to reduce the size of the retirement eligible enlisted workforce.[3] Appx39-44. The Coast Guard involuntarily retired approximately 358 enlisted members, including plaintiffs, as a result of the 2012, 2013, and 2014 CRSPs. *See* Appx5.

In 2018, six named plaintiffs filed a putative class action asserting wrongful discharge claims. *See* Appx28. In July 2021, the trial court issued a published opinion, *Tippins v. United States*, 154 Fed. Cl. 373 (2021) (*Tippins I*), which held that the six plaintiffs' involuntary retirements were unlawful because the CRSPs were not a "reduction in force" within the meaning of section 357(j), such that the procedures set forth in section 357(a)-(g) were violated. Appx2-17. In December 2021, the trial court issued another published opinion, *Tippins v. United States*, 157 Fed. Cl. 284 (2021) (*Tippins II*), which denied our motion for reconsideration, and

[2] From 1991 through 2003, the Coast Guard was a component of the Department of Transportation (DOT), and the Secretary of DOT possessed the reduction in force authority set forth in section 357(j). In 2003, the Coast Guard became a component of the Department of Homeland Security (DHS), and then the Secretary of DHS possessed that authority.

[3] DHS Secretary Janet A. Napolitano signed the 2012 and 2013 CRSP memoranda. Appx39-42. DHS Secretary Jeh H. Johnson signed the 2014 CRSP memorandum. Appx43-44. For ease of reference in this brief, we collectively refer to Secretaries Napolitano and Johnson as "the Secretary."

directed a partial final judgment upon the six plaintiffs' claims while proceedings continue with respect to a putative class of similarly situated individuals. Appx18-26. The United States appeals from the partial final judgment. Appx1.

## II. Statement Of Facts

The Coast Guard reduced the retirement-eligible enlisted workforce through five separate CRSPs in 2010, 2011, 2012, 2013, and 2014. Appx39-44; Appx66. Presumably because claims relating to the 2010 and 2011 CRSPs were time barred, this 2018 lawsuit only challenges involuntary retirements pursuant to the 2012, 2013, and 2014 CRSPs. There is no challenge to the 2010 or 2011 CRSPs in this case.

The CRSPs were necessary to reduce the bloated size of the retirement eligible enlisted workforce following the Great Recession and thus increase opportunities for advancement by high performing junior enlisted personnel. Appx39-44; Appx66. For this reason, the Coast Guard generally did not eliminate positions when senior enlisted members were selected for involuntary retirement by the CRSPs. Appx6. In other words, by increasing turnover with involuntary retirements of enlisted members in higher grades, while maintaining a stable number of positions for enlisted members in those higher grades, the Coast Guard reduced the size of the retirement eligible enlisted workforce and increased opportunities for advancement among enlisted members in junior grades.

For the most part, the Secretary's memoranda authorizing the 2012, 2013, and 2014 CRSPs are identical in relevant part. Appx39-44. In each authorization, the Secretary "determined that holding another [CRSP] panel . . . is in the best interest of the Coast Guard." Appx39, Appx41, Appx43. The Secretary explained that each "CRSP is designed to strategically rebalance the enlisted force toward a more upwardly mobile, performance based demographic," because "[r]elatively stagnant military end-strength and lower than normal attrition rates continue to result in lower than normal accession forecasts," and "[t]hese dynamics jeopardize the future military workforce of the Coast Guard by slowing the advancement of the Coast Guard's most high performing enlisted members." *Id.* The Secretary elaborated that "[t]hose [enlisted members] not selected for continued service will be involuntarily retired," and "[m]embers identified for involuntary retirement will be entitled to full retirement benefits." *Id.* The Secretary added that "[t]hese retirements will allow continued accessions and advancements that are *essential* for a healthy enlisted workforce." *Id.* (emphasis supplied). The Secretary concluded that the CRSPs "will ensure the high performance of our enlisted members," Appx40, while "ensur[ing] that we retain the best of our retirement eligible senior enlisted personnel." Appx42, Appx44.

The Secretary's memoranda also discuss the legal authority for the CRSPs. Appx39, Appx41, Appx43. In each memo, the Secretary determined that "[t]he

legal authority to conduct a CRSP panel derives from title 10, U.S. Code Section 1169 and title 14, U.S. Code Section 357(j)." *Id.* The Secretary explained that, (1) "[u]nder Section 1169, regular enlisted members of an armed force may be discharged, before service term expiration, as the Secretary concerned may prescribe," and (2) "[u]nder Section 357(j), the Secretary . . . may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a 'reduction in force.'" *Id.* The Secretary added that a legal review had "determined [the CRSP process] complies with applicable laws and regulations." Appx39. Each memo concluded that the Secretary's "endorsement . . . will provide the Coast Guard with the legal authority required to conduct the CRSP." Appx40, Appx42, Appx44.

The Secretary's memoranda also separately address how the "reduction of force" pursuant to section 357(j) would be communicated to the fleet, which includes both enlisted and civilian workforces. Appx39; Appx41; Appx43. The Secretary stated: "[i]n order to avoid creating confusion in the fleet, the CRSP process does not include the term 'reduction in force,' which has specific meanings in other statutory contexts" that may apply to civilian employees, whereas, "title 14 does not define, directly or by reference, [a] 'reduction in force'" for enlisted service members. Appx39; Appx41; *accord* Appx43.

Finally, the Secretary described ongoing legislative efforts to make the CRSP process more efficient by delegating to the Coast Guard permanent authority to conduct reductions in force using CRSPs without the need for Secretarial approval. Appx40. Specifically, the Secretary stated that the Coast Guard was "in the process of submitting a Legislative Change Proposal (LCP) granting the Coast Guard permanent authority to hold this [CRSP] panel as needed," but, "since the LCP approval may take several years," the Secretary granted the Coast Guard approvals "while awaiting [the Coast Guard's own] permanent authority." *Id.* This legislative change proposal came to fruition in 2016, when Congress repealed the relevant provisions of section 357. Coast Guard Authorization Act of 2016, Pub. L. 114-120, § 215, 130 Stat. 45 (2016) (repealing the enlisted personnel board procedures in section 357(a)-(g) along with the reduction in force exception in section 357(j)). In an accompanying report, the Senate Committee on Commerce, Science, and Transportation stated that this repeal would "enable the [Coast Guard] to more efficiently conduct career retention screening panels during reductions in force or performance-based senior enlisted continuation boards common to the other military services, specifically the Department of the Navy." S. Rep. No. 114-168, 114th Cong., 1st Sess. 13 (2015).

In sum, the Coast Guard "sought and received authorization from the Secretary . . . *to reduce the size of the retirement eligible enlisted workforce*" through CRSPs pursuant to section 357(j). Appx66.

III. The Course Of Proceedings And Disposition Below

In 2018, six named plaintiffs filed a putative class action asserting wrongful discharge claims. *See* Appx28. In April 2019, we filed a certified administrative record comprised of the documents reflecting the Secretary's decisions to authorize the CRSPs, the conduct of the CRSPs themselves, and the named plaintiffs' official military personnel files. *See* Appx29.

In *Tippins I*, the trial court recognized that "plaintiffs' involuntary retirements through the CRSPs were only lawful if they were part of a 'reduction in force' ordered by the Secretary . . . under § 357(j)," and this "case turns on the meaning of those three words." Appx7. The trial court held "that a 'reduction in force' is the elimination of positions or jobs, not merely the separation of personnel." Appx8. The trial court reached this conclusion primarily based upon its belief that "the Federal Circuit has defined 'reduction in force' in other circumstances" involving civil service employees, and a "'reduction in force' necessarily involves the elimination of positions as a prerequisite." *Id.* (citing *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002); *Huber v. Merit Sys. Prot. Bd.*, 793 F.2d 284, 286 (Fed. Cir. 1986); *Gandola v. F.T.C.*, 773 F.2d

308, 310 (Fed. Cir. 1985)). The trial court also relied on decisions by two other courts of appeals in the context of statutes governing private employers. *Id.* (citing *Sanders v. Kohler Co.*, 641 F.3d 290, 294 (8th Cir. 2011); *Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir. 1990)). Relying heavily upon these decisions from the realm of civilian employees, the trial court held that the military statute at issue, section 357(j), is unambiguous. Appx10-12. In the alternative, the trial court held that the Secretary had not offered an interpretation of the statute that would be entitled to deference even if the statute was held to be ambiguous. Appx12-16. Accordingly, the trial court granted summary judgment for the plaintiffs.[4] Appx17.

---

[4] By deciding this military pay case on a summary judgment standard of review under Rule 56, the trial court erroneously departed from the Administrative Procedure Act (APA) standard for judgment upon the administrative record under Rule 56.1. Order at 2, July 2, 2019, ECF No. 22; Order at 6, Aug. 10, 2020, ECF No. 52; *see Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006) ("[T]he Court of Federal Claims reviews [a military board] action *under the same standard as any other agency action*, [which is] whether the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law.") (emphasis supplied); *see also Allphin v. United States*, 758 F.3d 1336, 1341-44 (Fed. Cir. 2014) (affirming denial of motion to supplement record when service member had not sought review by a corrections board); *Bateson v. United States*, 48 Fed. Cl. 162, 164 (2000) (denying motion to supplement, explaining that, in "cases where an officer has not pursued an administrative appeal the officer has waived the right to make an administrative record and has to rely in a subsequent action for judicial review on the evidentiary record before the deciding official"), *aff'd*, 64 F. App'x 244 (Fed. Cir. 2003); *Wyatt v. United States*, 23 Cl. Ct. 314, 318-19 (1991) (finding "no reason why this [APA] standard should not apply" when "reviewing the battalion commander's decision (as opposed to a decision of a discharge review board or a records correction board"). Nevertheless, this case largely turns on a legal

We filed a motion for reconsideration of *Tippins I* based on several grounds. *See* Appx34. First, we argued that the trial court had overlooked dictionary definitions, along with Congress' history of using the terms "reduction in force" and "reduction in personnel" interchangeably, which demonstrate that the plain meaning of "reduction in force" includes a reduction in personnel. Second, we argued that the trial court erroneously assumed that statutes governing reductions in force in the civilian sphere have a "similar purpose" to military statutes in light of important differences in the statutory schemes. Third, we argued that the trial court had erred in holding that this Court has "defined" reduction in force in civilian employment cases, when this Court actually applied the regulatory framework applicable to civilian employees and did not purport to adopt an all-encompassing definition. Fourth, we argued that the trial court overlooked another military statute, 10 U.S.C. § 1174a, which uses the term "reduction in force" in the context of an incentive program for separating enlisted members without any requirement of a reduction in positions.

question of statutory interpretation, such that the differences between the standards of review under Rules 56 and 56.1 should be relatively minor. Although the trial court erroneously relied upon extra-record documents relating to the 2010 CRSP that was not at issue in this case, Appx3-4, Appx10, Appx15 (*Tippins I*); Appx19-20, Appx22-23 (*Tippins II*), the trial court stated that such material was "not particularly consequential at summary judgment." Appx22 (*Tippins II*).

In *Tippins II*, the trial court denied our motion for reconsideration. Appx18-26. First, the trial court dismissed our entire plain meaning argument as "dictionary shopping," even though there were several definitions in the record and all of them were consistent. Appx21. Next, without addressing any of the differences in the statutory schemes that govern military members and civilian employees, the trial court held that decisions involving civil service employees "remain[] useful in a vacuum created by the complete absence of a definition unique to 14 U.S.C. § 357." Appx22. The trial court also declined to consider 10 U.S.C. § 1174a because it governs voluntary separation benefits rather than involuntary separations. *Id.* Finally, the trial court directed entry of a partial final judgment in favor of the six named plaintiffs so that the time for appellate review may commence while class action proceedings continue with respect to several hundred other putative class members.[5] Appx1; Appx26.

This appeal followed.

## SUMMARY OF THE ARGUMENT

A cascade of errors led to the partial final judgment in favor of plaintiffs. Specifically, in holding "that a 'reduction in force' is the elimination of positions or jobs, not merely the separation of personnel," Appx8, the trial court refused to

[5] After entering the partial final judgment, the trial court granted plaintiffs' motion for class certification, and plaintiffs have filed several hundred consents for class members to opt-in to assert claims against the United States in this case.

apply traditional means of statutory construction, disregarded important differences in the statutory schemes governing military service members and civil service employees, grafted judicial descriptions of civilian regulations onto a military statute, and curtailed the Secretary's military authority in a way that Congress never expressed. The Court should vacate the partial final judgment and remand with instructions for the trial court to enter judgment in favor of the United States.

## ARGUMENT

### I. Standard Of Review

This Court reviews a grant of summary judgment "without deference." *Consol. Coal Co. v. United States*, 528 F.3d 1344, 1347 (Fed. Cir. 2008). The question before the Court is one of statutory interpretation. "Statutory interpretation is a question of law that [the Court] review[s] *de novo*." *Id.* (citation omitted). "*De novo*" review means a "complete and independent review" of the issue. *Consol. Coal Co. v. United States*, 351 F.3d 1374, 1377 (Fed. Cir. 2003).

### II. The Trial Court Misconstrued The Plain Meaning Of "Reduction In Force" In Section 357(j) As Necessarily Requiring Elimination Of Military Jobs, When Dictionary Definitions And The Statutory Scheme Establish That A Reduction In Military Force Includes A Reduction In Military Personnel

Congress broadly authorized, but did not define, the parameters for military reductions in force. Dictionary definitions indicate that a "reduction in force" in the military context may involve a reduction in the size of military personnel units and discharges of individual military members. The dictionary definitions make

sense in the context of the statutory scheme for enlisted military members who serve in a particular grade, not in a particular position. In this respect, the military is different from the civilian sphere. The military cannot reduce the size of the enlisted workforce (or any portion thereof) by eliminating positions because military members serve on enlistment contracts and therefore remain in the force regardless of whether any particular position exists. That is why, in the military, reductions in force target categories of enlisted personnel for discharge, as Congress recognized elsewhere in the statutory scheme.

### A. Congress Broadly Authorized, But Did Not Define, Reductions In Force

The Secretary's memoranda authorizing the 2012, 2013, and 2014 CRSPs invoked statutory authority in 10 U.S.C. § 1169 and 14 U.S.C. § 357(j). Appx39, Appx41, Appx43. Section 1169 provides: "No regular enlisted member of an armed force may be discharged before his term of service expires, except (1) *as prescribed by the Secretary concerned*; (2) by sentence of a general or special court martial; or (3) as otherwise provided by law." 10 U.S.C. § 1169 (emphasis supplied); *see also* 10 U.S.C. § 101(a)(4) ("The term 'armed forces' means the . . . Coast Guard."). The Secretary of DHS is the "Secretary concerned" for the Coast Guard when it is not operating as part of the Navy. 10 U.S.C. § 101(a)(9)(D).

Section 1169 conferred upon the Secretary the authority to prescribe CRSPs for the involuntary retirement of enlisted Coast Guard members. *See* 10 U.S.C.

§ 1169(1); *Lippmann v. United States*, 127 Fed. Cl. 238, 250-51 (2016). Likewise, this Court previously found that section 1169 confers upon the Secretaries of military components authority to make targeted reductions within particular grades to ensure proper functioning of the military workforce. *Allphin v. United States*, 758 F.3d 1336, 1342 (Fed. Cir. 2014). The Secretary's contemporaneous rationale in this case – reducing the number of retirement eligible enlisted members to ensure proper functioning of the workforce (Appx39-44) – is substantively identical to the Navy's reason for personnel reductions that were sustained by this Court in *Allphin*. Plaintiffs' only legal challenge in this case is whether section 357 nevertheless required the Coast Guard to follow enlisted personnel board procedures prior to ordering their involuntary retirements as part of what the Secretary authorized as a reduction in force.

Section 357 authorized the Commandant of the Coast Guard to involuntarily retire service members with 20 or more years of service on the recommendation of an "enlisted personnel board," convened by the Commandant. Appx37, 14 U.S.C. 357(a) (2012). A service member could be retired through those procedures only on two specified grounds: "(1) because the member's performance is below the standards the Commandant prescribes; or (2) because of professional dereliction." 14 U.S.C. 357(b) (2012). Any member whose service was under review by an enlisted personnel board was entitled to notice, an opportunity to submit a written

rebuttal, and an opportunity to appear and present witnesses at a hearing. 14 U.S.C. 357(c) (2012). If the enlisted personnel board recommended involuntary retirement, the member was then entitled to additional procedural protections before the Commandant could act on the recommendation. 14 U.S.C. 357(f) (2012). However, Congress established an exception in section 357(j), which allowed the Coast Guard to dispense with enlisted personnel boards during a "reduction in force." 14 U.S.C. 357(j) (2012). Section 357(j) provided that, "[w]hen the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action." *Id.*

The Secretary's contemporaneous memoranda discuss the legal authority for the 2012, 2013, and 2014 CRSPs. Appx39, Appx41, Appx43. In each memo, the Secretary determined that "[t]he legal authority to conduct a CRSP panel derives from" section 1169 *and section 357(j).*" *Id.* (emphasis supplied). The Secretary properly explained that, (1) "[u]nder Section 1169, regular enlisted members of an armed force may be discharged, before service term expiration, as the Secretary concerned may prescribe," *and* (2) "*[u]nder Section 357(j)*, the Secretary . . . may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a 'reduction in force.'" *Id.* (emphasis supplied). By invoking these authorities, including section 357(j), the Secretary expressly intended to "provide

the Coast Guard with the legal authority required to conduct the CRSP[s]" in 2012, 2013, and 2014.[6] Appx40, Appx42, Appx44.

B. Dictionary Definitions Demonstrate That The Plain Meaning Of "Reduction In Force" Includes Reductions Of Military Personnel

When Congress enacted section 357(j) in 1991, the legislature did not define the term "reduction in force." Coast Guard Authorization Act of 1991, Pub. L. 102-241, § 6(a), 105 Stat. 2211 (1991). There is no discussion of what constitutes a "reduction in force" in the legislative history of section 357 either. S. Rep. No. 102-169, 102nd Cong., 1st Sess. 9 (1991) ("These [board review] procedures [in section 357] would not be required during mandated reductions in force."); H.R. Rep. No. 102-132, 102nd Cong., 1st Sess. 29 (1991) ("When the Secretary orders a reduction in force, enlisted personnel may be involuntarily retired without [b]oard action.").

In the absence of a statutory definition, this Court has held that "the plain meaning of a statute is to be ascertained using standard dictionaries in effect at the time of the statute's enactment." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1353

[6] To the extent that the trial court may have had a concern that the Secretary's understanding of section 357(j) would have allowed the Coast Guard to separate individual enlisted members while rendering the enlisted board procedures of section 357(a)-(g) a nullity, this never happened and will never happen. The Secretary only invoked the authority conferred by section 357(j) in a few CRSPs involving large-scale reductions of hundreds of enlisted personnel, and that authority will never be invoked again given the repeal of section 357 in 2016.

(Fed. Cir. 2005) (citing *Lamar v. United States*, 241 U.S. 103, 113 (1916)). The contemporaneous dictionary definitions of "force" and "reduction in force" demonstrate that the plain meaning of "reduction in force" may include a reduction in the size of military personnel units and discharges of individual military members. The trial court's plain language analysis is not consistent with these definitions.

The Merriam-Webster's dictionary defines a labor "force" as "a body of persons" that is "available for a particular end." Force, Merriam-Webster's Collegiate Dictionary (9th ed. 1990) (defining "force" as "a body of persons" that are "available for a particular end" when used in the context of a "labor force"), Appx69. In contrast, that dictionary defines a military "force" as "a body" of "troops" that are "assigned to a military purpose." *Id.* (defining "force" as "a body (as of troops or ships) assigned to a military purpose" when used in the context of "military strength"). The Merriam-Webster's dictionary thus indicates that a reduction in military "force" – a reduction in that "body" of "troops" – plainly may involve a reduction in the "troops" that are "available." *See id.*

Likewise, the Random House dictionary defines a "RIF" – the abbreviation of reduction in force – as "a reduction in the personnel of an armed service or unit." RIF, Random House Unabridged Dictionary of the English Language 1655 (2d ed. 1987), Appx73. In other civilian contexts, that dictionary defines a "RIF"

as "a reduction in the number of persons employed by a business, government department, etc., esp[ecially] for budgetary reasons." *Id.* (emphasis supplied). The Random House dictionary also defines the verb, "rif," as "discharg[ing] (a *person*) from military or civil service, esp[ecially] as part of an economy program." *Id.* (emphasis supplied). Accordingly, the Random House dictionary indicates that a "reduction in force" plainly may involve reductions in units of military personnel and discharges of individual military members. *See id.* That is exactly what happened in this case when the Coast Guard reduced the number of the retirement-eligible enlisted members by several hundred upon discharging them as a result of the 2012, 2013, and 2014 CRSPs.

These dictionaries define reductions in force in terms of discharging military personnel, not eliminating military positions. There is no tension in the dictionary definitions in this case and they all support our plain meaning argument. The trial court failed to grapple with them in a meaningful way. By holding that a reduction in force is the elimination of positions, and not merely a reduction in military personnel, the trial court was not faithful to the statutory text and failed to discern the plain meaning of section 357(j) in harmony with the aforementioned dictionary definitions. *See Telecare*, 409 F.3d at 1353 (citing *Lamar*, 241 U.S. at 113).

### C. The Dictionary Definitions Are Consistent With The Statutory Scheme Where Enlisted Members Serve In Grades, Not Positions

The dictionaries that define military reductions in force in terms of discharging personnel, rather than eliminating positions, are consistent with the statutory scheme. Unlike the Federal civil service where employees are appointed to particular job positions, in the military, enlisted members serve under enlistment contracts, serve in particular grades, and are not enlisted to positions, such that, a reduction in positions does not reduce the size of the military workforce.

Specifically, Federal employees are appointed to *positions* in the civil service. 5 U.S.C. §§ 2101(1) ("the 'civil service' consists of all appointive positions in the executive, judicial, and legislative branches of the Government of the United States, except positions in the uniformed services"), 2105(a) ("employee" generally means an "individual who is . . . appointed in the civil service"). In contrast, enlisted members of the armed forces are defined solely by their duty status and *grade*, not by positions. 10 U.S.C. §§ 101(b)(6) ("'[E]nlisted member' means a person in an enlisted grade."), 505(b) ("A person is enlisted in the . . . Regular Army, Regular Navy, Regular Air Force, Regular Marine Corps, Regular Space Force, or Regular Coast Guard in the grade or rating prescribed by the Secretary concerned."). Likewise, with few exceptions, military officers are appointed to grades, not positions. 10 U.S.C. §§ 531 (commissioned officers are appointed to a commissioned officer grade in a military service), 571 (warrant

officers are appointed to a warrant officer grade), 624(b)(1) (when promoted, commissioned officers are appointed in the grade to which promoted). The only military officers appointed to *positions* are general or flag officers temporarily appointed by the President, with the advice and consent of the Senate, to "positions of importance and responsibility" in the grade of general or admiral or lieutenant general or vice admiral. 10 U.S.C. § 601(a).

Consistent with this statutory scheme, military reductions in force involve reductions in categories of enlisted personnel to ensure the proper functioning of that military workforce. *See*, *e.g.*, *Allphin*, 758 F.3d at 1342. Military branches also create, eliminate, and restructure positions to meet military needs as circumstances change from time to time. Positions help the military manage what the enlisted workforce *does*, but positions are not how the military manages the *composition* of the enlisted workforce under the statutory scheme.

### D. Another Military Statute Reinforces The Plain Meaning Of Section 357(j)

To our knowledge, there are only two provisions in the United States Code in which Congress has used the term "reduction in force" in relation to military service members: section 357(j) and section 1174a. 10 U.S.C. § 1174a; 14 U.S.C. § 357(j). Consistent with the dictionary definitions and statutory scheme discussed above, section 1174a uses the term "reduction in force" in the context of an incentive program for separating enlisted members in certain grades or with certain

years of service, without any requirement to eliminate positions. The trial court declined to consider section 1174a because it pertains to voluntary separations and thus does not apply to the facts of this case. Appx22. Nevertheless, section 1174a helps to illuminate the plain meaning of section 357(j).

Section 1174a prescribes a "special separation benefits program." 10 U.S.C. § 1174a. The applicability of this program is "subject to the needs of the service." *Id.* § 1174a(e). Accordingly, "the Secretary concerned may limit the applicability of a program under this section to any category of personnel defined by the Secretary in order to meet a need of the armed force under the Secretary's jurisdiction to reduce the number of members in certain grades, the number of members who have completed a certain number of years of active service, or the number of members who possess certain military skills or are serving in designated competitive categories." *Id.* § 1174a(e)(1). Moreover, "[a]ny category prescribed by the Secretary concerned for . . . regular enlisted members . . . shall be consistent with the categories applicable to . . . regular enlisted members . . . under . . . any . . . program established . . . by that Secretary for the involuntary separation of such members in the administration of a reduction in force." *Id.* § 1174a(e)(2).

In sum, section 1174a authorizes the Secretary concerned to prescribe categories of enlisted members for a special separation benefits program – to reduce (1) the number of members in certain grades, (2) the number of members

who have completed a certain number of years of active service, or (3) the number of members who possess certain military skills or are serving in designated competitive categories – *as long as those categories are consistent with the categories applicable to a reduction in force*. 10 U.S.C. § 1174a(e)(1)-(2). Section 1174a thus presupposes that various categories to reduce the number of enlisted members (either by grades, years of service, or skills), will correspond to the categories applicable to a reduction in force, when imposing a requirement that those categories must be "consistent." *Id.* Because Congress provided that categories in a special separation benefit program, which would reduce the number of enlisted members (by grades, years of service, or skills), must be consistent with categories in a reduction in force prescribed by the Secretary, it is manifest that Congress understood that reductions in categories of enlisted personnel fall within the plain meaning of a reduction in force under section 357(j).

Although section 1174a does not cross-reference section 357(j), the temporal and topical relationship between these two military provisions is strong. *See Azar v. Alina Health Servs.*, 139 S. Ct. 1804, 1811 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes."); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (explaining that the use of the same term in related statutes clarifies the meaning of that term). When Congress enacted section

357(j), it is presumed that the legislature had knowledge of section 1174a and had intended for those two statutes to be construed harmoniously. *See Aectra Ref. & Mktg. v. United States*, 565 F.3d 1364, 1370 (Fed. Cir. 2009) ("Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts."). This is especially true because sections 357(j) and 1174a were enacted by the same Congress just two weeks apart and generally address the same subject matter. *See* Coast Guard Authorization Act of 1991, Pub. L. 102-241, § 6, 105 Stat. 2211 (Dec. 19, 1991) (amending section 357); National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub. L. 102-190, § 661(a), 105 Stat. 1394 (Dec. 5, 1991) (enacting section 1174a); *Strategic Hous. Fin. Corp. v. United States*, 608 F.3d 1317, 1330 (Fed. Cir. 2010) (Under "the *in pari material* canon . . . courts should interpret statutes with similar language that generally address the same subject matter together, 'as if they were one law.'") (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243-44 (1972)).

Section 1174a thus demonstrates that military reductions in force may involve targeted reductions in enlisted personnel by grade and years of service. As part of the same statutory scheme governing military members, section 1174a sheds light on the plain meaning of section 357(j). After the Secretary exercised her reduction in force authority under section 357(j), Appx39-44, the CRSPs

considered enlisted members based upon their grades and years of service. Appx5; Appx46; Appx59; Appx62-63. This was a reduction in force within the meaning of section 357(j).

### E. The Trial Court Erroneously Relied Upon Cases Regarding Reductions In Force Under Statutes and Regulations Addressing Civilian Employees

Rather than interpret the plain meaning of section 357(j) using dictionary definitions in the context of the statutory scheme, the trial court primarily relied upon cases involving reductions in civilian employees. The trial court's reliance on these cases was flawed because statutes governing civilian employees and military members do not have a similar purpose, and the trial court misconstrued the term "reduction in force" from the civilian sphere in any event.[7]

[7] To the extent that the trial court may have been motivated by a concern that the Coast Guard "was purposefully misleading its own enlisted personnel," Appx22 & n.6, it was unfounded. The Secretary decided not to have the Coast Guard *publicly* describe the CRSPs as a reduction in force "to avoid creating confusion in the fleet," which was comprised of both civilian and military workforces, because the CRSPs were not being conducted pursuant to the statutes and regulations that govern reductions in force for civilian employees. Appx39; Appx41; *accord* Appx43. The lawfulness of the Secretary's reduction in force order does not depend upon how the Coast Guard later messaged that order to the fleet. Indeed, there is no statute or regulation that would have required the Coast Guard to publicly communicate the words "reduction in force" when conducting a reduction in force through the CRSPs, and the Secretary articulated a rational reason for not doing so in this situation where the CRSPs considered only enlisted Coast Guard members, not civilian Coast Guard employees. *See id.*

### 1. Statutes Governing Federal Civil Service Employees And Military Members Do Not Have a Similar Purpose

The trial court took an ill-advised analytical leap. Specifically, the trial court made an assumption that statutes governing reductions in force relative to civilian employees have a "similar purpose" to statutes governing enlisted Coast Guard members. Appx8. This was error. As demonstrated above, the statutory schemes governing military service members and civil service employees are different. Unlike the civilian context where Federal employees are appointed to particular job positions, in the military, enlisted members serve under enlistment contracts and are not enlisted to particular positions, such that, a reduction in military positions does not reduce the size of the military workforce.

Given the differences between the statutory schemes governing military service members and civilian employees, it was error for the trial court to construe a military "reduction in force" statute with reference to any civilian statute. *See Wilder v. Merit Sys. Prot. Bd.*, 675 F.3d 1319, 1322 (Fed. Cir. 2012) ("The Civil Service Reform Act" in title 5 "is directed . . . to [F]ederal civilian service," whereas, "[m]ilitary service is governed by a wholly different statutory scheme, principally lodged in title 10 of the United States Code."); *see also Cornetta v. United States*, 851 F.2d 1372, 1377 (Fed. Cir. 1988) (*en banc*) (explaining that there are "differences between civilian and military service that must be taken account of") (internal quotation marks and citation omitted); *Johnson v. Alexander*,

572 F.2d 1219, 1223-24 & n.4 (8th Cir. 1978) ("While military service possesses some of the characteristics of ordinary civilian employment, it differs materially from such employment in a number of respects . . . and the peculiar status of uniformed personnel of our armed forces has frequently been recognized by the courts.") (collecting cases); *Motto v. United States*, 360 F.2d 643, 646 (Ct. Cl. 1966) ("a civil office is not the same as a military office and the two terms are used in contradiction"); *Roberts v. United States*, 151 Ct. Cl. 360, 364 n.4 (1960) ("Civilian reductions in force involve different considerations of factual settings than do military retired pay cases which involve questions of law.").

The difference between civilian and military contexts also is evident in judicial decisions. In contrast to judicial statements from the civilian context that are cited by the trial court in *Tippins I*, in the military context, this Court and its predecessor the Court of Claims have referred to reductions in military personnel as "reductions in force" without regard for whether any positions were eliminated. *Allphin*, 758 F.3d at 1340-42 (quoting *Murphy v. United States*, 993 F.2d 871, 874 (Fed. Cir. 1993) ("[T]he "merits of the Air Force's decision to release [the plaintiff] from active duty [as part of *reduction-in-force* efforts] are beyond judicial reach") (brackets and alterations supplied by the Federal Circuit in *Allphin*)); *Berkley v. United States*, 287 F.3d 1076, 1081-82 (Fed. Cir. 2002) ("This is a military pay class action case brought on behalf of officers of the United States Air

Force terminated pursuant to a 1993 Reduction in Force" after the Secretary had convened a board to select officers for involuntary separation); *Rowker v. United States*, 650 F.2d 290, 290 (Ct. Cl. 1980) (using the term, "reduction-in-force"); *Davidson v. United States*, 650 F.2d 285, 285 (Ct. Cl. 1980) (same); *Curry v. United States*, 609 F.2d 980, 981, 984 (Ct. Cl. 1979) (same); *Doneghy v. United States*, 618 F.2d 121, 121 (Ct. Cl. 1979) (same); *Sherengos v. United States*, 214 Ct. Cl. 749, 749 (1977) (same); *see also Sargisson v. United States*, 913 F.2d 918, 922 (Fed. Cir. 1990) (as part of a "reduction in manpower requirements, the Secretary of the Air Force convened a Reserve Officer Screening Board (ROSB) . . . to review the records of all reserve officers on active duty . . . and 1133 of them, including Sargisson, were involuntarily released from active duty."); *Anderson v. United States*, 111 Fed. Cl. 572, 583 (2013) (describing *Murphy* and *Sargisson* as "reduction in force" cases), *aff'd sub nom.*, *Allphin v. United States*, 758 F.3d 1336 (Fed. Cir. 2014).

Likewise, in the military context, the trial court previously has referred to reductions in military personnel as "reductions in force" without regard for whether any positions were eliminated. *Crumley v. United States*, 133 Fed. Cl. 607, 609-10 (2017) (referring to a reduction in retirement-eligible military personnel as a "reduction-in-force"); *Anderson*, 111 Fed. Cl. at 583, 585-86 (same, using the terms "reduction in force," "workforce reduction," and "reduction of

enlisted personnel"); *Berkley v. United States*, 59 Fed. Cl. 675, 677 (2004) (same, "reduction in force"); *Alvin v. United States*, 50 Fed. Cl. 295, 296-97 (2001) (same, using the terms "reduction in force" and "reduction in manpower"); *Baker v. United States*, 34 Fed. Cl. 645, 648 (1995) (same, using the terms "reduction in force" and "force reduction"), *rev'd on other grounds*, 127 F.3d 1081 (Fed. Cir. 1997); *Vierrether v. United States*, 27 Fed. Cl. 357, 359 (1992) (same, "reduction in force"), *aff'd without op.*, 6 F.3d 786 (Fed. Cir. 1993) (table)). In *Vierrether*, the trial court addressed a Coast Guard "reduction in force" program that began in 1988, just a few years before Congress enacted section 357(j), without considering whether any positions had been eliminated. 27 Fed. Cl. at 359.

There is no evidence that Congress intended to cause a dramatic change to historical military practice for reducing personnel, just by using the undefined term "reduction in force" in section 357(j). *See Vierrether*, 27 Fed. Cl. at 359 (1988 Coast Guard "reduction in force"); *Murphy*, 993 F.2d at 872 (1975 Air Force reduction in force); *Sargisson*, 913 F.2d at 920 (1974 Air Force reduction in force); *Rowker*, 650 F.2d at 290 (1974 Army "reduction in force"); *Davidson*, 650 F.2d at 285 (1973 Army "reduction in force"); *Curry*, 609 F.2d at 981, 984 (1975 Air Force "reduction in force"); *Doneghy*, 618 F.2d at 121 (1973 Army "reduction in force"); *Sherengos*, 214 Ct. Cl. at 749 (1970 Air Force "reduction in force"). Indeed, the commonplace use of the term "reduction in force" by this Court, the

Court of Claims, and the trial court, to describe reductions in military personnel, further reinforces that the plain meaning of "reduction in force" includes a reduction in military personnel in the military context.

Nevertheless, by relying upon precedents involving civilian employees, the trial court ignored the differences between the statutory schemes governing military service members and civilian employees, ignored historical military practice, and ignored the large body of cases describing (in plain language) numerous reductions in military personnel as reductions in force.

2. The Trial Court Misconstrued The Term "Reduction In Force" From The Civilian Sphere

The trial court should not have considered statutes or regulations governing civilian employees, or precedents applying them, when construing the plain meaning of section 357(j). But the trial court did so, and in the process, also misconstrued the term "reduction in force" from the civilian context.

a. Congress Has Used The Terms "Reduction In Force" And "Reduction In Personnel" Interchangeably In The Civilian Context

In narrowly construing "a 'reduction in force'" as "the elimination of positions or jobs, not merely the separation of personnel," Appx8, the trial court overlooked that Congress historically has used the terms "reduction in force" and "reduction in personnel" interchangeably in the civil service laws.

In 1966, when Congress recodified 5 U.S.C. § 861(a) (1964) as 5 U.S.C. § 3502(a) (1970), and in the process substituted the term "reduction in force" for the term "reduction in personnel," the legislature did so "without substantive change." *See* Act of Sept. 6, 1966, Pub. L. 89-554, § 1, 80 Stat. 428 (1966) (substituting the term "reduction in force" for "reduction in personnel" in the re-codification of laws related to civilian federal employees in new title 5, United States Code); H.R. Rep. No. 89-901, 89th Cong., 1st Sess. 1 (1965) ("The purpose of this bill is to restate in comprehensive form, without substantive change, the statutes in effect before July 1, 1965, that relate to Government employees, the organization and powers of Federal agencies generally, and administrative procedure, and to enact title 5 of the United States Code."); S. Rep. No. 89-1380, 89th Cong., 1st Sess. 18 (1966) (same); *see also* H.R. Rep. No. 89-901, at 55 ("the words 'reduction in force' are substituted for 'reduction in personnel'"); S. Rep. No. 89-1380, at 74 (same). Indeed, similar to the definition of "force," the Merriam-Webster's dictionary defines "personnel" as "[a] body of persons" that "usu[ally]" are "employed" "in a factory, office, or organization." Personnel, Merriam-Webster's Collegiate Dictionary (9th ed. 1990), Appx70.

The trial court sidestepped our argument about historical use by chiding that it was inconsistent with our argument that the laws governing civilian employees are inapposite. Appx21. We have consistently argued that the laws governing

civilian employees are inapplicable to the military and are inapposite in this case. But our argument about historical use in the civil service laws demonstrates a fallacy in the trial court's reasoning. The trial court could not rely upon the statutes governing civilian employees while simultaneously ignoring what Congress meant by them. For these reasons, Congress' interchangeable use of the terms "reduction in force" and "reduction in personnel" does not alter the plain meaning from the dictionaries that define a military reduction in force as a reduction in military personnel.

b. This Court Has Recognized That Congress Has Not Specified The Circumstances Under Which Reductions In Force May Be Appropriate In The Civilian Sphere

In the civilian sphere, there is a detailed web of statutes and regulations governing reductions in force, which do not apply to the military. *See*, *e.g.*, 5 U.S.C. §§ 3501(b), 3502, 3595, 5361(7), 5362, 7512; 5 C.F.R. part 351. And in the civilian sphere, reductions in force frequently involve a reduction of personnel and positions. But, there is no statute, regulation, or rule, providing that *all* reductions in force must involve a reduction in positions. *See Cross v. Dep't of Transp.*, 127 F.3d 1443, 1447 (Fed. Cir. 1997) ("Congress has not specified the circumstances under which [reductions in force] may be appropriate"). In narrowly construing "a 'reduction in force'" as "the elimination of positions or jobs, not merely the separation of personnel," Appx8, the trial court imposed its

own narrow view of the circumstances under which a reduction in force may be appropriate, when Congress did not express those limitations. This was error.

c. Reductions In Force Are Not Limited To Circumstances With An Elimination Of Jobs In The Civilian Context

The trial court also incorrectly surmised that all reductions in force in the civilian sphere necessarily involve a reduction of positions. Under reduction in force regulations promulgated by the Office of Personnel Management (OPM), 5 C.F.R. § 351.201, a reduction in force may involve a reduction in personnel without a reduction in positions.

For example, as this Court has recognized, furloughs are covered by OPM's reduction in force regulations under 5 C.F.R. § 351.201, *Huber*, 793 F.2d at 286-87, and furloughs do not involve the elimination of a position. 5 U.S.C. § 7511(a)(5) ("'furlough' means the placing of an employee in a temporary status without duties and pay because of lack of work or funds or other nondisciplinary reasons"). OPM's regulations also expressly contemplate targeted "reductions in force in [an] employee's competitive area," 5 C.F.R. § 351.201(a)(2), while agencies may maintain "vacant position[s]." 5 C.F.R. § 351.201(b).

These regulations from the civilian sphere do not apply to enlisted members of the military, but they show that the trial court even misconstrued the term "reduction in force" from the civilian sphere. If this misconstruction were followed in future cases involving civilian employees, it could have consequences

that Congress never intended, such as depriving employees of their reduction in force rights if they are separated or furloughed without an elimination of their vacant position. *See* 5 U.S.C. § 3502; *see also* 5 C.F.R. §§ 351.201, 351.901.

d. The Trial Court Erroneously Relied Upon Precedents Concerning Reductions In Force Involving Civilian Employees

At plaintiffs' urging, the trial court relied upon a line of decisions by this Court in Merit Systems Protection Board (MSPB) appeals. Appx8 (citing *James*, 284 F.3d at 1314; *Huber*, 793 F.2d at 286; *Gandola*, 773 F.2d at 310). In these MSPB appeals, each employee's civilian position had been abolished pursuant to a reduction in force. *James*, 284 F.3d at 1313; *Huber*, 793 F.2d at 285; *Gandola*, 773 F.2d at 310. In the context of resolving these appeals involving civilian positions that were eliminated, the Court described reductions in force as an "administrative *procedure* by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James*, 284 F.3d at 1314 (emphasis supplied). This was not a *statutory* interpretation or a definition; as this Court observed, this was a description of the reduction in force *procedure* established by OPM's *regulations*, 5 C.F.R. §§ 351.201(a)(1), 351.401. *James*, 284 F.3d at 1315 ("OPM has promulgated regulations at 5 C.F.R. part 351 to implement the RIF statutes. *The regulations address* what kinds of actions constitute a RIF and *what procedures must be followed* in determining which

employees will be reassigned during a RIF and which will be separated.") (emphasis supplied). In these MSPB appeals, the Court did not consider, much less decide, whether a reduction in force also may be an administrative procedure by which agencies reduce certain personnel without reducing positions when the OPM regulations *do not apply*, as in the case of military service members.

The Court also had to consider in these appeals whether the MSPB possessed jurisdiction to entertain the appeals in light of 5 U.S.C. §§ 7512 and 7513(d), which grant civilian employees a right to appeal to the MSPB in cases involving enumerated adverse personnel actions (removal, suspension for more than 14 days, reductions in pay or grade, and furlough for 30 days or less), but there is no right to appeal in such cases involving a reduction in force pursuant to 5 U.S.C. § 3502. In contrast, the MSPB possesses jurisdiction to entertain appeals by "an employee who has been furloughed for more than 30 days, separated, or demoted by a reduction in force action." 5 C.F.R. § 351.901.

Against this backdrop, the Court has described a reduction in force "not [as] an adverse personnel action against a particular employee" (such as a removal under 5 U.S.C. § 7512), but instead, as an action "directed solely at a [civilian] position within an agency" (such as a separation due to abolishment of a position in a reduction in force action under 5 C.F.R. § 351.901). *James*, 284 F.3d at 1314; *Huber*, 793 F.2d at 286. The Court was describing reductions in force in the

context of *jurisdictional* issues in those MSPB cases. *See James*, 284 F.3d at 1312 (holding that the MSPB "had jurisdiction over the appeal from her separation.") (emphasis supplied); *Huber*, 793 F.2d at 285 ("Petitioners appeal the decision of the [MSPB] ('Board'), which dismissed petitioners' appeals for lack of jurisdiction. For the reasons that follow, we affirm the decision of the Board."). In contrast, this Court has never described a reduction in force as an action directed at a *military position*, because that would make no sense under the statutory scheme.

Moreover, in *Tippins I*, the trial court misconstrued the Court's decision in *Gandola* as having "made clear that a 'reduction in force' necessarily involves the elimination of positions as a prerequisite." Appx8. *Gandola* does not apply, much less interpret, any Federal statute. Rather, *Gandola* described the two-step process for reductions in force under OPM's regulations, 5 C.F.R. §§ 351.201(a)(1), 351.401. *Gandola*, 773 F.2d at 310 (affirming MSPB decision, explaining: "If the agency proves that the reduction in force regulations were invoked for a legitimate reason and that those regulations were properly applied to the individual employees – as was the case here – the agency action will be sustained."). Specifically, as the Court explained in the civilian context, "[a] reduction in force involves two steps." *Id.* "First, the [civilian] agency determines which positions to abolish." *Id.* (describing the first step of the process, which is governed by 5 C.F.R. § 351.201(a) ("Each agency is responsible for determining

the categories within which positions are required, where they are to be located, and when they are to be filled, abolished, or vacated.”)). “Second, [the civilian agency] selects the people to be eliminated serving in those positions on the basis of their retention standing.” *Id.* (describing the second step of the process, which is governed by 5 C.F.R. § 351.401 (“Each agency shall determine the retention standing of each competing employee on the basis of the factors in this subpart [5 C.F.R. § 351.401 *et seq.*] and in Subpart E of this part [5 C.F.R. §§ 351.501 *et seq.*].”)). The OPM regulations at issue in *Gandola* (and *James* and *Huber*) only apply to civilian employees.

In these MSPB appeals, the Court was describing matters of board jurisdiction and regulatory procedure applicable to civilian employees; it was not defining the term “reduction in force” for purposes of any Federal statute, and certainly not for purposes of a military statute. These MSPB cases do not interpret section 357(j), do not interpret any statute or regulation applicable to the military, do not engage in a plain meaning analysis of “reduction in force,” and do not adopt an all-encompassing definition of “reduction in force” for any purpose. Indeed, the Court has *never* purported to adopt such a definition. It was error for the trial court to graft this Court’s descriptions of OPM regulations onto a military statute.

The trial court also misconstrued two other court of appeals decisions as having interpreted the term “reduction in force” in other Federal statutes. Appx8

(citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990); *Sanders v. Kohler Co.*, 641 F.3d 290, 294 (8th Cir. 2011)). In *Barnes*, the court of appeals considered the appropriate burden of proof for a plaintiff filing suit against a private employer under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. (ADEA). *Barnes*, 896 F.2d at 1464-65. The ADEA does not contain the term "reduction in force" and the court of appeals did not purport to interpret any such term in *Barnes*. Rather, the court of appeals crafted an exception to the normal rules for establishing a *prima facie* case of discrimination under the ADEA in cases of a "work force reduction" by a private employer.[8] *Id.* Defining the contours of this judicially-crafted exception, the court of appeals stated: "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company," and "[a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *Id.* at 1465. But, *Barnes* did not interpret the term "reduction in force" in a statute or consider any statute applicable to military members.

Likewise, in *Sanders*, 641 F.3d at 294, the court of appeals interpreted the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. § 2101 *et*

[8] *Barnes* involved alleged violations of 29 U.S.C. § 623, the ADA provision that applies to certain private employers and state employees, but not to Federal employees. 29 U.S.C. § 630(b) (ADA definition of "employer" "does not include the United States"). A separate provision, 29 U.S.C. § 633a, applies to civilian Federal employees and was not at issue in *Barnes*.

*seq.*, which applies to "business enterprise[s]," and does not apply to Federal employees in the executive branch whether civilian or military. *See* 29 U.S.C. § 2101(a)(1) (WARN Act definition of "employer" means certain "business enterprise[s]"); *but see* 2 U.S.C. § 1315 (extending certain WARN Act provisions to certain legislative branch employees). The WARN Act defines "mass layoff" as "a reduction in force, which" (A) "is not the result of a plant closing," and (B) "results in an employment loss at the single site of employment during any 30-day period for" (i) at least 50 employees and 33 percent of all employees, or (ii) at least 500 employees. 29 U.S.C. § 2101(a)(3). The court of appeals held that these "numerosity thresholds" and the term "reduction in force" could not be "decouple[d]," such that, taken together, in context, a "'reduction in force'" means "a net loss in the underlying productivity of a business, with the numerosity thresholds specifying the extent of the net loss that must result from such a reduction in force to qualify as a 'mass layoff.'" *Sanders*, 641 F.3d at 294. The court of appeals elaborated that "employees who are fired but replaced are not part of a reduction in force and do not count as part of the aggregate number of employee layoffs that must be met to satisfy the numerosity thresholds of § 2101(a)(3)." *Id.* In contrast, Congress did not include any numerosity thresholds in 14 U.S.C. § 357(j) or make the WARN Act applicable to the military.

It was error for the trial court to rely upon judicial statements about different statutory schemes with different provisions that are applicable to private employers when interpreting a military statute. Instead, the trial court should have remained faithful to the dictionary definitions and statutory scheme for military members when ascertaining the plain meaning of "reduction in force" in section 357(j).

## CONCLUSION

For these reasons, we respectfully request that the Court vacate the partial final judgment of the Court of Federal Claims and remand with instructions to enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Martin F. Hockey, Jr.
MARTIN F. HOCKEY, JR.
Deputy Director

/s/ Douglas G. Edelschick
DOUGLAS G. EDELSCHICK
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9303

Attorneys for Defendant-Appellant

Of Counsel:

CDR JARED H. HOOD
Deputy Chief
Office of Claims & Litigation
United States Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, D.C. 20593-7213

April 7, 2023

CERTIFICATE OF COMPLIANCE

I hereby certify that this brief: (1) complies with the type volume limitation of Federal Circuit Rule 32(a); (2) contains 9,212 words, excluding the portions of this response exempted from the type volume limitation by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b); (3) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5); (4) complies with the type style requirements of Federal Rule of Appellate Procedure 32(a)(6); and (5) has been prepared on a computer in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman type style and 14 point size. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system that was used to prepare the response.

/s/ Douglas G. Edelschick

# ADDENDUM

# In the United States Court of Federal Claims

**No. 18-923 C**
**Filed: December 9, 2021**

**TONIA TIPPINS, et al.**

**v.**

**RULE 54(b)**
**JUDGMENT**

**THE UNITED STATES**

Pursuant to the court's Memorandum Opinion and Order, filed July 6, 2021, granting plaintiffs' motion for summary judgment and denying defendant's cross-motion for summary judgment, and Memorandum Opinion and Order, filed December 8, 2021, denying defendant's motion for reconsideration and directing the entry of judgment pursuant to Rule 54(b), there being no just reason for delay,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that the United States Coast Guard shall expeditiously correct the military records of Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner. The Coast Guard shall also award any back pay, allowances, or other benefits to which the named plaintiffs are entitled by law as a result of the corrections.

Lisa L. Reyes
Clerk of Court

By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 18-923C
Filed: July 6, 2021
Corrected: July 13, 2021†

**TONIA TIPPINS, et al.,**

***Plaintiffs,***

**v.**

**THE UNITED STATES,**

***Defendant.***

*Nathan S. Mammen*, with whom were *Ragan Naresh* and *Emily M. Scott*, Kirkland & Ellis LLP, Washington, D.C., for Plaintiffs.

*Douglas G. Edelschick*, Senior Trial Counsel, with whom were *Marin F. Hockey*, Deputy Director, *Robert E. Kirschman, Jr.*, Director, *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *LCDR Justin R. Jolley*, Deputy Chief, and *Brian Judge*, Chief, Office of Claims & Litigation, U.S. Coast Guard, Of Counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**[1]

In this military pay case, several former members of the United States Coast Guard ("USCG" or "Coast Guard") challenge their involuntary retirements as unlawful. Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner (collectively, "Plaintiffs") served as enlisted members of the Coast Guard until their respective separations through Career Retention Screening Panels ("CRSPs"). They bring this action seeking corrective action, back pay and related benefits, reinstatement to active service, and a declaratory judgment that the process used to effectuate their retirement was contrary to law. (Am. Compl. at 17, ECF No. 8).

The question at the heart of this dispute appears simple enough: were the CRSPs lawfully convened as part of a "reduction in force" pursuant to 14 U.S.C. § 357(j)? If they were, the

---

† This corrected Opinion removes the directive to the Clerk to enter judgment in Section III.

[1] This case was originally assigned to Senior Judge Loren Smith. (ECF No. 2). On December 3, 2019, this case was transferred to the undersigned. (ECF No. 33).

United States is entitled to judgment. If not, the Plaintiffs are entitled to some measure of relief. To answer this question, the Court must determine whether the statute is unambiguous and, if it is not, whether the Coast Guard's application is entitled to deference.

The Court finds the statute is unambiguous and agrees with the Plaintiffs' interpretation of "reduction in force." As the Court will explain below, even if the statute were ambiguous, the Secretary's memoranda authorizing the CRSPs under § 357(j) did not interpret the statute, and thus the Coast Guard would not be entitled to deference. Accordingly, Plaintiffs' Motion for Summary Judgment, (Pls.' Mot., ECF No. 62), is granted, and the United States' Cross-Motion for Summary Judgment, (Def.'s Mot., ECF No. 67), is denied. Finally, the Plaintiffs' Motion to Strike is denied as moot.

## I. Background[2]

Plaintiffs are Coast Guard veterans who each honorably served twenty years or more before being forced to retire by CRSPs conducted between 2013 and 2015. (Am. Compl. ¶¶ 7–12; Answer ¶¶ 7–12, ECF No. 9). While serving in the Coast Guard their occupations varied widely and each received numerous awards for their excellent service. (Am. Compl. ¶¶ 7–12).

The CRSPs were first authorized in 2010 when the Secretary of Homeland Security (the "Secretary") affixed his signature to a memorandum sent by the Commandant of the Coast Guard. On August 13, 2010, the Commandant received approval from the Secretary "to conduct an Active Duty Enlisted Career Retention Screening Panel in the fall of 2010." (Pls.' Mot. Ex. 7 at pp. 8–9).[3] The Commandant had advised the Secretary that the panel was "required to address high retention and its adverse impact on workforce flow[,]" citing the tendency of junior enlisted members to request voluntary separations, while senior members remained with the force. (*Id.*). The Commandant warned that "[i]f allowed to continue, this trend . . . will result in an imbalance in the enlisted workforce's experience level for many years to come." (*Id.*).

---

[2] The Court has ordered resolution via summary judgment rather than judgment on the administrative record—the normal means for resolving military pay cases. (Order, ECF No. 22). After detailing the facts relevant to this dispute, the Court will explain why this case proceeds on the path less traveled. Despite the exceptional posture, the United States has filed an Administrative Record containing numerous relevant documents. (AR, ECF No. 58). Although the Court is not conducting a trial on the Administrative Record under RCFC 56.1, the parties stipulated that no material factual issues preclude summary judgment. (Tr. of Oral Arg. at 13–14, 26:13–15, ECF No. 74).

[3] To their Motion for Summary Judgment, Plaintiffs have attached as an exhibit the Administrative Record from *Lippmann v. United States*, 127 Fed. Cl. 238 (2016) (Case No. 15-192, ECF No. 11-1). To avoid confusion between that record and the one the United States has filed in this case, the Court will cite to the PDF pagination as it appears in the Court's blue CM/ECF Bates Stamp in the header of Pls.' MSJ Ex. 7. For example, when referring to the *Lippmann* AR, the Court would cite to the cover page, which simply reads "EXHIBIT 7," as "(Pls.' MSJ Ex. 7 at p. 1)."

Invoking 10 U.S.C. § 1169 and 14 U.S.C. § 357(j), the Secretary authorized CRSPs to review "the records of all first class petty officers and below with twenty or more years of service and all chief petty officers and above with twenty or more years of service and three years or more time in grade." (*Id.*). The first of these statutes, 10 U.S.C. § 1169, in relevant part, simply provides that no regular enlisted member of an armed force may be discharged before his or her term of service expires, except as prescribed by the Secretary. When it was in effect, 14 U.S.C § 357[4] governed the involuntary retirement of enlisted members. It provided, in relevant part:

> (j) When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the [Enlisted Personnel] Board's action.

§ 357(j).

Notably, although it cited § 357(j), the 2010 authorization by the Secretary did not mention a "reduction in force" (often abbreviated as a "RIF"). (Pls.' Mot. Ex. 7 at pp. 8–9; *see also* AR 27 ("Section 357(j) does not define 'reduction in force,' directly or by reference, and the 2010 CRSP avoided that expression in describing the process to the fleet.")). In fact, the Office of Military Personnel, a component of the Coast Guard administrative hierarchy, was messaging to the rank-and-file servicemembers that the 2010 process was "not a RIF and we need to ensure that it is not associated with a RIF." (Pls.' Mot. Ex. 9). This message was part of a strategy to "create flow and provide opportunities to [the Coast Guard's] junior workforce[,]" thus the Coast Guard intended to "design[] and message[]" the CRSPs "as a flow stimulating tool and not a RIF." (Pls.' Mot. Ex. 10). Essentially, the Secretary sought to clear out older members to "accelerate advancement of junior enlisted members" and "reinvigorate accession of recruits[.]" (Pls.' Mot. Ex. 11). "[T]he CRSP was not intended to reduce the overall size of the force." (*Id.*; *see also* Pls.' Mot. Ex. 9 ("Body to billet we are doing fine, but upward mobility and flow continues to be a problem and will pose bigger problems down the road.")).

The Secretary similarly authorized CRSPs in 2011–2014. (AR 27, 53, 86, 128). Interestingly, the memoranda authorizing these CRSPs contain slightly varying language regarding § 357(j) and "reduction(s) in force." The 2011 memorandum stated:

> Under Section 357 (j), the Secretary of Homeland Security must provide authorization for involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." Section 357(j) does not define "reduction in force," directly or by reference, and the 2010 CRSP avoided that expression in describing the process to the fleet. The Assistant Commandant for Human Resources designed CRSP to strategically rebalance the force toward a more upwardly mobile, performance based demographic.

---

[4] Subsection (j) of § 357 was repealed in 2016. Coast Guard Authorization Act of 2015, Pub. L. No. 114-120, § 215, 130 Stat 27, 45–46 (2016).

(AR 27). The 2012 and 2013 memoranda contained the following identical language:

> Under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force," which has specific meanings in other statutory contexts, because title 14 does not define, directly or by reference, "reduction in force."

(AR 53, 86). The 2014 memorandum provided:

> Under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by Enlisted Personnel Boards pursuant to a "reduction in force." In order to avoid creating confusion in the fleet, the CRSP process does not include the term "reduction in force."

(AR 128).

The 2010 and 2011 CRSPs reviewed the records of all retirement-eligible Coast Guard service members at (1) pay grade E-6 and below with at least twenty years of active military service; and (2) at pay grade E-7 and above with at least twenty years of active military service and three or more years of service at their current pay grades. (AR 17, 32). Servicemembers that had been reviewed in the 2010 CRSP were excluded from the 2011 CRSP. (AR 17, 32). The 2012 CRSP utilized the same selection criteria but did not exclude those previously screened and retained by the 2010 and 2011 CRSPs. (AR 57).

The 2013 CRSP reviewed the records of retirement-eligible service members who were either at pay grade E-6 and below with at least 19.5 years of active military service, or at pay grade E-7 and above with at least 19.5 years of active military service and three or more years of service at their current pay grade that had not been reviewed by the CRSP in the two years prior. (AR 89). The 2014 CRSP reviewed all personnel grade "E-7 and above with 19 or more years of active military service who have three or more [years'] time in grade as of 1 June 2014." (AR 131). Those members reviewed in 2012 or 2013 were excluded from 2014 CRSPs. (AR 132).

Communication between selected members and the CRSPs was limited to a written memorandum with a command signature, without attachments, and less than two pages in length. (AR 18, 33–34, 59, 92, 133). Service members selected for involuntary retirement were permitted to appeal only in circumstances of "material error, newly discovered evidence, or the presence of improper documents" in the member's personnel file. (AR 19, 34, 59, 92, 133).

From 2010 to 2014, the Coast Guard selected a total of 832 service members for involuntary retirement. (Pls.' Mot. Ex. 12 at 8). At the end of fiscal year 2014, "the number of actual enlisted service members (31,126) had dropped to more than 1,000 below the authorized number of enlisted billets (32,368)." (*Id*. at 9). Accordingly, "the Coast Guard decided that it was not necessary to hold another CRSP in 2015." (*Id*. (citing AR 164–65)). Throughout this multi-year process, the Coast Guard "generally did not eliminate the billets that were occupied by the enlisted service members in higher grades (E-7 and above) who were selected for involuntary retirement" but did reduce numbers of enlisted billets for grades E-6 and below. (*Id*. at 9–10).

Notably, the Coast Guard did not eliminate the billets Plaintiffs held prior to their involuntary retirement. (Pls.' Mot. Ex. 8 at 7–8). From 2009 to the end of 2015, the Coast Guard reduced its total number of authorized enlisted billets from 33,550 to 31,990, with each year logging a decline from the previous year. (Pls.' Mot. Ex. 12 at 7–10).

In July 2018, three plaintiffs brought this action on behalf of themselves and a class of service members retired using the 2012–2014 CRSPs. (Compl., ECF No. 1). Several months later, Plaintiffs filed an Amended Complaint, adding three additional service members. (Am. Compl. at 1). Plaintiffs never sought to certify a class under RCFC 23.

In July 2019, the Court determined that this action should proceed on motions for summary judgment under RCFC 56 rather than motions for judgment on the Administrative Record under RCFC 52.1(b). (Order, ECF No. 22); *supra* n.1. The Court reasoned that because Plaintiffs were "challenging the legality of the CRSPs for the first time, and neither the Coast Guard nor a military corrections board has considered this issue, there is no appropriate administrative record for the Court to review" and thus *de novo* review is the appropriate standard. (*Id*. (citing *Lippmann*, 127 Fed. Cl. 238)).[5] Thereafter, the Court permitted limited discovery regarding the Coast Guard's interpretation of "reduction in force" in the context of 14 U.S.C. § 357(j). (Disc. Opinion at 6–7, ECF No. 52).

That limited discovery period now being closed, the parties submit the case on cross-motions for summary judgment. The United States attached an appendix to its Cross-Motion, (Def.'s Appendix ("DA"), ECF No. 67-1), which contains a "Declaration of Captain Christopher P. Calhoun" who served as Chief in the Office of Military Personnel and authored several of the messaging emails described above. (DA 61–63). Plaintiffs, in their Reply and Opposition, move to strike this document. (Pls.' Reply at 14, ECF No. 69). The Court will address those issues in turn.

## II. Analysis

The parties present the Court with a "*Chevron*" issue. In *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Supreme Court held that when a court reviews an agency's construction of a statute the agency administers, the court must answer two questions. First, the reviewing court must determine whether Congress has spoken to the precise question at issue—that is, whether the statute is ambiguous or unambiguous. *Id*. at 843. If Congress has clearly spoken—i.e., the court determines that the statute is unambiguous—the Court must give effect to Congress's plain words expressing its intent. *Id*. If Congress has not clearly spoken—i.e., the Court finds that the statute is ambiguous—the Court looks to the agency's interpretation and asks whether that interpretation is reasonable. *Id*. If the agency's interpretation is reasonable, the Court must afford the deference to the agency's construction. *Id*.

---

[5] Although the United States believes this case should have proceeded to judgment on the Administrative Record rather than summary judgment, because there are no disputed issues of material fact, the United States now acknowledges it no longer matters. (Tr. of Oral Arg. at 29–31).

at 844. But if the agency has not offered an administrative interpretation of the statute, then the Court must "impose its own construction on the statute[.]" *Chevron*, 467 U.S. at 843.

Here, the Court concludes that § 357(j) is unambiguous: a "reduction in force" is the elimination of positions or jobs, not merely the separation of personnel. The Court's conclusion differs from the interpretation the Coast Guard offers in its briefs. But the Court owes no deference to that interpretation because it is merely the Coast Guard's convenient litigating position, not based on any meaningful agency interpretive process. Therefore, even if the Court were to determine that § 357(j) was ambiguous, then the Court would be required to "impose its own construction on the statute[.]" That construction would lead the Court to the same conclusion: the Coast Guard's involuntary retirement of Plaintiffs through CRSPs was not part of a "reduction in force" under § 357(j) and thus was contrary to law.

The parties agree that there are no genuinely disputed issues of material fact. (Tr. of Oral Arg. at 26:13–15). And statutory interpretation is purely a matter of law. *Deutsche Bank AG v. United States*, 742 F.3d 1378, 1381 (Fed. Cir. 2014). Therefore, under RCFC 56 and for the reasons that follow, Plaintiffs are entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*A. 14 U.S.C. § 357(j) is unambiguous.*

As an initial matter, it is helpful to orient Subsection (j) and the phrase at issue within the context of the entire statute. Title 14 Section 357 of the U.S. Code governed the involuntary retirement of Coast Guard members until its repeal in 2016. *Supra* n.4. Section 357(a) provided that "Enlisted Personnel Boards shall be convened as the Commandant may prescribe to review the records of enlisted members who have twenty or more years of active military service." Subsection (b) prescribed two instances where an Enlisted Personnel Board could review enlisted members and recommend their involuntary retirement to the Commandant: (1) the servicemember's performance was unsatisfactory; or (2) professional dereliction. § 357(b). Subsections (c)–(h) described the procedure for that review process, the makeup of the review Board, procedure for appeal, timing of separation, and entitlement to retired pay. Subsection (i) described the retired pay increase owed upon separation to enlisted members cited for extraordinary heroism in the line of duty. Finally, Subsection (j) announced an exception to the statute's otherwise detailed procedures for involuntary retirements: "[w]hen the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action." § 357(j).

There is no dispute that the CRSPs were not Enlisted Personnel Boards formed under 14 U.S.C. § 357(a)–(g). (Def.'s Mot. at 2). Therefore, Plaintiffs' involuntary retirements through the CRSPs were only lawful if they were part of a "reduction in force" ordered by the Secretary of Homeland Security under § 357(j). This case turns on the meaning of those three words.

The United States argues that Congress intended to assign "reduction in force" a "flexible" definition depending on the circumstances in which § 357(j) was invoked, and the phrase can therefore be read to mean "a reduction in personnel, a reduction in positions, or both." (Def.'s Mot. at 12). Plaintiffs counter that "reduction in force" has a clear meaning: "a reduction in the size of the force—that is, the elimination of positions or jobs—not termination of

individual members or employees." (Pls.' Reply at 5). The Court agrees with Plaintiffs and holds that a "reduction in force" is the elimination of positions or jobs, not merely the separation of personnel.

"In determining the meaning of a statutory provision, [courts must] look first to its language, giving the words used their ordinary meaning." *Artis v. D.C.*, __ U.S. __, 138 S. Ct. 594, 603 (2018) (internal quotations omitted). "[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1335 (Fed. Cir. 2017) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (internal quotation marks omitted)). Although interpretation of the "reduction in force" clause in § 357(j) is an issue of first impression, the Federal Circuit has defined "reduction in force" in other circumstances. In the context of civil service employees, "[a reduction in force] is an administrative procedure by which agencies *eliminate jobs* and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002) (emphasis added). "A RIF is not an adverse action against a particular employee, but *is directed solely at a position within an agency*." *Id*. (emphasis added); *see also Huber v. Merit Sys. Prot. Bd.*, 793 F.2d 284, 286 (Fed. Cir. 1986). The Federal Circuit has made clear that a "reduction in force" necessarily involves the elimination of positions as a prerequisite. *Gandola v. F.T.C.*, 773 F.2d 308, 310 (Fed. Cir. 1985) ("A reduction in force involves two steps. First, the agency determines which positions to abolish. Second, it selects the people to be eliminated serving in those positions on the basis of their retention standing."). And while the elimination of positions indubitably might involve the separation of personnel who occupy those eliminated positions, the agency cannot target specific personnel and then decide to eliminate their positions under the guise of a reduction in force. *Id*. at 312. ("A reduction in force may not be used as a disguised adverse action to remove or demote a particular employee."); *Huber*, 793 F.2d at 286 ("A RIF is an administrative procedure by which agencies eliminate jobs and account for employees who occupied abolished positions.").

Other Courts have interpreted "reduction in force," albeit in the context of statutes governing civilian workforce protections. In *Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir. 1990), the court considered an age discrimination case brought under the Age Discrimination in Employment Act. There, the court interpreted "reduction in force" to mean the "elimin[ation] of one or more positions[,]" not a situation where the employee "is replaced after his or her discharge." *Id*. at 1465. Critically, the *Barnes* court clarified that "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id*. Therefore, a reduction in force can occur where the employer eliminates positions and redistributes responsibilities to remaining employees without replacing the eliminated personnel. *Id*. ("A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."); *see also Sanders v. Kohler Co.*, 641 F.3d 290, 294 (8th Cir. 2011) ("When a company fires one worker and replaces him with another, there is no net loss in the number of employees and no 'reduction in force' as the term is commonly understood.").

In support of its position that Congress intended to assign a flexible definition to the phrase "reduction in force," the United States cites *Cross v. Dep't of Transp.*, 127 F.3d 1443 (Fed. Cir. 1997), *Nat'l Fed'n of Fed. Emps., Loc. 1442 v. Dep't of the Army*, 810 F.3d 1272 (Fed.

Cir. 2015) ("*NFFE, Local 1442*") and *Welch v. Dep't of Army*, 323 F.3d 1042 (Fed. Cir. 2003). However, those cases do not support the broad definition the United States urges the Court to adopt.

In *Cross*, the Federal Circuit examined employment actions surrounding Congress' dissolution of the Interstate Commerce Commission ("ICC"). *Cross*, 127 F.3d at 1445. The ICC was abolished by an act of Congress in 1996 and many of its functions were absorbed by its successor agency, the Surface Transportation Board ("STB"), as well as the Federal Highway Administration within the Department of Transportation. *Id*. In the summer of 1995, while Congress was debating legislation to abolish the ICC, officials within that agency began discussing which functions and positions would be transferred to the STB and the Federal Highway Administration. *Id*. Later the same year, the ICC began to notify employees that the agency would conduct a reduction in force, during which employees "identified as holding positions within the identified functions" would be transferred out of the ICC and into the appropriate agency (STB or the Federal Highway Administration) while those without a surviving function would be separated. *Id*. at 1446. Even before the RIF was announced, it was obvious that all positions within the ICC were to be eliminated, but the *Cross* plaintiffs challenged the RIF on the grounds that, until the law abolishing the ICC was enacted, there was no "lack of funding" that justified the RIF. *Id*. However, the Federal Circuit disagreed, holding that a RIF conducted pursuant to an anticipated shortage of funding was lawful. *Cross*, 127 F.3d at 1447. *Cross* is largely inapplicable to this case, but in recognizing an agency's discretion to conduct a RIF, the Circuit cited *Grier v. Department of Health and Human Servs.*, 750 F.2d 944, 945–46 (Fed. Cir. 1984). Significantly, the *Cross* court summarized its understanding of *Grier*'s holding in a parenthetical: "*a RIF* is not aimed at removing particular individuals, but *is directed solely at positions*." *Cross*, 127 F.3d at 1447 (emphasis added). The Circuit's interpretation of its own case law, focusing on positions rather than individuals, supports Plaintiffs' reading of 14 U.S.C. § 357(j) and contradicts the definition offered by the United States.

The United States cites *NFFE, Local 1442* for the proposition that "a reduction in force may involve a reduction in personnel without a reduction in positions, if, for example, an agency furloughs personnel, or, as in this case, the military needs to ensure the proper functioning of the workforce by reducing personnel without reducing positions[.]" (Def.'s Mot. at 13 (citing *NFFE, Local 1442*, 810 F.3d 1272)). However, *NFFE, Local 1442* does not support that proposition and did not involve or interpret a statutory "reduction in force." In *NFFE, Local 1442*, the plaintiff, a federal workers union comprised of civilian employees at the Letterkenny Army Depot, appealed the workers' six-day furloughs. *NFFE, Local 1442*, 810 F.3d at 1273. "The furloughs were the result of an automatic process of federal agency spending reductions known as 'sequestration.'" *Id*. The furloughs were conducted pursuant to Title 5, chapter 75 of the U.S. Code, which pertains to the organization of the Federal Government and its employees. 5 U.S.C. § 7501 *et seq*.; *see also NFFE, Local 1442*, 810 F.3.d at 1277 (discussing various provisions of that title applicable to adverse actions against unionized employees). The unionized workers challenged the adverse action against them under § 7512, which *specifically* "does not apply to . . . a reduction-in-force action[.]" 5 U.S.C. § 7512. *NFFE, Local 1442* simply has no application to this case.

In *Welch*, the plaintiff, an Army Corps of Engineers employee, appealed his involuntary separation from the Corps through a single-position RIF. *Welch*, 323 F.3d at 1044. John Welch,

the plaintiff, was one of five Information Management Officers within the Corps district area. *Id*. One of those positions was GS-14, while the rest (including Welch's) were GS-13. *Id*. After conducting a "consistency review," the Corps recommended that Welch report to the Deputy Commander, rather than to a Special Assistant. *Id*. After his realignment, the Corps adopted a new position description for the district's GS-14 Information Management Officer and announced a vacancy for which Welch applied and was not selected. *Welch*, 323 F.3d at 1044. Afterward, the Corps conducted a RIF and eliminated his GS-13 position, then reassigned Welch to a GS-12 position with a different title. *Id*. Welch appealed to the Merit Systems Protections Board and his claim was denied. *Id*. The Circuit upheld that denial, observing that "[a]lthough a reduction-in-force frequently involves a reduction in the number of employees, it need not do so. *If a position is eliminated* for a proper managerial reason, *that will justify a reduction-in-force*." *Id*. at 1046 (emphasis added). Importantly, in *Welch*, the agency *eliminated positions* as part of the reduction in force.

As the Plaintiffs point out, *Welch* does not support the United States' flexible reading of "reduction in force" because the holding in *Welch* relied on the agency's elimination of positions. Here, the vacated positions were not eliminated, but rather opened to promote junior servicemembers. As the United States admitted, "[w]hen the Secretary of Homeland Security ordered reductions in force in [2010–2014], . . . the Secretary did not separately and specifically order the elimination of particular billets (or positions) in the Coast Guard." (Pls.' Mot. Ex. 12 (Interrogatory Responses) at 11). And Plaintiffs' positions (or "billets") were not eliminated after Plaintiffs were involuntarily retired. (Def.'s Admissions, Pls.' Mot. Ex. 8 at 7–8). As the Sixth Circuit articulated in *Barnes*, "[a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *Barnes*, 896 F.2d at 1465.

Moreover, the Coast Guard's public messaging campaign around the CRSPs sharply undercuts the United States' argument that the involuntary retirements were actually a reduction in force. Under orders from the Assistant Commandant for Human Resources (Rear Admiral Neptun), Captain Calhoun—the Chief of Military Personnel—made clear that he understood the CRSPs were "not a RIF and [the Coast Guard] need[ed] to ensure that [the CRSPs were] not associated with a RIF." (Tr. of Oral Arg. at 39:6–23; Pls.' Mot. Ex. 9).[6] This messaging campaign reflected the reality that if the Coast Guard described the CRSPs as part of a RIF, it would have been misleading "because the CRSP was not intended to reduce the overall size of the force." (Pls.' Mot. Ex. 11). The Coast Guard has since admitted that it never informed its members that it considered the CRSPs to be part of a reduction in force. (Def.'s Admissions at 6–7).

Finally, the United States argues that review of Coast Guard personnel actions is beyond the Court's purview. (Def.'s Mot. at 13–14) (arguing that "Congress did not establish any 'test or standard' that would constrain the Secretary's exercise of military discretion[,]" thus the Court

---

[6] On January 28, 2021, Captain Calhoun signed an affidavit declaring that his email exchanges included as Plaintiffs' Exhibits 9–11 & 14 reflected a "communications strategy," that he did not have legal or policymaking authority. (DA 61–63). That is the context in which the Court places Captain Calhoun's contemporaneous emails, and his current statements prepared for the purposes of this litigation do not contradict his previous statements.

must abstain from judicial review). The United States appears to base this argument on the "necessary and appropriate" clause of the Coast Guard's authorizing statute: "For the purpose of executing the duties and functions of the Coast Guard the Secretary may within the limits of appropriations . . . do any and all things necessary to carry out the purposes of this title." 14 U.S.C. § 501(h).

This argument lacks merit. First, "[t]he very function of the courts is to apply statutes and necessarily to interpret and explain them." *Texas State Com'n for the Blind v. United States*, 796 F.2d 400, 417 (Fed. Cir. 1986). Second, "a 'necessary or appropriate' provision in an agency's authorizing statute does not necessarily empower the agency to pursue rulemaking that is not otherwise authorized." *New York Stock Exch. LLC v. Sec. & Exch. Comm'n*, 962 F.3d 541, 556 (D.C. Cir. 2020); *see also Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015) (explaining that an "appropriate and necessary" clause is not a blank check for agency action).

The United States also cites *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993) ("We have emphasized that judicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct.") and *Allphin v. United States*, 758 F.3d 1336, 1341 (Fed. Cir. 2014). (Def.'s Mot. at 13–14). That quote from *Murphy* lacks context and refers to whether courts should reweigh the evidence presented to a military corrections board. It does not impose a limit on this Court's role as arbiter and interpreter of federal statutes. *Marbury v. Madison*, 1 Cranch 137, 177, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of [the courts] to say what the law is."); *see also Martin v. Creasy*, 360 U.S. 219, 228 (1959) (Douglas, J. dissenting) (Federal courts have a "responsibility in cases properly before them under heads of jurisdiction prescribed by Congress to construe federal statutes and the Federal Constitution."); 28 U.S.C. § 1491 (The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon . . . any Act of Congress . . ..").

Likewise, *Allphin* does not support the United States' argument. *Allphin* involved a similar factual scenario, where Navy servicemembers were separated using Enlisted Retention Boards. 758 F.3d 1336. However, those Boards were constituted by the Secretary of the Navy under 10 U.S.C. § 1169. *Allphin*, 758 F.3d at 1340–41. That statute is much simpler and broader than the one at issue in this case. That section provides:

> No regular enlisted member of an armed force may be discharged before his term of service expires, except--
>
> **(1)** as prescribed by the Secretary concerned;
>
> **(2)** by sentence of a general or special court martial; or
>
> **(3)** as otherwise provided by law.

10 U.S.C § 1169. The Navy used this statute to separate approximately 3,000 sailors from positions that were "overmanned" due to "record high retention in the [2011] economic environment." *Allphin*, 758 F.3d 1340. Positions that were not overmanned were published, and sailors were permitted to apply "as a contingency in case they were selected to be discharged." *Id*. The Federal Circuit held that the Enlisted Retention Boards were properly constituted under

§ 1169, and merits review of the separations was a nonjusticiable personnel decision committed to the discretion of the Navy. *Id*. at 1341–43. Those holdings do not apply to this case, and *Allphin* did not grapple with 14 U.S.C. § 357 nor did it mention a "reduction in force." Therefore, *Allphin* is inapplicable and does not support the United States' urged construction of § 357(j).

It is the Court's role to interpret § 357, if possible, using the plain language of the statute. As stated above, a "reduction in force" involves the elimination of positions or jobs and not merely the separation of personnel. Those words in § 357(j) are plain and unambiguous, and the Court assigns a definition that has been embraced by numerous federal appellate courts. In making this determination, the Court offers no opinion regarding the Coast Guard's policy objectives in shaping its force. That is a matter fittingly within the expertise of the Commandant and the Secretary.

*B. Even if the Court were to find that 14 U.S.C. § 357(j) is ambiguous, the Coast Guard has not offered an interpretation of the statute that is entitled to* Chevron *deference.*

As explained above, the phrase "reduction in force" is unambiguous and the Court affords those words their plain and ordinary meaning—the same meaning ascribed to them by the Federal Circuit and other U.S. Courts of Appeals. However, in finding § 357(j) unambiguous, the Court has sidestepped what is known as "*Chevron* step-zero"—that is, whether the Court would even need to conduct the full two-step *Chevron* analysis or whether the Court should proceed directly to an interpretation of the statute.

Plaintiffs argue that the Coast Guard described the CRSPs as a "reduction in force" only when the legality of the involuntary retirements was challenged. (Pls.' Mot. at 16–17). Plaintiffs continue that Congress did not authorize the Secretary to define "reduction in force," but even if Congress did, the Secretary never attempted to interpret that phrase in a manner that warrants *Chevron* deference. (Pls.' Reply at 2–3). The United States argues that Congress did authorize the Secretary to define "reduction in force" and the Secretary did so through the CRSP authorization memoranda, which warrant *Chevron* deference. (Def.'s Reply at 2–7, ECF No. 70). The Court agrees with the Plaintiffs on two fronts: (1) the Secretary did not interpret "reduction in force" using the tools that would afford that interpretation *Chevron* deference; and (2) the United States' litigating position is not entitled to *Chevron* deference.

In *Chevron*, the Supreme Court acknowledged that, upon judicial review, courts might find the record devoid of the agency's administrative interpretation of the statute at issue. *Chevron*, 467 U.S. at 843 ("If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, *as would be necessary in the absence of an administrative interpretation*.") (emphasis added). In *United States v. Mead Corp.*, the Supreme Court fleshed out that acknowledgment, holding that:

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the

> agency interpretation claiming deference was promulgated in the exercise of that authority.

*Mead*, 533 U.S. 218, 226–27 (2001). "Delegation of such authority may be shown in a variety of ways," the Supreme Court explained, such "as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Id*. at 227. Thus, *Mead* provided a "safe-harbor" of *Chevron* deference for agency interpretations conducted through formal rulemaking or adjudication, as well as informal notice-and-comment rulemaking. *Id*.

But sometimes informal agency actions are entitled to *Chevron* deference. *Id*. at 219 ("[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they may influence courts facing questions the agencies have already answered."). The *Mead* court, quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), clarified that instances in which courts should defer to informal agency action are context specific. *Mead*, 533 U.S. at 219 ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.") (internal quotations omitted). Thus, the instances in which courts should defer to less-formal interpretative acts remain murky. *See Barnhart v. Walton*, 535 U.S. 212, 222 (2002) ("[W]hether a court should give such deference depends in significant part upon the interpretive method used and the nature of the question at issue.").

The Supreme Court has recently expounded on and limited the various doctrines of agency deference. In *Kisor v. Wilkie*,[7] the court explained that lower courts "must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Kisor*, __ U.S. __, 139 S. Ct. 2400, 2416 (2019). The court clarified that, to receive deference, the "interpretation must be one actually made by the agency. In other words, it must be the agency's 'authoritative' or 'official position,' rather than any more *ad hoc* statement not reflecting the agency's views." *Id.* at 2416. Elaborating, the court recognized that "the requirement of 'authoritative' action must recognize a reality of bureaucratic life: Not everything the agency does comes from, or is even in the name of, the Secretary or his chief advisers." *Id*. at 2416. As an example, the court pointed to "'official staff memoranda' that were 'published in the Federal Register,' even though never approved by the agency head" as the type of document that should receive deference. *Id*. (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980)). However, the Court did not demarcate boundaries of administrative interpretation, but merely offered a minimum standard: "[t]he interpretation must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context. . . . If the interpretation does not do so, a court may not defer." *Id*. at 2416–17,

[7] In *Kisor*, the Supreme Court examined whether the character and context of an agency's interpretation of its own *regulations* entitles that interpretation to controlling weight whereas here, the agency interprets a statute. However, the Court made clear that the Chevron step-zero analysis involved an "analogous though not identical inquiry[.]" *Kisor*, 139 S. Ct. at 2416.

2421 ("Remember that a court may defer to only an agency's authoritative and considered judgments.").

Here, there is no evidence of a "considered judgment" by the Coast Guard, and the character of the memoranda establishing the CRSPs is conclusory, not interpretative. When prodded for evidence of interpretive agency analysis, the United States pointed only to the memoranda from the Commandant to the Secretary authorizing the CRSPs:

> **The Court:** What sentence can you point to—I mean, I think we're supposed to be . . . somewhat vigilant about looking for an analysis of agencies and not just agencies saying, well, this is what it is. What sentence in that paragraph provides an analysis?
>
> **[The United States]:** Your Honor, it is relatively conclusory, I'll grant you that. But there is an interpretation that under 357(j) –
>
> **The Court:** I've got that one highlighted myself. So "under Section 357(j), the Secretary of Homeland Security may authorize involuntary retirements without action by enlisted personnel boards pursuant to a reduction in force." That's a restatement of the statute, right?
>
> **[The United States]:** Well, it's—it comes in conjunction with the sentence that came two sentences before it that says the legal authority to conduct the CRSP panel derives from 357(j).
>
> **The Court:** So is that an analysis? That's just a conclusion. . . .
>
> **[The United States]:** Well, it's an interpretation.

(Tr. of Oral Arg. at 41–42). The United States has not provided the Court with any document other than the CRSP memoranda that purports to interpret the statute.

Despite the United States' urgings, the Coast Guard memoranda are not an interpretation. In *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) the Supreme Court explains that an agency does not receive deference by merely offering conclusory statements. There, the Supreme Court examined whether to apply *Chevron* deference to the Department of Labor's ("DOL") interpretation of the term "salesman" as it appeared in the Fair Labor Standards Act ("FLSA"). From 1970 to 2011, the DOL reversed course twice on whether "service advisors" qualified as "salesmen," and attempted to amend its definition accordingly. *Id*. at 2121–24. But when DOL's 2011 rule was challenged, the Supreme Court found the interpretative explanation lacking: "the [DOL] said almost nothing. It stated only that it would not treat service advisors as exempt [from the FLSA] because 'the statute does not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met.'" *Id*. at 2127. Recognizing that an agency could justify its policy choices by explaining how that policy is consistent with the statute, the Supreme Court noted that the DOL "did not analyze or explain why the statute should be interpreted" consistently with its policy choices. *Id*. In fact, the DOL "gave almost no reasons at all." *Id*. Therefore, the Court declined to

afford deference to the 2011 regulation in interpreting the FLSA, holding that "the [agency's] conclusory statements [did] not suffice to explain its decision." *Id*.

Here, like the agency in *Encino Motorcars*, the Coast Guard has not explained how § 357(j) should be interpreted to permit the policy it seeks to implement. The memoranda authorizing the CRSPs are scant, merely restating the language of the statute. The 2010 memorandum even fails to do that. (Pls.' Mot. Ex. 7 at pp. 8–9; *see also* AR 27). Each memorandum, which the Coast Guard issued annually, is approximately a page-and-a-half long and contains no legal analysis. (AR 27, 53, 86, 128). The memoranda cite the statute but provide no meaningful interpretative analysis of "reduction in force," how it has been previously understood by the Coast Guard or other agencies, how the phrases are used in other statutes, or how the phrase has been interpreted by federal courts and other adjudicative bodies in other contexts. The Administrative Record lacks any indicia of considered interpretive analysis from the Coast Guard, much less the Department of Homeland Security. Like the DOL in *Encino Motorcars*, the Coast Guard offered no explanation at all as to how involuntary separations using CRSPs were a reduction in force permitted under § 357(j). The Commandant's conclusory statements are insufficient to warrant deference.

The United States argues that the military's statutory interpretations are always afforded *Chevron* deference. (Def.'s Reply at 4–5 (citing *Favreau v. United States*, 317 F.3d 1346 (Fed. Cir. 2002) (*per curiam*) and *Small v. United States*, 158 F.3d 576 (Fed. Cir. 1998), *amended on reh'g in part,* 180 F.3d 1343 (Fed. Cir. 1999)). *Favreau* confirms that Congress has given the military "explicit authority to adopt interpretive regulations[.]" *Favreau*, 317 F.3d at 1358. That truism is not at issue here. In *Favreau*, the court examined "whether only those who request separation *voluntarily* come to the end of their enlistment" for the purposes of a bonus recoupment provision. *Id*. (emphasis added). The court was presented with a litany of record evidence interpreting the relevant statute, including military regulations, directives and official orders, memoranda relating to bonus recoupment, the agency's financial regulations, and examples of actual agency practice, "all knit together by the affidavit of [a Colonel]." *Id*. The court explicitly stated that it was relying on the entire package to discern the agency's interpretation of the statute. *Id*. ("It is only by considering this package that one could discern the relevant unifying interpretation[.]"). *Favreau* provides useful background for how the military might lawfully interpret a statute, but it does not support the United States' position here where the Coast Guard did not analyze the statute.

Seeking further support for its automatic deference argument, the United States cites *Small v. United States*, 158 F.3d 576 (Fed. Cir. 1998), *amended on reh'g in part,* 180 F.3d 1343 (Fed. Cir. 1999). *Small* was decided by the Federal Circuit more than two years before the Supreme Court issued its decision in *Mead*, and contains no discussion of the *Chevron* step-zero issues *Mead* highlighted. Furthermore, *Small* does not analyze the question presented in this case—that is, whether the Coast Guard offered an interpretation of the statute at issue.

The United States catalogs several cases from the Court of Federal Claims, which it believes support its automatic deference argument. (Def.'s Reply at 5). However, the cases cited do not involve *Chevron* step-zero analysis, and/or the military's interpretative process is far more extensive than the Coast Guard's conclusory memoranda in this case. *Martin v. United States*, 133 Fed. Cl. 248 (2017) (*Chevron* deference warranted where term at issue was explicitly

defined by three Department of Defense documents); *Towne v. United States*, 106 Fed. Cl. 704 (2012) (the term at issue was explicitly defined by statute *and* by internal DoD memorandum; *Chevron* deference awarded); *Miller v. United States*, 58 Fed. Cl. 540 (2003) (finding the statute was unambiguous and supported the United States' interpretation, but even if ambiguous, *Chevron* deference was warranted where DoD issued a memorandum explaining DoD's construction of the statute). In any event, these cases do not bind this Court. *W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court.").

Here, the Court is left with only the Commandant's short, conclusory memoranda authorizing the CRSPs. Because the Commandant's memoranda are devoid of any analysis suggesting they represent the Coast Guard's "authoritative and considered judgments," the Court does not owe those memoranda *Chevron* deference. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (listing situations in which deference is unwarranted, including "when there is reason to suspect that the agency's interpretation *does not reflect the agency's fair and considered judgment* on the matter in question . . . when the agency's interpretation conflicts with a prior interpretation, . . . or *when it appears that the interpretation is nothing more than a convenient litigating position* . . . or *a post hoc rationalization advanced by an agency seeking to defend past agency action against attack*[.]") (cleaned up) (emphasis added). Likewise, the Court does not owe deference to the definition of "reduction in force" that the United States advances for the first time in its briefs, as that definition appears to be merely a convenient litigation position.

Therefore, even if § 357(j) were ambiguous, the Court would be required to "impose its own construction on the statute" because the Coast Guard failed to offer an interpretation that warrants deference. *Chevron*, 467 U.S. at 843. The Court completed that task in Section II(A) above, determining that "reduction in force" means the elimination of positions or jobs, not merely separation of personnel. That analysis is supported by substantial case law and need not be repeated.

*C. Plaintiffs' Motion to Strike is denied.*

Finally, as noted above (*supra* n.6), the United States attached an affidavit of a Coast Guard official to its Motion for Summary Judgment. (DA 61–63). In that affidavit, Captain Calhoun addressed emails discussing the CRSPs that were included in the Administrative Record and Plaintiffs' Exhibits. Plaintiffs now move to strike Capt. Calhoun's declaration. (Pls.' Reply at 15). Capt. Calhoun's past and present statements merely indicate that the Coast Guard's current legal strategy differs from its then-offered communication strategy. The Court does not rely on the truth of either Capt. Calhoun's past or present statements for its own legal analysis in this Opinion. In any event, the Court's decision on the merits renders the issue moot. Therefore, Plaintiffs' Motion to Strike is denied.

## III. Conclusion

The phrase "reduction in force" within 14 U.S.C. § 357(j) is unambiguous. A reduction in force involves the elimination of positions or jobs, not merely separation of personnel. But even if that phrase were ambiguous, the Court would define it as stated, and would not be required to

defer to any Coast Guard definition as the Coast Guard did not interpret the statute in a manner that would entitle its interpretation to *Chevron* deference. Finally, the Court need not address whether to strike Captain Calhoun's affidavit because that issue is mooted by a decision on the merits that does not rely on Capt. Calhoun for its legal analysis.

In summary:

(1) Plaintiffs' Motion for Summary Judgment (ECF No. 62), is **GRANTED**.

(2) Plaintiffs' Motion to Strike is **DENIED AS MOOT**.

(3) The United States' Cross-Motion for Summary Judgment (ECF No. 67), is **DENIED**.

(4) On or before July 20, 2021, the parties shall file a joint status report proposing appropriate next steps consistent with this Opinion, including remedies, and a schedule for post-judgment proceedings should they be necessary.

**IT IS SO ORDERED.**

s/ David A. Tapp
DAVID A. TAPP, Judge

# In the United States Court of Federal Claims

No. 18-923C
Filed: December 8, 2021

**TONIA TIPPINS, et al.,**

***Plaintiffs*,**

**v.**

**THE UNITED STATES,**

***Defendant*.**

*Nathan S. Mammen*, with whom were *Ragan Naresh* and *Emily M. Scott*, Kirkland & Ellis LLP, Washington, D.C., for Plaintiffs.

*Douglas G. Edelschick*, Senior Trial Counsel, with whom were *Marin F. Hockey*, Deputy Director, *Robert E. Kirschman, Jr.*, Director, *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *LCDR Justin R. Jolley*, Deputy Chief, and *Brian Judge*, Chief, Office of Claims & Litigation, U.S. Coast Guard, Of Counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Before the Court is the United States' Motion for Reconsideration, as well as competing memoranda regarding the scope of relief should reconsideration be denied. (Def.'s Mot. to Recons., ECF No. 84). In its bid for reconsideration, the United States challenges portions of the Court's July 13, 2021 Opinion granting summary judgment to Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner (collectively "Plaintiffs"). *See generally*, *Tippins v. United States*, 154 Fed. Cl. 373 (2021) (docketed at ECF 75). Notably, the United States does not request that the Court reconsider its alternate finding that even if 14 U.S.C. § 357 was ambiguous, the Coast Guard has not offered an interpretation of the statute which is entitled to *Chevron* deference. (Def.'s Mot. to Recons. at 20 n.3).[1] The Court first addresses the Motion for Reconsideration.

[1] (*See also* Tr. of Oral Arg. at 41–42, ECF No. 74; Tr. of Hearing on Mot. to Recons. at 19:4–12, ECF No. 89.)

## I. The United States' Motion for Reconsideration

There are two statutes at issue in this case. The first, 10 U.S.C. § 1169, protects honorably serving enlisted members of the armed forces. That statute provides simply that regular enlisted members of an armed force may not be discharged before their term of service expires, except as prescribed by the secretary leading the relevant armed force—in this case, the Secretary of Homeland Security (the "Secretary"). The second operative statute, which is specific to the United States Coast Guard, provides in part that "[w]hen the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the [Enlisted Personnel] Board's action." 14 U.S.C. § 357(j). Enlisted Personnel Board actions involve performance issues of individual service members and are not at issue here.[2] This statutory structure safeguards the service of enlisted members of the Coast Guard. Except in individual cases brought before an Enlisted Personnel Board, enlisted Coast Guard personnel cannot be involuntarily discharged except pursuant to a reduction in force ("RIF") ordered by the Secretary. This statutory structure frames Plaintiffs' claim.

Beginning in 2010 and continuing through 2014, the Secretary authorized the Coast Guard to utilize a newly crafted mechanism entitled Career Retention Screening Panels ("CRSPs"). (*See, e.g.*, Pls.' MSJ Ex. 7 at p. 8–9, ECF No. 62-7).[3] The stated purpose of the CRSPs was to reshape the enlisted ranks to provide for enhanced upward mobility. (AR 27, (CRSP designed to stimulate workforce flow and improve enlisted advancements), AR 26 (describing the 2011 and 2012 CRSPs as a "performance-based enlisted workforce management tool.")).

The Secretary's initial CRSP authorization in 2010 did not reference a "reduction in force" and troublingly, the Coast Guard publicly expressed to its enlisted personnel that the

---

[2] U.S. Coast Guard policy speaks to the use of Enlisted Personnel Boards in cases involving "the involuntary separation, ineligibility for reenlistment, and reduction in rate for incompetence." Enlisted Personnel Administrative Boards Manual (PSCINST M1910.1) p. 3, U.S. Coast Guard, (published June 2014), *available at* https://www.dcms.uscg.mil/Portals/10/CG-1/psc/psd/docs/EPAB%20(Final%20Revised%20August%202017).pdf?ver=2018-03-30-101707-787 (last visited December 8, 2021).

[3] As noted in the Court's July 13, 2021, Memorandum Opinion and Order, Plaintiffs attached as an exhibit to their summary judgment briefing the Administrative Record from *Lippmann v. United States*, Case No. 15-192. The United States did not object. That case involved a single former enlisted Coast Guard member and has substantial factual commonality with this case, including the initial 2010 Secretary of Homeland Security's approval of the inaugural CRSP. The *Lippmann* record contained a document inexplicably omitted from the Administrative Record of this case. To avoid confusion between the records, when referring to the *Lippmann* record the Court will cite to the PDF pagination as it appears in the Court's blue CM/ECF stamp in the header of Plaintiffs' Motion for Summary Judgment Exhibit 7. For example, when referring to the *Lippmann* AR, the Court would cite to the cover page, which simply reads "EXHIBIT 7," as "(Pls.' MSJ Ex. 7 at p. 1)." Citations to the Administrative Record in this case are simply (AR __).

authorized CRSP service record review and resulting forced retirements were not a RIF. (Pls.' MSJ Ex. 7 at p. 8–9; Pls.' MSJ Ex. 9). In fact, the Coast Guard formulated and issued to its members, including those enlisted personnel who would later be subject to involuntary retirement, its policies and procedures governing the initial CRSP *prior* to the Secretary's approval. (*Compare* AR 1 (Internal Comms Bulletin issued August 19, 2010) *with* Pls.' MSJ Ex. 7 at 8–9 (Secretary's approval of the 2010 CRSP on Sept. 21, 2010)). Given that sequence, and in the absence of any record evidence that the Secretary reviewed CRSP policies and procedures, any claim that the Secretary considered and analyzed whether the CRSP was a RIF under 14 U.S.C. § 357(j) lacks credibility.

In the years after 2010, the Coast Guard's request for Secretarial approval referenced "reductions in force" but reflected no analysis concluding that the CRSP constituted a RIF. (*See, e.g.*, AR 27–28). Neither the Coast Guard nor the Secretary has produced contemporaneous documents that establish the CRSPs were simply RIFs by another name. Neither does the uncontested record disclose any analysis suggesting that the Secretary (or the Coast Guard) contemporaneously considered that the CRSPs were a statutorily authorized RIF.

In fact, in the original memorandum from the Commandant of the Coast Guard, setting forth the policies and procedures that would guide the CRSP and preceding the Secretary's CRSP approval, the Commandant acknowledged "[w]hile officer management tools are clearly defined by law and policy, similar workforce shaping tools *do not exist* for the enlisted workforce." (AR 1 (emphasis added)). Lastly, the Coast Guard did not proffer a comparison of the CRSP process to prior RIFs that, at least, might have suggested some degree of similarity from which the Court could conclude that the two were essentially the same. The Coast Guard, however, *now* alleges, rather conveniently, that the CRSPs were in fact a RIF. In doing so, the Coast Guard disavows its own contemporaneous messaging that the CRSPs were not a RIF.

In seeking reconsideration, the United States continues to dispute the Court's interpretation of 14 U.S.C. § 357(j), which authorizes RIFs, and whether that statute justifies the Coast Guard's separation of servicemembers via CRSPs. (Def.'s Mot. to Recons. at 4–19); *Tippins*, 154 Fed. Cl. at 378 (concluding that § 357(j) is unambiguous and the Coast Guard's interpretation is not entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). The United States asks the Court to reconsider its interpretation that the phrase "reduction in force" includes the "elimination of positions or jobs, not merely the separation of personnel." (Def.'s Mot. to Recons. at 4–19); *Tippins*, 154 Fed. Cl. at 378.

The United States' Motion raises four primary grounds on which the Court should reconsider its prior Opinion. (Def.'s Mot. to Recon. at 1–2). The United States asserts: (1) the Court's interpretation is inconsistent with an alternative plain language interpretation based on dictionary definitions and ignores Congress's historical use of the phrase "reduction in force"; (2) the Court erred by relying on case law that interprets civilian statutes; (3) the Federal Circuit has not defined "reduction in force"; and (4) the Court should look to 10 U.S.C. § 1174a, a military statute, for its plain language interpretation of "reduction in force." (*Id.* at 5–19). Though the United States maintains that the Secretary's interpretation of 14 U.S.C. § 357(j) is

entitled to deference under *Chevron* step two, its Motion focuses solely on the Court's plain language determination under *Chevron* step one. (*Id.* at 20 n.3).[4]

The United States' first argument refers to its merits brief, which offers a single dictionary definition of "force." (*See* Def.'s Cross-MSJ at 15, ECF No. 67 (citing to Merriam-Webster's Collegiate Dictionary 489 (11th ed. 2005)).[5] To buttress its first argument, the United States isolates the last word within the phrase "reduction in force." (Def.'s Mot. to Recons. at 5–6). The United States offers no dictionary definition of the complete phrase. Nor does the United States focus on "reduction." Instead, utilizing its chosen dictionary definition of "force," the United States urges the Court to construe the operative wording of § 357(j) as meaning a reduction in "terms of people or troops, not positions or billets." (*Id.*). Utilizing this selective approach, the Court would presumably find that the Coast Guard's involuntary retirement of several hundred enlisted members, which did not have the effect of reducing the total number of authorized billets within the Coast Guard, was lawful.

In its first argument, in addition to urging the Court to go dictionary shopping, the United States adds that Congress has historically utilized the phrases "reduction in personnel" and "reduction in force" interchangeably. (*Id*. at 6). In doing so, however, the United States cites to statutes arising under Title 5 of the United States Code, which the United States characterizes as relating to "re-codification of laws related to civilian Federal employees." (*Id*.). This renders the United States' first argument inconsistent with a fundamental tenet of its second argument. In the page following its suggestion that the Court look to Title 5, the United States urges the Court to eschew the application of statutes governing Federal civilian employees because they are incongruous with those regulating Coast Guard members. (*Id.* at 7–8).

Though the United States urges reliance on its favored dictionary, the Court need not pick from this or other dictionaries in fashioning its interpretation of "reduction in force," a relatively simple phrase. *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 226 (courts need not defer to "the agency's choice among available dictionary definitions" and may look at other "contextual indications[.]"). The Court's finding that the phrase "reduction in force" is unambiguous considers the entirety of the term rather than its subparts. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme because the same terminology is used elsewhere in a context that makes its meaning clear[.]"). Congress could have easily expressed the phrase in a manner more attuned to the United States' litigation position. Had it intended to do so, Congress could have chosen some other version of the phrase, perhaps a realignment, repositioning, reorganization, restructuring, redeployment, reformation, reshuffling, or manipulation of the "force." It did not. Congress chose to limit the discharge of

---

[4] The United States does not urge the Court to reconsider its *Chevron* step zero analysis. *Cf. Tippins*, 154 Fed. Cl. at 383 (holding that even if the Court were to find 14 U.S.C. § 357(j) ambiguous, the Coast Guard did not offer an interpretation of the statute that is entitled to *Chevron* deference).

[5] In its Motion to Reconsider, the United States cites to an earlier version of the same dictionary utilizing a similar definition. (Def.'s Mot. to Recons. at 5).

enlisted service members to situations involving individual conduct or by a reduction in force. In the latter instance, the Secretary is statutorily required to "order" a RIF. 14 U.S.C. § 357.

In its second and third arguments, the United States points out that the Federal Circuit has not assigned an all-encompassing definition to the phrase "reduction in force." (Def.'s Mot. to Recons. at 12). The United States urges the Court to reject the Circuit's interpretation and usage of that phrase as circumscribed to Merit Systems Protection Board ("MSPB") appeals and Office of Personnel Management regulations. (*Id*. at 12–17 (citing cases the Court relied on)). The Federal Circuit's usage, though not involving RIFs within a military context, remains useful in the vacuum created by the complete absence of a definition unique to 14 U.S.C. § 357. The United States also argues that the Court should not have relied on *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990), despite previously citing that case in support of its interpretation in analogous litigation before this very Court. (*Compare* Def.'s Mot. to Recons. at 15 (arguing the Court erred in its reliance on *Barnes*) *with Lippmann v. United States*, Case No. 15-192, Def.'s Mot. to Dismiss at 22, ECF No. 10 (citing *Barnes* in support of its argument)). Fourth and finally, for the first time, the United States cites to 10 U.S.C. § 1174a, arguing that the Court should attempt to read that statute in harmony with 14 U.S.C. § 357(j). (Def.'s Mot. to Recons. at 17–19). Nothing within that statute persuasively informs the Court's decision. *See* 10 U.S.C. § 1174a (permitting the Secretary to establish special separations benefits programs in which eligible members may opt-in). Both § 1174a, and its companion statute which it references, 10 U.S.C. § 1175, concern voluntary separation benefits and incentives. That is not the situation here.

The Court declines to adjust its prior conclusions. The United States' arguments, individually and collectively, are unconvincing. Moreover, to the extent that the United States continues to press that "reduction in force" is capable of multiple interpretations to include a reduction in a body of persons, personnel, positions, troops, labor force, jobs, or billets, each at the unbridled discretion of the Coast Guard, the Court rejects such an amorphous interpretation. (*See* Def.'s Mot. to Recons. at 7 ("[W]e have argued that a 'reduction in force' . . . is sufficiently broad to include a reduction in positions, a reduction in personnel, or both . . ..")). The Court again notes that, while not particularly consequential at summary judgment, the Coast Guard's own contemporaneous statements sharply undercut the position it now stakes in seeking reconsideration.

Initially, the Coast Guard Commandant advised the Secretary that its newly conceptualized CRSP was required to address an "imbalance" in junior and senior enlisted service and retention rates. The Commandant did not request, nor did the Secretary authorize, a RIF. A high-level administrative Coast Guard office messaged enlisted members that the 2010 process "was not a RIF" and cautioned other members of the Coast Guard that "we need to ensure that [the CRSP] is not associated with a RIF."[6] (Pls.' MSJ Ex. 9). In subsequent years, the Coast Guard's written request for CRSP approval to the Secretary referenced a RIF but noted

[6] Though the Coast Guard now seeks to disavow these earlier statements to its service members, such post hoc rationalizations carry little, if any weight. If in fact, the Coast Guard was purposefully misleading its own enlisted personnel, as the United States seems to now suggest, such efforts are disquieting.

that the CRSP process excluded the use of "reduction in force" language. (*See, e.g.,* AR 53). The written policies guiding CRSP procedure never mentioned a RIF. (*See* AR 69–81).

These characterizations cannot be ignored: the CRSP was not intended to reduce the size of the Coast Guard but rather to account for "upward mobility and flow" concerns and thereby provide for improved opportunities for junior non-commissioned personnel. (*See* AR 27 (The purpose of the 2011 CRSP was "to strategically rebalance the force toward a more upwardly mobile, performance-based demographic.").[7] Based only on the Coast Guard's own contemporaneous statements, the Court has no concern regarding the sagacity of its Opinion and Order granting summary judgment in Plaintiffs' favor.

Here, not only did the Secretary fail to order a reduction in force consistent with the plain meaning of that phrase, the Secretary and the Coast Guard purposefully avoided the phrase and publicly rebuffed any notion that the CRSPs were associated with a RIF. The CRSPs accomplished exactly what the Coast Guard expressed was its intent: the reshuffling of enlisted personnel by forcing the retirement of senior enlisted personnel to enable the upward mobility of more junior personnel. Any reduction in the overall number of enlisted personnel was incidental to the plainly stated purposes of realigning the senior enlisted ranks to promote the upward mobility of junior service members.

This is also not an instance in which Congress authorized early retirements, except in specified circumstances, despite having done so in statutes pertaining to other branches. In fact, for the other branches, Congress delegated broader authority to shape their forces. Under 10 U.S.C. § 638(a)(1), "[a] regular officer on the active-duty list of the Army, Navy, Air Force, Marine Corps, or Space Force may be considered for selective early retirement by a selection board . . ..."). Those service branches have lawfully invoked § 638(a) to conduct reductions in force. *Crumley v. United States*, 133 Fed. Cl. 607, 609 (2017), *aff'd,* 738 F. App'x 1020 (Fed. Cir. 2018) ("In 2011, the USAF conducted a reduction-in-force ('RIF'), pursuant to 10 U.S.C. § 638(a) . . . ."). Section 638 also authorizes "Selective Early Retirement Boards" ("SERBs"), which the branches have historically used as a workforce shaping tool, eerily similar to the CRSPs in this case. *See Christian v. United States*, 46 Fed. Cl. 793, 797 (2000) ("Under [§ 638], Regular Army Lieutenant Colonels (LTCs) twice considered but not selected for promotion to Colonel and not placed on another promotion recommendation list may be considered for mandatory early retirement by a [SERB].").

The Coast Guard's absence from 10 U.S.C. § 638 is conspicuous. Likewise, 14 U.S.C. § 357 did not include the broad language contained in an earlier statute which would have plausibly authorized the Coast Guard's use of CRSPs as a force reshaping tool. *Compare* 10 U.S.C. § 1169 (authorizing early discharge of regular enlisted members under circumstances "prescribed by the Secretary[.]") *with* 14 U.S.C. § 357. For the Coast Guard, Congress enhanced

---

[7] In 2015, following the last of the CRSPs, the Coast Guard noted the success of the program: "For the past five years, the Coast Guard has sought and received authorization from the Secretary of Homeland Security (DHS) to convene a CRSP in order to increase workforce flow, address high retention issues through the involuntary retirement of selected enlisted members, and to reduce the size of the retirement eligible enlisted workforce." (AR 164).

the limitation on discharge through § 357 by referencing a selection board and limiting the Secretary's authority to involuntarily separate enlisted service members in two narrow circumstances—pursuant to Enlisted Personnel Board decisions or a RIF.

The Court recognizes that it writes on a blank slate regarding this issue. It agrees that the Federal Circuit has not, within the narrow context of these facts, defined "reduction in force" as that phrase is used in 14 U.S.C § 357(j). Consequently, the Court has resorted to the analogous treatment of the term within the civilian context. Relying on the persuasive authority of decisions from other courts, taken together with the absence of contemporary supporting documentation by the Secretary, the contemporaneous statements of the Coast Guard, and statutes authorizing every other military branch to consider selective early retirements, the Court continues to believe that the 2010–2015 CRSPs were not conducted as part of a RIF and that the phrase "reduction in force" necessarily means the elimination of positions or jobs.

## II. Appropriate Remedies

Having reaffirmed that Plaintiffs are entitled to summary judgment, the Court now addresses what must come next. Plaintiffs seek certification of a class to pursue the identical claims presented in the Complaint. (Tr. of Hearing on Mot. to Recons. at 43:13–23). Long before the undersigned's involvement, and in an unusual move, the parties agreed that any issue related to certification of a class should await a determination on the merits of Plaintiffs' claims. (*Id*. at 41:11–43:23). That posture presents some obstacles to the efficient resolution of this matter.

In its Motion for Reconsideration, the United States suggests two mutually exclusive avenues to expedite resolution. First, should the Court reverse its conclusion and find that 14 U.S.C. § 357(j) and the operative phrase "reduction in force" are indeed ambiguous, the United States asserts that the Court must remand this case to the Coast Guard for "additional explanation and analysis of the statutory ambiguity." (Def.'s Mot. to Recons. at 20). Second, the United States suggests that if the Court were to deny the United States' motion in its entirety, the Court should enter judgment for the six named plaintiffs and direct the Coast Guard to correct the plaintiffs' military records. (Id. at 20–22). Plaintiffs agree with the second option in principle but seem to suggest that the Court, rather than the Coast Guard, should attempt tabulations of backpay. (Pls.' Resp. at 17, ECF No. 85).

As explained above, the Court declines to reconsider its holdings that 14 U.S.C. § 357 is unambiguous and that statute does not support the Coast Guard's actions here. However, the Court agrees that the Coast Guard is better poised to evaluate the facts and circumstances of each plaintiff and calculate their entitlement to relief. But, in recognizing that the United States is considering its options for appellate review, the Court is compelled to explain that even if it were to find § 357 ambiguous, remand would be unproductive.

As previewed above, the United States argues that "given the Court's ruling that the Secretary has not yet sufficiently articulated a reasonable interpretation, the appropriate remedy would be a remand to the Secretary for additional explanation and analysis of the statutory ambiguity." (Def.'s Mot. to Recons. at 20 (citing *Negusie v. Holder*, 555 U.S. 511, 523 (2009) and *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907–08 (2020)). The Court disagrees.

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Regents of the Univ. of California*, 140 S. Ct. at 1907 (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). If the stated grounds for agency action are inadequate, "a court *may* remand" for the agency to either expand upon its analysis or take new action. *Id*. (emphasis added). If the Court remands for further analysis, the agency may provide additional explanation of its reasoning "*at the time of the agency action.*" *Id*. (emphasis in original) (internal quotation and citation omitted). An agency may amplify its articulation of a prior conclusory observation, or elaborate on its reasons, "but may not provide new ones." *Id*. at 1908. When the agency has not exercised its discretion to interpret a statute, the normal course of action is for the Court to remand. *Negusie*, 555 U.S. at 523.

Initially, the Court notes the deliberate use of the Supreme Court's permissive modal verb—a court *may* remand to the agency. *Michigan*, 576 U.S. at 758. Putting aside the implicit grant of discretion, as the Court explained in *Tippins*, 154 Fed. Cl. at 384, the Coast Guard offered only the most bare-bones conclusory statement without any considered analysis or judgment. In 2010, the Secretary did not use the phrase "reduction in force" in the memo authorizing the CRSP. Therefore, any additional reasoning or explanation could only be considered "new," rather than elaborating on or further articulating a stated reason. *See Regents of the Univ. of California*, 140 S. Ct. at 1908. If the Court were to remand this case and permit the Coast Guard to offer "analysis" of its position from 2010, it would undermine "confidence that the reasons given are not simply convenient litigating positions." *Id*. at 1909 (cleaned up). Additionally (and relatedly), remand would allow a new Secretary of Homeland Security to invoke new justifications and undertake fresh analysis over a decade after the original decision to institute CRSPs. Permitting the Secretary to invoke such "belated justifications" would disrupt the Court's judicial review function and force "both litigants and [the Court] to chase a moving target." *Id*. (internal citations and quotations omitted). Thus, even had the Court found the statute ambiguous, the United States' request for remand would be denied because the United States fails at *Chevron* step zero.

The Court concludes that remand would be inappropriate as a practical matter, but also as a jurisprudential concern. Rote remand scenarios such as those urged by the United States in this case only encourage agency decision-makers to initially avoid articulating justifications in any degree of detail. Why provide a full explanation of the agency's reasoning if, when later challenged, a second opportunity is routinely provided to supply a more fulsome rationale? Especially when, by rendering a decision, the reviewing court might eventually hand the agency a skeleton key to unlock the door to its original intended destination. Here, the Court retains discretion to prevent such a scenario where it is clear that any "additional" analysis would only consist of post hoc rationalizations. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (the reviewing court has "considerable discretion" when the agency seeks remand either to correct errors or provide additional analysis support a decision).

In this case, the record is unequivocal in stating the decision to utilize CRSPs to massage the composition of the Coast Guard's enlisted ranks. Nothing within the record supports the conclusion that the Secretary intended to order a RIF but simply failed to articulate that intent. On the contrary, the Secretary acquiesced to the use of a new administrative policy intended to force senior enlisted members to retire from their service to the United States. Had the Secretary

indicated intent to declare a RIF, not just invoke 14 U.S.C. § 357 as a pretext, then remand might be appropriate to expound on the annual justifications. However, that is not the situation the Court finds here. Absent documentation in the administrative record supporting an intention to declare a reduction in force, the current Secretary has nothing to expound upon.

In summary, even if the Court were to find the statute ambiguous and that the Coast Guard had failed to offer an interpretation, the Court would not remand for further analysis. The Court has both practical and jurisprudential concerns, but most importantly, the facts of this case would not support giving the Coast Guard a second bite at the proverbial apple.

## III. Conclusion

The Court stands by its analysis in *Tippins v. United States*, 154 Fed. Cl. 373 (2021) (docketed at ECF 75). Consequently, the Court orders the following:

(1) The United States' Motion for Reconsideration, (ECF No. 84), is **DENIED**.

(2) Pursuant to RCFC 54(b), there being no just reason for delay, the Clerk is **DIRECTED** to enter judgment for the six named plaintiffs listed below. This action shall remain open to allow further collective action proceedings.

(3) Consistent with the Court's decision in *Tippins v. United States*, 154 Fed. Cl. 373 (2021), the United States Coast Guard is **ORDERED** to expeditiously correct the military records for:

a. Tonia Tippins;

b. Derrik Magnuson;

c. George Holloway;

d. Jennifer Rehberg;

e. Glenda Smithleeth; and

f. M. Allen Bumgardner.

The Coast Guard is **ORDERED** to award any back pay, allowances, or other benefits to which those plaintiffs are entitled by law as a result of that correction.

(4) On or before January 24, 2021, the parties are **ORDERED** to file a joint status report setting forth a schedule that proposes dates pertinent to the Court's consideration of collective action proceedings.

**IT IS SO ORDERED.**

s/ David A. Tapp
DAVID A. TAPP, Judge

(Aug. 4, 1949, ch. 393, 63 Stat. 521; Pub. L. 98–557, §15(a)(3)(A), Oct. 30, 1984, 98 Stat. 2865; Pub. L. 99–348, title II, §205(b)(8), July 1, 1986, 100 Stat. 700.)

HISTORICAL AND REVISION NOTES

Based on title 14, U.S.C., 1946 ed., §185a (May 24, 1939, ch. 146, §2, 53 Stat. 755).

Changes were made in phraseology. 81st Congress, House Report No. 557.

AMENDMENTS

1986—Pub. L. 99–348 struck out ", with retired pay of the grade or rating with which retired" after "active service".

1984—Pub. L. 98–557 substituted reference to enlisted member for reference to enlisted man.

**[§356. Repealed. Aug. 3, 1950, ch. 536, §36, 64 Stat. 408]**

Section, act Aug. 4, 1949, ch. 393, 63 Stat. 521, related to retirement for disabilities incident to service. See sections 1204 and 1376 of Title 10, Armed Forces.

**§357. Involuntary retirement of enlisted members**

(a) Enlisted Personnel Boards shall be convened as the Commandant may prescribe to review the records of enlisted members who have twenty or more years of active military service.

(b) Enlisted members who have twenty or more years of active military service may be considered by the Commandant for involuntary retirement and may be retired on recommendation of a Board—

(1) because the member's performance is below the standards the Commandant prescribes; or

(2) because of professional dereliction.

(c) An enlisted member under review by the Board shall be—

(1) notified in writing of the reasons the member is being considered for involuntary retirement;

(2) allowed sixty days from the date on which counsel is provided under paragraph (3) to submit any matters in rebuttal;

(3) provided counsel, certified under section 827(b) of title 10, to help prepare the rebuttal submitted under paragraph (2) and to represent the member before the Board under paragraph (5);

(4) allowed full access to and be furnished with copies of records relevant to the consideration for involuntary retirement prior to submission of the rebuttal submitted under paragraph (2); and

(5) allowed to appear before the Board and present witnesses or other documentation related to the review.

(d) A Board convened under this section shall consist of at least three commissioned officers, at least one of whom shall be of the grade of commander or above.

(e) A Board convened under this section shall recommend to the Commandant enlisted members who—

(1) have twenty or more years of active service;

(2) have been considered for involuntary retirement; and

(3) it determines should be involuntarily retired.

(f) After the Board makes its determination, each enlisted member the Commandant considers for involuntary retirement shall be—

(1) notified by certified mail of the reasons the member is being considered for involuntary retirement;

(2) allowed sixty days from the date counsel is provided under paragraph (3) to submit any matters in rebuttal;

(3) provided counsel, certified under section 827(b) of title 10, to help prepare the rebuttal submitted under paragraph (2); and

(4) allowed full access to and be furnished with copies of records relevant to the consideration for involuntary retirement prior to submission of the rebuttal submitted under paragraph (2).

(g) If the Commandant approves the Board's recommendation, the enlisted member shall be notified of the Commandant's decision and shall be retired from the service within ninety days of the notification.

(h) An enlisted member, who has completed twenty years of service and who the Commandant has involuntarily retired under this section, shall receive retired pay.

(i) An enlisted member voluntarily or involuntarily retired after twenty years of service who was cited for extraordinary heroism in the line of duty shall be entitled to an increase in retired pay. The retired pay shall be increased by 10 percent of—

(1) the active-duty pay and permanent additions thereto of the grade or rating with which retired when the member's retired pay is computed under section 423(a) of this title; or

(2) the member's retired pay base under section 1407 of title 10, when a member's retired pay is computed under section 423(b) of this title.

(j) When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action.

(Aug. 4, 1949, ch. 393, 63 Stat. 521; Aug. 3, 1950, ch. 536, §17, 64 Stat. 407; Pub. L. 88–114, §1(1), Sept. 6, 1963, 77 Stat. 144; Pub. L. 98–557, §15(a)(3)(A), (B), Oct. 30, 1984, 98 Stat. 2865; Pub. L. 99–348, title II, §205(b)(9), July 1, 1986, 100 Stat. 700; Pub. L. 102–241, §6, Dec. 19, 1991, 105 Stat. 2210.)

HISTORICAL AND REVISION NOTES

Based on title 14, U.S.C., 1946 ed., §§185, 185d (May 24, 1939, ch. 146, §§1, 5, 53 Stat. 755).

Subsection (b) is new and implements the preceding subsection; it seems necessary in view of certain statutes enacted as the result of World War II.

Subsection (c) is based on title 14, U.S.C., 1946 ed., §185d (May 24, 1939, ch. 146, §5, 53 Stat. 756). Said section has been divided. The first sentence is incorporated in section 423 of this title. The second proviso is incorporated in section 424 of this title. The remainder is placed in this subsection.

Changes were made in phraseology. 81st Congress, House Report No. 557.

AMENDMENTS

1991—Pub. L. 102–241 substituted "Involuntary retirement of enlisted members" for "Enlisted Personnel

Board" in section catchline and amended text generally. Prior to amendment, text provided that the Commandant assemble annually a Coast Guard Enlisted Personnel Board to recommend enlisted members for retirement, that the recommendations be transmitted to the Commandant for approval, in which event the enlisted members concerned would be notified and given opportunity to file a written protest, which would require a subsequent annual Board determination and approval by the Commandant to effect the involuntary retirement of that member, and further provided that an enlisted member with twenty years' service retired from active duty by the Commandant pursuant to this section was to receive retired pay, and that an enlisted member voluntarily or involuntarily retired by reason of twenty years' service who had been cited for extraordinary heroism was entitled to an increase in retired pay.

1986—Subsec. (b). Pub. L. 99–348, §205(b)(9)(A), substituted "retired pay" for "the retired pay of the grade or rating with which retired".

Subsec. (c). Pub. L. 99–348, §205(b)(9)(B), substituted provision that retired pay be increased by an amount equal to 10 percent of the active-duty pay and permanent additions thereto of the grade or rating with which retired, in the case of a member whose retired pay is computed under 423(a) of this title, or the member's retired pay base under section 1407 of title 10, in the case of a member whose retired pay is computed under section 423(b) of this title for provision that the retired pay be increased by an amount equal to 10 per cent of the active-duty pay and permanent additions thereto of the grade or rating with which retired.

1984—Pub. L. 98–557, §15(a)(3)(A), substituted reference to enlisted member for reference to enlisted man wherever appearing in subsecs. (a) to (c).

Subsec. (a). Pub. L. 98–557, §15(a)(3)(B), substituted reference to enlisted members for reference to enlisted men in two places.

1963—Subsec. (c). Pub. L. 88–114 struck out provisions which entitled enlisted men whose average marks in conduct were not less than 97½ percent of the maximum to a 10-percent increase of their retired pay.

1950—Subsec. (c). Act Aug. 3, 1950, substituted "years'" for "years".

SERVICE CREDIT FOR CERTAIN ENLISTED PERSONNEL

Act June 3, 1948, ch. 394, 62 Stat. 302, provided: "That those enlisted men of the Coast Guard who, during 1940 and 1941, were discharged from the Coast Guard to accept employment as policemen and guards at the Ivigtut Cryolite Mine, Greenland, and who reenlisted in the Coast Guard within three months after the termination of their service as such policemen and guards, shall be credited with the time between discharge and reenlistment for purposes of longevity pay and retirement, but no increased retroactive pay shall accrue by reason of the enactment of this Act."

ENLISTED MEN IN SERVICE ON SEPTEMBER 6, 1963

Pub. L. 88–114, §2, Sept. 6, 1963, 77 Stat. 144, provided that: "The amendment made by subsection (1) of section 1 of this Act [amending this section] does not apply to any enlisted man in service on the effective date of this Act [Sept. 6, 1963]."

### [§358. Repealed. Pub. L. 88–114, §1(2), Sept. 6, 1963, 77 Stat. 144]

Section, act Aug. 4, 1949, ch. 393, §1, 63 Stat. 522, limited number of retirements in a calendar year of enlisted men who had completed 20 years of service, to not more than the whole number nearest 1 percent of the total enlisted force on the active list, and any men so authorized to be retired annually who were not so retired, could be retired during any subsequent year providing the total retired in that year did not exceed 3 percent of the total enlisted force.

### §359. Recall to active duty during war or national emergency

In times of war or national emergency, the Commandant may order any enlisted member on the retired list to active duty.

(Aug. 4, 1949, ch. 393, 63 Stat. 522; Aug. 3, 1950, ch. 536, §18, 64 Stat. 407; Pub. L. 98–557, §15(a)(3)(A), Oct. 30, 1984, 98 Stat. 2865.)

HISTORICAL AND REVISION NOTES

Based on title 14, U.S.C., 1946 ed., §185c (May 24, 1939, ch. 146, §4, 53 Stat. 755).

This section was changed so as to make provisions for enlisted men parallel to similar provisions for commissioned and warrant officers (see §§240 and 310 of the revised title). It seems fair and equitable that similar provisions should apply to all classes of personnel insofar as practicable. 81st Congress, House Report No. 557.

AMENDMENTS

1984—Pub. L. 98–557 substituted reference to enlisted member for reference to enlisted man.

1950—Act Aug. 3, 1950, struck out all references to pay.

DELEGATION OF AUTHORITY

For delegation of authority under this section, as invoked by section 2 of Ex. Ord. No. 13223, Sept. 14, 2001, 66 F.R. 48201, as amended, to Secretary of Homeland Security when Coast Guard is not serving as part of Navy, see section 5 of Ex. Ord. No. 13223, set out as a note under section 12302 of Title 10, Armed Forces.

### §360. Recall to active duty with consent of member

Any enlisted member on the retired list may, with his consent, be assigned to such duties as he may be able to perform, except that no enlisted member on the retired list who has reached the age of sixty-two years shall be recalled in time of peace.

(Aug. 4, 1949, ch. 393, 63 Stat. 522; Aug. 3, 1950, ch. 536, §19, 64 Stat. 407; Pub. L. 98–557, §15(a)(3)(A), (4)(B)(i), Oct. 30, 1984, 98 Stat. 2865.)

HISTORICAL AND REVISION NOTES

Based on title 14, U.S.C., 1946 ed., §185c (May 24, 1939, ch. 146, §4, 53 Stat. 755).

This section was changed so as to make provisions for enlisted men parallel to similar provisions for commissioned and warrant officers (see §§241 and 311 of the revised title). It seems fair and equitable that similar provisions should apply to all classes of personnel insofar as practicable. 81st Congress, House Report No. 557.

AMENDMENTS

1984—Pub. L. 98–557 substituted "member" for "man" in section catchline, and in text substituted reference to enlisted member for reference to enlisted man in two places.

1950—Act Aug. 3, 1950, struck out all references to pay.

### §361. Relief of retired enlisted member promoted while on active duty

Any enlisted member on the retired list recalled to active duty who during such active duty is advanced to a higher grade or rating under a permanent or temporary appointment or promotion shall, upon relief from active duty be advanced on the retired list to the highest grade or rating held while on active duty. In

CERTIFICATE OF SERVICE

I hereby certify that, on this 7th day of April, 2023, I caused to be served electronically to all parties by operation of the Court's electronic filing system, a copy of the foregoing document, "Corrected Brief For Defendant-Appellant United States."

/s/ Douglas G. Edelschick