# United States Court of Appeals for the Federal Circuit

---

**TONIA TIPPINS, DERRIK MAGNUSON, GEORGE HOLLOWAY, JENNIFER REHBERG, GLENDA SMITHLEETH, M. ALLEN BUMGARDNER, FOR THEMSELVES AND AS REPRESENTATIVES OF A CLASS OF SIMILARLY SITUATED PERSONS,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2022-1462

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-00923-DAT, Judge David A. Tapp.

---

Decided: March 1, 2024

---

NATHAN S. MAMMEN, Kirkland & Ellis LLP, Washington, DC, argued for plaintiffs-appellees. Also represented by GRACE BRIER.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY; JARED HOOD, JUSTIN

RAND JOLLEY, Office of Claims and Litigation, United States Coast Guard, Washington, DC.

---

Before REYNA, TARANTO, and CHEN, *Circuit Judges*.

TARANTO, *Circuit Judge.*

Between 2010 and 2014, the United States Coast Guard convened Active Duty Enlisted Career Retention Screening Panels (CRSPs) to select enlisted service members for involuntary retirement. This process did not follow the procedures and standards of then-applicable 14 U.S.C. § 357(a)–(h), which (before those provisions were repealed in 2016) addressed involuntary retirement of certain Coast Guard service members with specified seniority. Several former Coast Guard service members, after being involuntarily retired through the CRSP process, brought this action on behalf of themselves and others similarly situated against the United States in the Court of Federal Claims (Claims Court) under the Tucker Act, 28 U.S.C. § 1491, asserting that their retirements were contrary to law because the Coast Guard proceeded without following § 357(a)–(h). The government responded by invoking § 357(j), which stated that § 357(a)–(h) did not apply to a "reduction in force." The applicability of that exception to the CRSPs is the issue on appeal.

The Claims Court held, on the parties' cross-motions for summary judgment, that the involuntary retirements were unlawful because the CRSPs were not part of a "reduction in force." *Tippins v. United States*, 154 Fed. Cl. 373, 375, 378–83 (2021) (*Tippins I*). On the government's motion for reconsideration, the Claims Court reiterated its conclusion and entered partial final judgment for the six named plaintiffs. *Tippins v. United States*, 157 Fed. Cl. 284, 292 (2021) (*Tippins II*). The government appeals. We affirm.

I

Plaintiffs Tonia Tippins, Derrik Magnuson, George Holloway, Jennifer Rehberg, Glenda Smithleeth, and M. Allen Bumgardner are Coast Guard veterans who each honorably served twenty years or more and reached senior enlisted ranks. Between 2012 and 2014, the Coast Guard selected plaintiffs for involuntary retirement through CRSPs created as part of a program for clearing spots to make room for the promotion of less senior service members.

The CRSPs were first authorized in 2010, when the Coast Guard became concerned about high retention among retirement-eligible enlisted personnel and the resulting lack of advancement opportunities for high-performing junior enlisted personnel. *See Tippins I*, 154 Fed. Cl. at 375–76. To address the perceived "'workforce flow'" issue, the Commandant of the Coast Guard sought and received approval from the Secretary of Homeland Security to conduct a CRSP in the fall of 2010 to select service members for involuntary retirement. *Id.* (quoting J.A. 74). Between 2010 and 2014 the Coast Guard received approval for, and conducted, five separate CRSPs, one each year. *Id.* at 376–77.

Each memorandum authorizing the CRSPs at issue cites two statutes, 10 U.S.C. § 1169 and 14 U.S.C. § 357(j), as the sources of the "legal authority to conduct a CRSP panel." J.A. 39, 41, 43. In relevant part, 10 U.S.C. § 1169 provides (as it did in 2010–14) that "[n]o regular enlisted member of an armed force may be discharged before his term of service expires, except . . . as prescribed by the Secretary concerned." At the time relevant to this case, 14 U.S.C. § 357 authorized the Commandant of the Coast Guard to involuntarily retire enlisted personnel with 20 or more years of service and outlined procedures and standards for selecting those service members based on recommendations of an "Enlisted Personnel Board[]." 14 U.S.C.

§ 357(a)–(h).[1] But § 357(j) stated an exception: "When the Secretary orders a reduction in force, enlisted personnel may be involuntarily separated from the service without the Board's action." It is undisputed that the relevant CRSPs were not enlisted personnel boards and did not proceed under the standards and procedures of § 357(a)–(h). As the case is presented to us, plaintiffs' involuntary retirements were lawful if and only if they were part of a "reduction in force" ordered by the Secretary under § 357(j).

In the CRSPs, the Coast Guard involuntarily retired several hundred enlisted members, including the six named plaintiffs. J.A. 123. In 2018, three of the plaintiffs brought this action under the Tucker Act, 28 U.S.C. § 1491. J.A. 27–28. Several months later, an amended complaint was filed adding three additional named plaintiffs. J.A. 28. Of relevance to this appeal, all six named plaintiffs served in positions at pay grade E-7 or higher at the time of their involuntary separation. J.A. 291–94 ¶¶ 7–12. The plaintiffs asserted wrongful-discharge claims and sought constructive service credit, back pay, allowances, and reinstatement to active duty pursuant to the Military Pay Act, 37 U.S.C. § 204(a). J.A. 291; Amended Complaint, *Tippins v. United States*, No. 18-cv-00923 (Fed. Cl. Nov. 16, 2018), ECF No. 8.

In July 2021, the Claims Court granted the plaintiffs' motion for summary judgment and denied the government's cross-motion for summary judgment. *Tippins I*, 154 Fed. Cl. at 375. The court explained that the dipositive

---

[1] Congress enacted the relevant provisions of § 357 in 1991. Coast Guard Authorization Act of 1991, Pub. L. No. 102-241, § 6, 105 Stat. 2208, 2210–12. The relevant subsections were repealed in 2016. Coast Guard Authorization Act of 2015, Pub. L. No. 114-120, § 215, 130 Stat. 27, 45–46 (2016) (repealing § 357(a)–(h), (j)). We cite the statute as it existed during 2010–14, without including a date.

issue in the litigation is whether the CRSPs were lawfully convened as part of a "reduction in force" pursuant to 14 U.S.C. § 357(j). *Id.* at 379. That is, no other statutory argument was advanced by the government to defend the retirements. The court then concluded that the language of the statute is unambiguous and held that a "'reduction in force' is the elimination of positions or jobs, not merely the separation of personnel." *Id.* at 378–83.[2]

The government does not dispute that, after the named plaintiffs were involuntarily retired, their specific billets (*i.e.*, positions)[3] were not eliminated. J.A. 102–03. Nor does the government allege that the relevant CRSPs were used to eliminate *any* billets in pay grade E-7 and above. J.A. 124 ("The Coast Guard generally did not eliminate the billets that were occupied by the enlisted service members in higher grades (E-7 and above) who were selected for involuntary retirement."). Rather, the authorization memoranda stated the purpose of these CRSPs in the following terms: to "strategically rebalance the enlisted force toward a more upwardly mobile, performance based demographic." J.A. 39, 41, 43. While the Coast Guard did reduce the number of total authorized enlisted billets service-wide during the period at issue, *Tippins I*, 154 Fed. Cl. at 377, the

---

[2] The Claims Court also held, in the alternative, that if the statute were to be deemed ambiguous, the Coast Guard's current interpretation of the term "reduction in force" would not be entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Tippins I*, 154 Fed. Cl. at 383–86; *see also Tippins II*, 157 Fed. Cl. at 286–88, 288 n.4. The government does not argue for *Chevron* deference on appeal.

[3] Both parties agree that, in this context, Coast Guard billets can be understood as analogous to positions in the civilian context. *See* Oral Arg. at 14:51–15:24, 31:49–31:56.

government admits that the CRSPs at issue here were not "necessitated by either (1) a reduction in the Congressional authorization for total force strength in the Coast Guard, or (2) a reduction in the authorized number of enlisted billets in higher grades (E-7 and above)," J.A. 99–101.[4] On these facts, the Claims Court held that § 357(j) was inapplicable to the CRSPs at issue, so the Coast Guard had unlawfully forced the plaintiffs to retire when it did so without complying with § 357(a)–(h). *See Tippins I*, 154 Fed. Cl. at 375, 379.

The government sought reconsideration, but the Claims Court again rejected the government's position. *See Tippins II*, 157 Fed. Cl. at 286, 292. It concluded that the named plaintiffs were entitled to a final judgment under Rule 54(b) of the Rules of the Court of Federal Claims, and it ordered the government to correct the named plaintiffs' military records and provide associated relief. *Id.* at 292. The Claims Court entered its Rule 54(b) judgment on December 9, 2021, and the government timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).[5]

## II

The sole issue raised by the government on appeal is whether the Claims Court erred in holding that the

---

[4] Our decision proceeds on the premise of the government's admission quoted in text above. We do not rule on limits on "reduction in force" where that premise is absent.

[5] After the appeal was filed, the Claims Court granted an unopposed motion to certify a class of similarly situated plaintiffs. *Tippins*, No. 18-cv-00923 (Fed. Cl. Mar. 14, 2022) (order certifying class action), ECF No. 101. The Claims Court stayed further proceedings related to the certified class pending this appeal. *Id.* (Aug. 17, 2022) (order staying case).

involuntary retirements of the enlisted service members without the elimination of their positions did not constitute a "reduction in force" within the meaning of 14 U.S.C. § 357(j). Government's Opening Br. at 1. This question is one of statutory interpretation—a legal issue we decide de novo. *Dixon v. United States*, 67 F.4th 1156, 1165 (Fed. Cir. 2023); *Ampersand Chowchilla Biomass, LLC v. United States*, 26 F.4th 1306, 1310 (Fed. Cir. 2022). We agree with the Claims Court.

A

No definition of the term "reduction in force" is provided in 14 U.S.C. § 357 or elsewhere in Title 14. *See* 14 U.S.C. § 357; *Tippins I*, 154 Fed. Cl. at 376–77 (noting that the memoranda authorizing the CRSPs state that neither § 357 nor Title 14 defines, directly or by reference, the term "reduction in force"). Nor have we been pointed to any discussion of what constitutes a "reduction in force" in the legislative history of § 357. *See* S. Rep. No. 102-169, at 9 (1991) (stating only that the board review procedures "would not be required during mandated reductions in force"); H.R. Rep. No. 102-132, at 29 (1991) (stating only that "[w]hen the Secretary orders a reduction in force, enlisted personnel may be involuntarily retired without Board action"). Because "reduction in force" has not been given a definition in § 357, it should be construed "in accordance with its ordinary or natural meaning." *Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 476 (1994).

The Claims Court held that a "reduction in force," in its ordinary meaning, does not cover the mere separation of personnel from positions with the intent to refill those positions. *Tippins I*, 154 Fed. Cl. at 378, 382; *Tippins II*, 157 Fed. Cl. at 290. The government argues that the term has a broad enough meaning to cover such separations. In determining the meaning of the term, our "proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Marketing Institute*

*v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011)). We conclude that a "reduction in force" as used in § 357(j) does not include actions to separate current occupants from their positions simply to make room for others to be installed in the positions instead.

1

We begin with the statutory text. In the absence of a statutory definition of the term "reduction in force," we consider its use and interpretation in other statutory contexts. *See Azar v. Allina Health Services*, 139 S. Ct. 1804, 1812 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes."); *Federal Aviation Administration v. Cooper*, 566 U.S. 284, 291–92 (2012) ("[W]hen Congress employs a term of art, 'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" (quoting *Molzof v. United States*, 502 U.S. 301, 307 (1992))); *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1335 (Fed. Cir. 2017) ("'[W]hen Congress uses the same language in two statutes having similar purposes, . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.'" (quoting *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005))).

The term "reduction in force" is used in provisions related to federal civilian employment. For example, 5 U.S.C. § 3502 directs the Office of Personnel Management to prescribe regulations "for the release of competing employees in a reduction in force." While neither the statute nor regulations promulgated under its authority specifically define the term, *see* 5 U.S.C. § 3502; 5 C.F.R. § 351.203 (providing definitions for 5 C.F.R. pt. 351), this court has repeatedly addressed the phrase in cases appealed from the Merit Systems Protection Board interpreting the term in that setting. We have consistently defined

a "reduction in force" as an "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *Welch v. Department of the Army*, 323 F.3d 1042, 1046 (Fed. Cir. 2003); *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002); *see also Huber v. Merit Systems Protection Board*, 793 F.2d 284, 286 (Fed. Cir. 1986). We have clarified that a reduction in force "is not an adverse action against a particular employee, but is directed solely at a position within an agency." *Welch*, 323 F.3d at 1046; *James*, 284 F.3d at 1314; *Huber*, 793 F.2d at 286; *see also Gandola v. Federal Trade Commission*, 773 F.2d 308, 312 (Fed. Cir. 1985) ("A reduction in force may not be used as a disguised adverse action to remove or demote a particular employee."); *Schall v. U.S. Postal Service*, 73 F.3d 341, 344 (Fed. Cir. 1996).

Moreover, in 5 U.S.C. § 3595(d), which involves reductions in force in the Senior Executive Service, the term is explicitly defined as "includ[ing] the *elimination or modification of a position* due to a reorganization, due to a lack of funds or curtailment of work, or due to any other factor." (emphasis added). The language of the provision starts with the premise that a reduction in force must be focused on the position, not just its current occupant, and serves to affirm, for that context, both that the term extends to "elimination or modification" and that the range of covered reasons for such action is broad. In that way, the provision, while limited to "purposes of this section," 5 U.S.C. § 3595(d), confirms the core focus on the position, not just its current occupant, when the phrase is used in other federal employment provisions.

In several decisions, other circuits have expressed a materially similar understanding when addressing "reduction in force" or similar terms in the private employment context. While there are important differences between private employment, federal employment, and military service, those decisions are highly relevant to our

understanding of the commonly understood meaning of "reduction in force."

In *Sanders v. Kohler Co.*, the Eighth Circuit considered the phrase "reduction in force" in the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. § 2101. 641 F.3d 290, 292, 294–95 (8th Cir. 2011). In *Sanders*, employees who were hired as replacement workers during a union strike brought an action under the WARN Act, which requires that covered employers give employees sixty days' notice of a "mass layoff." *Id.* at 292–93. A "mass layoff" is defined in the statute as a "reduction in force" that results in an employment loss of at least 33%. *Id.* at 293. The court in *Sanders* considered whether enough workers had been laid off (*i.e.*, were part of the "reduction in force") to meet the numerical threshold. *Id.* The court ruled that employees who were fired but then replaced with others were *not* part of the "reduction in force." *Id.* at 294–95. The Eighth Circuit explained: "When a company fires one worker and replaces him with another, there is no net loss in the number of employees and no 'reduction in force' as the term is commonly understood." *Id.* at 294 (citing *Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1217 (7th Cir. 1985) ("[B]y definition, when the employer reduces his work force he hires no one to replace the ones he let go.")).

The First and Sixth Circuits have considered the meaning of a similar term, "work force reduction," in the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. *LeBlanc v. Great American Insurance Co.*, 6 F.3d 836, 845–46 (1st Cir. 1993); *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Both circuits explained that "[a] work force reduction situation occurs when business considerations cause an employer to *eliminate one or more positions* within the company" and that "[a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge." *LeBlanc*, 6

F.3d at 845–46 (quoting *Barnes*, 896 F.2d at 1465) (emphasis altered).

Those authorities provide compelling evidence that the phrase "reduction in force," as commonly understood, does not cover the mere separation of personnel from positions to be refilled. In the absence of sufficiently clear contrary indications, this established meaning must apply in 14 U.S.C. § 357(j).

2

There are no contrary indications that warrant adoption of a different meaning here. Had Congress intended a different meaning, it could have provided a statute-specific definition, chosen different language, or added an additional clause to exempt from § 357(a)–(h) specified actions that involve the separation of personnel without elimination of their positions. For example, Congress could have omitted the words "a reduction in force" and said, instead: "When the Secretary orders, enlisted personnel may be involuntarily separated from the service without the Board's action." Congress did not say that. It restricted the actions of "the Secretary" that were exempt from the § 357(a)–(h) provisions to ordering "a reduction in force."

Moreover, the structure of 14 U.S.C. § 357 supports adoption of the common meaning of "reduction in force," as we have described it, rather than the government's view. Unlike 10 U.S.C. § 1169, which broadly authorizes the Secretary to discharge an enlisted member of an armed force before his or her term of service expires, § 357 outlined only two mechanisms for discharging an enlisted Coast Guard member with twenty or more years of service: by recommendation of an enlisted personnel board or pursuant to a "reduction in force" ordered by the Secretary. 14 U.S.C. § 357(a)–(b), (j).

As to the first mechanism, enlisted members could be involuntarily retired on the Board's recommendation for two reasons: substandard performance or professional dereliction. 14 U.S.C. § 357(b). Section 357 also afforded service members procedural protections, such as the right to counsel, written notification of the reasons for involuntary retirement, access to the full record, an opportunity to present rebuttal and appear before the Board, and an opportunity to appeal. 14 U.S.C. § 357(c), (f).

The second mechanism for involuntary retirement, pursuant to a "reduction in force," must be understood in this statutory context. The government urges us to adopt an understanding of "reduction in force" that is broad enough to encompass the discharge of any individual service member. *See* Oral Arg. at 29:41–30:46 (asserting that firing an employee would be included in the government's definition of a "reduction in force"). But to adopt this interpretation of a "reduction in force" would allow the narrow exception of § 357(j) to swallow the rule. To allow *any* involuntary retirement to be deemed a "reduction in force" would render the enhanced limitations on discharge imposed by Congress in the remainder of § 357 a nullity. And it would produce a statute that effectively erases the "a reduction in force" words from § 357(j).

We conclude that the phrase used in this subsection should be understood in accordance with the established meaning the phrase has in other contexts.

B

We reject the government's several arguments for a different conclusion.

1

The government first argues that, given the nature of military enlistment, it is improper to rely on cases involving the statutory and regulatory scheme governing federal civilian employment. Specifically, the government argues

that, whereas in the civil service employees are appointed to specific positions, military service members serve under enlistment contracts and are not enlisted to a particular billet. Rather, service members have a duty status and grade. 10 U.S.C. §§ 101(b)(6), 505(b). Thus, the government argues, a reduction in positions does not, by itself, reduce the size of the military workforce because military members, if not discharged from service, will remain in the force regardless of whether any particular position exists. But this military-civilian distinction does not support a special meaning of § 357(j) as covering the mere emptying of a slot, by discharging its current occupant, so that it may be filled with a different person—which is what occurred here.

As explained by the government, "Congress typically authorizes a total force strength" and then "the Coast Guard separately authorizes billets (or positions) that the Coast Guard has determined it can afford to maintain." J.A. 98. The Coast Guard can, and does, manage the number of authorized billets by grade. *See* J.A. 124. Moreover, "every branch of the armed services has the statutory discretion to terminate a term of enlistment early and involuntarily if it is in the interest of the respective branch to do so and applicable procedures are followed." *Spehr v. United States*, 51 Fed. Cl. 69, 82 (2001) (citing 10 U.S.C. § 1169), *aff'd*, 49 F. App'x 303 (Fed. Cir. 2002). Thus, the Coast Guard can, if proper procedures are followed, reduce the size of its workforce by eliminating billets in certain grades and terminating service member contracts. That practice, though, is not the same as emptying a position simply to fill it with another person.

Branches of the military regularly reduce the size of their workforces when Congress cuts appropriations or reduces authorized end-strength by eliminating *personnel and positions*, and such programs have been referred to, if informally, as "reduction in force" programs. *See, e.g.*, *Vierrether v. United States*, 27 Fed. Cl. 357, 359 (1992)

(explaining that the Coast Guard Command "opted to meet [a budget] shortfall in part by reducing its personnel" and implementing a "involuntary reduction in force ('RIF') program"), *aff'd*, 6 F.3d 786 (Fed. Cir. 1993); *Berkley v. United States*, 287 F.3d 1076, 1082 (Fed. Cir. 2002) (describing a "RIF" Board to select officers in the Air Force for involuntary separation in response to congressionally mandated reductions); *Anderson v. United States*, 111 Fed. Cl. 572, 577, 585 (2013) (describing a "reduction in force accomplished by [an Enlisted Retention Board] process" that "enable[d] the Navy to meet FY-12 end strength targets"); *Alvin v. United States*, 50 Fed. Cl. 295, 296 (2001) (describing a "statutorily required reduction in force" that stemmed from "Congress mandat[ing] reductions in manpower throughout the military"); *Baker v. United States*, 34 Fed. Cl. 645, 649 (1995) (describing "reduction in force requirements" related to "a congressionally-directed force reduction"), *vacated on other grounds*, 127 F.3d 1081 (Fed. Cir. 1997). The government argues that those cases refer to reductions in military personnel as "reductions in force." Even if so, however, those cases do not address what occurred here—the emptying of positions simply to fill them with other service members. As previously noted, such action cannot, as a matter of law, constitute a "reduction in force" under § 357(j).

2

The government further argues that the term "reduction in force" even in the civilian context does not exclude mere termination of personnel. We disagree.

In support of this contention, the government argues that Congress has used the terms "reduction in force" and "reduction in personnel" interchangeably in the civilian context. Specifically, the government points to the large-scale 1966 recodification of civil-service law, in which, among other things, in recodifying 5 U.S.C. § 861(a) (1964) as 5 U.S.C. § 3502(a) (1970), Congress substituted the term

"reduction in force" for "reduction in personnel," while a committee report stated that the recodification was "without substantive change." *See* Act of Sept. 6, 1966, Pub. L. No. 89-554, § 3502, 80 Stat. 378, 428; H.R. Rep. No. 89-901, 89th Cong., 1st Sess., at 1, 55 (1965); S. Rep. No. 89-1380, 89th Cong., 1st Sess., at 18, 74 (1966). But the government fails to show that the earlier phrase "reduction in personnel" covered situations where civil service employees are terminated simply to refill their positions. The government has shown nothing sufficient to supplant this court's subsequent, consistent interpretation of the term "reduction in force" in the Title 5 setting.

Next, the government points to 5 C.F.R. pt. 351 as evidence that there are examples of "reductions in force" that do not involve the elimination of positions. Specifically, the government argues that the civil service regulations contemplate (1) furloughs and (2) the maintenance of "vacant position[s]." But those references do not address what occurred here—service members were terminated from service simply to allow refilling of their positions—much less characterize these facts as a "reduction in force." Such action is neither a furlough nor a maintenance of vacant positions. The references to furloughs concern the proper placement of an employee once his or her position is (if only temporarily) eliminated. *See* 5 C.F.R. §§ 351.201(a)(2), 351.203, 351.604. And the reference to vacant positions states only that "[t]his part does not require an agency to fill a vacant position." 5 C.F.R. § 351.201(b).

The government observes that no civilian statute or regulation states an all-encompassing definition of "reduction in force" as limited to elimination of positions, excluding actions simply to empty a position to make room for another occupant. *See also Cross v. Department of Transportation*, 127 F.3d 1443, 1447 (Fed. Cir. 1997) ("Congress has not specified the circumstances under which [reductions in force] may be appropriate."). But the absence of

such a legislative or executive pronouncement does not negate the force of the well-established judicial interpretation of the phrase.

3

The government directs us to definitions in two contemporaneous dictionaries. But the definitions cited by the government do not support departing from the well-established meaning of "reduction in force."

The government cites Merriam-Webster's dictionary for definitions of the term "force." In the context of a labor force, Merriam-Webster defines "force" as "a body of persons or things available for a particular end." Force, Merriam-Webster's New Collegiate Dictionary (9th ed. 1990). In the context of military strength, Merriam-Webster defines "force" as "a body (as of troops or ships) assigned to a military purpose." *Id.* But those definitions do not address the phrase as a whole, which, as we have discussed, has a well-established meaning. The present case is one in which it is not appropriate, in order to capture the meaning of a phrase as a unit, to break it into its parts, find definitions of each part, and put the definitions together. *See Federal Communications Commission v. AT&T Inc.*, 562 U.S. 397, 404–06 (2011) (rejecting an argument "treat[ing] the term 'personal privacy' as simply the sum of its two words" and explaining that "two words together may assume a more particular meaning than those words in isolation"). Here, the phrase operates in a context (concerning employment) that is not the specific focus of the quoted "force" definitions, and in this context the phrase has an established meaning.

The government also cites the Random House Dictionary's definitions of the noun "RIF": (1) "a reduction in the personnel of an armed service or unit" in the military context, and (2) "a reduction in the number of persons employed by a business, government department, etc., esp. for budgetary reasons." Random House Unabridged

Dictionary of the English Language 1655 (2d ed. 1987). The dictionary also defines the verb "rif" as having an "informal" meaning of "discharg[ing] (a person) from military or civil service, esp. as part of an economy program." *Id.* Again, it is not clear how these definitions affirmatively support the government's position that discharges of individual military members can constitute a "reduction in force." The government fails to persuasively explain how the mere separation of a service member, independently of an elimination of his or her position or even of others' positions, would be properly understood as a "*reduction* in the personnel of an armed service" as outlined in the noun definition. Nor does the government explain why the informal verb definition—the only cited definition to mention the discharge of an individual—should govern, particularly given its qualification that such individual discharges are commonly part of a broader economy program.

4

Finally, the government argues that 10 U.S.C. § 1174a, the only other statute that uses the term "reduction in force" in relation to military service members, supports its position. Section 1174a describes a program of voluntary special separation benefits for which members of the armed forces who have served for 5 to 20 years may be eligible. 10 U.S.C. § 1174a(a), (c). Under the statute, the Secretary concerned has the discretion to confine this program to specific categories of personnel in order "to reduce the number of members in certain grades, the number of members who have completed a certain number of years of active service, or the number of members who possess certain military skills or are serving in designated competitive categories." 10 U.S.C. § 1174a(e)(1). The statute goes on to require, in relevant part, that any such categories "be consistent with the categories applicable to" service members under "any . . . program established by law or by that Secretary for the involuntary separation of such members in the administration of a reduction in force." 10 U.S.C. § 1174a(e)(2).

The government argues that because (1) Congress authorized the Secretary to limit a special separation program to categories defined by grades, years of service, or skills, and (2) Congress stated that such categories must be "consistent" with categories in a reduction in force, then (3) targeted reductions simply by grade, years of service, or skills, without any elimination of positions (and even with the aim to refill the positions with non-incumbents), fall within the meaning of a "reduction in force" in 14 U.S.C. § 357(j). The suggested inference does not follow from the premises. All the consistency provision does, as relevant here, is prescribe that targeting of the voluntary special separation benefit program to particular categories must not contradict (in some sense, whether strict or loose we need not say) the same Secretary's choice of categories to include in a reduction in force. That does not change the meaning of the comparator action, *i.e.*, reduction in force. The § 1174a directive—that the identification of people for receipt of special benefits upon separating *without* a position reduction should align with the identification of people for separation *with* a position reduction—in no way suggests that the latter group of people are themselves separating without a position reduction. All the more clearly so given that § 1174a is limited to members of the armed forces with not more than 20 years of service and § 357 is limited to members of the Coast Guard with at least 20 years of service. We see no implication from § 1174a for what the "reduction in force" phrase in § 357(j) means.

## III

We have considered the government's other arguments and find them unpersuasive. Because the Claims Court correctly concluded that the proper meaning of the term "reduction in force" in 14 U.S.C. § 357(j) does not cover the discharge program for grades E-7 and above at issue here, we affirm the Claims Court's partial final judgment.

**AFFIRMED**